# Exhibit B



---

# MEMORANDUM OF UNDERSTANDING

---





# MEMORANDUM OF UNDERSTANDING

## BETWEEN

### ZIMBABWE MINING DEVELOPMENT CORPORATION

A body corporate established in terms of the Zimbabwe Mining Development Corporation Act [Chapter 21:08] of the Republic of Zimbabwe

(hereinafter referred to as "ZMDC")

And

### AMARI HOLDINGS LIMITED

A company incorporated in the British Virgin Islands

Registration number: 1007239

(hereinafter referred to as "Amari")





2



## 1. DEFINITIONS

In this MOU, unless the context clearly requires otherwise, the following words and expressions shall have the meanings ascribed to them below:

Business Day    means any day other than a Saturday, Sunday or public holiday in Zimbabwe;

Company    means a company to be incorporated by the Parties in accordance with the laws of Zimbabwe to house the joint venture;

Effective Date    means 3 business days after fulfilment or waiver of the condition precedent as contemplated in 9;

Force Majeure    means any act, event or cause, whether foreseeable or unforeseeable, not within the reasonable control of the Party affected by an event of Force Majeure ("Affected Party") including acts of God, strikes, stoppages, restraints of labour, wars whether declared or undeclared, blockades and insurrections, sabotage and civil disturbance, accident, the adverse application of any laws or enforcement actions of any court or governmental agency (including legal or illegal expropriation) not resulting from any wrongful act or omission of the Affected Party, the refusal of or delay in obtaining any necessary consents from any government agency, provided that the Affected Party has acted in a timely manner in endeavouring to secure them.

MOU    means this memorandum of understanding including any annexure hereto;

Nickel Claims    means the nickel claims held by PV as listed in the Option Agreement over which ZMDC has an option and Nickel Claim means any one of the Nickel Claims;

Nickel Claims Areas    means areas covered by the Nickel Claims;



3



| Parties | means the parties to this MOU and "Party" means one of them; |
| PV | means Prospecting Ventures (Pvt) Ltd a corporation incorporated in Zimbabwe; |
| Option | means the option granted to ZMDC in terms of the Option Agreement to purchase the Nickel Claim; |
| Option Agreement | means the Memorandum of an Option Agreement entered into between ZMDC and PV on 3 August 2005 as extended in writing by the Parties; |
| Signature Date | means the date upon which this MOU is signed by the Party signing last in time; |
| Zimbabwe | means the Republic of Zimbabwe; |

## 2.  INTERPRETATION

2.1   A reference to a Party includes that Party's successors and permitted assigns.

2.2   Words importing –

2.2.1   any one gender includes the other two genders;

2.2.2   the singular includes the plural and *vice versa*;

2.2.3   natural persons include created entities (corporate or unincorporated) and *vice versa*.

2,3   The headings to the paragraphs of this MOU are included for reference purposes only and shall not in any way affect or govern the interpretation or construction of this MOU.

2.4   If any provision in this MOU is a substantive provision conferring rights or imposing duties on any Party, notwithstanding that it is only in the definition or introduction clause, effect shall be given to it as if it were a substantive provision in the operative part of this MOU;

2.5   When any period is prescribed in this MOU, that period shall be reckoned exclusively of the first and inclusively of the last day unless the last day falls on a day other than a Business Day, in which case the last day shall be the next succeeding Business Day;

2.6   Where words have been defined in the body of this MOU, such words will, unless otherwise required by the context, have the meanings so assigned throughout this MOU.

3.   PREAMBLE

Whereas:

3.1   ZMDC is a body corporate established in terms of the Zimbabwe Mining Development Corporation Act [Chapter 21:08] whose main business is *inter alia* investing in mining and mining development on behalf of the Government of Zimbabwe.

3.2   Amari is a resource investment company focused on exploration and mining in sub-Saharan Africa.

3.3   PV is the owner of the Nickel Claims.

3.4   ZMDC has been granted the Option and wishes to exercise the Option as soon as possible.

3.5   ZMDC and Amari wish to incorporate a joint venture company to exploit the Nickel Claims.

3.6   Following the exercise of the Option by ZMDC and the purchase of the Nickel Claims the Company wishes to prospect for nickel on the Nickel Claims Areas and subject to successful feasibility study/ies develop mines on the Nickel Claims Areas.

