**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Amaplat Mauritius Ltd.,<br>c/o CKLB International Management Ltd.,<br>P.O. Box 80, Felix House, 24 Dr. Joseph<br>Riviere Street, Port Louis 11602, Mauritius;<br>and<br><br>Amari Nickel Holdings Zimbabwe Ltd.,<br>c/o CKLB International Management Ltd.,<br>P.O. Box 80, Felix House, 24 Dr. Joseph<br>Riviere Street, Port Louis 11602, Mauritius,<br><br>        Plaintiffs,<br><br>   v.<br><br>Zimbabwe Mining Development Corporation,<br>90 Mutare Road, Msasa, Harare, Zimbabwe;<br><br>The Chief Mining Commissioner, Ministry of<br>Mines of Zimbabwe,<br>6th Floor, ZIMRE Centre, Cnr. Leopold<br>Takawira Street/Kwame Nkrumah Avenue,<br>Private Bag 7709, Causeway, Harare,<br>Zimbabwe;<br><br>and the Republic of Zimbabwe,<br>c/o Head of the Ministry of Foreign Affairs,<br>Ministry of Foreign Affairs, P.O. Box 4240,<br>Munhumutapa Building, Cnr. Samora Machel<br>Avenue/Sam Nujoma Street, Harare,<br>Zimbabwe<br><br>        Defendants. | Civil Action No. 1:22-cv-00058-CRC |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS CHIEF MINING COMMISSIONER
AND REPUBLIC OF ZIMBABWE'S MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   RELEVANT BACKGROUND. ......................................................................... 5

    A.    The Arbitration Award and Zambian Judgment. ..................................... 6

    B.    The Republic Is The Judgment Debtors' Alter Ego—And Has Already
         Been Adjudged As ZMDC's Alter Ego. .................................................. 9

III.  ARGUMENT ...................................................................................................... 10

    A.    This Court Has Subject-Matter Jurisdiction. .......................................... 10

         1.    The FSIA's Arbitration Exception Includes Recognizing
              Judgments On An Arbitration Award. ......................................... 11

         2.    In Any Event, Arbitrating Abroad In A Country That Is Party To
              the New York Convention Is Implied Waiver Under The FSIA. ............ 13

         3.    Because the Republic's Alter Ego Waived Its Sovereign Immunity,
              This Court Has Subject-Matter Jurisdiction Over the Republic. ............ 17

            a.    Under *Bancec*, The Alter Ego Test Applies To Sovereign
                 Immunity Exceptions Just Like Substantive Liability. ................ 17

            b.    The Two-Step Test for Alter Ego Liability................................. 18

            c.    As *Funnekotter* Held, ZMDC Is The Republic's Alter Ego. ....... 21

         4.    The Commissioner Submitted To Arbitration And Thus Lost Its
              Sovereign Immunity.................................................................... 24

            a.    The Commissioner Is Part of the State, Not An Individual ........ 24

            b.    The Commissioner Submitted To The Arbitrators'
                 Jurisdiction, And Thereby Also Lost Its Sovereign
                 Immunity.................................................................................... 26

    B.    This Court Has Personal Jurisdiction Because Defendants Are A "Foreign
         State" Under The FSIA. ........................................................................... 27

    C.    Plaintiffs' Complaint States A Claim. .................................................... 27

         1.    The New York Convention Implementing Act's Statute of
               Limitations Applies Only To Arbitral Awards, Not To Foreign
              Judgments Confirming Them. ...................................................... 28

         2.    Defendants' Cursory Zambian Law Arguments Are Meritless. ............. 29

            a.    Defendants' Challenges To The Zambian Court's
                 Jurisdiction and Service in Zambia Are Meritless, and At
                 Best, Depend On Disputed Facts. ............................................... 30

# TABLE OF CONTENTS
(continued)

**Page**

        b.    In Any Event, Defendants' Zambian Law Arguments Are Wrong. ........................................................................ 31

           (1)   ZMDC's and the Commissioner's Zambian Counsel Accepted Service. ............................................. 32

           (2)   For Multiple Reasons, Defendants Waived Their State Immunity In Zambia. ............................... 32

    3.    *Ex Parte* Recognition of an Arbitration Award Followed By An Opportunity To Set It Aside Is Consistent With Due Process and Public Policy. ............................................................ 34

    4.    Plaintiffs' Concise Restatement of the Facts Proven In *Funnekotter*—Together With The *Funnekotter* Court's Order—States An Alter Ego Claim. ....................................................... 36

    5.    Plaintiffs Are Entitled To Attorneys' Fees. ............................................. 37

IV.    CONCLUSION. ............................................................................. 37

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Abdullah v. Washington*,
    530 F. Supp. 2d 112 (D.D.C. 2008) ....................................................................37

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989) ...........................................................................................10

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*,
    734 F.3d 1175 (D.C. Cir. 2013) .........................................................................11

*Cargill Int'l S.A. v. M/T Pavel Dybenko*,
    991 F.2d 1012 (2d Cir. 1993) .............................................................................15

*Commissions Imp. Exp. S.A. v. Republic of the Congo*,
    757 F.3d 321 (D.C. Cir. 2014) ...............................................................4, 28, 29

*Compagnie Noga D'Importation et D'Exportation, S.A. v. Russian Fed'n*,
    361 F.3d 676 (2d Cir. 2004) ...............................................................................19

*Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*,
    697 F. Supp. 2d 46 (D.D.C. 2010) .................................................................2, 12

*Creighton Ltd. v. Gov't of State of Qatar*,
    181 F.3d 118 (D.C. Cir. 1999) ...............................................................14, 15, 16

*de Csepel v. Republic of Hungary*,
    No. 1:10-CV-01261(ESH), 2020 WL 2343405 (D.D.C. May 11, 2020), *aff'd*,
    27 F.4th 736 (D.C. Cir. 2022) ............................................................................20

*Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*,
    234 F. Supp. 3d 251 (D.D.C. 2015) ...............................................................10, 11

*Env't Barrier Co., LLC v. Slurry Sys., Inc.*,
    540 F.3d 598 (7th Cir. 2008) ..............................................................................26

*Executone Info. Sys., Inc. v. Davis*,
    26 F.3d 1314 (5th Cir. 1994) ..............................................................................26

*Firestone v. Firestone*,
    76 F.3d 1205 (D.C. Cir. 1996) ...........................................................................37

*First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*,
    462 U.S. 611 (1983) ...........................................................................3, 18, 19, 20

*In re Francis*,
   No. ADV 11-01245, 2013 WL 3497657 (B.A.P. 9th Cir. July 12, 2013) .............................22

*Funnekotter v. Agric. Dev. Bank of Zimbabwe*,
   No. 13 CIV.1917(CM), 2015 WL 9302560 (S.D.N.Y. Dec. 17, 2015)......................... *passim*

*Gater Assets Ltd. v. AO Moldovagaz*,
   2 F.4th 42 (2d Cir. 2021) ....................................................................................................13

*Golden v. Mgmt. & Training Corp.*,
   266 F. Supp. 3d 277 (D.D.C. 2017) .....................................................................................37

*GSS Grp. Ltd v. Nat'l Port Auth.*,
   680 F.3d 805 (D.C. Cir. 2012)..............................................................................................27

*Guinness PLC v. Ward*,
   955 F.2d 875 (4th Cir. 1992) ...............................................................................................34

*Hirsh v. State of Israel*,
   962 F. Supp. 377 (S.D.N.Y.), *aff'd,* 133 F.3d 907 (2d Cir. 1997).....................................12, 13

*Hurst v. Socialist People's Libyan Arab Jamahiriya*,
   474 F. Supp. 2d 19 (D.D.C. 2007) .......................................................................................21

*Ipitrade Int'l, S. A. v. Fed. Republic of Nigeria*,
   465 F. Supp. 824 (D.D.C. 1978)..........................................................................................14

*Jack Faucett Associates, Inc. v. AT & T*,
   744 F.2d 118 (D.C. Cir. 1984)..............................................................................................21

*Katz v. Berisford Int'l PLC*,
   No. 96 CIV. 8695 (JGK), 2000 WL 959721 (S.D.N.Y. July 10, 2000) .................................37

*Kaupthing ehf. v. Bricklayers & Trowel Trades Int'l Pension Fund Liquidation
   Portfolio*, 291 F. Supp. 3d 21 (D.D.C. 2017).........................................................................30

*In re Kilroy*,
   357 B.R. 411 (Bankr. S.D. Tex. 2006) ..................................................................................36

*M.B.L. Int'l Contractors, Inc. v. Republic of Trinidad & Tobago*,
   725 F. Supp. 52 (D.D.C. 1989).............................................................................................13

*Parker v. John Moriarty & Assoc.*,
   320 F.R.D. 95 (D.D.C. 2017).................................................................................................37

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
   27 F.4th 771 (D.C. Cir. 2022)...........................................................................................2, 15

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
   No. 18-CV-594 (CRC), 2020 WL 7122896 (D.D.C. Dec. 4, 2020) .................................2, 15

*RLS Assocs., LLC v. United Bank of Kuwait PLC*,
   464 F. Supp. 2d 206 (S.D.N.Y. 2006).....................................................................................37

*Roeder v. Islamic Republic of Iran*,
   333 F.3d 228 (D.C. Cir. 2003) ...............................................................................................19

*Rubin v. Islamic Republic of Iran*,
   138 S. Ct. 816 (2018) .............................................................................................................20

*Samantar v. Yousuf*,
   560 U.S. 305 (2010).........................................................................................................24, 25

*Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co.,*
   *Kommanditgesellschaft v. Navimpex Centrala Navala*,
   29 F.3d 79 (2d Cir. 1994)................................................................................................16, 29

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co.,*
   *Kommanditgesellschaft v. Navimpex Centrala Navala*,
   989 F.2d 572 (2d Cir. 1993)..................................................................................14, 15, 16, 17

*Servaas Inc. v. Republic of Iraq*,
   653 F. App'x 22 (2d Cir. 2011) .............................................................................................19

*Sheehan v. TCI Fund Mgmt. (US), Inc.*,
   No. 14-CV-3338 JPO, 2014 WL 7176258 (S.D.N.Y. Dec. 16, 2014) ...................................35

*Tatneft v. Ukraine*,
   771 F. App'x 9, 10 (D.C. Cir. 2019).................................................................................14, 15

