# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Amaplat Mauritius Ltd.,<br>c/o CKLB International Management Ltd.,<br>P.O. Box 80, Felix House, 24 Dr. Joseph<br>Riviere Street, Port Louis 11602, Mauritius;<br>and<br><br>Amari Nickel Holdings Zimbabwe Ltd.,<br>c/o CKLB International Management Ltd.,<br>P.O. Box 80, Felix House, 24 Dr. Joseph<br>Riviere Street, Port Louis 11602, Mauritius,<br><br>             Plaintiffs,<br><br>    v.<br><br>Zimbabwe Mining Development Corporation,<br>90 Mutare Road, Msasa, Harare, Zimbabwe;<br><br>The Chief Mining Commissioner, Ministry of<br>Mines of Zimbabwe,<br>6th Floor, ZIMRE Centre, Cnr. Leopold<br>Takawira Street/Kwame Nkrumah Avenue,<br>Private Bag 7709, Causeway, Harare,<br>Zimbabwe;<br><br>and the Republic of Zimbabwe,<br>c/o Head of the Ministry of Foreign Affairs,<br>Ministry of Foreign Affairs, P.O. Box 4240,<br>Munhumutapa Building, Cnr. Samora Machel<br>Avenue/Sam Nujoma Street, Harare,<br>Zimbabwe<br><br>             Defendants. | Civil Action No. 1:22-cv-00058-CRC |

# PLAINTIFFS' OPPOSITION TO DEFENDANT ZIMBABWE MINING DEVELOPMENT CORPORATION'S MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................. 1

II.   RELEVANT BACKGROUND ............................................................................. 4

    A.    The Arbitration Award and Zambian Judgment. ........................................ 4

    B.    ZMDC Is An Alter Ego of the Republic of Zimbabwe. .............................. 7

    C.    Service on ZMDC. ....................................................................................... 8

III.  ARGUMENT ..................................................................................................... 11

    A.    ZMDC Was Properly Served. ................................................................... 11

        1.    Because ZMDC Is An Agency or Instrumentality, Substantial
            Compliance Plus Actual Notice Suffices. ..................................... 11

        2.    ZMDC Agreed That "Documents In Legal Proceedings" Could Be
            Served By Hand Delivery At Its Headquarters. ............................. 12

        3.    Plaintiffs Served ZMDC In Accordance With The MoUs, And
            ZMDC's Failure to Give Notice of Its Office Move Does Not
            Avail It. ......................................................................................... 13

        4.    If The Court Nonetheless Finds Service Ineffective, Dismissal Is
            Still Inappropriate And The Court Should Authorize Alternate
            Service Under 28 U.S.C. § 1608(b)(3)(C). ................................... 16

    B.    This Court Has Subject-Matter Jurisdiction. ............................................ 17

        1.    The FSIA's Arbitration Exception Includes Recognizing
            Judgments On An Arbitration Award. ........................................... 18

        2.    In Any Event, Arbitrating Abroad In A Country That Is Party To
            the New York Convention Is Implied Waiver Under The FSIA. ........... 19

    C.    Because ZMDC Is An Alter Ego of the State, It Lacks Due Process
        Rights—So Service Equals Personal Jurisdiction. .................................... 20

    D.    Plaintiffs' Complaint States A Claim. ....................................................... 23

IV.   CONCLUSION .................................................................................................. 26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n*,
    798 F. Supp. 2d 260 (D.D.C. 2011) .......................................................................11

*In re Airadigm Commc'ns, Inc.*,
    616 F.3d 642 (7th Cir. 2010) ..............................................................................13

*Angellino v. Royal Fam. Al-Saud*,
    688 F.3d 771 (D.C. Cir. 2012) ............................................................................12

*Azima v. RAK Inv. Auth.*,
    926 F.3d 870 (D.C. Cir. 2019) ............................................................................13

*Barot v. Embassy of the Republic of Zambia*,
    785 F.3d 26 (D.C. Cir. 2015) ..............................................................................16

*Bazarian Int'l Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.*,
    168 F. Supp. 3d 1 (D.D.C. 2016) ........................................................................17

*Commissions Imp. Exp. S.A. v. Republic of the Congo*,
    757 F.3d 321 (D.C. Cir. 2014) ............................................................................24

*Cont'l Transfert Technique, Ltd. v Fed. Republic of Nigeria*,
    697 F. Supp. 2d 46 (D.D.C. 2010) ......................................................................18

*Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion Y Produccion*,
    832 F.3d 92 (2d Cir. 2016) ................................................................................20

*Creighton Ltd. v. Gov't of State of Qatar*,
    181 F.3d 118 (D.C. Cir. 1999) ............................................................................19

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
    No. CV 17-MC-151-LPS, 2021 WL 129803 (D. Del. Jan. 14, 2021), *appeal dismissed,* 24 F.4th 242 (3d Cir. 2022) ....................................................................22

*Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*,
    225 F. Supp. 3d 18 (D.D.C. 2014) .............................................................12, 15, 16

*In re Francis*,
    No. ADV 11-01245, 2013 WL 3497657 (B.A.P. 9th Cir. July 12, 2013) ..............................22

*Freedom Watch, Inc. v. Org. of the Petroleum Exporting Countries*,
    766 F.3d 74 (D.C. Cir. 2014) ..............................................................................17

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*,
    582 F.3d 393 (2d Cir. 2009)......................................................................................21

*Funnekotter v. Agric. Dev. Bank of Zimbabwe*,
    No. 13 CIV.1917(CM), 2015 WL 9302560 (S.D.N.Y. Dec. 17, 2015).......................... *passim*

*GSS Grp. Ltd v. Nat'l Port Auth.*,
    680 F.3d 805 (D.C. Cir. 2012)...............................................................................3, 21

*Hashem v. Shabi*,
    No. CV 17-1645 (ABJ), 2018 WL 3382913 (D.D.C. Apr. 26, 2018) ...................................17

*Hirsh v. State of Israel*,
    962 F. Supp. 377 (S.D.N.Y.), *aff'd,* 133 F.3d 907 (2d Cir. 1997)...........................................19

*Int'l Rd. Fed'n v. Embassy of the Democratic Republic of the Congo*,
    131 F. Supp. 2d 248 (D.D.C. 2001) .....................................................................12, 15

*Kaupthing ehf. v. Bricklayers & Trowel Trades Int'l Pension Fund Liquidation
    Portfolio*, 291 F. Supp. 3d 21 (D.D.C. 2017)..........................................................24

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006).................................................................................................13

*New England Merchants Nat. Bank v. Iran Power Generation & Transmission
    Co.*,
    495 F. Supp. 73 (S.D.N.Y. 1980)............................................................................17

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
    27 F.4th 771 (D.C. Cir. 2022)................................................................................20

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
    No. 18-CV-594 (CRC), 2020 WL 7122896 (D.D.C. Dec. 4, 2020) ....................................20

*Ry. Mail Ass'n v. Moore*,
    15 F.2d 547 (4th Cir. 1926) ...................................................................................14

*Saleh v. Al Nahyan*,
    No. CV 20-1168 (ABJ), 2021 WL 7210780 (D.D.C. July 16, 2021)...................................17

*Schimmelpennich v. Bayard*,
    26 U.S. 264 (1828)...............................................................................................13

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co.,
    Kommanditgesellschaft v. Navimpex Centrala Navala*,
    29 F.3d 79 (2d Cir. 1994) ......................................................................................24