3.7   The Parties wish to enter into this MOU to formalise the relationship between the Parties relating to the above matters.



4.   EXERCISE OF OPTION

4.1   ZMDC shall, immediately after the Signature Date, exercise the Option and execute a purchase agreement with PV to purchase the Nickel Claims in accordance with the terms of the Option Agreement.

4.2   The Company, as the ZMDC nominee, shall fund payment of the purchase price of up to a maximum of Zim$39 billion (thirty nine billion Zimbabwe dollars) for the Nickel Claims purchased in terms of the purchase agreement executed by ZMDC with PV upon the Option being exercised.

4.3   ZMDC shall procure that the purchase agreement with PV provides for the following:

   4.3.1   payment of the purchase price referred to in 4.2 shall be paid directly by the Company to PV; and

   4.3.2   the Nickel Claims shall be transferred directly from PV to the Company as the ZMDC nominee.

5.   JOINT VENTURE COMPANY

5.1   The Parties shall incorporate the Company as soon as possible after the Signature Date.

5.2   The issued share capital in the Company shall be 1000 ordinary shares to be issued at Zim$300, 000. 00 (three hundred thousand Zimbabwe dollars) each.

5.3   The initial shareholding in the Company shall be:

   ZMDC              450 shares

   Amari             550 shares

5.4   The subscription price for the shares shall be as follows:

   5.4.1   ZMDC: Zim$135, 000, 000. 00; and

   5.4.2   Amari:  Zim$165, 000, 000. 00;



6



and each shareholder shall pay such respective subscription price in cash on date of subscription.

5.5    The Parties record, in the event that ZMDC is required in terms of legislation in Zimbabwe relating to indigenisation to hold a majority interest in the Company, that ZMDC shall have an option to increase its shareholding in the Company to 51%. Such option shall be exercised in writing and shall be purchased at market value as determined by an independent third party agreed by the shareholders. The exercise of the option shall not have any other material impact on any of the other terms of the shareholders agreement at the time.

5.6    The shareholders shall have pre-emptive rights in respect of the disposal of any shareholder's shareholding and loan account in the Company ("interest") in that a shareholder shall first offer its interest in writing to the other shareholders pro rata to their respective shareholdings in the Company prior to offering its interest to any third party. The offeree shareholders shall further have the right to match any third party offer.

5.7    ZMDC shall ensure that it retains its indigenous status as required in terms of any Zimbabwe government policy or legislation for as long as it is a shareholder in the Company and subject to the provisions of 5.6 shall only dispose of its shareholding to other indigenous groupings as required in terms of government policy or legislation.

5.8    The Company's purpose shall be to hold the Nickel Claims, undertake exploration and subject to successful bankable feasibility studies develop and operate mines on the Nickel Claims Areas.

5.9    The overall management of the Company shall vest in the board of directors.

5.10   The board shall appoint Amari or its designate to manage the day to day affairs of the Company and any exploration and mining programmes and a management agreement on commercial terms between the Company and Amari shall be concluded upon incorporation of the Company.  Amari in its capacity as manager shall report to the board.

5.11   The initial board shall consist of five directors, two directors appointed by ZMDC and three directors appointed by Amari



5.12  The directors shall jointly appoint a chairman.

5.13  Questions arising at meetings of directors shall be decided by a simple majority of votes. Each board member shall have one vote.

5.14  Questions arising at meetings of shareholders shall, subject to the provisions of 5.15, be decided by a simple majority of votes.

5.15  Notwithstanding the provisions of 5.14 the Parties agree that certain decisions of the shareholders of the Company shall require a 70% majority vote. These will include but may not be limited to:

    5.15.1  The disposal of the whole or substantially of the whole of the undertaking of the Company, or the whole or greater part of the assets of the Company;

    5.15.2  Dividend policy;

    5.15.3  Determination of strategy, capital expenditure and annual budgets of the Company;

    5.15.4  The provision of security against the Company's assets;

6.  CONTRIBUTION OF PARTIES TO THE JV

6.1  ZMDC shall

    6.1.1  procure that all the Nickel Claims are transferred directly from PV to its nominee, the Company, as soon as the Option has been exercised and the purchase agreement executed and obtain all statutory and government approvals in respect thereof.