*TIG Ins. Co. v. Republic of Argentina*,
   No. 18-MC-00129 (DLF), 2022 WL 1154749 (D.D.C. Apr. 18, 2022), *order*
   *corrected and superseded,* No. 18-MC-00129 (DLF), 2022 WL 3594601
   (D.D.C. Aug. 23, 2022)...........................................................................................................13

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
   30 F.3d 148 (D.C. Cir. 1994) ...................................................................................... *passim*

*Transamerica Leasing, Inc. v. La Republica de Venezuela*,
   200 F.3d 843 (D.C. Cir. 2000).........................................................................................18, 20

*Transamerican S.S. Corp. v. Somali Democratic Republic*,
   767 F.2d 998 (D.C. Cir. 1985)................................................................................................11

*In re Tulloch*,
   373 B.R. 370 (Bankr. D.N.J. 2007) ........................................................................................23

*Turan Petroleum, Inc. v. Ministry of Oil & Gas of Kazakhstan*,
    406 F. Supp. 3d 1 (D.D.C. 2019), *aff'd*, No. 21-7023, 2022 WL 893011 (D.C.
    Cir. Mar. 25, 2022) ....................................................................................16

*Usoyan v. Republic of Turkey*,
    438 F. Supp. 3d 1 (D.D.C. 2020) .............................................................11

**International Cases**

*African Consolidated Resources Plc v. Minister of Mines And Mining
    Development*,
    No. HC 1345/10, [2010] ZWHHC 57.........................................................25

*Collavino Inc. v. Tihama Development Authority*,
    2007 ABQB 212, 2007 CarswellAlta 633 .................................................33

*Marasha v. Shirihuru*,
    Nos. HH 565/15 & HC 9059/14, [2015] ZWHHC 656 ..............................25

*TMR Energy Ltd. v. State Property Fund of Ukraine*,
    2003 FC 1517 (CanLII) ..............................................................................33

**State Cases**

*CIBC Mellon Tr. Co. v. Mora Hotel Corp. N.V.*,
    100 N.Y.2d 215, 792 N.E.2d 155 (2003)...................................................34

**Federal Statutes**

9 U.S.C. § 207.........................................................................................4, 28, 29

28 U.S.C. § 1330(a) ........................................................................................16

28 U.S.C. § 1330(b) ........................................................................................27

28 U.S.C. § 1603.............................................................................................24

28 U.S.C. § 1603(b)(1) ...................................................................................18

28 U.S.C. § 1605(a)(1)................................................................11, 13, 14, 26

28 U.S.C. § 1605(a)(6)................................................................11, 12, 13, 26

28 U.S.C. § 1608.............................................................................................18

**International Statutes**

Arbitration Act, No. 19 of 2000, § 18 (Zambia) ..............................................8

Mines and Minerals Act 1961 c.21:05 § 343 (Zimbabwe) ............................................25

**State Statutes**

2008 Sess. Law News of N.Y. Ch. 66 § 2 (S. 6687–C) ...............................................30

D.C. Code § 15-364(b)..............................................................................................30

D.C. Code § 15-364(b)(1)..........................................................................................34

D.C. Code § 15-364(c)(1)..........................................................................................34

D.C. Code § 15-364(d)....................................................................................30, 31, 34

N.Y. CPLR 5304 ......................................................................................................30

**Rules**

Arbitration (Court Proceedings) Rules, 2001, Rule 15 (Zambia) .....................................8

Arbitration (Court Proceedings) Rules, 2001, Rule 16 (Zambia) .....................................8

Fed. R. Civ. P. 12(b)(6).........................................................................................4, 27

Fed. R. Civ. P. 12(g)(2)...........................................................................................27

Fed. R. Civ. P. 12(h)(1)(A) ......................................................................................27

Fed. R. Civ. P. 15(a)(2)...........................................................................................36

Fed. R. Civ. P. 44.1 ................................................................................................30

**Other Authorities**

H.R. REP. 94-1487, 1976 U.S.C.C.A.N. 6604 ...............................................13, 24, 33

International Law Commission, 1991 Draft Articles on the Jurisdictional
   Immunities of States, art. 17 ................................................................................33

New York Arbitration Convention, Contracting States,
   https://treaties.un.org/pages/ViewDetails.aspx?src=IND&mtdsg_no=XXII-
   1&chapter=22&clang=_en....................................................................................6, 14

## I.     INTRODUCTION

Once again, Zimbabwe seeks to evade legal obligations it voluntarily assumed. Zimbabwe Mining Development Corporation ("ZMDC") voluntarily entered into two agreements—the Memoranda of Understanding ("MOUs")—awarding Plaintiffs rights to important mining concessions in Zimbabwe, which, once developed, would yied substantial royalties to Zimbabwe and the local communities. Then, it changed its mind and sought to revoke them. Both MOUs provided for submission of disputes to final and binding arbitration before the International Chamber of Commerce's International Court of Arbitration in Paris (the "ICC Court"). Plaintiffs filed for arbitration against ZMDC and the Chief Mining Commissioner before the ICC Court, which ordered that the arbitration be seated in Zambia.

After the dispute was submitted to arbitration, ZMDC and the Chief Mining Commissioner participated vigorously to try to justify their pretextual termination of the MOUs. But, midway through the merits hearing, after five witnesses were cross-examined, they had second thoughts again and no-showed for the rest of the hearing and initiated various unsuccessful court challenges to the arbitration before the courts of Zambia, the arbitration's seat. The members of the tribunal—preeminent international commercial arbitrators—authorized the arbitration to resume and then rendered an award in Plaintitffs' favor, Plaintiffs sought the registration of the arbitral award as a judgment, and it was registered as a judgment in Zambia's High Court. ZMDC and the Chief Mining Commissioner voluntarily accepted service, through their Zambian counsel, of the order recognizing the award as a judgment, subject to a 30-day period after service to move to set it aside.

But, despite present protestations, Defendants failed to raise *any* challenges to the order, either within the statutory 30-day set-aside period; as a result, the Zambian judgment is now final. Defendants now ask this Court to disregard settled law under the Foreign Sovereign

Immunities Act and hold them immune from suit and—based on the *ipse dixit* and factually tenuous positions of its Zambian law expert—to predict that Zambia would depart from abundant authority that it would consider mining concession joint ventures to be commercial and thus not subject to state immunity, as well as multiple other ways that Defendants waived any immunity that they may have had. And despite having litigated and lost the same issue in U.S. courts before, the Republic contends that it is not an alter ego of ZMDC—allegations that are not merely well-pleaded but rather are conclusively established by issue preclusion. This Court should not tolerate Zimbabwe's continued evasion of its obligations; it should deny the motion to dismiss.

Beginning with the Republic's arguments that this Court lacks subject-matter jurisdiction, all are meritless.

***First***, the Republic contends that *ZMDC's* conduct did not amount to a waiver of sovereign immunity. It contends that the Foreign Sovereign Immunities Act's arbitration exception to sovereign immunity does not extend to the recognition and enforcement of a judgment upon the arbitration award, and that there is no implied waiver of sovereign immunity by submitting to arbitration in a forum that is a party to the New York Convention. But courts in this District—including this one—have repeatedly rejected both arguments. *See Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, No. 18-CV-594 (CRC), 2020 WL 7122896, at *6 (D.D.C. Dec. 4, 2020) (holding that Nigeria's submission to arbitration constituted implied waiver of sovereign immunity, regardless of whether arbitration exception applied), *aff'd on other grounds,* 27 F.4th 771 (D.C. Cir. 2022) (finding that arbitration exception applied, and thus declining to reach implied waiver issue); *Cont'l Transfer Technique Ltd. v. Fed. Gov't of*

*Nigeria*, 697 F. Supp. 2d 46, 62 (D.D.C. 2010) (holding that arbitration exception applied to action to recognize foreign judgment on the award).

**Second**, the Republic contends that only ZMDC signed the arbitration agreement, not the Republic, so the Republic can rely on its juridical separateness from ZMDC to deny that it waived sovereign immunity by agreeing to arbitrate or submitting to arbitration. That puts the cart before the horse: the Complaint adequately pleads that ZMDC is the Republic's alter ego, so ZMDC's waiver is the Republic's. *See First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 630 (1983) (*Bancec*) (holding that state-owned bank's waiver of sovereign immunity could be attributed to the Cuban Government under equitable veil-piercing principles). Here, the analysis is a simple one because ZMDC has already been found to be the Republic's alter ego in another case involving similar award-evasion antics. *Funnekotter v. Agric. Dev. Bank of Zimbabwe*, No. 13 CIV.1917(CM), 2015 WL 9302560, at *5-6 (S.D.N.Y. Dec. 17, 2015) (determining that ZMDC was an alter ego of the Republic). Having operated ZMDC as a single enterprise with the Republic's treasury, the Republic cannot now rely on juridical separateness to evade ZMDC's waiver of sovereign immunity and its liabilities.

The Commissioner's subject-matter jurisdiction and personal jurisdiction[1] arguments similarly fail. The Commissioner contends that it is an individual, and thus, that common-law sovereign immunity applies and that it is not the state for personal jurisdiction purposes. That is incorrect: the Commissioner is not sued as an individual but rather as a juridical person. Zimbabwean case law shows that it is the office of Commissioner that sues and can be sued, not any particular incumbent. Its role—which even includes quasi-judicial duties such as resolving

---

[1] It is uncontested that, for the Republic, personal jurisdiction exists if the Court has subject-matter jurisdiction and the Republic was properly served, and the Republic does not contend that service was improper. Dkt. 23 at 18.

mining disputes and issuing injunctions—is plainly governmental rather than commercial and it is thus treated for FSIA purposes as part of the state itself.

Turning to the moving Defendants' Rule 12(b)(6) arguments, each of them similarly fails.

***First***, Defendants' argument that the three-year statute of limitations for recognition and enforcement of an arbitral award under 9 U.S.C. § 207 applies to bar claims upon foreign judgments upon arbitral awards has been specifically rejected by the D.C. Circuit. *Commissions Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321 (D.C. Cir. 2014) (*Comimpex*).