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co.,*
    *Kommanditgesellschaft v. Navimpex Centrala Navala,*
    989 F.2d 572 (2d Cir. 1993)..........................................................................19, 20

*Tatneft v. Ukraine,*
    771 F. App'x 9, 10 (D.C. Cir. 2019) ..........................................................19

*TMR Energy Ltd. v. State Prop. Fund of Ukraine,*
    411 F.3d 296 (D.C. Cir. 2005) ....................................................................21

*Transaero, Inc. v. La Fuerza Aerea Boliviana,*
    30 F.3d 148 (D.C. Cir. 1994) ...............................................................11, 16

*In re Tulloch,*
    373 B.R. 370 (Bankr. D.N.J. 2007) ............................................................23

*UAB Skyroad Leasing v. OJSC Tajik Air,*
    No. 21-7015, 2022 WL 2189300 (D.C. Cir. June 17, 2022) ....................21

*von Pezold v. Republic of Zimbabwe,*
    No. 21-CV-02004 (APM), 2022 WL 4078896 (D.D.C. Sept. 6, 2022)....................22

**State Cases**

*Long v. Home Indem. Co. of New York,*
    169 So. 154 (La. Ct. App. 1936) ................................................................14

*Robbins v. S. Gen. Ins. Co.,*
    243 A.2d 686 (D.C. 1968) ..........................................................................14

**Federal Statutes**

28 U.S.C. § 1605(a)(1)..........................................................................................19

28 U.S.C. § 1605(a)(6)....................................................................................18, 20

28 U.S.C. § 1608(a) ......................................................................................11, 15

28 U.S.C. § 1608(b) ...............................................................................11, 15, 16

28 U.S.C. § 1608(b)(1) ..........................................................................2, 9, 11

28 U.S.C. § 1608(b)(3)(B) ....................................................................9, 11

28 U.S.C. § 1608(b)(3)(C) ...............................................................3, 16, 17

**International Statutes**

Arbitration Act, No. 19 of 2000, § 18 (Zambia) ..............................................6

**State Statutes**

2008 Sess. Law News of N.Y. Ch. 66 § 2 (S. 6687-C) ....................................................24

D.C. Code § 15-364(b)....................................................................................................24

D.C. Code § 15-364(d)....................................................................................................24

N.Y. CPLR 5304..............................................................................................................24

**Rules**

Arbitration (Court Proceedings) Rules, 2001, Rule 15 (Zambia)....................................6

Arbitration (Court Proceedings) Rules, 2001, Rule 16 (Zambia)....................................6

Fed. R. Civ. P. 4(f)(3) ....................................................................................................17

Fed. R. Civ. P. 12(b)(6)........................................................................................23, 24, 26

**Constitutional Provisions**

U.S. Const. amend. V....................................................................................................3, 21

**Other Authorities**

72 C.J.S. Process § 126 ..................................................................................................14

New York Arbitration Convention, Contracting States,
    https://treaties.un.org/pages/ViewDetails.aspx?src=IND&mtdsg_no=XXII-
    1&chapter=22&clang=_en.........................................................................................4

New York Arbitration Convention on the Recognition and Enforcement of
    Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3..............................4

## I.    INTRODUCTION

Zimbabwe Mining Development Corporation ("ZMDC") has concertedly evaded its debts and legal obligations—including an arbitration award and judgment rendered against it and in favor of Plaintiffs, after it unlawfully terminated a mining concession on pretexts the arbitrators found plainly false—while simultaneously operating as Zimbabwe's pocketbook for activities well outside its stated mining purpose. Its recalcitrance and its domination by Zimbabwe have already led a court to find it to be Zimbabwe's alter ego. And it, like its codefendants, has continued a strategy of evasion here, concocting meritless procedural arguments, even now denying that a Zambian judgment it has known about for *years* was served on counsel with authority to accept it.

Its motion to dismiss evinces the same strategy of evasion. Like the other defendants, it contends that, despite signing an arbitration agreement, it has not waived any sovereign immunity it may have had.  Its motion fails for the same reasons: the Foreign Sovereign Immunities Act's ("FSIA") arbitration and implied waiver exceptions cover judgments on an arbitration award and apply here. Like the other defendants, it contends that the Federal Arbitration Act's statute of limitations for New York Convention awards applies only to proceedings under that Act, not to actions on judgments. Courts have consistently rejected that position. It erroneously contends that Plaintiffs were required in this action to anticipate and plead around every defense to enforcement; the District of Columbia Uniform Foreign Country Money Judgment Recognition Act expressly places the burden on ZMDC.

While this Court thus need not address at this juncture ZMDC's or its codefendants' collateral attacks on the Zambian judgment—attacks, one might note, that it has chosen not to raise before Zambian courts familiar with Zambian procedure—they are in any event meritless. Indeed, ZMDC does not offer any evidence of what Zambian law on service is. Rather,

consistent with ZMDC's pattern of evasion, a corporate officer now conclusorily denies having given its Zambian counsel actual authority to accept service. That is not credible—it is belied by Mr. Sangwa's (Plainitffs' Zambian counsel) testimony that ZMDC's counsel represented that they had the authority to accept service, and, notably, ZMDC does not offer its own Zambian counsel's declaration to controvert that. And even if one were to credit ZMDC's newfound recollection that it did not give its counsel actual authority, its Zambian counsel would still have had apparent authority to accept service. Under Zambian law, service on counsel is *required* once a lawyer either informs opposing counsel to serve documents on the lawyer or enters an appearance with a court. Here, ZMDC's Zambian counsel was representing ZMDC in a host of related applications to the Zambian courts (and continued to do so after the Judgment); Zambian law would thus require Plaintiffs to continue serving counsel.

That leaves ZMDC's two *unique* arguments: that it was not properly served and that this Court cannot exercise jurisdiction consistent with due process. Neither has any merit.

***First***, ZMDC was properly served in the way it agreed to be served in the Memoranda of Understanding between ZMDC and Plaintiffs ("MOUs"), and thus consistent with 28 U.S.C. § 1608(b)(1). ZMDC agreed that "*documents in legal proceedings* or any written notices *may be served*" at its headquarters or such other address as it specified. Doc. 1-2 § 12.8.1; Doc. 1-4 § 10.9.1 (emphases added). It also agreed that "[a]ny notice given in terms of this MOU shall be in writing and shall if delivered by hand to a responsible person during normal business hours at the physical address chosen as its *domicilium citandi et executandi* be deemed to have been duly received by the addressee on the date of delivery unless the contrary is proven." Doc. 1-2 § 12.8.2; Doc. 1-4 § 10.9.2. That is a special agreement for service. So, Plaintiffs served a responsible person at ZMDC's headquarters by hand during normal business hours.

To be sure, ZMDC was served at its new headquarters, 6 Constantia Avenue, rather than the old one, 90 Mutare Road, which it left in mid-2020. The MOUs state that actual receipt always suffices, so ZMDC's move is immaterial. In any event, during settlement negotiations, ZMDC began corresponding with Plaintiffs' Zimbabwean counsel from its new address; that either satisfies the requirements of the MoUs for a change of address or results (in combination with ZMDC's failure to maintain the "responsible person" at its old address to receive service) in ZMDC being estopped from relying on its own failure to serve a formal change of address notice if its correspondence listing the new address does not suffice.