    6.1.2  provide technical, financial and legal advice to the Company required from time to time;

    6.1.3  subject to any other obligations, allow the Company to use the infrastructure owned by ZMDC including but not limited to roads, rail, power and water supply and warehouses necessary for the Company's activities at market related rates and shall maintain such infrastructure in good working order;

8



6.1.4 in the event that the Company requires the use of infrastructure owned by the government of Zimbabwe, ZMDC shall assist the Company in obtaining the right to use such infrastructure;

6.1.5 use its best endeavours to ensure that the Company obtains fiscal, foreign exchange, social, export/import, environment and labour dispensations from the Zimbabwe government;

6.1.6 assist the Company in obtaining all necessary licences and permits to undertake exploration and operate any mine once developed;

6.1.7 assist the Company with lobbying government and/or statutory bodies when required; and

6.2 Amari shall:

6.2.1 provide expertise to the Company including but not limited to funding, listing, technical, exploration, financial, structuring, investor relations, corporate marketing; and legal as required from time to time;

6.2.2 manage the affairs of the Company as contemplated in 5.7;

6.2.3 perform the structuring and facilitation of a public listing of the Parties' interests in the Company in the event that the Parties elect to list their interests in the Company on an internationally recognised stock exchange;

6.2.4 procure that the Company obtains non recourse funding from a Zimbabwean entity to enable the Company to fulfil its obligations contemplated in 4.2; and

6.2.5 facilitate funding for the Company as contemplated in 7.1 and 7.2.

6.3 The Parties shall jointly work together to obtain any necessary statutory approvals to incorporate the Company including obtaining the necessary approvals for a foreign company to invest in Zimbabwe, obtaining Zimbabwean Reserve Bank approval and to undertake exploration and subsequently develop any mines to operational status.

9



7.  COMPANY FUNDING

7.1  Amari shall provide funding of up to USD5 million to the Company to undertake exploration of the Nickel Claims and any feasibility study/ies.

7.2  Once a decision has been made by the Company to exploit a Nickel Claim and commence production thereon the activities of the Company in respect of development of such Nickel Claim from time to time shall be funded:

(i)  firstly by its internal resources; and

(ii)  otherwise by third party funding; and

(iii) failing that by shareholders loans pro rata to shareholders shareholding. In the event that any shareholder does not provide such pro rata shareholder funding such shareholder's shareholding shall be diluted accordingly. In the event any shareholder elects to provide the funding required in terms of this clause on behalf of a non funding shareholder, the funding shareholder may elect that such funding shall be in the form of a loan granted at commercial rates to the non funding shareholder shall be set off against any dividends due to the non funding shareholder until such time as the funding is paid in full. Notwithstanding the aforementioned it is recorded that ZMDCs shareholding shall not be diluted to below 26% as a consequence of a failure to fund in terms of this clause.

7.3  In the event that the activities of the Company are funded by third party funding as contemplated in 7.2(ii) all shareholders shall provide any necessary guarantees or pledge shares in the Company as required to raise such third party funding.

7.4  The funding provided by Amari in terms of 7.1 shall be provided either on loan account at commercial interest rates to the Company or via third party funding at Amari's option.

7.5  Shareholder loans provided in terms of this clause shall rank above any payments due by the Company, (other than in the ordinary course of business)

10



including dividends and any other distributions to shareholders, and shall be repaid at commercial interest rates to the respective shareholder.

7.6   All US dollar loans to the Company for funding purposes shall be repaid in US dollars and shall be repatriated subject to exchange control approvals. Such repayments shall be on terms no less favourable than those currently offered to other Nickel mining operators in Zimbabwe.

## 8.   DATE OF COMMENCEMENT AND DURATION

This MOU shall commence on the Effective Date and supercedes any other prior documents relating to the matters specified herein and shall, subject to the provisions of this MOU:

8.1   be binding on the Parties upon signature hereof by each of the Parties; and

8.2   be superseded by comprehensive subscription and shareholder/joint venture agreements which shall incorporate the terms and conditions contained herein.

## 9.   CONDITION PRECEDENT

9.1   This MOU excluding 9 and 11, is subject to fulfilment or waiver of the following condition precedent:

9.1.1   the Parties obtaining necessary board and/or shareholder approval to this MOU.