***Second***, Defendants spend a single paragraph contending that the Zambian judgment is either void due to sovereign immunity under *Zambian* law or was not properly served in Zambia, which they contend means that the 30-day period to set it aside has not run and therefore it is non-final. The latter is a factual question that is improper on a motion to dismiss, given that the complaint expressly alleged that the Zambian judgment had been served. But in any event, ZMDC and the Commissioner *were* properly served in Zambia and there is a good reason Plaintiffs did not move to serve the order outside of Zambia: Zambian counsel for ZMDC and the Commissioner *accepted service* in compliance with Zambian law, so service occurred in Zambia. Declaration of John Sangwa ("Sangwa Decl.") ¶¶ 22-25. Defendants' generalized assertion that Zambia would hold ZMDC and the Commissioner immune from suit similarly depends on factual questions—such as whether their prior assertion of affirmative claims in Zambia to try to enjoin the arbitration was itself a waiver of state immunity—but in any event, they are simply wrong about Zambian law. Under Zambia's restrictive theory of state immunity, commercial transactions such as under the MOUs do not receive state immunity. That is in addition to other bases for sovereign immunity waiver, such as submission to the Zambian court's jurisdiction or whether Zambia would follow the trend in other common law jurisdictions

of holding that agreeing to arbitrate constitutes waiver of immunity. Indeed, it is telling that Defendants ask this Court to speculate about Zambian law based on their declarant's say-so rather than raising their arguments before Zambian courts that are well versed in Zambian law.

*Third*, for substantially the same reasons that subject-matter jurisdiction exists against the Republic, the Plaintiffs have adequately pleaded an alter ego claim. The Court can quickly dispense with this argument because the Republic has already litigated and lost in *Funnekotter* whether ZMDC is its alter ego, and the Complaint pleads precisely the facts that *Funnekotter* found. That is not only enough to plead alter ego status but to prove it since the Republic is collaterally estopped from relitigating these facts.[2]

Defendants' remaining arguments are similarly without merit. This Court should deny the motion to dismiss.

## II.    RELEVANT BACKGROUND.

This case is, at its heart, a straightforward judgment recognition action against ZMDC—a Zimbabwean state-owned company that commercializes Zimbabwe's mining resources—and the Commissioner, an office in the Ministry of Mines, who are each liable on a Zambian judgment based on a prior arbitration award Plaintiffs won against them. The award was originally for a total of around $50,000,000, although that amount has increased significantly with post-award and post-judgment interest. Plaintiffs claim that the Republic is liable on the Zambian judgment as an alter ego of ZMDC and the Commissioner, as the *Funnekotter* court previously found.

---

[2] While the Complaint adequately pleads alter ego status, if the Court were to disagree, leave to amend is amply warranted to (i) replead in greater detail the facts found in *Funnekotter* or alleged by the *Funnekotter* plaintiffs, and (ii) plead additional facts supporting alter ego status, including the Republic's publicly-discussed plan to strip ZMDC of its assets, leave its liabilities where they are, and grant the assets to some new state-owned entity.

Service was completed against the Republic and the Commissioner on June 20, 2022, and ZMDC on August 10, 2022 (assuming that earlier service attempts on each were not received). The Republic and the Commissioner—the moving parties on this motion—have not challenged service. ZMDC's response is due on October 9, 2022.

### A.    The Arbitration Award and Zambian Judgment.

ZMDC entered into two memoranda of understanding with Plaintiffs that provided for arbitration before the ICC Court. Dkt. 1 ¶¶ 18 & 21; Dkt. 1-2 at Art. 11; Dkt. 1-4 at Art. 9. All relevant countries are parties to the New York Arbitration Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3.[3] After ZMDC unsuccessfully sought to terminate the memoranda of understanding, Plaintiffs filed for arbitration against ZMDC and the Commissioner before the ICC Court which, after contested proceedings, ordered that the arbitral tribunal be seated in Zambia. Dkt. 1 ¶ 28. While only ZMDC was a named party to the memoranda of understanding, the Commissioner actively participated in the arbitration all the way through at least five witnesses being cross-examined at the merits hearing and thus submitted to arbitration before it. *Id.* ¶ 29. Indeed, both ZMDC and the Commissioner signed the Terms of Reference for the arbitration through counsel, expressly submitting to the tribunal's jurisdiction. Sangwa Decl. Ex. 1 (ICC Terms of Reference) § 6.2(1) (arbitral tribunal to determine its own jurisdiction); *id.* § 8.1 ("By signing these Terms of Reference, the parties acknowledge that they agree to submit to this arbitration and expressly waive any procedural objections they may have with respect to known events, including the

---

[3] The Secretary-General of the United Nations, as depositary under the Convention, maintains a list of contracting parties under the Convention at https://treaties.un.org/pages/ViewDetails.aspx?src=IND&mtdsg_no=XXII-1&chapter=22&clang=_en.

appointment of the Tribunal."). The arbitration proceeded to a hearing on the merits. Dkt. 1 ¶¶ 29-30; Dkt. 23 at 3.

During the merits hearing, by their own account dissatisfied with the arbitral tribunal's rulings, Dkt. 23 at 3-4, ZMDC and the Commissioner, following cross-examination of five witnesses, procured the resignation of their party-appointed arbitrator and then declined to participate further in the arbitration, Dkt. 1 ¶¶ 30-32. In 2012, they obtained an *ex parte* temporary restraining order from the Zambian High Court staying the arbitration while their assertions that the tribunal was incorrectly reconstituted by the ICC Court were litigated in Zambia. Sangwa Decl. Ex. 2 (October 18, 2012 Order). The Zambian High Court later determined that the temporary restraining order was entered with "no jurisdiction" and had only been entered *ex parte* because "the applicant suppressed material facts and laws from this court thereby misleading it to grant the ex-parte order of injunction." Sangwa Decl. Ex. 3 (June 19, 2014 Order). It also observed that the proper remedy was to oppose the entry of a judgment based on the award. *Id.*

Correctly understanding that the *ex parte* order was void as in excess of jurisdiction, the arbitral tribunal—as reconstituted by the ICC Court, comprised of Professor Doug Jones A.O., Stuart Isaacs Q.C., and Chikwendu Madumere[4]—had in the meantime completed hearings and issued a final award against ZMDC and the Commissioner. Dkt. 1-1. The Final Award rejected jurisdictional challenges, ordered ZMDC to pay Amaplat US$42,882,000 and ZMDC to pay Amari US$3,900,000, ordered both Respondents (ZMDC and the Commissioner) jointly to pay

---

[4] These are all well-known, experienced arbitrators. Their biographies can be viewed at: https://www.stuartisaacsqc.com/biography, https://www.madumereandco.com/team/, and https://dougjones.info/wp/. All tribunal members are globally well-known arbitrators and have arbitrated several disputes.

Plaintiffs' legal costs of US$2,220,583.74 and the costs of the arbitration of US$900,000, and ordered post-award interest at the rate of 5%. Dkt. 1-1 at 39. ZMDC and the Commissioner again applied *ex parte* to the Zambian High Court to enjoin enforcement of the award, but the Zambian High Court declined to sign the proposed order. Sangwa Decl. ¶ 13. Proceedings in Zambia were stayed for several years pending Plaintiffs' successful appeal to the Zambian Supreme Court against an order consolidating the two proceedings brought by ZMDC. Sangwa Decl. ¶13.

After years of post-award litigation were resolved in favor of Plaintiffs, on August 9, 2019, the High Court for Zambia at the Commercial Registry at Lusaka issued the Judgment—formally, an *Ex Parte* Order for Leave to Register and Enforce the Final Arbitration Award, No. 2019/HPC/ARB/No. 0337, under Section 18 of the Arbitration Act, No. 19 of 2000, and Rules 15 and 16 of the Arbitration (Court Proceedings) Rules, 2001. Dkt. 1 ¶ 34; Dkt. 1-5. The Judgment provided that ZMDC and the Commissioner had 30 days after service to move to set aside the Judgment. Dkt. 1-5. That is Zambia's statutory procedure for registering an arbitral award as a judgment: an *ex parte* application is made to register it, which results in a judgment stayed for 30 days after service to allow for a set-aside application. Sangwa Decl. ¶¶ 18, 21.

On August 16, 2019, Plaintiffs' Zambian counsel, Simeza Sangwa & Associates, contacted ZMDC's and the Commissioner's Zambian counsel, Dinah Nundwe of the law firm Ranchhod Chungu Advocates, to ask if the latter would accept service. Sangwa Decl. ¶ 23. The latter confirmed that Ranchhod Chungu Advocates could accept service of the *Ex Parte* Order granting leave to register and enforce the Arbitral Award and the Notice of Registration of the Arbitral Award on behalf of ZMDC and the Commissioner. *Id.* ¶ 24. Accordingly, Simeza Sangwa & Associates sent a copy of the *Ex Parte* Order granting leave to register and enforce the final arbitral award and the notice of registration of the award on August 19, 2019. *Id.* ¶ 24.

No application to set aside the Judgment was ever filed—within or outside of the 30-day period after service. *Id.* ¶ 27. The Judgment is thus valid and enforceable in Zambia. Dkt. 1 ¶ 37.

**B.    The Republic Is The Judgment Debtors' Alter Ego—And Has Already Been Adjudged As ZMDC's Alter Ego.**

Given ZMDC's failure to honor the award or the Zambian judgment upon it, Dkt. 1 ¶¶ 38-40, Plaintiffs also bring claims against the Republic on the Judgment because it is the Judgment Debtors' alter ego.[5] As alleged in the Complaint, the Republic appoints ZMDC's Board of Directors, approves decisions of any significance by ZMDC, has the power to direct ZMDC's actions, uses ZMDC to pay the Republic's debts, and by law must always be the majority owner of ZMDC. Dkt. 1 ¶ 15. These allegations are precisely the ones that the *Funnekotter* court held, in a contested proceeding, were established:

> Defendant ZMDC was structured to be dominated by Zimbabwe. The Zimbabwe Mining Development Corporation Act, which created ZMDC, mandates that Zimbabwe is to own no less than 51% of the entity's stock and that members of its board of directors—as well as the boards of directors of its subsidiaries— are to "be appointed by the Minister after consultation with the President and in accordance with any directions the President may give him." (Rule 56.1 Statement at ¶¶ 33–41; Jacob Decl. Exh. 12.) The Act also bars ZMDC from making any investments or loans without seeking the directions and advice of the Minister of Mines, who also sets the terms and conditions for the transfer of shares, approves auditors, and gives ZMDC's board of directors directions for managing the corporation's general reserve account. More generally, the Minister of Mines may direct ZMDC to take any actions that the Minister deems to be in the national interest, which ZMDC is responsible for promoting. *(Id.)*

> Furthermore, Plaintiffs' 56.1 Statement describes instances in which ZMDC was forced to repay a loan Zimbabwe received from third parties using ZMDC's share of dividends from a mining project, to turn over the majority of its interest in a mining joint- venture to the National Army of Zimbabwe, and to permit Zimbabwe to retain revenue from certain other joint ventures in

---

[5] ZMDC is not a movant on this motion, presumably because it contends that it did not receive a prior attempt at service and contends that it was only served on August 10, 2022. Dkt. 24.

which ZMDC partnered with the government. (Rule 56.1
Statement at ¶¶ 42–52.)