While that disposes of the service issue, even if this Court were to disagree, the appropriate response would be not a dismissal. Courts consistently grant leave to reattempt service after finding a foot fault with FSIA service. What is more, because Plaintiffs have now attempted service on three different occasions, if it finds that the attempted service was ineffective, this Court can and should order alternate service under Section 1608(b)(3)(C), by ordering either (a) hand or courier service on the new ZMDC headquarters address or (b) service on ZMDC's U.S. counsel.

**_Second_**, ZMDC contends that this Court lacks personal jurisdiction over it. But the D.C. Circuit has made clear that "foreign sovereigns and their extensively-controlled instrumentalities are not 'persons' under the Fifth Amendment's Due Process Clause—and thus have no right to assert a personal jurisdiction defense." _GSS Grp. Ltd v. Nat'l Port Auth._, 680 F.3d 805, 809 (D.C. Cir. 2012). An alter ego instrumentality has no due process rights. And ZMDC is collaterally estopped from arguing it is not an alter ego, because it litigated precisely that issue

and lost. *Funnekotter v. Agric. Dev. Bank of Zimbabwe*, No. 13 CIV.1917(CM), 2015 WL 9302560, at *5-6 (S.D.N.Y. Dec. 17, 2015).[1]

In short, ZMDC's arguments are meritless. Its motion should be denied.

## II.    RELEVANT BACKGROUND

This case is, at its heart, a straightforward judgment recognition action against ZMDC—a Zimbabwean state-owned company that commercializes Zimbabwe's mining resources—based on a Zambian judgment based on a prior arbitration award Plaintiffs won against ZMDC. The award was originally for a total of approximately $50,000,000, although that amount has increased significantly with post-award and post-judgment interest.

### A.    The Arbitration Award and Zambian Judgment.

ZMDC entered into two MoUs with Plaintiffs that provided for arbitration before the ICC Court. Doc. 1 ¶¶ 18 & 21; Doc. 1-2 at Art. 11; Doc. 1-4 at Art. 9. All relevant countries are parties to the New York Arbitration Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3.[2] After ZMDC unsuccessfully sought to terminate the MoUs, Plaintiffs filed for arbitration against ZMDC and the Commissioner before the ICC Court which, after contested proceedings, ordered that the Tribunal be seated in Zambia. Doc. 1 ¶ 28. ZMDC further submitted to the arbitration in Zambia by signing the Terms of Reference, which expressly provided that "[b]y signing these Terms of

---

[1] If the Court finds that collateral estoppel based on *Funnekotter* is insufficient to plead ZMDC's alter ego status, it should grant leave to amend, since Plaintiffs can plainly plead the same facts that were established in *Funnekotter* as well as subsequent developments that confirm that ZMDC is functionally the Republic's pocketbook, paying the Republic's debts even when it is not paying its own.

[2] The Secretary-General of the United Nations, as depositary under the Convention, maintains a list of contracting parties under the Convention at https://treaties.un.org/pages/ViewDetails.aspx?src=IND&mtdsg_no=XXII-1&chapter=22&clang=_en.

Reference, the parties acknowledge that they agree to submit to this arbitration and expressly waive any procedural objections they may have with respect to known events, including the appointment of the Tribunal." Doc. 28-2 at Ex. 1 § 8.1. The Terms of Reference also agreed that the Tribunal would have the authority to decide its own jurisdiction. *Id.* § 6.2(1). The arbitration proceeded to a hearing on the merits. Doc. 1 ¶¶ 29-30; Doc. 30 at 3.

During the merits hearing, by their own account dissatisfied with the Tribunal's procedural rulings and interpretations of the ICC Court's rules, Doc. 30 at 2, ZMDC's party-appointed arbitrator submitted his resignation and then declined to participate further in the arbitration, Doc. 1 ¶¶ 30-32. In 2012, they obtained an *ex parte* temporary restraining order from the Zambian High Court staying the arbitration while their assertions that the Tribunal was incorrectly reconstituted by the ICC Court were litigated in Zambia. Doc. 28-2 at Ex. 2 (October 18, 2012 Order). The Zambian High Court later determined that the temporary restraining order was entered with "no jurisdiction" and had only been entered *ex parte* because "the applicant suppressed material facts and laws from this court thereby misleading it to grant the ex-parte order of injunction." Doc. 28-2 at Ex. 3 (June 19, 2014 Order). It also observed that the proper remedy was to oppose the entry of a judgment based on the award. *Id.*

Correctly understanding that the *ex parte* order was void as in excess of jurisdiction, a preeminent Tribunal—as reconstituted by the ICC Court, Professor Doug Jones A.O., Stuart Isaacs Q.C., and Chikwendu Madumere[3]—resumed, with all proper notice to ZMDC, and completed hearings and issued a Final Award. Doc. 1-1. The Final Award rejected jurisdictional

---

[3] These are all well-known, experienced arbitrators. Their biographies can be viewed at: https://www.stuartisaacsqc.com/biography, https://www.madumereandco.com/team/, and https://dougjones.info/wp/. All Tribunal members are globally well-known arbitrators and have arbitrated several disputes.

challenges, ordered ZMDC to pay Amaplat US$42,882,000 and ZMDC to pay Amari US$3,900,000, ordered both Respondents (ZMDC and the Commissioner) jointly to pay Plaintiffs' legal costs of US$2,220,583.74 and the costs of the arbitration of US$900,000, and ordered post-award interest at the rate of 5%. Doc. 1-1 at 39. ZMDC and the Commissioner again applied *ex parte* to the Zambian High Court to enjoin enforcement of the award; but the Zambian High Court declined to sign the proposed order. Sangwa Decl. ¶ 13. Proceedings in Zambia were stayed for several years pending Plaintiffs' successful appeal to the Zambian Supreme Court against an order consolidating the two proceedings brought by ZMDC. Sangwa Decl. ¶13.

After years of post-award litigation were resolved in favor of Plaintiffs, on August 9, 2019, the High Court for Zambia at the Commercial Registry at Lusaka issued the Judgment—formally, an *Ex Parte* Order for Leave to Register and Enforce the Final Award, No. 2019/HPC/ARB/No. 0337, under Section 18 of the Arbitration Act, No. 19 of 2000, and Rules 15 and 16 of the Arbitration (Court Proceedings) Rules, 2001. Doc. 1 ¶ 34; Doc. 1-5. The Judgment provided that ZMDC and the Commissioner had 30 days after service to move to set aside the Judgment. Doc. 1-5. That is Zambia's standard procedure for reducing an arbitral award to judgment: an *ex parte* application is made to register it, which results in a judgment stayed for 30 days after service to allow for a set-aside application. Doc. 28-2 ¶¶ 18, 21.

On August 16, 2019, Plaintiffs' Zambian counsel, Simeza Sangwa & Associates, contacted ZMDC's and the Commissioner's Zambian counsel, Ms. Dinah Nundwe of the law firm, Ranchhod Chungu Advocates, to ask if the latter would accept service. Doc. 28-2 ¶ 23. The latter confirmed that Ranchhod Chungu Advocates could accept service of the *Ex Parte* Order granting leave to register and enforce the Final Award and the Notice of Registration of the

Arbitral Award on behalf of ZMDC and the Commissioner. *Id.* ¶ 24. Accordingly, Simeza Sangwa & Associates sent a copy of the *Ex Parte* Order granting leave to register and enforce the Final Award and the Notice Of Registration of the award on August 19, 2019. *Id.* ¶ 24. No application to set aside the Judgment was ever filed—within or outside of the 30-day period after service. *Id.* ¶ 27. The Judgment is thus valid and enforceable in Zambia. Doc. 1 ¶ 37. Indeed, even Defendants do not claim that they were unaware of the judgment—so any attempt to vacate the judgment in Zambia or to seek to file its set-aside application out of time would fail for lack of diligence in moving.