9.2   The Parties shall use their best endeavours to fulfil or waive the above conditions precedent on or before 31 December 2007 in full, or such later date as the Parties may agree in writing, failing which this MOU will lapse and be of no force and effect and no Party shall have a claim against the other as a result of the failure of such condition precedent.

11



## 10. CESSION AND ASSIGNMENT

The Parties shall not be entitled to cede and assign their rights and obligations arising out of this MOU to a third party other than a cession and assignment of their rights and obligations to a company which is held at least 75% by the same ultimate shareholders of the respective Party without the prior written consent of the other Parties, which consent shall not be unreasonably withheld.

## 11. DISPUTE RESOLUTION

In the event of a dispute or disputes arising, such disputes, controversies or differences between the Parties, which may arise out of or in relation to MOU, and which cannot be settled by the board, the Parties shall first try to resolve it amicably through negotiation. In the event that no settlement can be reached through negotiation in reasonable time, any Party may submit the dispute to ICC International Court of Arbitration in Paris for arbitration in accordance with the procedural rules of arbitration of the said Arbitration Court in effect at the time of applying arbitration, the award of which shall be final and binding upon all Parties. The language in Arbitration shall be in English.

## 12. GENERAL PROVISIONS

### 12.1 Further assurance

Each Party shall execute all documents promptly and do all things that the other Party may from time to time reasonably require of it to effect, perfect or complete the provisions of this MOU.

### 12.2 Entire contract and variation

This MOU constitutes the entire contract between the Parties with regard to the matters dealt with herein. There are no terms, conditions or warranties, express or implied, other than those contained in this MOU and there have been no prior representations made by the Parties or any agent or other person purporting to act for the Parties. No variation of the terms of this MOU, or consensual cancellation of this MOU, shall be effective unless reduced to writing and signed by or on behalf of the Parties.

12



### 12.3  Counterparts

This MOU may be concluded by the Parties signing separate counterparts, which shall together constitute the MOU.

### 12.4  Confidentiality

Except where such disclosure is required by law, an order of a court of competent jurisdiction or by stock exchange rules, no Party may make a public announcement relating to this MOU without first getting the written consent of the other Parties who may not withhold their consent unreasonably.

### 12.5  Good faith

The Parties undertake to act in the utmost good faith to each other in giving effect to this MOU.

### 12.6  Force Majeure

An Affected Party will be excused from performance of and will not be liable to the other Party for any failure to carry out its obligations under this MOU if, and only to the extent of and for the time that it is prevented or delayed in whole or in part from doing so by Force Majeure and any time within which the Affected Party is required to perform any obligation under this MOU will be extended to that extent.

### 12.7  Applicable law

This MOU shall be governed by, construed and interpreted in accordance with the laws of Zimbabwe.

### 12.8  Notices and domicilia

12.8.1  The Parties choose the following physical addresses at which documents in legal proceedings or any written notices in connection with this MOU may be served:

13



| | |
|---|---|
| 12.8.1.1 ZMDC | Ground floor |
| | MMCZ Building |
| | 90 Mutare Road |
| | Msasa |
| | Harare |
| | Zimbabwe |
| 12.8.1.2 Amari | c/o DF Management |
| | Le Montaigne |
| | 7 Avenue de Grande Bretagne |
| | Monte Carlo |
| | MC 98000 |
| | Monaco |

or at such other address (not being a post office box or *poste restante*) of which the Party concerned may notify the other Party in writing.

12.8.2   Any notice given in terms of this MOU shall be in writing and shall if delivered by hand to a responsible person during ordinary business hours at the physical address chosen as its domicilium citandi et executandi be deemed to have been duly received by the addressee on the date of delivery unless the contrary is proved.

Notwithstanding anything to the contrary contained or implied in this MOU, a written notice or communication actually received by one of the Parties from the other Party shall be adequate written notice or communication to such Party.



72

Signed at _____*HARARE*_____ on _*22nd November*_ 2007

As Witnesses: -

For ZMDC

Name: *I. L. MUBAYIWA*.

Capacity: *CEO*

Who warrants his/her authority


Signed at _____*HARARE*_____ on _*22-d November*_ 2007

As Witnesses: -

for: AMARI

Name: *M. J. NUNN*

Capacity: *CEO*

Who warrants his/her authority



CELESTE KEARTLAND
NOTARY PUBLIC
SOUTH AFRICA
GAUTENG