*Funnekotter*, 2015 WL 9302560, at \*5-6.

Since those facts have already been litigated and proven, Plaintiffs did not opted not to
clutter up the Complaint with unnecessary allegations, despite ample evidence of their existence.
At the same time as ZMDC was litigating about the award, for example, it was granting mineral
rights to a group of Russian investors in return for weapons from Russian state-owned arms
conglomerate Rostec. Declaration of Steven K. Davidson ("Davidson Decl.") Ex. 1. (Zimbabwe:
Arms Deal Behind Platinum Project, Zimbabwe Independent, September 19, 2014). More
recently, ZMDC "sold" mining rights to the Zimbabwean military, continuing its habit of using
its assets to support state functions regardless of its own debts. Davidson Decl. Ex. 2. (Sale of
Zim mining assets: Who is getting what?, Africa Press, July 27, 2020)  And just in the last year,
reports have emerged that the Republic may dissolve ZMDC and transfer its assets to a different
state-owned entity that does not have ZMDC's debts—a classic shell-game. Davidson Decl.
Ex. 3. (Fearing seizures, Mnangagwa transfers state mining assets to a new entity, Africa
Intelligence, May 11, 2022). And the Republic seems to see the Judgment as effectively against
the Republic, having acknowledged the arbitration award as its public debt. *See* Dkt. 1 ¶ 39.

## III.   ARGUMENT

### A.   This Court Has Subject-Matter Jurisdiction.

Defendants' contention that this Court lacks subject-matter jurisdiction is meritless. The
Foreign Sovereign Immunities Act is "the sole basis for obtaining jurisdiction over a foreign
state in [U.S.] courts." *Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*, 234 F.
Supp. 3d 251, 254 (D.D.C. 2015) (Cooper, J.) (quoting *Argentine Republic v. Amerada Hess
Shipping Corp.*, 488 U.S. 428, 434 (1989)). When a plaintiff invokes an enumerated exception

under the Act, "initially, the plaintiff bears the burden of overcoming the presumption of sovereign immunity 'by producing evidence that an [FSIA] exception applies,'" *Usoyan v. Republic of Turkey*, 438 F. Supp. 3d 1, 10 (D.D.C. 2020) (quoting *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013).) But once "the plaintiff has met this initial burden of production, the foreign sovereign defendant bears the 'ultimate burden of persuasion' to show that the alleged exception to sovereign immunity does not apply." *Id.* As this Court has put it, "[t]he party opposing the invocation of an exception bears the burden of proof "[i]n accordance with the restrictive view of sovereign immunity reflected in the FSIA.'" *Enron Nigeria*, 234 F. Supp. 3d at 254 (quoting *Transamerican S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1002 (D.C. Cir. 1985)). In so doing, the Court may go beyond the pleadings and resolve disputed facts. *Usoyan*, 438 F. Supp. 3d at 10.

Here, this case falls squarely within the two enumerated exceptions to sovereign immunity: (1) the "implied waiver" exception under 28 U.S.C. § 1605(a)(1), which has long been held to apply whenever a sovereign agrees to arbitrate a dispute covered by the New York Convention in another country that is a party to the Convention; and (2) the "arbitration" exception under 28 U.S.C. § 1605(a)(6), which has been held to cover both the award itself and foreign judgments based upon it. Both of these extend to the Republic because it is ZMDC's alter ego, as the *Funnekotter* court found. And they extend to the Commissioner because that office is part of the state itself under the FSIA or its alter ego as well as because the Commissioner voluntarily submitted to arbitration after the dispute arose.

> 1.  **The FSIA's Arbitration Exception Includes Recognizing Judgments On An Arbitration Award.**

Defendants contend that they do not fall within the FSIA's arbitration exemption. Mot. at 12. That provision, in relevant part, states that there is no sovereign immunity in an action "to

enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if . . . the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6).

The FSIA's arbitration exemption, however, covers not just the award itself but also the recognition of foreign judgments on an award. Thus, this court has held that when an award was registered as a judgment in England but enjoined from enforcement in Nigeria, the court had jurisdiction under Section 1605(a)(6), even where one claim was under the D.C. Uniform Foreign-Country Money Judgment Recognition Act to recognize the judgment on the award rather than on the award directly. *Cont'l Transfert*, 697 F. Supp. 2d at 62. That makes sense—otherwise, parties might have to preemptively and wastefully seek recognition of their arbitration awards in the United States even if the defendant had no assets in the country because a foreign judgment confirming the award would not be sufficient to recognize the award itself in the United States. And it is consistent with the exception's text: the exception does *not* specifically reference the Federal Arbitration Act, emphasizing that it is dealing with the substance of the claim against the sovereign rather than the statute under which it is enforced.

The cases Defendants cite are straightforwardly distinguishable. *Hirsh* involved a claim that Israel had mismanaged reparations payments from Germany under a treaty and that individual plaintiffs were somehow entitled to compel direct payments to themselves; unsurprisingly, the courts gave short shrift to the plaintiffs' unexplained assertion that the

arbitration exception applied to a case that had nothing to do with arbitration. *Hirsh v. State of Israel*, 962 F. Supp. 377, 384 (S.D.N.Y.), *aff'd,* 133 F.3d 907 (2d Cir. 1997). It does not make any pronouncements about whether a judgment based on an arbitral award falls within the section. Likewise, while Defendants try to claim that the exception can never apply to nonsignatories, the cases they cite prove Plaintiffs' point: they conduct lengthy alter ego analyses before concluding insufficient proof of alter ego status. *TIG Ins. Co. v. Republic of Argentina*, No. 18-MC-00129 (DLF), 2022 WL 1154749 (D.D.C. Apr. 18, 2022), *order corrected and superseded,* No. 18-MC-00129 (DLF), 2022 WL 3594601 (D.D.C. Aug. 23, 2022); *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42 (2d Cir. 2021). It is precisely because the arbitration exception applies to signatories' alter egos that such an analysis was necessary. And, as explained below, *Funnekotter* is preclusive: the Republic is ZMDC's alter ego.

> 2. **In Any Event, Arbitrating Abroad In A Country That Is Party To the New York Convention Is Implied Waiver Under The FSIA.**

In any event, Defendants have waived sovereign immunity under 28 U.S.C. § 1605(a)(1), which provides that a foreign state is not immune in a case "in which the foreign state has waived its immunity either explicitly or by implication." This provision has long been held to include agreements to arbitrate—in fact, the Foreign Sovereign Immunities Act's legislative history expressly says so, as the very first example of an implicit waiver: "With respect to implicit waivers, the courts have found such waivers in cases where a foreign state has agreed to arbitration in another country." H.R. REP. 94-1487, 18, 1976 U.S.C.C.A.N. 6604, 6617. And prior to the 1990 passage of Section 1605(a)(6)'s express arbitration exception, arbitration awards were often enforced through the implied waiver exception. *E.g.*, *M.B.L. Int'l Contractors, Inc. v. Republic of Trinidad & Tobago*, 725 F. Supp. 52, 55 (D.D.C. 1989) ("To accept Respondent's contention that it did not waive its sovereign immunity by agreeing to arbitrate this

dispute under the terms of the Convention would defeat the very purpose of the Convention which is to provide for the enforcement of foreign arbitration awards."); *Ipitrade Int'l, S. A. v. Fed. Republic of Nigeria*, 465 F. Supp. 824, 826 (D.D.C. 1978) ("Respondent's agreement to adjudicate all disputes arising under the contract in accordance with Swiss law and by arbitration under International Chamber of Commerce Rules constitutes a waiver of sovereign immunity under the Act.").

For a sovereign to impliedly waive its immunity by agreeing to arbitrate, within the meaning of Section 1605(a)(1), it must both be a signatory to the New York Convention and have agreed to arbitrate in the territory of a state that had signed the New York Convention. *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 123 (D.C. Cir. 1999). In such a case, "when a country becomes a signatory to the Convention, by the very provisions of the Convention, the signatory state must have contemplated enforcement actions in other signatory states," meaning that it could have foreseen enforcement in any state that is a party to the Convention, including the United States. *Id.* (quoting *Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 578 (2d Cir. 1993) (noting that the Convention mandates recognizing and enforcing arbitral awards in each contracting state)). In *Creighton*, Qatar had not joined the Convention. But here, every state involved is a contracting party: Zimbabwe is, Zambia is, the United States is, and to the extent that the ICC's headquarters in Paris is relevant, France too.[6] ZMDC (and thus its alter ego) unequivocally agreed to arbitration in a New York Convention state, and thus could have foreseen enforcement efforts in the United States. *See also Tatneft v. Ukraine*, 771 F.

---

[6] New York Arbitration Convention, Contracting States, available at https://treaties.un.org/pages/ViewDetails.aspx?src=IND&mtdsg_no=XXII-1&chapter=22&clang=_en.

App'x 9, 10 (D.C. Cir. 2019) ("[A] sovereign, by signing the New York Convention, waives its immunity from arbitration-enforcement actions in other signatory states.").

Notably, this Court has agreed. In *Process & Indus. Devs. Ltd.*, 2020 WL 7122896, at \*6, this Court cited *Seetransport* (and *Creighton*'s dicta approving of it, as well as numerous other cases) to hold that Nigeria's agreement to arbitrate in a New York Convention signatory was an implied waiver of sovereign immunity. While the D.C. Circuit found it unnecessary to determine the issue given its holding that the arbitration exception applied anyhow, 27 F.4th at 771, this Court's analysis was precisely right. ZMDC—and thus the Republic—agreed to arbitrate in a New York Convention contracting state, and thus knew that the award could be enforced in any New York Convention state.