### B.    ZMDC Is An Alter Ego of the Republic of Zimbabwe.

ZMDC is not a mere commercial instrumentality of Zimbabwe—it functions as effectively Zimbabwe's wallet. As alleged in the Complaint, the Republic appoints ZMDC's Board of Directors, approves decisions of any significance by ZMDC, has the power to direct ZMDC's actions, uses ZMDC to pay the Republic's debts, and by law must always be the majority owner of ZMDC. Doc. 1 ¶ 15. These allegations are precisely the ones that the *Funnekotter* court held, in a contested proceeding, were established:

> Defendant ZMDC was structured to be dominated by Zimbabwe.
> The Zimbabwe Mining Development Corporation Act, which
> created ZMDC, mandates that Zimbabwe is to own no less than
> 51% of the entity's stock and that members of its board of
> directors—as well as the boards of directors of its subsidiaries—
> are to "be appointed by the Minister after consultation with the
> President and in accordance with any directions the President may
> give him." (Rule 56.1 Statement at ¶¶ 33–41; Jacob Decl. Exh. 12.)
> The Act also bars ZMDC from making any investments or loans
> without seeking the directions and advice of the Minister of Mines,
> who also sets the terms and conditions for the transfer of shares,
> approves auditors, and gives ZMDC's board of directors directions
> for managing the corporation's general reserve account. More
> generally, the Minister of Mines may direct ZMDC to take any
> actions that the Minister deems to be in the national interest, which
> ZMDC is responsible for promoting. *(Id.)*

> Furthermore, Plaintiffs' 56.1 Statement describes instances in
> which ZMDC was forced to repay a loan Zimbabwe received from
> third parties using ZMDC's share of dividends from a mining
> project, to turn over the majority of its interest in a mining joint-
> venture to the National Army of Zimbabwe, and to permit
> Zimbabwe to retain revenue from certain other joint ventures in
> which ZMDC partnered with the government. (Rule 56.1
> Statement at ¶¶ 42–52.)

*Funnekotter*, 2015 WL 9302560, at *5-6.

Since those facts have already been litigated and proven, Plaintiffs did not deem it

necessary to clutter up the complaint with more allegations of what has already been proven. But

there is more—much more. At the same time as ZMDC was litigating over the Final Award, for

example, it was granting mineral rights to a group of Russian investors in return for weapons

from Russian state-owned arms conglomerate Rostec. Doc. 28-4 at Ex. 1. (Zimbabwe: Arms

Deal Behind Platinum Project, Zimbabwe Independent, September 19, 2014). More recently,

ZMDC "sold" mining rights to the Zimbabwean military, continuing its habit of using its assets

to support sovereign functions regardless of its own debts. Doc. 28-4 at Ex. 2. (Sale of Zim

mining assets: Who is getting what?, Africa Press, July 27, 2020)  And just in the last year,

reports have emerged that the Republic may be considering dissolving ZMDC and transferring

its assets to a different state-owned entity that does not have ZMDC's debts—a classic shell-

game. Doc. 28-4 at Ex. 3 (Fearing seizures, Mnangagwa transfers state mining assets to a new

entity, Africa Intelligence, May 11, 2022). And the Republic seems to interpret the Judgment as

effectively against the Republic, having acknowledged the Final Award as its public debt. *See*

Doc. 1 ¶ 39.

## C.    Service on ZMDC.

Service on ZMDC—which is a Specially Designated National under the Zimbabwe

Sanctions Regulations—took some time. Plaintiffs initially attempted service by mail at the 90

Mutare address specified in the MoUs (under 28 U.S.C. § 1608(b)(1)) or clerk's mailing (under 28 U.S.C. § 1608(b)(3)(B)) by international mail. Docs. 8, 10, 11. Plaintiffs did not receive any proof that ZMDC received the mail, so they reattempted the same form of service via DHL. Docs. 12, 18. While DHL successfully served the other defendants, it returned the package for ZMDC because it would not accept a package directed to a sanctioned entity.

Plaintiffs thus opted to serve by hand, consistent with the MoUs, which state as follows:

12.8 **Notices and domicilia**

12.8.1  The Parties choose the following physical addresses at which documents in legal proceedings or any written notices in connection with this MOU may be served:

12.8.1.1 ZMDC          Ground floor

MMCZ Building

90 Mutare Road

Msasa

Harare

Zimbabwe

12.8.1.2 Amari         c/o DF Management

Le Montaigne

7 Avenue de Grande Bretagne

Monte Carlo

MC 98000

Monaco

or at such other address (not being a post office box or *poste restante*) of which the Party concerned may notify the other Party in writing.

12.8.2    Any notice given in terms of this MOU shall be in writing and shall if delivered by hand to a responsible person during ordinary business hours at the physical address chosen as its domicilium citandi et executandi be deemed to have been duly received by the addressee on the date of delivery unless the contrary is proved.

Notwithstanding anything to the contrary contained or implied in this MOU, a written notice or communication actually received by one of the Parties from the other Party shall be adequate written notice or communication to such Party.

Doc. 1-2 § 12. The Amaplat MOU contains identical provisions. Doc. 1-4 § 10.

       In mid-2020, ZMDC moved from its old headquarters at the 90 Mutare Road address to the 6 Constantia Avenue address. While it did not serve a formal "Notice of Change of Address" under the MoUs, it started sending Plaintiffs' Zimbabwean counsel letters listing its new address. Declaration of Steven Davidson ("Davidson Decl.") Ex. 1. And it updated its contact details on its website accordingly. Davidson Decl. Exs. 2-3 (Internet Archive pages from ZMDC's website).

       Given that ZMDC had failed to maintain the required "responsible person" at the 90 Mutare address, Plaintiffs served ZMDC at its new headquarters by delivering the papers to a

responsible person by hand during business hours on August 10, 2022. Doc. 24 ¶¶ 2-4. To confirm actual receipt, Plaintiffs' South African counsel took a photograph of a ZMDC secretary who stated that she was authorized to accept service accepting the documents. *Id.* at 3.

## III.    ARGUMENT

ZMDC's motion, in large part, conclusorily restates the other Defendants' arguments and points the Court to their brief. Plaintiffs will similarly not engage in an undue repetition of these common points.

### A.    ZMDC Was Properly Served.

While acknowledging that 28 U.S.C. § 1608(b)(3)(B) only applies if there is no "special arrangement" for service under 28 U.S.C. § 1608(b)(1), ZMDC entirely ignores the fact that there is a clear special arrangement for service here: the MoUs expressly agree to service of "documents in legal proceedings," not just contractual notices, at the "domicilium *citandi* et executandi." That requires denial of ZMDC's motion.