Defendants choose to confront none of these cases. Instead, they cite a long list of cases about the general principle that implied waiver is construed narrowly—which *Creighton* and *Seetransport* say too. Worse, they actively misrepresent the holding of the principal case they rely upon, *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012 (2d Cir. 1993). Defendants quote dictum, from which they misstate that the case held that only arbitration in the United States would trigger implied waiver. Mot. at 10. But of course, the same court had decided in *Seetransport* earlier that same year that a party to the New York Convention arbitrating in the territory of another Convention party impliedly waived its immunity in other contracting parties such as the United States. Nothing in *CISA* contradicts that (and even if it had, *Creighton* and *Tatneft* make clear which way this court should go). The principal holding of *CISA* is that waivers are plaintiff-specific, so Cargill B.V. could not take advantage of a Russian state-owned company's agreement to arbitrate with Cargill International S.A. 991 F.2d at 1017 ("When the

case involves an implied waiver, we think that a court should be even more hesitant to extend the waiver in favor of third parties.").

Defendants compound their misrepresentation of *CISA*'s holding by claiming that it limits any waiver to ZMDC and not the Republic—but *CISA* involved attempting to extend the sovereign's waiver to a non-party plaintiff, not whether the entity that signed for the sovereign was the alter ego of the sovereign. And Defendants once again make Plaintiffs' point when they misleadingly quote *Turan Petroleum, Inc. v. Ministry of Oil & Gas of Kazakhstan*, which, citing *Creighton*, holds that *arbitration awards* under the ICSID Convention would fall within the implied waiver exception but that a regular lawsuit not based on or in any way related to an arbitration award was outside the scope of the waiver. 406 F. Supp. 3d 1, 13 (D.D.C. 2019), *aff'd,* No. 21-7023, 2022 WL 893011 (D.C. Cir. Mar. 25, 2022).

Finally, it is long settled that the implied waiver exception applies not only to the arbitration award itself but also to foreign judgments recognizing the award. *Seetransport*—the leading case on the implied waiver exception as applied to arbitration agreements and the one whose reasoning was adopted by *Creighton*—was a *judgment recognition* case, not an action under the New York Convention itself. It held unequivocally that the implied waiver by agreeing to arbitrate in a Convention state extended to recognizing a judgment on the award too: "Although the claim for enforcement of the arbitral award has been dismissed as time-barred, we nonetheless conclude that subject matter jurisdiction exists, under § 1330(a), with respect to the alternative cause of action seeking enforcement of the decision of the Court of Appeals of Paris." *Seetransport I*, 989 F.2d at 582. "[T]he cause of action to enforce the foreign judgment," it held, "is within the scope of Navimpex's implicit waiver of sovereign immunity." *Id.*; *see also Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co., Kommanditgesellschaft v.*

*Navimpex Centrala Navala*, 29 F.3d 79, 81 (2d Cir. 1994) ("[B]y signing the Convention and proceeding to arbitration, Romania waived its immunity to an action to enforce a foreign money judgment under Article 53."). After all, when a party arbitrates and knows that the award can be entered as a judgment in any New York Convention contracting state, it recognizes that there may be judgments against it based on the award. As the *Seetransport* court recognized, there is no meaningful difference between one that got there directly and one that occurred through recognition of a judgment entered elsewhere first.

3.    **Because the Republic's Alter Ego Waived Its Sovereign Immunity, This Court Has Subject-Matter Jurisdiction Over the Republic.**

The Republic contends that this Court lacks subject-matter jurisdiction over it because ZMDC rather than the Republic signed the Memoranda of Understanding. Mot. at 10. But that argument assumes that the Republic's answer to the question at issue here—whether Zimbabwe is ZMDC's alter ego, so the law views them as the same—is the right one. And it is not: the Republic has already litigated and lost on precisely this issue; the Republic is thus preclusively established to be ZMDC's alter ego. And while *Funnekotter* is sufficient to plead (and prove) alter ego status, there is far more evidence that ZMDC and the Republic are alter egos.

a.    **Under *Bancec*, The Alter Ego Test Applies To Sovereign Immunity Exceptions Just Like Substantive Liability.**

To start, the Supreme Court has settled that when an entity that is nominally juridically distinct from the sovereign itself is the sovereign's alter ego, the FSIA treats the entity's acts as acts of the sovereign for the purposes of the Act's exceptions to sovereign immunity. In *Bancec*— having recognized that principles of alter ego liability apply to sovereigns and the entities they create—the Court held that the Cuban government could not assert sovereign immunity to prevent Citibank from setting off what Cuba had wrongfully seized from Citibank against what Citibank owed a dissolved Cuban state-owned bank whose assets had been

-17-

transferred to other state-owned entities. 462 U.S. at 633. The bank had waived sovereign immunity to set off by suing in U.S. courts. *Id.* at 630.

That waiver, the Court held,  covered its alter egos too: "Giving effect to Bancec's separate juridical status in these circumstances, even though it has long been dissolved, would permit the real beneficiary of such an action, the Government of the Republic of Cuba, to obtain relief in our courts that it could not obtain in its own right without waiving its sovereign immunity and answering for the seizure of Citibank's assets—a seizure previously held by the Court of Appeals to have violated international law." *Id.* at 632. Thus, Bancec's waiver was Cuba's waiver, so "Citibank may set off the value of its assets seized by the Cuban Government against the amount sought by Bancec." *Id.*; *see also Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000) (the *alter ego* factors identified in *Bancec* "serve also as exceptions to the rule that a foreign sovereign is not amenable to suit based upon the acts of such an instrumentality.").

> b.       **The Two-Step Test for Alter Ego Liability.**

Under *Bancec* and this Circuit's precedent applying it, determining whether a foreign state is responsible for a nominally distinct entity's conduct is a two-step process: first, whether the entity *is* the state itself for FSIA purposes; and second, whether, despite being a separate instrumentality, the presumption of juridical separation is rebutted by proof of *either* such extensive control that the entity and the state are effectively a single enterprise *or* the corporate form is used to shield fraud or injustice.

At the first step, courts analyze whether the entity "counts as a 'foreign state' or rather as an 'agency or instrumentality' under [28 U.S.C.] section 1608." *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994). "That in turn depends upon whether the [entity] is a 'separate legal person, corporate or otherwise' under section 1603(b)(1)." *Id.* The

D.C. Circuit has adopted a "categorical approach," holding that the distinction between a state and a mere instrumentality is "whether the core functions of the foreign entity are predominantly governmental or commercial." *Id.*

Thus, for example, a military is "so closely bound up with the structure of the state" that it will always fall on the governmental side and be a "foreign state" itself. *Id.* at 153. As the D.C. Circuit later put it, "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003) (holding that the Iranian Ministry of Foreign Affairs was Iran itself). Other circuits that have expressly adopted the *Transaero* test have similarly concluded that, whatever their legal status under foreign law, ministries and the like are "political organs" or "political subdivisions" that are considered to be the foreign state itself under the FSIA and federal common law. *E.g.*, *Compagnie Noga D'Importation et D'Exportation, S.A. v. Russian Fed'n*, 361 F.3d 676, 688 (2d Cir. 2004) (rejecting the contention that the Russian Federation was separate from the Government of Russia); *Servaas Inc. v. Republic of Iraq*, 653 F. App'x 22, 25 (2d Cir. 2011) (holding Iraq liable for the contracts of the Ministry of the Interior, notwithstanding its separateness under Iraqi law). In other words, whatever the foreign state's law says, if an entity's functions are predominantly governmental, federal common law and the FSIA regard it and the state as the same.

But just because an entity is predominantly commercial—and thus an "agency or instrumentality" rather than the state itself—does not necessarily mean that its conduct is not attributed to the state. To be sure, *Bancec* holds that "duly created instrumentalities of a foreign state are to be accorded a presumption of independent status." 462 U.S. at 627. But that presumption is a rebuttable one: "where a corporate entity is so extensively controlled by its

owner that a relationship of principal and agent is created, we have held that one may be held liable for the actions of the other." *Id.* at 629. And "our cases have long recognized the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice." *Id.* (internal quotation marks omitted). "[S]imilar equitable principles" govern the alter ego liability of a sovereign for its instrumentalities' conduct. *Id.* at 630. And it is settled law that *either* extensive control *or* fraud or injustice will suffice. *E.g.*, *de Csepel v. Republic of Hungary*, No. 1:10-CV-01261(ESH), 2020 WL 2343405, at *10 (D.D.C. May 11, 2020) ("Later courts have interpreted *Bancec* to allow them to disregard separate juridical status when the foreign entity is exclusively controlled by the foreign state *or* where recognizing the separateness of that entity and the foreign state would work fraud or injustice." (internal quotation marks omitted)), *aff'd*, 27 F.4th 736 (D.C. Cir. 2022); *see also Transamerica Leasing*, 200 F.3d at 847.

As the Supreme Court later noted, courts have identified a number of "*Bancec* factors" to determine whether an instrumentality is the sovereign's alter ego: "(1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations." *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823 (2018) (observing that Congress had broadened the alter ego doctrine for terrorism-related liabilities notwithstanding the *Bancec* test).

c.      **As *Funnekotter* Held, ZMDC Is The Republic's Alter Ego.**

Here, the alter ego analysis is unusually simple for a straightforward reason: the Republic has litigated and lost before on whether ZMDC is its alter ego. Its alter ego status is conclusively established by collateral estoppel.

"Under the doctrine of offensive collateral estoppel, or issue preclusion, a defendant may be prevented from relitigating identical issues that the defendant litigated and lost against another plaintiff." *Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp. 2d 19, 31 (D.D.C. 2007) (citing *Jack Faucett Associates, Inc. v. AT & T*, 744 F.2d 118, 124 (D.C. Cir. 1984)). Offensive nonmutual collateral estoppel is appropriate where "(1) the issue was actually litigated, that is, contested by the parties and submitted for determination by the court; (2) the issue was actually and necessarily determined by a court of competent jurisdiction in the first trial; and (3) preclusion in the second action would not work an unfairness." *Id.* Each of those elements is satisfied by the *Funnekotter* court's orders.

**Identity of Parties.** In *Funnekotter*, the plaintiffs were judgment creditors of the Republic of Zimbabwe and sought a finding that ZMDC was an alter ego of the Republic. 2015 WL 9302560, at *1. The parties—the Republic and ZMDC—are thus the same as here.