#### 1.    Because ZMDC Is An Agency or Instrumentality, Substantial Compliance Plus Actual Notice Suffices.

To start, D.C. Circuit law holds that for agencies or instrumentalities served under Section 1608(b), Congress adopted a substantial compliance standard for service as long as the agency or instrumentality received actual notice. "The authorities generally hold that section 1608(b) may be satisfied by technically faulty service that gives adequate notice to the foreign state." *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994). Indeed, "[t]he Committee Report [for FSIA] states that section 1608(a) 'sets forth the exclusive procedures for service on a foreign state,' but contains no such admonition for section 1608(b)." *Id.* at 154. Thus, courts in this district apply a substantial compliance test to service on agencies and instrumentalities as long as the defendant received actual notice. *See, e.g.*, *Agudas Chasidei*

*Chabad of U.S. v. Russian Fed'n*, 798 F. Supp. 2d 260, 268 (D.D.C. 2011) (substantial compliance standard applies to agencies and instrumentalities).

      2.     **ZMDC Agreed That "Documents In Legal Proceedings" Could Be Served By Hand Delivery At Its Headquarters.**

That the domicilium clauses here agree to service—thus constituting a special arrangement—is not a close call. The D.C. Circuit has favorably cited a case holding that a "contract provision providing '[a]ll notices, demands, or requests between Sublessor and Sublessee shall be delivered in person, by certified mail, return receipt requested, or by registered mail' and providing addresses for notification constituted 'special arrangement for service' under section 1608(a)(1)" *Angellino v. Royal Fam. Al-Saud*, 688 F.3d 771, 777 (D.C. Cir. 2012) (quoting *Int'l Rd. Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 251 (D.D.C. 2001)). This Court has suggested that, at least where a provision refers to notices under a contract, some contemplation of legal process rather just contractual notices may be necessary. *Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*, 225 F. Supp. 3d 18, 23 (D.D.C. 2014) (Cooper, J.).

The provisions here unambiguously refer to service of process, not just contractual notices: they state that "documents in legal proceedings"—not just notices—"may be served" at the specified addresses, or at such other address as may be notified in writing. Doc. 1-2 § 12.8.1; Doc. 1-4 § 10.9.1. And they say that the address is the "domicilium citandi et executandi," a term used in Zimbabwean and South African law that translates as "domicile for being summonsed and execution" and means the address for service of process.[4] Doc. 1-2 § 12.8.2; Doc. 1-4

---

[4] While the term is self-explanatory once translated, publicly available sources also confirm that it means an address for service of process. *E.g.*, *Hay Management Consultants Ltd v. P3 Management Consultants (Pty) Ltd* [2004] ZASCA 116, [2005] 3 All SA 119 (SCA) (translating the term as "a domicilium for service of process and writs of execution").

§ 10.9.2; *see also Schimmelpennich v. Bayard*, 26 U.S. 264, 275 (1828) (quoting Amsterdam merchant's use of the variant "domicilium citandi et exequendi" to designate a notary's office as agent for service of process).

Similarly, the provisions apply to this case because an action to recognize a judgment based on the MoUs is in connection with them. While the rule of the last antecedent[5] means that, in the phrase "documents in legal proceedings or any written notices in connection with this MOU," Doc. 1-2 § 12.8.1; Doc. 1-4 § 10.9.1, "in connection with this MOU" modifies only "any written notices" and not "documents in legal proceedings," this Court need not resolve the point. "[I]n connection with" is broad language, and an action to domesticate a judgment based on the MoUs is easily "in connection with" them. *Cf. Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) ("in connection with" is given a "broad construction"). Indeed, the D.C. Circuit has held that an "in connection with" forum-selection provision "applies to claims arising from the Agreement *and* from its subject-matter or formation, not just claims connected to the 'contract.'" *Azima v. RAK Inv. Auth.*, 926 F.3d 870, 878 (D.C. Cir. 2019). A judgment on an arbitration award for breach of the contract easily satisfies that test.

> 3.    **Plaintiffs Served ZMDC In Accordance With The MoUs, And ZMDC's Failure to Give Notice of Its Office Move Does Not Avail It.**

And Plaintiffs did what the service provision asked of them. It appears undisputed that Plaintiffs served a "responsible person" by hand during normal business hours. The only slight complication here is that ZMDC moved offices without serving Plaintiffs with a formal document calling itself a change of address notice. That changes nothing, for several independent reasons.

---

[5] *See In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 655 (7th Cir. 2010) ("[R]elative and qualifying phrases, grammatically and legally, where no contrary intention appears, refer solely to the last antecedent.").

*First*, ZMDC did, in fact, notify Plaintiffs that it had moved: it sent Plaintiffs correspondence listing its new headquarters address as 6 Constantia Avenue. Davidson Decl. Ex. 1. Because the MoUs do not set specific form requirements for changing addresses other than that they are in writing, correspondence listing a new headquarters is sufficient under the MoUs themselves.

*Second*, even if the letters listing the new address were not sufficient to satisfy the contractual provisions themselves, courts have held that a party that learns of a change of address from a party to a contractual notices provision "not only may but must send notice . . . to the new or changed address." *Robbins v. S. Gen. Ins. Co.*, 243 A.2d 686, 688 (D.C. 1968) (discussing notice of cancellation of insurance policy where a jury found policyholder had informed the insurer of his new address). Indeed, because service on what is known to be an out-of-date address is unlikely to achieve notice, courts have held that a party with "actual knowledge" of the new address must serve notices there, even where the other party failed to supply the new address in the correct formal manner. *Ry. Mail Ass'n v. Moore*, 15 F.2d 547, 551 (4th Cir. 1926); *see also Long v. Home Indem. Co. of New York*, 169 So. 154, 159 (La. Ct. App. 1936) ("[W]here the insurer has definite knowledge that the assured's address has been changed, it is required to govern itself thereby."). The same rule applies here: Plaintiffs learned that ZMDC's address had changed, so it was not only proper but necessary so that ZMDC would receive actual notice that Plaintiffs serve ZMDC at its new address.

*Second*, if this Court disagrees, then ZMDC—while contractually obligated to have a "responsible person" to accept service at 90 Mutare—failed either to have someone there or to serve a proper change of address notice. As such, it is estopped from relying on its own failures to do what it should have done. *See generally* 72 C.J.S. Process § 126 (collecting cases holding

that parties who affirmatively represented their address were estopped from challenging service). Having signed a contract that directed it to serve notice if it changed its address, it *should have* served the formal notice of its office move, and its failure to do so prejudices Plaintiffs because it can unilaterally prevent hand service by keeping no one to receive it at the contractual address. Thus, equity treats as done that which ought to have been done: it. The basis for estoppel is even stronger, indeed, when ZMDC directly communicated with Plaintiffs' Zimbabwean counsel identifying its new offices as the appropriate return address, thus representing that it was now the correct address. Having unilaterally frustrated service at the specified address, if it is deemed to have also failed to sufficiently update its address for service, it cannot now insist that Plaintiffs do the impossible and hand-serve process on its old address. Otherwise, it could prevent service *at all* by simply refusing to serve formal notice of its updated address.