**Identity of Issues.** The issues in *Funnekotter* were also precisely identical. The *Funnekotter* court was applying precisely the same *Bancec* test at issue here, even citing to D.C. Circuit case law interpreting *Bancec* and identifying precisely the same "*Bancec* factors" as governing the analysis. *Id.* at *5. Upon an extensive factual record, the *Funnekotter* court found compelling evidence of that ZMDC and the Republic were alter egos under *Bancec*. ZMDC was sanctioned under the U.S. sanctions on Zimbabwe's government precisely because the Republic used it as its pocket-book. *See id.* at *5. Zimbabwean law requires that the Republic control ZMDC, including a legal requirement that the Republic directly hold a majority of ZMDC's

shares. *Id.* The Republic's Minister of Mines names the directors of ZMDC and must approve a wide range of its actions. *Id.* And—crucially—the Republic has used that control to make ZMDC pay the Republic's debts even over its own and to use ZMDC's revenues to pay the army. *Id.* at \*6; *see also Transaero*, 30 F.3d at 153 (holding that military forces are categorically governmental rather than commercial). In short, *Funnekotter* held that the Republic operated ZMDC as a single enterprise with the Republic's treasury, and thus *Bancec* would treat them as the same; that is precisely the issue here.

    ***Actually Litigated.*** Alter ego status was fervently contested in *Funnekotter*, with ZMDC opposing the summary judgment motion after extensive (and contentious) discovery proceedings. *Funnekotter*, 2015 WL 9302560, at \*3 ("On August 11, 2015, the Non–ZB Bank Defendants filed an opposition to Plaintiffs' motion for summary judgement, arguing that Plaintiffs had not overcome the presumption that the Non–ZB Bank Defendants were independent of Zimbabwe because (1) Plaintiffs had identified no evidence that any of the Non–ZB Bank Defendants were created by Zimbabwe for the specific purpose of working a fraud or an injustice on Plaintiffs or a third party, and (2) OFAC's designation of the Non–ZB Bank Defendants as SDNs is not persuasive evidence of their alter ego status."). Precisely the issue as to which Plaintiffs seek preclusion was the focus of the opposition in *Funnekotter*. And while the *Funnekotter* court drew adverse inferences from defendants' refusal to comply with certain discovery requests, courts have held that even more severe discovery sanctions—such as deeming matters conclusively established or striking an answer and entering default judgment as a sanction—do not prevent an order from having issue-preclusive effect. *See, e.g.*, *In re Francis*, No. ADV 11-01245, 2013 WL 3497657, at \*5 (B.A.P. 9th Cir. July 12, 2013) (collecting cases holding that adverse inference sanctions, tactical defaults after participating in litigation, and

other similar sanctions constitute "a full and fair opportunity to litigate for issue preclusion purposes."); *In re Tulloch*, 373 B.R. 370, 387 (Bankr. D.N.J. 2007) (affording collateral estoppel effect to order based in part on adverse inference).

      ***Actually and Necessarily Determined.*** The *Funnekotter* decision rests on no alternative independent grounds; ZMDC was conclusively found to be the Republic's alter ego because it met the *Bancec* test and for no other reason.

      ***Fairness***. Finally, there is nothing unfair about denying the Republic a second bite at the apple. As *Funnekotter* found, it is a serial recalcitrant debtor that has engaged in asset shell games and defiance of court-ordered discovery in its efforts to evade judgments rather than engaging in productive efforts to resolve its liabilities. Forcing serial relitigation of the same alter ego issues every time Zimbabwe or the entities it uses as its pocket-book defies another judgment would reward Zimbabwe for its obstructionism, which is precisely what collateral estoppel exists to prevent.

      Finally, there is even more evidence of alter ego status now than there was in *Funnekotter*. Zimbabwe has continued to use ZMDC as a conduit for its military with a mines-for-weapons deal, Davidson Decl. Ex. 1 ('Zimbabwe: Arms Deal Behind Platinum Project, Zimbabwe Independent, September 19, 2014) and a "sale" of mines to Zimbabwe's military. Davidson Decl. Ex. 2 ('Sale of Zim mining assets: Who is getting what?', Africa Press, July 27, 2020). And it has reportedly discussed dissolving ZMDC and moving all its assets to new state-owned entities to try to make it harder for ZMDC's creditors to reach them. All this amply justifies treating ZMDC and the Republic as the same, both for jurisdictional and liability purposes.

4.      **The Commissioner Submitted To Arbitration And Thus Lost Its Sovereign Immunity.**

While Commissioner's liability under the Zambian judgment is considerably smaller than that of ZMDC, it too is properly before this Court. Defendants' arguments to the contrary—that the judgment is against a particular individual who has common-law sovereign immunity and that the Commissioner never agreed to arbitrate—are both wrong. The Commissioner is an office (or corporation sole) of Zimbabwe, with a governmental role that means that it is part of the state itself. The office, not any particular incumbent, sues and can be sued in Zimbabwe's courts. And while the Commissioner was not a named party to the memoranda of understanding, the Commissioner voluntarily submitted to arbitration by participating in the ICC proceeding and signing the Terms of Reference that expressly submitted to the arbitration (including delegating jurisdictional issues to the arbitrators). Sangwa Decl. Ex. 1 § 6.2(1); *id.* § 8.1 ("By signing these Terms of Reference, the parties acknowledge that they agree to submit to this arbitration.").

a.      **The Commissioner Is Part of the State, Not An Individual**

Defendants claim that the Commissioner is an individual, and thus falls outside the definition of "foreign state" in 28 U.S.C. § 1603. Mot. at 8. If that were the case, then the Commissioner's immunity (or not) would be a matter of the common law. *Samantar v. Yousuf*, 560 U.S. 305, 315 (2010). That would not necessarily be dispositive, given that Congress recognized that implied waiver of sovereign immunity by agreeing to arbitrate existed at common law, H.R. REP. 94-1487, 18, 1976 U.S.C.C.A.N. 6604, 6617, and this Court would have supplemental jurisdiction even absent the FSIA's grant of subject-matter jurisdiction over foreign states.

But the Court need not determine that issue, since the Commissioner is either the state itself or a separate legal person that is the state's agency or instrumentality within the meaning of

the FSIA. Plaintiffs are seeking damages payable out of the public fisc, not out of the incumbent's pockets. *Cf. Samantar*, 560 U.S. at 325 ("[W]e think this case, in which respondents have sued petitioner in his personal capacity and seek damages from his own pockets, is properly governed by the common law because it is not a claim against a foreign state as the Act defines that term.").

The Commissioner is an office in the Ministry of Mines and Mining Development created by Section 343 of the Mines and Minerals Act 1961 c.21:05. In Zimbabwe, the Chief Mining Commissioner—like other offices in the ministry, such as the minister and the secretary—sues and can be sued by the name of the office, rather than the name of any particular incumbent. *E.g.*, *African Consolidated Resources Plc v. Minister of Mines And Mining Development*, No. HC 1345/10, [2010] ZWHHC 57 (action brought against, among others, "The Chief Mining Commissioner"); *Marasha v. Shirihuru*, Nos. HH 565/15 & HC 9059/14, [2015] ZWHHC 656 (same). That is a tell-tale sign that "Chief Mining Commissioner" refers to a juridical person—a government office or a governmental corporation sole—rather than any particular individual.

Moreover, the Commissioner's duties under the Mines and Minerals Act are governmental, not commercial. Mining Commissioners have broad administrative duties, including registering mining claims, issuing regulations, and inspecting mines, and even judicial or quasi-judicial duties, including resolving mining disputes and issuing injunctions enforceable by contempt. Those are core, sovereign powers. Under *Transaero*, the Chief Mining Commissioner *is* the foreign state—a political organ like a ministry—rather than a commercial agency or instrumentality.

-25-

b. **The Commissioner Submitted To The Arbitrators'
Jurisdiction, And Thereby Also Lost Its Sovereign Immunity.**

Defendants also claim that the Commissioner never waived sovereign immunity because ZMDC, rather than the Commissioner, is the party to the MOU. But that presumes that only a pre-dispute arbitration agreement counts as an arbitration agreement. Here, the Commissioner not only actively participated in the arbitration but signed the arbitrators' Terms of Reference that explicitly asked the arbitrators to decide on their own jurisdiction. Sangwa Decl. Ex. 1. "If a party voluntarily and unreservedly submits an issue to arbitration, he cannot later argue that the arbitrator had no authority to resolve it." *Env't Barrier Co., LLC v. Slurry Sys., Inc.*, 540 F.3d 598, 607 (7th Cir. 2008). "If the parties go beyond their promise to arbitrate and actually submit an issue to the arbitrator, we look both to the contract *and* to the scope of the submissions to the arbitrator to determine the arbitrator's authority. . . . Thus, the parties may agree to arbitration of disputes that they were not contractually compelled to submit to arbitration." *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1323 (5th Cir. 1994). One need only look to the Terms of Reference, expressly authorizing the arbitrators to resolve both jurisdictional and merits issues, to see that the Commissioner *did* agree to arbitrate, even if the Commissioner had been under no obligation to do so under the memoranda of understanding.[7] Sangwa Decl. Ex. 1 § 8.1 (Terms of Reference); Declaration of Michael M. Mundashi ("Mundashi Decl.") ¶¶ 22-23.

And a submission as much as a pre-dispute arbitration agreement falls within 28 U.S.C. §§ 1605(a)(1) and (a)(6)—after all, international arbitration has long been used as an after-the-fact way to resolve international disputes, not just ones where there was a pre-dispute agreement to arbitrate.

---

[7] Indeed, the point of having terms of reference under the ICC rules is precisely to clarify what the parties have agreed to submit to the arbitrators.

**B.     This Court Has Personal Jurisdiction Because Defendants Are A "Foreign State" Under The FSIA.**

Defendants also briefly contest personal jurisdiction. As to the Republic, Defendants agree that subject-matter jurisdiction and personal jurisdiction are one and the same: personal jurisdiction exists if the Court has subject-matter jurisdiction and the Republic was properly served, and the Republic does not argue that service was improper.[8] Dkt. 23 at 18. That is because the FSIA expressly confers this Court with personal jurisdiction over foreign states if process is properly served or waived, and "foreign sovereigns and their extensively-controlled instrumentalities are not 'persons' under the Fifth Amendment's Due Process Clause—and thus have no right to assert a personal jurisdiction defense." *GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 809 (D.C. Cir. 2012); *see also id.* at 814-15 (noting that *Bancec* determines whether an instrumentality is sufficiently distinct from the state itself to have due process rights).