Indeed, at least one court has found, under analogous circumstances, that it is proper to serve a foreign sovereign at its actual address when it fails to update a contractually-specified address. In *International Road Federation v. Embassy of the Democratic Republic of Congo*, the embassy subleased a property, but never took possession, and the sublease specified service at the subleased property. 131 F. Supp. 2d at 251. While acknowledging that Section 1608(a) of the FSIA (unlike Section 1608(b), the provision that applies to agencies and instrumentalities) requires "strict adherence" to *the Act's* terms the court found that the embassy's failure to take possession precluded it from arguing that the plaintiff should have served an empty building: "because service at the subleased premises would have been senseless, service at the Embassy's primary location satisfied the terms of the special agreement." *Id.* at 251.[6]

---

[6] This Court has previously expressed concern that the *International Road* court applied a "substantial compliance" rather than "strict adherence" standard to Section 1608(a). *Enron*, 225

*Third*, and regardless, the parties agreed that actual receipt would always suffice. "Notwithstanding anything to the contrary contained or implied in this MOU," it said, "a written notice or communication actually received by one of the Parties from the other Party shall be adequate written notice or communication to such Party." Doc. 1-2 § 12.8.2; Doc. 1-4 § 10.9.2. That encompasses service: that text is contained in a section that deals with "documents in legal proceedings or any written notices," so the word "communication" would be superfluous if it only referred to written notices. It thus plainly includes "documents in legal proceedings," as a form of communication. And, since it is undisputed that Defendants received actual notice, that suffices under the contracts.

### 4. If The Court Nonetheless Finds Service Ineffective, Dismissal Is Still Inappropriate And The Court Should Authorize Alternate Service Under 28 U.S.C. § 1608(b)(3)(C).

Finally, it is settled law in this Circuit that it is inappropriate to outright dismiss a case when service may yet be achieved. "[D]ismissal is not appropriate when there exists a reasonable prospect that service can be obtained." *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 29 (D.C. Cir. 2015). Moreover, there is no statutory deadline to serve under the Foreign Sovereign Immunities Act. *Id.*

Rather, this Court should authorize alternate service if it finds that ZMDC has successfully prevented service under the MoUs. Under 28 U.S.C. § 1608(b)(3)(C), the Court may approve any method of service "reasonably calculated to give actual notice" that is consistent with the laws of the place where service is to be made. *Transaero*, 30 F.3d at 154. The chosen

---

F. Supp. 3d at 22. While *International Road* expressly stated that it was applying the strict adherence standard to the Act even as it applied equity to the contract, this case in any event involves Section 1608(b), which this Court noted in *Enron* was less unforgiving. *Id.*; *see Transaero*, 30 F.3d at 153 ("The authorities generally hold that section 1608(b) may be satisfied by technically faulty service that gives adequate notice to the foreign state.").

method need not be the same way that service would be made in local proceedings—it just cannot violate positive law. *See New England Merchants Nat. Bank v. Iran Power Generation & Transmission Co.*, 495 F. Supp. 73, 78–79 (S.D.N.Y. 1980) ("The language in the FSIA requiring that the mode of service fashioned by the court be 'consistent' with the law of the foreign state, does not require that service be identical to the method prescribed by the foreign state. Rather, the language indicates that the mode of service authorized by the court should not be prohibited under the law of the foreign state."). Plaintiffs have now attempted service under the MoUs, mail service, and DHL service to no avail, and Zimbabwe is not a party to any relevant service treaty.

Accordingly, the Court should authorize alternative service. Specifically, the Court should authorize Plaintiffs to (1) hand-serve a responsible person at ZMDC at its 6 Constantia Avenue address, or any other address identified by ZMDC, during business hours; and (2) serve ZMDC's counsel in these proceedings as its agent. Many courts have authorized service on counsel in the United States as a form of alternate service on a foreign entity under 28 U.S.C. § 1608(b)(3)(C) or Federal Rule of Civil Procedure 4(f)(3). *See Hashem v. Shabi*, No. CV 17-1645 (ABJ), 2018 WL 3382913, at *5 (D.D.C. Apr. 26, 2018); *Saleh v. Al Nahyan*, No. CV 20-1168 (ABJ), 2021 WL 7210780, at *4 (D.D.C. July 16, 2021); *Bazarian Int'l Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.*, 168 F. Supp. 3d 1, 14 (D.D.C. 2016); *see also Freedom Watch, Inc. v. Org. of the Petroleum Exporting Countries*, 766 F.3d 74, 83 (D.C. Cir. 2014) (remanding to allow the district court to exercise its discretion as to whether to authorize service on counsel in the United States for foreign entity).

## B.     This Court Has Subject-Matter Jurisdiction.

ZMDC contends that neither the FSIA's arbitration nor its implied waiver exceptions to sovereign immunity apply, referencing the other defendants' arguments on this point. For the

same reasons, it is wrong.

    1.    **The FSIA's Arbitration Exception Includes Recognizing Judgments On An Arbitration Award.**

The FSIA's arbitration exception to sovereign immunity provides that there is no sovereign immunity in an action "to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if . . . the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6).

As Plaintiffs have previously explained, this Court has held that Section 1605(a)(6) includes not only enforcing the award itself, but also recognizing foreign judgments on awards. *Cont'l Transfer Technique, Ltd. v Fed. Republic of Nigeria*, 697 F. Supp. 2d 46, 62 (D.D.C. 2010). ZMDC cites its codefendants' attempt to distinguish that case by asserting that Nigeria did not contest that an exception to sovereign immunity applied. Doc. 29 at 8. That is, respectfully, simply wrong, as is obvious from even a cursory reading of the case. This Court identified each of Nigeria's arguments—and one of them was contending that "Nigeria is not amenable to suit because it has not waived sovereign immunity." *Cont'l Transfer*, 697 F. Supp. 2d at 55. To be sure, like Defendants here, Nigeria *also* contended that the complaint failed to state a claim—but it absolutely and unequivocally made sovereign immunity arguments too. That is why the Court addressed at length the arbitration exception.

Otherwise, ZMDC simply relies on the same obviously distinguishable cases as the other

-18-

defendants. It speaks volumes that, in its second bite at the apple, it *still* cannot find better

authority for its arguments than a case in which a plaintiff frivolously asserted the arbitration

exception in a case that did not involve an arbitration at all, but rather a quixotic attempt to create

a private right of action against a foreign state as a supposed third-party beneficiary of that

state's treaty with another state. *Hirsh v. State of Israel*, 962 F. Supp. 377, 384

(S.D.N.Y.), *aff'd,* 133 F.3d 907 (2d Cir. 1997).

### 2.    In Any Event, Arbitrating Abroad In A Country That Is Party To the New York Convention Is Implied Waiver Under The FSIA.

Similarly, the implied waiver exception under 28 U.S.C. § 1605(a)(1) applies here.

ZMDC does not really dispute that a long list of cases have found that it applies to arbitrating in

a state party to the New York Convention, which courts have found expresses a willingness to

submit to the entry of judgment on the award in any other contracting state. Instead, ZMDC just

cites cases requiring that the conduct constituting implied waiver manifest a subjective intent to

waive immunity. But *Creighton Ltd. v. Gov't of State of Qatar* states that "when a country

becomes a signatory to the Convention, by the very provisions of the Convention, the signatory

state must have contemplated enforcement actions in other signatory states," meaning that it

could have foreseen enforcement in any state that is a party to the Convention, including the

United States. , 181 F.3d 118, 123 (D.C. Cir. 1999) (quoting *Seetransport Wiking Trader*

*Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989

F.2d 572, 578 (2d Cir. 1993) (noting that the Convention mandates recognizing and enforcing

arbitral awards in each contracting state)). Zimbabwe did exactly that (unlike Qatar in

*Creighton*). *See also Tatneft v. Ukraine*, 771 F. App'x 9, 10 (D.C. Cir. 2019) ("[A] sovereign, by

signing the New York Convention, waives its immunity from arbitration-enforcement actions in

other signatory states."). Thus, ZMDC's point about subjective intent does not avail it, because

-19-

the D.C. Circuit has explained that arbitrating while having ratified the New York Convention is a sufficient manifestation of that intent.