That leaves the Defendants' contention that the Commissioner is an individual rather than part of the state forms the basis for their personal jurisdiction challenge. If the Commissioner were an individual (or even a non-alter ego instrumentality), this would require close analysis, consistent with *GSS*. But it is not. The incumbent Commissioner is not being sued individually; the office is being sued, and for the reasons discussed above, it is part of the foreign state under *Transaero*. Personal jurisdiction thus exists under the FSIA's grant of jurisdiction over foreign states, 28 U.S.C. § 1330(b), and the Commissioner, as an integral part of the foreign state, is not a "person" for due process purposes.

**C.     Plaintiffs' Complaint States A Claim.**

Finally, Defendants raise a litany of arguments under Rule 12(b)(6). None of these have merit: it is settled law that the statute of limitations in the implementing statute for the New York

---

[8] It is now too late for it to do so. Fed. R. Civ. P. 12(h)(1)(A) & (g)(2).

Convention does not bar judgment recognition proceedings based on arbitration awards;

Defendants' Zambian law arguments involve factual questions outside the pleadings and are

meritless in any event; and Defendants state an alter ego claim for precisely the reasons that the

*Funnekotter* court found alter ego status proven.

> 1. **The New York Convention Implementing Act's Statute of Limitations Applies Only To Arbitral Awards, Not To Foreign Judgments Confirming Them.**

Defendants' argument that the three-year statute of limitations for recognition and

enforcement of an arbitral award under 9 U.S.C. § 207 applies to bar claims upon foreign

judgments upon arbitral awards has been specifically rejected at length by the D.C. Circuit. In

*Comimpex*, the court observed that the implementing statute for the New York Convention

contains no preemption provision, and thus conventional conflict and obstacle preemption

analyses apply. 757 F.3d at 326. And while the implementing statute provides a speedy summary

proceeding to recognize arbitration awards, and thus set a relatively strict time limit to access

that procedure, it does not preclude parties from seeking to enforce arbitration awards in other

ways. *Id.* at 327. Indeed, as the D.C. Circuit recognized, Chapter 1 of the FAA contains an even

shorter statute of limitations but does not preempt state laws that may have longer statutes of

limitations to enforce awards. *Id.* And—contrary to what Defendants claim—the New York

Convention itself says nothing about limitations periods; to the contrary, it expressly preserves,

in Article VII, the right to rely on more favorable domestic laws. *Id.* at 328. Section 207 is

instead purely a matter of Congress's choices in how to implement the Convention domestically,

and the D.C. Circuit has held that neither Congress's will nor the purposes of the Convention are

harmed by "recourse to parallel enforcement mechanisms that exist independently of the FAA."

*Id.* at 330. In short, binding precedent holds that the implementing statute's limitations period is

not preemptive—to the contrary, it is "a 'floor' but *not* a 'ceiling.'" *Id.* at 328 (quoting amicus

brief of the United States). There is no "mandatory requirement[]" under the New York Convention to sue within three years, as Defendants contend. Mot. at 18. There is a limit on one procedure Congress created to implement the Convention, but binding precedent holds that other procedures are not preempted.

Defendants' attempt to distinguish *Comimpex* by contending that the result would somehow be different when the basis of jurisdiction is the implied waiver or arbitration exceptions under the FSIA is meritless. While *Comimpex* was an express waiver case, it relied extensively on the Second Circuit's holding in *Seetransport II*, which was, as discussed above, a case in which recognition of a foreign *judgment* was proper under the implied waiver exception even though it was too late to bring a New York Convention proceeding given Section 207. *Seetransport II*, 29 F.3d at 80. That is enough to dispose of this argument alone, but it also simply makes no sense. There is no judicial estoppel principle that relying on exceptions that apply to arbitration awards generally—whether enforced under Chapter 2 of the FAA, Chapter 1 of the FAA, state arbitration statutes, contract law, or state judgment recognition laws— somehow makes it unfair not to comply with a statute of limitations for a particular type of summary proceeding. That is like saying that it is unfair for a plaintiff to bring supplemental jurisdiction claims because it also alleged there was a federal question—there is nothing in conflict about those contentions. Defendants' unfairness or estoppel argument is precisely contrary to *Comimpex*'s reasoning on why Section 207 is not preemptive.

### 2. Defendants' Cursory Zambian Law Arguments Are Meritless.

Defendants rely on Zambian law to make two arguments against recognition: (1) that there is no valid judgment because they say the Zambian court lacked jurisdiction because of sovereign immunity under *Zambian* law; and (2) that the court file does not include a proof of

service, which they contend means that it was never served and thus is not enforceable in the rendering state.

a.   **Defendants' Challenges To The Zambian Court's Jurisdiction and Service in Zambia Are Meritless, and At Best, Depend On Disputed Facts.**

To start, even if what Zambian law is can be resolved as a matter of law under Rule 44.1 of the Federal Rules of Civil Procedure, Defendants ask this Court to presume facts exist that are neither pleaded in the complaint nor subject to judicial notice. The rendering court's lack of jurisdiction is an affirmative defense under the D.C. UFCMJRA. D.C. Code § 15-364(b) & (d). If any facts might establish defects in the Zambian court's jurisdiction, they neither appear on the face of the complaint nor are subject to judicial notice, so they are a matter for a motion for summary judgment, not a Rule 12 motion.[9]

Any number of things could have happened to cause ZMDC to waive its sovereign immunity in Zambia—it could have agreed to do so, it could have taken some action that is a waiver under Zambian law, or it could have submitted to Zambian jurisdiction. In fact, in addition to the arbitration itself being a waiver, Plaintiffs also contend that ZMDC waived sovereign immunity by repeatedly bringing affirmative litigation in the courts of Zambia. Indeed, Defendants availed themselves of the Zambian courts before the Plaintiffs applied for the

---

[9] Plaintiffs cite *Kaupthing ehf. v. Bricklayers & Trowel Trades Int'l Pension Fund Liquidation Portfolio*, in which the court cited a New York case holding that parties seeking recognition had to plead around the mandatory grounds for non-recognition. 291 F. Supp. 3d 21, 33 (D.D.C. 2017). But New York's judgment recognition statute at the time did not contain a provision similar to D.C. Code § 15-364(d), which explicitly places the burden for *both* mandatory and discretionary grounds for nonrecognition on the party opposing recognition. *See* 2008 Sess. Law News of N.Y. Ch. 66 § 2 (S. 6687–C) (pre-2021 version of N.Y. CPLR 5304). In fact, in 2021, New York revised its version of the UFCMJRA to include a provision similar to D.C. Code § 15-364(d). *See* N.Y. CPLR 5304(c) (enacted in 2021 to clarify that, as in D.C., the party opposing recognition bears the burden). *Kaupthing* is thus plainly wrong: the D.C. implementation of the UFCMJRA speaks expressly to this question, but *Kaupthing* relied on case law interpreting a different statute—and one that has since been amended on precisely this point.

registration of the award. *See* Sangwa Decl. ¶¶ 10-17. That is what Plaintiffs know now; perhaps discovery on Defendants' affirmative defense will uncover more. Either way, these factual arguments about affirmative defenses are improper on a motion to dismiss.

The same goes for Defendants' challenge to service in Zambia. This argument is a purely factual one about whether service occurred, even if Defendants' declarant could not find proof in the court records. The complaint pleads service occurred, and there exists evidence that it did: Plaintiffs' Zambian counsel asked ZMDC's and the Commissioner's Zambian counsel—who was actively representing the latter in proceedings seeking to stay enforcement of the award— whether they were authorized to and would accept service, and they agreed to do so. *See* Sangwa Decl. ¶¶ 23-24. And as Mr. Mundashi explains, Zambian law provides that service out of the jurisdiction is unnecessary when the party's Zambian counsel agrees to accept service. *See* Mundashi Decl. ¶ 24. This Court cannot resolve the facts of Zambian service on a motion to dismiss, especially where the statute makes the rendering court's personal jurisdiction and adequacy of notice affirmative defenses rather than elements. D.C. Code § 15-364(d).

b. **In Any Event, Defendants' Zambian Law Arguments Are Wrong.**

Defendants offer a single paragraph of argument in their brief to support their contentions about Zambian law, and otherwise offer only a short declaration of a Zambian lawyer that notes that Zambia has adopted the "restrictive" theory of sovereign immunity for commercial acts (the theory that Congress codified here in the FSIA), and opines conclusorily that waiver is purely a matter of whether the sovereign engaged in a private (that is, commercial) act. He seems to assume that the MOUs—agreements to commercialize mining rights and create joint ventures with ZMDC—were not commercial, although it is not exactly clear why. He also asserts that the lack of a proof of service in the court files and the lack of an application for leave to serve

-31-

outside the jurisdiction in the court files mean service would have been a nullity. Both points are straightforwardly wrong or based on factual assumptions that are simply untrue.

(1)    <strong>ZMDC's and the Commissioner's Zambian Counsel Accepted Service.</strong>

There is a very good reason there was no application for leave to serve outside of Zambia in the court file: ZMDC's and the Commissioner's Zambian counsel agreed to accept service *in* Zambia. *See* Sangwa Decl. ¶¶ 23-24. Plaintiffs' Zambian counsel proceeded to serve them in accordance with that agreement. *See* Sangwa Decl. ¶ 22. Service under such an agreement is valid, and there is no need to seek leave to serve outside the jurisdiction when service occurs inside the jurisdiction. *See* Mundashi Decl. ¶ 24. ZMDC's and the Commissioner's Zambian counsel was their agent for service, or at a minimum had ostensible or usual authority by virtue of their status as counsel of record to agree to accept service on behalf of their clients. The requirement for leave of court to serve outside the jurisdiction is a procedural requirement that can be voluntarily waived by the party's counsel agreeing to accept service within Zambia. Mundashi Decl. ¶ 31.

Similarly, there is a very good reason no proof of service has been filed with the court: a proof of service need only be filed with the court when Plaintiffs want to issue a writ of execution in Zambia, which Plaintiffs have not yet sought to do. Mundashi Decl. ¶ 36. The judgment on its face ties its enforceability to the date of service, not to the filing of proof of service. *Id*.