Nor can ZMDC dispute that this Court has agreed. In *Process & Indus. Devs. Ltd.*, 2020 WL 7122896, at *6, this Court cited *Seetransport* (and *Creighton*'s dicta approving of it, as well as numerous other cases) to hold that Nigeria's agreement to arbitrate in a New York Convention signatory was an implied waiver of sovereign immunity. All ZMDC has to say in response is that the D.C. Circuit found it unnecessary to resolve the point on appeal, which Plaintiffs themselves noted. That is not a reason for the Court to change its mind.

Similarly, Defendants' efforts to limit *Creighton* to awards themselves (rendering it entirely duplicative of 28 U.S.C. § 1605(a)(6)) are contrary to *Creighton* itself, which relied on a *judgment recognition* case, *Seetransport*.

### C. Because ZMDC Is An Alter Ego of the State, It Lacks Due Process Rights—So Service Equals Personal Jurisdiction.

ZMDC again claims that it *is* Zimbabwe for sovereign immunity purposes, but that it is *not* Zimbabwe for personal jurisdiction purposes, and thus has due process rights.[7] As Defendants themselves have agreed, for a foreign state, subject-matter jurisdiction and personal jurisdiction are one and the same: personal jurisdiction exists if the Court has subject-matter jurisdiction and the Defendant was properly served. Doc. 23 at 18. That is because the FSIA expressly confers this Court with personal jurisdiction over foreign states if process is properly served or waived, and "foreign sovereigns and their extensively-controlled instrumentalities are

---

[7] *But see Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion Y Produccion*, 832 F.3d 92, 103 (2d Cir. 2016) ("This is one of the easy cases because PEP affirmatively claims that it is functionally the Mexican government—which it advances as the reason it cannot be forced to arbitrate. . . . PEP's assertion (in arguing the merits) that it is integral to the Mexican government binds it for all portions of this appeal, including personal jurisdiction.").

not 'persons' under the Fifth Amendment's Due Process Clause—and thus have no right to assert a personal jurisdiction defense." *GSS*, 680 F.3d at 809; *see also id.* at 814-15; *UAB Skyroad Leasing v. OJSC Tajik Air*, No. 21-7015, 2022 WL 2189300, at *1 (D.C. Cir. June 17, 2022) (clarifying that either prong of *Bancec* will suffice to show alter ego status for jurisdictional purposes).

ZMDC nevertheless contends that it *does* have due process rights, and thus that Plaintiffs must establish general or specific personal jurisdiction consistent with due process. But that is wrong: as *GSS* recognized in holding that *non-alter ego* instrumentalities have due process rights, the Supreme Court's *Bancec* test for alter ego status also determines whether an instrumentality is entitled to the protections of the Due Process Clause. "*Bancec* 'must govern' the question whether a foreign instrumentality has due process rights under the Fifth Amendment," it held. *Id.* at 815 (quoting *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 301 (D.C. Cir. 2005) (holding that Ukraine's extensive control over the State Property Fund rendered it an alter ego under *Bancec*)); *see also Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 400 (2d Cir. 2009) ("*Bancec*'s analytic framework is also applicable when the question is whether the instrumentality should have due process rights to which the state is not entitled.").

Here, ZMDC is not just alleged to be an alter ego—it has already been proven to be one in *Funnekotter*, as explained at length in Plaintiffs' opposition to the other motion to dismiss. It thus lacks due process rights, and service equals personal jurisdiction.[8]

---

[8] To the extent that the Court is inclined to consider ZMDC's factual assertions that *Funnekotter* was wrong or that things have changed, it should order jurisdictional discovery so that Plaintiffs can build a factual record that ZMDC is an alter ego of Zimbabwe. Specifically, Plaintiffs would seek discovery of, among other things, (i) the facts that were alleged in *Funnekotter* as a basis for

ZMDC asserts that issue preclusion does not run against foreign governments, citing a single district court case about service of process addressed to a deceased officeholder rather than the incumbent due to a delay in updating a government website, where the court spent approximately a sentence analogizing to the heightened standard for regular equitable estoppel against the *United States* government. *von Pezold v. Republic of Zimbabwe*, No. 21-CV-02004 (APM), 2022 WL 4078896, at *2 (D.D.C. Sept. 6, 2022). (Indeed, even there, the point was that there is a heightened equitable estoppel standard against the United States government, not that it is unavailable.) That case did not involve collateral estoppel. Courts have employed issue preclusion against sovereigns and their instrumentalities. *E.g.*, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. CV 17-MC-151-LPS, 2021 WL 129803, at *9 (D. Del. Jan. 14, 2021) (finding that state oil company was precluded from relitigating issues its affiliates had litigated and lost), *appeal dismissed,* 24 F.4th 242 (3d Cir. 2022).

Nor is the fact that ZMDC faced adverse inference sanctions in *Funnekotter* relevant. *Funnekotter* was a litigated case, not a no-show default, so the rule that default judgments do not have collateral estoppel effect does not apply. Defendants point to nothing in response to Plaintiffs' citation to cases affording collateral estoppel effect to orders entered based in part on adverse inference sanctions. *See, e.g.*, *In re Francis*, No. ADV 11-01245, 2013 WL 3497657, at *5 (B.A.P. 9th Cir. July 12, 2013) (collecting cases holding that adverse inference sanctions, tactical defaults after participating in litigation, and other similar sanctions constitute "a full and

---

alter ego status, and any subsequent developments; (ii) occasions where ZMDC funds or assets have been used to perform sovereign functions, including but not limited to military functions; (iii) the extent of Zimbabwe's control over ZMDC; (iv) whether ZMDC has distributed funds to its equityholders while not paying its debts; (v) whether Zimbabwe has attempted to shield ZMDC's assets from creditors; (vi) the extent to which ZMDC directors and officers also have other roles in the government or political parties; and (vii) the extent to which ZMDC's "national interest" function is distinct from any commercial function.

fair opportunity to litigate for issue preclusion purposes."); *In re Tulloch*, 373 B.R. 370, 387 (Bankr. D.N.J. 2007) (affording collateral estoppel effect to order based in part on adverse inference).

And the passage of time since *Funnekotter* does not avail ZMDC either. For one thing, the underlying facts in this case are within exactly the same timeframe as *Funnekotter*; it is only because of the time to get an award and enter it as a judgment in Zambia that this case is brought later.

Indeed, Defendants seem to admit that they *still* use ZMDC as Zimbabwe's pocketbook, asserting only that they are entitled to do so as a shareholder. Doc. 29 at 17. But that is precisely the problem: ZMDC is deeply indebted and not paying for (among other things) judgments against it. Normal companies that are not paying their debts as they come due cannot pay dividends. ZMDC apparently is, which is further proof that it is not being operated like a normal, separate company. Nor do normal companies, let alone ones not paying their bills, trade their assets for Russian tanks or give their assets for below value to the military. Doc. 28-4 at Exs. 1 & 2. And if ordinary companies become insolvent, they go through a bankruptcy process to protect their creditors' interests; they don't have the government orchestrate a stripping of all of their assets while leaving the debts behind. Doc. 28-4 at Ex. 3. Under the *Bancec* test, then, ZMDC is treated as part of the state and thus lacks due process rights.