(2)    <strong>For Multiple Reasons, Defendants Waived Their State Immunity In Zambia.</strong>

As for Defendants' Zambian law sovereign immunity contentions, they are simply wrong. As their own expert concedes, Zambia is a common law country and has followed the modern trend of interpreting common law sovereign immunity (or "state immunity," as it is more

-32-

commonly known in Zambia) restrictively. *See* Dkt. 23-3 at ¶¶ 23-24. But unlike Mr. Mundashi, their expert fails to seriously engage with whether the transaction here is commercial—and it is. These were memoranda of understanding for commercializing mineral deposits, including creating a joint venture between ZMDC and Plaintiffs. They are thus commercial, not sovereign, acts under Zambia's restrictive theory of sovereign immunity. Mundashi Decl. ¶¶ 14, 21 & 23. Notably, Zambia does *not* limit its application of the restrictive theory to commercial acts *in Zambia*—all it requires is some basis for Zambian jurisdiction (here, an arbitration occurring in Zambia). *Id.* ¶ 14.

Additionally, there is ample evidence that ZMDC and the Commissioner did waive their sovereign immunity, in at least two ways. First, while Zambian courts have not yet addressed the issue, the trend in other common law countries is finding that arbitrating in a foreign country, especially one party to the New York Convention, is itself a waiver of sovereign immunity. . Notably, this rule was the common law position in the United States, even prior to the FSIA, as Congress itself noted. H.R. REP. 94-1487, 18, 1976 U.S.C.C.A.N. 6604, 6617 ("With respect to implicit waivers, the courts have found such waivers in cases where a foreign state has agreed to arbitration in another country."). Canada, applying common law sovereign immunity, has similarly held that agreement to arbitrate in a foreign state subject to the New York Convention waives sovereign immunity. *See, e.g.*, *Collavino Inc. v. Tihama Development Authority*, 2007 ABQB 212, 2007 CarswellAlta 633; *TMR Energy Ltd. v. State Property Fund of Ukraine*, 2003 FC 1517 (CanLII). And common law countries routinely find that customary international law forms a part of the common law, so the International Law Commission's 1991 Draft Articles on the Jurisdictional Immunities of States are also relevant, and Article 17 holds that there is no immunity when a sovereign agrees to arbitrate in a foreign state.

Second, there is another alternative ground for common law waiver of sovereign immunity in Zambia: ZMDC and the Commissioner repeatedly affirmatively sought relief related to precisely the arbitration at issue in the Zambian courts, thus submitting themselves to Zambian jurisdiction in related matters. *See* Sangwa Decl. ¶¶ 11-16. The Defendants thus waived their sovereign immunity when Plaintiffs sought to enforce the award in the very same court in which ZMDC and the Commissioner sought to stay or enjoin the award, regardless of whether under Zambian procedure the cases had different cause numbers.

3.   ***Ex Parte* Recognition of an Arbitration Award Followed By An Opportunity To Set It Aside Is Consistent With Due Process and Public Policy.**

Defendants also contend that the procedure under Zambia's arbitration statutes—registering the arbitration award as a judgment followed by a 30-day period to set it aside—somehow renders recognition unfair. Mot. at 18. It is unclear exactly what they are attempting to invoke by this argument, but presumably it is a contention that they were not afforded due process or lacked adequate notice. D.C. Code § 15-364(b)(1) & (c)(1). Both are affirmative defenses on which they bear the burden of proof under D.C. Code § 15-364(d), so again they are improper on a motion to dismiss absent admissions on the face of the complaint or judicial notice. Moreover, it is established law in Zambian that the application to register and enforce an arbitration award can be (and is usually) made *ex parte* and so can the order granting such application.

Regardless, these arguments need not detain the Court long; it is settled law that procedures like these—where an order is initially entered *ex parte* but there is an opportunity to set aside or vacate it—satisfy due process, and they are common in many countries for arbitration awards. *See, e.g.*, *Guinness PLC v. Ward*, 955 F.2d 875, 901 (4th Cir. 1992) (use of *ex parte* orders that could be challenged after initial entry did not violate due process); *CIBC*

*Mellon Tr. Co. v. Mora Hotel Corp. N.V.*, 100 N.Y.2d 215, 222, 792 N.E.2d 155, 160 (2003) (recognizing English default judgment entered due to violation of *ex parte* freezing injunction, even though such an injunction would have been unavailable in New York, noting that "defendants were given ample notice and numerous opportunities to present their defense in England; they simply elected to forego these opportunities (apparently against the advice of their English attorneys) for strategic reasons."). When an order is "only made *ex parte* because [the party opposing recognition] declined to appear to challenge them," that is perfectly consistent with due process. *Sheehan v. TCI Fund Mgmt. (US), Inc.*, No. 14-CV-3338 JPO, 2014 WL 7176258, at *3 (S.D.N.Y. Dec. 16, 2014). Rather tellingly, Defendants do *not* produce a declaration from their Zambian counsel actually denying service, let alone notice, of the judgment. Moreover, they never moved in Zambia to vacate or set aside the registration of the award. *See* Sangwa Decl. ¶ 27 That strongly suggests that they have *chosen* not to raise any merits defenses in that proceeding, not that they lacked notice or an opportunity to be heard.

Separately, Defendants make a cursory argument that the order violates public policy as against the Commissioner because the Commissioner was not a party to memoranda of understanding, which they contend amounts to basic disregard of contract law. But that fundamentally misunderstands how arbitration works: the Commissioner may not have been *required* to arbitrate beforehand, but when named as a Respondent, the Commissioner voluntarily chose to submit, including signing Terms of Reference that expressly delegated jurisdictional questions to the arbitrators and expressly states that "[b]y signing these Terms of Reference, the parties acknowledge that they agree to submit to this arbitration." Sangwa Decl. Ex. 1 §§ 6.2(1), 8.1. Zambia's enforcement of an award premised on a submission rather than a pre-dispute agreement does not violate public policy. On the contrary, the same result would

occur in the United States if a party not bound by a pre-dispute agreement but named in an arbitration signed terms of reference expressly agreeing that the arbitrators could determine their jurisdiction and then participated on the merits before suddenly absenting itself in the middle of a merits hearing. The Commissioner chose—for a while at least—to appear and defend. It is not contrary to public policy to make the Commissioner live with the consequences of that choice, even if the Commissioner regrets it.

4. **Plaintiffs' Concise Restatement of the Facts Proven In *Funnekotter*— Together With The *Funnekotter* Court's Order—States An Alter Ego Claim.**

Next, Defendants contend that Plaintiffs have not adequately pled alter ego liability. For the reasons above, that argument is meritless; given that the Republic had *already been adjudicated* to be ZMDC's alter ego in a court of competent jurisdiction, and is thus collaterally estopped, *supra* § III.A.3.c, Plaintiffs needed not lard up the complaint beyond a concise recitation of the facts found by the *Funnekotter* judgment; that judgment alone is enough to establish alter ego status. *See, e.g.*, *In re Kilroy*, 357 B.R. 411, 427 (Bankr. S.D. Tex. 2006) (holding that complaint stated a veil-piercing claim because the defendant was collaterally estopped from denying alter ego status, having litigated and lost the alter ego issue elsewhere). For much the same reasons that the complaint, together with the judicially-noticeable judgment of the *Funnekotter* court, establishes that the Republic is ZMDC's alter ego for jurisdictional purposes, they establish that Plaintiffs have pleaded (and, indeed, would be entitled to partial summary judgment on) their alter ego claims.

To the extent that this Court believes that Plaintiffs must replead at length the facts identified in *Funnekotter* (and the post-*Funnekotter* developments discussed above that further reinforce that ZMDC is the Republic's pocket-book, *supra* § II.B), leave to amend is plainly warranted. Under Rule 15(a)(2), leave to amend "should be freely given unless there is a good

-36-

reason to the contrary." *Parker v. John Moriarty & Assoc.*, 320 F.R.D. 95, 97 (D.D.C. 2017).

"Because amendments are to be liberally granted, the non-movant bears the burden of showing

why an amendment should not be allowed." *Abdullah v. Washington*, 530 F. Supp. 2d 112, 115

(D.D.C. 2008). It is especially obvious that any pleading deficiencies are merely technical and

could be "cured through the allegation of additional facts" where a court has actually found

additional facts to be not just pleaded but proven. *Golden v. Mgmt. & Training Corp.*, 266 F.

Supp. 3d 277, 287 (D.D.C. 2017); *see also Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir.

1996) ("A dismissal *with prejudice* is warranted only when a trial court determines that the

allegation of other facts consistent with the challenged pleading could not possibly cure the

deficiency.").

### 5. Plaintiffs Are Entitled To Attorneys' Fees.

Finally, Plaintiffs are entitled to their attorneys' fees because both Zambia (the rendering

state) and Zimbabwe (the chosen law) follow the English rule of attorneys' fees, and the right to

attorneys' fees is substantive and thus part of the judgment. *See, e.g.*, *RLS Assocs., LLC v. United

Bank of Kuwait PLC*, 464 F. Supp. 2d 206, 213 (S.D.N.Y. 2006) (holding that attorneys' fees

would follow the chosen law in a case governed by English law). Alternatively, by incorporating

the law of Zimbabwe, which follows the English rule, into their memoranda of understanding,

the parties agreed to follow Zimbabwe's rules regarding attorneys' fees too. *See Katz v.

Berisford Int'l PLC*, No. 96 CIV. 8695 (JGK), 2000 WL 959721, at *8 (S.D.N.Y. July 10, 2000)

("In as much as the parties to the U.S. Agreement incorporated English law into their agreement,

the parties' agreement provides for the recovery of attorneys' fees.").

## IV.  CONCLUSION.

For the foregoing reasons, Defendants' motion to dismiss should be denied. To the extent

any portion of it is granted, it should be without prejudice, since Plaintiffs are able to amend to

plead additional facts.

Dated: September 23, 2022                    Respectfully submitted,


  _/s/ Steven K. Davidson_
Steven K. Davidson (D.C. Bar No. 407137)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, D.C.  20036-1795
Telephone:        202 429 3000
Facsimile:        202 429 3902
sdavidson@steptoe.com

Robert W. Mockler
Joseph M. Sanderson
 (*pro hac vice*)
Niyati Ahuja (*pro hac vice* to be filed)
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY  10036-7703
Telephone:        212 506 3900
Facsimile:        212 506 3950
rmockler@steptoe.com
josanderson@steptoe.com
nahuja@steptoe.com


*Attorneys for Plaintiffs*