### D.    Plaintiffs' Complaint States A Claim.

Finally, ZMDC raises the same Rule 12(b)(6) arguments as the other Defendants. They fail for much the same reasons.[9]

_____

[9] Oddly, ZMDC also argues that Plaintiffs have not pleaded an alter ego *claim* against it. Doc. 30 at 16. But that is a claim asserted against the Republic, since ZMDC is *directly* liable on the judgment. Against ZMDC, alter ego status is relevant only to personal jurisdiction.

**Statute of Limitations.** As previously explained, the New York Convention Implementing Act's statute of limitations does not apply to judgment recognition proceedings**.** *Comimpex*, 757 F.3d at 326; *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 29 F.3d 79, 80 (2d Cir. 1994). These arguments are thus meritless.

**Collateral Attacks on the Zambian Judgment.** Like the other Defendants, ZMDC raises a host of efforts to collaterally attack the Zambian judgment. As an initial matter, Defendants' collateral attacks on the Zambian judgments are not proper on a motion to dismiss, since they are fact-bound affirmative defenses. D.C. Code § 15-364(b) & (d). As the District's version of the UFCMJRA recognizes by making the grounds for non-recognition affirmative defenses,[10] a healthy dose of skepticism is warranted when a party collaterally attacks a judgment here rather than challenging its validity in its country of origin. After all, Zambian courts know Zambian law and Zambian practice—they know what arguments are specious, they know when terms have different meanings in Zambian practice compared to here, and they know how Zambian lawyers normally function. This Court, in interpreting technical questions of Zambian procedure, is stepping quite far outside its day-to-day practice.

ZMDC's collateral attacks also involve contested issues of fact, making them improper to resolve on Rule 12(b)(6) motion. ZMDC presents a declaration in which its corporate secretary,

---

[10] ZMDC, like the other defendants, cites *Kaupthing ehf. v. Bricklayers & Trowel Trades Int'l Pension Fund Liquidation Portfolio*, in which the court erroneously applied New York case law that, under the prior version of New York's UFCMJRA, obliged plaintiffs to plead around grounds for non-recognition. 291 F. Supp. 3d 21, 33 (D.D.C. 2017). The D.C. Code expressly makes these grounds affirmative defenses, not elements. *Compare* D.C. Code § 15-364(d), *with* 2008 Sess. Law News of N.Y. Ch. 66 § 2 (S. 6687-C) (pre-2021 version of N.Y. CPLR 5304). In fact, in 2021, New York revised its version of the UFCMJRA to include a provision similar to D.C. Code § 15-364(d). *See* N.Y. CPLR 5304(c) (enacted in 2021 to clarify that, as in D.C., the party opposing recognition bears the burden).

in conclusory fashion, that ZMDC did not give its Zambian counsel actual authority to accept service, as well as a declaration from its Zimbabwean arbitration lawyer. Notably, it does not present one from its Zambian counsel—or any evidence from anyone of what Zambian law regarding when a lawyer is permitted to accept service is. Plaintiffs are entitled to discovery to test the credibility of ZMDC's self-serving denial that it authorized its lawyer to accept service— which is judged by the objective circumstances rather than subjective intent, Supplemental Declaration of Michael Mundashi S.C. ("Supp. Mundashi Decl.") ¶ 4, as well as circumstances that support apparent authority in any event.

Moreover, ZMDC fails to address apparent authority, even if they had secretly limited their Zambian counsel's authority to agree to accept service. Zambia recognizes the concept of apparent authority in the context of serving papers on an advocate when the advocate so directs. Supp. Mundashi Decl. ¶¶ 5, 11. In Zambia, an advocate's direction to serve the advocate is especially significant, since it is improper to serve a client with process once the advocate has so directed since that is viewed as a form of contact with a represented party. *Id*. ¶¶ 6-9. Thus, if an advocate says that the advocate will accept service, that will usually bind the client vis-à-vis third parties, even if it is wrongful as between the advocate and the advocate's client. *Id.* ¶ 11. Zambian courts have taken a practical approach to service, and have inferred from the circumstances, from acknowledgements of receipt, and from the lack of an application to set aside a judgment that documents were properly served. *Id.* ¶¶ 13-14. Here, the fact that there was litigation in Zambia under multiple cause numbers arising out of the same subject-matter between the same parties in which papers were consistently served on the same counsel, together with the advocate signing and stamping to acknowledge service of the papers, would likely be understood by Zambian courts as showing that there was an understanding that ZMDC's

Zambian counsel had authority to accept service. *Id.* ¶ 12. A Zambian court would be unlikely to credit ZMDC's denials when it has made no application to set aside the judgment in Zambia and has not presented testimony from its advocate about the advocate's supposed mistake in accepting service.

After all, ZMDC initiated proceedings to enjoin enforcement of the arbitration award, in which its lawyers appeared on the record and accepted service of papers; the Judgment, while docketed as a separate cause number, was to enforce that same arbitration award. Especially in combination with Mr. Sangwa's testimony that ZMDC's Zambian counsel directed him to serve them, Doc. 28-2 ¶ 23, that strongly suggests that *even if* ZMDC's denials that their Zambian lawyers had actual authority to accept service were credible, a Zambian court would find that they had apparent authority to agree to accept service. At any rate, this argument is a fact-intensive one that requires discovery and assessing the credibility of witnesses; it is not a proper subject for a Rule 12(b)(6) motion.

***Public Policy.*** Defendants' similarly fact-bound argument that a judgment based on an arbitration award that Defendants think was unfair—despite the Zambian courts finding otherwise after years of litigation—violates public policy is untenable. Arbitration awards are entitled to a lot of deference even on an initial motion to confirm them; a judgment recognition proceeding certainly does not provide another bite at the apple. If ZMDC wished to raise defenses to confirmation of the Final Award, it should have moved to set aside the Judgment in Zambia when Zambian law allowed it to, not wait until years later in a recognition proceeding.

## IV.  CONCLUSION

For the foregoing reasons, ZMDC's motion to dismiss should be denied. To the extent any portion of it is granted, it should be without prejudice since Plaintiffs are able to amend to plead additional facts.

Dated: November 1, 2022                    Respectfully submitted,


                                            /s/ Steven K. Davidson
                                           Steven K. Davidson (D.C. Bar No. 407137)
                                           STEPTOE & JOHNSON LLP
                                           1330 Connecticut Avenue, NW
                                           Washington, D.C.  20036-1795
                                           Telephone:        202 429 3000
                                           Facsimile:        202 429 3902
                                           sdavidson@steptoe.com

                                           Robert W. Mockler
                                           Joseph M. Sanderson
                                            (*pro hac vice*)
                                           Niyati Ahuja (*pro hac vice* to be filed)
                                           STEPTOE & JOHNSON LLP
                                           1114 Avenue of the Americas
                                           New York, NY  10036-7703
                                           Telephone:        212 506 3900
                                           Facsimile:        212 506 3950
                                           rmockler@steptoe.com
                                           josanderson@steptoe.com
                                           nahuja@steptoe.com


                                           *Attorneys for Plaintiffs*