**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **AMAPLAT MAURITIUS LTD.** *et al.*, |
| Plaintiffs, |
| v. |
| **ZIMBABWE MINING DEVELOPMENT CORPORATION** *et al.*, |
| Defendants. |

Case No. 22-cv-58 (CRC)

<u>**MEMORANDUM OPINION AND ORDER**</u>

In this case, two Mauritian mining companies seek recognition of a foreign court judgment enforcing an arbitral award against the Republic of Zimbabwe, the Chief Mining Commissioner of the Zimbabwean Ministry of Mines, and the Zimbabwe Mining Development Corporation ("ZMDC"), a corporation that is majority-owned by the government of Zimbabwe. All three Defendants have moved to dismiss the complaint for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim. The Court will grant the motions as to ZMDC and the Republic. Plaintiffs' theory for the Court's subject matter jurisdiction over the Republic and their theory for personal jurisdiction over ZMDC are both premised on the allegation that ZMDC is the Republic's alter ego. But, for the reasons explained below, the Court is not convinced that Plaintiffs have adequately pleaded that alter ego relationship. Because Plaintiffs might remedy that omission with more developed factual allegations, the Court will permit them to amend their complaint accordingly. As for the claims against the Chief Mining Commissioner, the Court concludes that it has jurisdiction and will deny the Commissioner's motion to dismiss.

I.    **Background**

Plaintiffs Amaplat Mauritius Ltd. and Amari Nickel Holdings Zimbabwe Ltd.

(collectively, "Plaintiffs") are two mining companies incorporated under the laws of the nation of

Mauritius.  Compl. ¶¶ 13–14.  In 2007 and 2008, Plaintiffs each entered into memorandums of

understanding ("MOUs") with Defendant ZMDC, which is majority-owned by the Republic of

Zimbabwe ("the Republic"), to incorporate as joint ventures to prospect for nickel and platinum

deposits and develop mines.  Id. ¶¶ 18–22.  Both MOUs included arbitration clauses, which

provided that the parties must submit disputes arising out of or in relation to the MOUs to the

ICC International Court of Arbitration in Paris for final and binding arbitration.  Id. ¶¶ 24–25.

In 2010, ZMDC purported to cancel the MOUs.  Id. ¶ 23.  In 2011, Plaintiffs initiated

arbitration proceedings consistent with the MOU arbitration clauses, and the ICC Court

determined that arbitration would occur in Zambia.  Id. ¶ 28; Compl. Ex. A (ICC Arbitral

Award) ¶¶ 8–9.  Plaintiffs named both ZMDC and the Chief Mining Commissioner of the

Zimbabwean Ministry of Mines (the "Commissioner") as respondents in the arbitration. Compl.

Ex. A ¶ 2.  The parties participated in the arbitration proceedings for about a year and a half,

during which they filed amended pleadings, conducted discovery, prepared expert reports, served

various written submissions, and otherwise prepared for arbitration.  Id. ¶¶ 12–46.  The parties

also signed Terms of Reference which, among other things, provided that the parties

"acknowledge[d] that they agree to submit to this arbitration and expressly waive any procedural

objections they may have with respect to known events."  Declaration of John Peter Sangwa ISO

Pls' Opp. ("Sangwa Decl.") Ex. 1 § 8.1.  At multiple points during this time period, ZMDC and

the Commissioner asked the panel to hear a challenge to its jurisdiction as a preliminary matter,

but the panel deferred hearing the jurisdictional challenge on the ground that it was inextricably

linked to the merits.  Compl. Ex. A ¶¶ 28, 45.  In August 2012, the arbitral panel began hearing

evidence, including testimony from a number of witnesses for Plaintiffs, and ZMDC and the

Commissioner cross-examined at least one of Plaintiffs' witnesses.  Id. ¶¶ 47–51.

After that cross examination, however, ZMDC and the Commissioner indicated that they

wished to challenge the arbitral tribunal under Article 11 of the ICC International Court of

Arbitration Rules and applied for the arbitration to be adjourned in the interim.  Id. ¶ 51.  The

panel denied that request, at which point the respondents sought a short adjournment and, shortly

thereafter, withdrew from the proceedings, although the panel continued to provide them with

submissions and transcripts of the proceedings.  Id. ¶ 51–56.  After ZMDC and the

Commissioner withdrew from the arbitration, their appointed arbitrator likewise tendered his

resignation.  Id. ¶ 57.  Proceedings continued through October 2012, when the now-absent

respondents obtained an ex parte order from the Zambian High Court temporarily enjoining the

proceeding.  Id. ¶¶ 58–67.  Eventually, the arbitration panel was reconstituted, and after some

further delays and changes of personnel (which were challenged by the respondents), the panel in

January 2014 issued an award ordering ZMDC and the Commissioner to pay damages, costs, and

expenses, totaling about $50 million.  Id. ¶¶ 68–88, 227.[1]

After post-award litigation in Zambian courts, in which ZMDC and the Commissioner

again challenged the composition and authority of the panel, the High Court of Zambia issued a

judgment in Plaintiffs' favor in August 2019.  Compl. ¶ 34 & Ex. E (Ex Parte Order for Leave to

Register and Enforce the Final Arbitration Award).  The Judgment provided that ZMDC and the

---

[1] A few months later, in June 2014, the Zambian High Court issued an opinion stating
that ZMDC and the Chief Mining Commissioner had "suppressed material facts and laws" in
their ex parte injunction application, concluding that the court lacked jurisdiction, and dissolving
the injunction that had stayed the arbitration proceedings.  Sangwa Decl. Ex. 3 at R24–R25.

Commissioner had 30 days after service to move to set aside the Judgment.  Id. ¶ 35.  Plaintiffs allege that they served the Judgment on October 23, 2019.  Id.[2]  The parties negotiated for a time, but after Defendants refused to pay the Judgment, Plaintiffs filed their complaint in this Court against ZMDC, the Commissioner, and the Republic of Zimbabwe.  Id. ¶¶ 38–40.

The complaint alleges a cause of action under the D.C. Uniform Foreign-Country Money Judgments Recognition Act, D.C. Code § 15-361 et seq., and asks this Court to enter an order recognizing and enforcing the Judgment, finding that the Republic of Zimbabwe is the alter ego of ZMDC and the Commissioner, and entering a money judgment against Defendants.  Id. at 10.

Defendants have filed two separate motions to dismiss—one by the Republic and the Commissioner, and the other by ZMDC.  The Republic and Commissioner contend that the Court lacks subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA") because the Republic did not sign the MOUs containing an arbitration agreement, did not participate in the Zambian arbitration, is not an alter ego of ZMDC, and therefore retains its sovereign immunity.  See Zimbabwe MTD at 6–12.  The motion also maintains that the Court lacks jurisdiction as to the claims against the Commissioner because he is an individual, not an agency or instrumentality of Zimbabwe.  Id. at 8–9.  In any event, the Republic and the Commissioner further contend that neither the FSIA's waiver exception nor arbitration exception to sovereign immunity applies in this case.  Id. at 9–12.  Next, the motion contends that the Court

---

[2] Defendants contend that they were never served with the Zambian judgment, citing an expert declaration from a Zambian lawyer stating that there is no evidence from the Zambian court docket that Plaintiffs sought leave of the court to serve documents outside the jurisdiction.  See Zimbabwe Motion to Dismiss ("Zimbabwe MTD") at 18–19; Expert Declaration of Likando Kalaluka ISO Zimbabwe MTD ("Kalaluka Decl.") ¶¶ 27–30, ECF No. 23-3.  In their opposition, Plaintiffs state that they served Defendants' Zambian counsel in Zambia, explaining why they did not need to serve elsewhere.  Opp. to Zimbabwe MTD at 31; Sangwa Decl. ¶¶ 23–25, ECF No. 28-1.  In any event, the complaint pleads that Plaintiffs served the Zambian judgment on Defendants.

lacks personal jurisdiction over both the Republic and the Commissioner.  Id. at 13–14.  Finally, the Republic and Commissioner maintain (1) that Plaintiffs have failed to state a claim because they are seeking to enforce the arbitration award judgment past the three-year statute of limitations under the New York Convention, (2) that Plaintiffs have failed to allege sufficient facts to support their claim that ZMDC is an alter ego of the Republic, (3) that Plaintiffs have not pleaded an entitlement to fees and interest, and (4) that the Zambian High Court lacked jurisdiction to issue the Judgment.  Id. at 15–25.  In addition to reiterating many of the same arguments raised by the Republic and the Commissioner, ZMDC separately maintains that it was not properly served under the FSIA and that the Court lacks personal jurisdiction over it because the complaint does not allege minimum contacts with the District of Columbia.  ZMDC MTD at 7–9.

Both motions are fully briefed and ripe for decision.

## II.   Legal Standards

On a motion to dismiss for lack of subject matter jurisdiction or lack of personal jurisdiction, "[t]he plaintiff bears the burden of establishing, by a preponderance of the evidence, that the court has jurisdiction."  Cause of Action Inst. v. IRS, 390 F. Supp. 3d 84, 91 (D.D.C. 2019) (quoting Whiteru v. Wash. Metro. Area Transit Auth., 258 F. Supp. 3d 175, 182 (D.D.C. 2017)); see Burman v. Phoenix Worldwide Indus., Inc., 437 F. Supp. 2d 142, 147 (D.D.C. 2006).  Because this suit involves claims against a foreign nation, the FSIA provides the framework for determining subject matter jurisdiction.  Creighton Ltd. v. Gov't of State of Qatar, 181 F.3d 118, 121 (D.C. Cir. 1999).  Under the FSIA, federal district courts "have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state" as defined by the FSIA "with respect to which the foreign state is not entitled to immunity" under the statute.

28 U.S.C. § 1330(a).  As the statute's text suggests, "the FSIA begins with a presumption of immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an exception applies."  Bell Helicopter Textron, Inc. v. Islamic Republic of Iran, 734 F.3d 1175, 1183 (D.C. Cir. 2013).  Once the plaintiff has made that threshold showing, however, "the sovereign bears the ultimate burden of persuasion to show that the exception does not apply." Id.; accord Phoenix Consulting Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000) ("'In accordance with the restrictive view of sovereign immunity reflected in the FSIA,' the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." (quoting Transamerican S.S. Corp. v. Somali Democratic Republic, 767 F.2d 998, 1002 (D.C. Cir. 1985))).

If, on the one hand, "the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff."  Phoenix Consulting, 216 F.3d at 40.  On the other hand, if the motion to dismiss presents "a dispute over the factual basis of the court's subject matter jurisdiction under the FSIA" by contesting a jurisdictional fact or raising a "mixed question of law or fact," such as whether the "person alleged to have harmed [the] plaintiff was [an] agent of [the] sovereign," then "the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged" but instead "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."  Id. (citing Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 448–49 (D.C. Cir. 1990)).

Defendants also move to dismiss under Rule 12(b)(6).  In reviewing a motion to dismiss for failure to state a claim, the Court must "accept all the well-pleaded factual allegations of the

complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor." Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1129 (D.C. Cir. 2015). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," however, nor does the Court "assume the truth of legal conclusions." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Iqbal, 556 U.S. at 678).

### III. Analysis

District courts have jurisdiction over "any nonjury civil action against a foreign state as defined in" 28 U.S.C. § 1603(a) as to any claim "with respect to which the foreign state is not entitled to immunity" under §§ 1605–07 of the FSIA or an international agreement. 28 U.S.C. § 1330(a). For purposes of the FSIA, § 1603(a) defines a foreign state as a state, any political subdivision of a state, or an agency or instrumentality of a state. Id. § 1603(a). The statute defines agency or instrumentality, in turn, as "any entity" which "is a separate legal person, corporate or otherwise," "is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof," and "which is neither a citizen of a State of the United States . . . nor created under the laws of any third country." Id. § 1603(b).

Section 1605 of the FSIA sets forth general exceptions to foreign sovereign immunity. Plaintiffs assert that either of two possible exceptions apply in this case. First, Plaintiffs point to § 1605(a)(1)—the waiver exception—which divests a sovereign of immunity when "the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms

of the waiver." Id. § 1605(a)(1).  Alternatively, Plaintiffs rely on § 1605(a)(6), which, as

relevant here, waives sovereign immunity when an "action is brought, either to enforce an

agreement made by the foreign state with or for the benefit of a private party to submit [certain

disputes] to arbitration" or "to confirm an award made pursuant to such an agreement to

arbitrate" if "the agreement or award is or may be governed by a treaty or other international

agreement in force for the United States calling for the recognition and enforcement of arbitral

awards."  Id. § 1605(a)(6).

     Plaintiffs maintain that ZMDC waived its sovereign immunity under §§ 1605(a)(1) and

(a)(6) by agreeing to arbitrate disputes in the 2007 and 2008 MOUs and that the Commissioner,

although not a party to those agreements, waived immunity by participating in the Zambian

arbitration and by signing Terms of Reference agreeing to submit to the arbitration.  As for the

Republic, Plaintiffs allege that ZMDC is the Republic's alter ego under First National City Bank

v. Banco Para El Comercio Exterior de Cuba (Bancec), 462 U.S. 611 (1983), and that ZMDC's

actions relating to the arbitration and MOUs are therefore attributable to the Republic.  In turn,

Plaintiffs maintain that personal jurisdiction exists over ZMDC, despite the absence of any

alleged minimum contacts with the United States, because ZMDC is the Republic's alter ego,

and under the FSIA, "subject matter jurisdiction plus service of process equals personal

jurisdiction."  GSS Grp. Ltd. v. Nat'l Port Auth., 680 F.3d 805, 811 (D.C. Cir. 2012) (quoting

Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 95 (D.C. Cir. 2002)).  With

these frameworks for analysis in mind, the Court will proceed to assess the motions to dismiss as

to each defendant, beginning with the Republic.

A.  The Republic

Plaintiffs contend that ZMDC's agreement to arbitrate disputes in the 2007 and 2008

MOUs, combined with the fact that Zimbabwe, Zambia, and the United States are all signatories

to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral

Awards ("New York Convention"), satisfies either the waiver exception or arbitration exception

to sovereign immunity under § 1605(a).  But ZMDC's conduct is relevant for jurisdiction over

the Republic only if ZMDC is the Republic's alter ego, such that the company's actions may be

attributed to the Republic.  Accordingly, the Court begins by addressing Plaintiffs' central

contention that ZMDC is the Republic's alter ego.

"A government instrumentality 'established as [a] juridical entit[y] distinct and

independent from [its] sovereign should normally be treated as such,'" and therefore such entities

are "presumed to have legal status separate from that of the sovereign."  Transamerica Leasing,

Inc. v. La Republica de Venezuela, 200 F.3d 843, 847 (D.C. Cir. 2000) (alterations in original)

(quoting Bancec, 462 U.S. at 627).[3]  "That presumption can be overcome," however, "where a

corporate entity is so extensively controlled by its owner that a relationship of principal and

agent is created" or "where recognition of the instrumentality as an entity apart from the state

'would work fraud or injustice.'"  Id. at 847–48 (quoting Bancec, 462 U.S. at 629).  The

existence of those conditions serves as an "exception[] to the rule that a foreign sovereign is not

amenable to suit based upon the acts of such an instrumentality."  Id. at 848.

---

[3] Plaintiffs maintain, and Defendants do not dispute, that ZMDC is an "agency or instrumentality" of the Republic of Zimbabwe as that term is defined in the FSIA.  See Compl. ¶ 15 (alleging that the Republic owns a majority of ZMDC); see 28 U.S.C. § 1603(b) (defining "agency or instrumentality of a foreign state" as any entity "which is a separate legal person, corporate or otherwise," "a majority of whose shares or other ownership interest is owned by a foreign state," and "which is neither a citizen of a State of the United States . . . nor created under the laws of any third country").

Whether a state instrumentality is so closely tied to the sovereign that it may be the state's alter ego depends on a number of factors, including the level of the government's economic control over the entity, whether the entity's profits go to the government, the degree to which government officials manage the entity or its daily affairs, whether the government is the real beneficiary of the entity's conduct, and whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations. Rubin v. Islamic Republic of Iran, 138 S. Ct. 816, 823 (2018) (quoting Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines, 965 F.2d 1375, 1380 n.7 (5th Cir. 1992)). The sovereign's degree of control over the instrumentality must, however, "significantly exceed[] the normal supervisory control exercised by any corporate parent over its subsidiary." Transamerica, 200 F.3d at 848. Under such circumstances, the sovereign and the instrumentality are "not meaningfully distinct entities; they act as one." Id.; see also id. at 849 ("[C]ontrol is relevant when the sovereign exercises its control in such a way as to make the instrumentality its agent. . . . The relationship of principal and agent depends, however, upon the principal having 'the right to control the conduct of the agent with respect to matters entrusted to [the agent].'" (last alteration in original) (quoting Restatement (Second) of Agency § 14 (1958))).

Plaintiffs offer two grounds for finding that ZMDC is the Republic's alter ego. First, they rely on the allegations in the complaint, which in relevant part state that ZMDC "was created by the Zimbabwe Mining Development Corporation Act, and by law the Republic of Zimbabwe appoints its Board of Directors, approves significant actions, has the power to direct its actions, [sic] pays the debts of the Republic of Zimbabwe, and must be majority-owned by the Republic of Zimbabwe." Compl. ¶ 15; Opp. to Zimbabwe MTD at 9. Second, Plaintiffs maintain that the Southern District of New York's decision in Funnekotter v. Agricultural

Development Bank of Zimbabwe, No. 13 CIV.1917(CM), 2015 WL 9302560 (S.D.N.Y. Dec. 17, 2015), which found that ZMDC was the Republic's alter ego, is dispositive here under the doctrine of issue preclusion.  Opp. to Zimbabwe MTD at 9–10, 21–23.  The Court concludes that neither of these theories suffices to show that ZMDC is the Republic's alter ego.

First, the single paragraph of alter ego allegations in Plaintiffs' complaint is inadequate to displace the presumption of juridical separateness.  Plaintiffs allege that the Republic, by law, must be a majority owner of ZMDC and is empowered to appoint ZMDC's Board of Directors.  But "[a] sovereign does not create an agency relationship merely by owning a majority of a corporation's stock or by appointing its Board of Directors."  Transamerica, 200 F.3d at 849; accord Foremost-McKesson, 905 F.2d at 448 ("Majority shareholding and majority control of a board of directors, without more, are not sufficient to establish a relationship of principal to agent under FSIA.").  Moreover, the fact that ZMDC was created by Zimbabwean statute does not distinguish it from what Bancec described as the "typical government instrumentality" entitled to separate juridical status, which is "created by an enabling statute that prescribes the powers and duties of the instrumentality."  462 U.S. at 624; see also Transamerica, 200 F.3d at 846 (describing instrumentality there as a state-owned shipping company created by the sovereign).  The complaint further alleges that the Republic approves or has the power to direct "significant actions" by ZMDC.  But "it is not uncommon for a government—as regulator, not as shareholder—to require approval for certain transactions" in certain sectors.  Transamerica, 200 F.3d at 851.  The complaint does not describe what "significant actions" the Republic must approve, how extensive that alleged approval authority is, or whether that authority "represents the exercise of [the Republic's] authority as shareholder rather than its exercise of governmental power in the ordinary course of regulation."  Id.; see id. at 849 ("[T]he parent [must] exercise[]

11

its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors.").

That leaves the complaint's allegation that ZMDC pays the Republic's debts.  Compl. ¶ 15.  Plaintiffs attempt to bolster their argument of financial interdependence with a few news articles appended to their briefing, which suggest that ZMDC has had some involvement in a joint venture with a Russian military-industrial firm and that ZMDC has sold off mineral rights to the Zimbabwean military and other entities.  <u>See</u> Declaration of Steven K. Davidson ISO Opp. to Zimbabwe MTD ("Davidson Decl."), Exs. 1–3.  Although these allegations are relevant to the extent that they suggest some share of ZMDC's profits may go to the Republic, the complaint and Plaintiffs' handful of news articles do not support the inference that ZMDC's and the Republic's finances are "so intermingled that no distinct corporate lines are maintained."  <u>See</u> <u>Transamerica</u>, 200 F.3d at 849 (quoting <u>NLRB v. Deena Artware, Inc.</u>, 361 U.S. 398, 403 (1960)); <u>id.</u> at 848 (noting that a separate entity may functionally be "operated as a division of another" if the subsidiary does "not handle any funds" and pays "all profits to parent" (citing <u>Joseph R. Foard Co. v. Maryland</u>, 219 F. 827, 829 (4th Cir. 1914))); <u>see also</u> <u>Bancec</u>, 462 U.S. at 614 (observing that Cuba's government "supplied all of [Bancec's] capital and owned all of its stock," and that the "General Treasury of the Republic received all of Bancec's profits, after deduction of amounts for capital reserves").  In short, the sparse allegations in Plaintiffs' complaint, combined with a few newspaper articles, are insufficient to overcome the presumption that ZMDC has "legal status separate from that of the sovereign."  <u>Transamerica</u>, 200 F.3d at 847.[4]

---

[4] Although Plaintiffs emphasize that "*either* extensive control *or* fraud or injustice will suffice" to displace the presumption, they do not elaborate on a theory of fraud or injustice beyond asserting that one of the newspaper articles shows that ZMDC "may dissolve" and

Aside from the allegations in the complaint, Plaintiffs largely rely on the Southern District of New York's decision in Funnekotter.  Funnekotter concerned a declaratory judgment action brought by Dutch nationals seeking to satisfy a judgment against the Republic of Zimbabwe with the assets of several Zimbabwean corporations, including ZMDC.  2015 WL 9302560, at *1.  Ruling on the plaintiffs' motion for summary judgment, the court concluded that ZMDC, as well as the other corporations, were sufficiently dominated by the Republic to be considered its alter egos under Bancec.  Id. at *5–6.  Plaintiffs here, who were not a party to that case, contend that the Court should apply the doctrine of offensive non-mutual collateral estoppel to give Funnekotter preclusive effect concerning ZMDC's alter ego status in this case.  Opp. to Zimbabwe MTD at 21–23; Opp. to ZMDC MTD at 22–23.

"Under the doctrine of offensive collateral estoppel, or issue preclusion, a defendant may be prevented from relitigating identical issues that the defendant litigated and lost against another plaintiff."  Hurst v. Socialist People's Libyan Arab Jamahiriya, 474 F. Supp. 2d 19, 31 (D.D.C. 2007).  A district court, "in its discretion, may only apply preclusive effect to a judgment if (1) the issue was actually litigated, that is, contested by the parties and submitted for determination by the court; (2) the issue was actually and necessarily determined by a court of competent jurisdiction in the first trial; and (3) preclusion in the second action would not work an unfairness."  Id. at 31–32 (citing Jack Faucett Assocs., Inc. v. AT&T, 744 F.2d 118, 125 (D.C. Cir. 1984)); see Smith v. District of Columbia, 387 F. Supp. 3d 8, 21 (D.D.C. 2019) ("[T]he party against whom estoppel is [offensively] asserted [must] ha[ve] litigated and lost in an earlier action." (alterations in original) (quoting Parklane Hosiery Co. v. Shore, 439 U.S. 322, 329

---

"transfer its assets to a different state-owned entity."  Opp. to Zimbabwe MTD at 10, 20.  This allegation is not enough to satisfy Plaintiffs' burden of establishing jurisdiction.

(1979))).  "The doctrine is detailed, difficult, and potentially dangerous," and "[w]here offensive estoppel is involved, the element of 'fairness' gains special importance."  Jack Faucett, 744 F.2d at 124–25.

For several reasons, the Court will not exercise its discretion to give Funnekotter preclusive effect here.  First, although the Republic was a named defendant in Funnekotter, Defendants point out that the Republic itself never actually made an appearance in the case.  See Zimbabwe Reply at 12; see also Docket, Funnekotter v. Agric. Dev. Bank of Zimbabwe, No. 13-cv-1917 (S.D.N.Y.); Funnekotter v. Agric. Dev. Bank of Zimbabwe, No. 13 CIV. 1917 CM, 2015 WL 3526661, at *2 (S.D.N.Y. June 3, 2015).  To be sure, as a named party, the Republic had the opportunity to litigate the alter ego issue in Funnekotter.  Jack Faucett, 744 F.2d at 127 (issue preclusion applies only against a party who had "a 'full and fair' opportunity to litigate the issue to be precluded").  But the fact that the Republic did not, in fact, participate in the Funnekotter litigation makes the Court hesitate to give Funnekotter preclusive effect here.

Even if the Republic's prior opportunity to litigate alone was sufficient, it is unclear whether the question decided in Funnekotter is sufficiently "identical" to the one here.  Id. at 124.  For instance, there may be "a lack of total identity between the matters involved" in two proceedings when "the events in suit took place at different times."  Restatement (Second) of Judgments § 27 cmt. c (Am. L. Inst. 1982).  Here, the question relevant to subject matter jurisdiction is whether ZMDC was the Republic's alter ego either when it entered into the MOUs with Plaintiffs in 2007 and 2008 or when it actually participated in the Zambian arbitration starting in 2011.  It is not apparent during what time period the Funnekotter court determined ZMDC was functionally the Republic's alter ego.  The Funnekotter decision was rendered in 2015, and the conduct that gave way to the underlying arbitration in Funnekotter occurred

between 1992 and 2001, when the Zimbabwean government expropriated a number of commercial farms in which the plaintiffs held investments.  Funnekotter, 2015 WL 9302560, at *1.  If, as appears to be the case, Funnekotter may have addressed ZMDC's relationship with the Republic at a different period of time than the period relevant here, there may be "a difference in pertinent facts" here "sufficient to substantially change the issue" and "render[] the doctrine of issue preclusion inapplicable."  Safadi v. Novak, 574 F. Supp. 2d 52, 55–56 (D.D.C. 2008) (quoting 18 James W. Moore, et al., Moore's Federal Practice § 132.02[2][3], at 27–29 (3d ed. 2008)).  In light of these considerations, the Court is not convinced that this is an appropriate case for the application of non-mutual offensive collateral estoppel.[5]

Because Plaintiffs' allegations that the Republic has waived its sovereign immunity are premised on the allegation that ZMDC acted as the Republic's alter ego, and because the complaint lacks sufficient factual allegations to overcome the presumption of juridical separateness between the Republic and ZMDC, the Court accordingly concludes that Plaintiffs

---

[5] Additionally, although not dispositive, the Republic correctly observes that the decision in Funnekotter was based partially on that court's application of adverse-inference discovery sanctions against ZMDC and the other defendants in that case.  Funnekotter, 2015 WL 9302560, at *5.  Because the defendants there failed to produce certain documents in response to discovery orders, specifically "minutes and resolutions of their boards of directors," the court drew an "adverse inference about the contents" of those documents to support the plaintiffs' argument that the defendants there were alter egos of the Republic.  Id. at *3, *5.  To be sure, this is not a situation in which issue preclusion is inappropriate because the defendant "was unable to engage in full scale discovery" in the prior proceeding.  Parklane Hosiery, 439 U.S. at 331 n.15.  But at least when combined with the other considerations just discussed, the fact that adverse-inference discovery sanctions apparently played an important role in the Funnekotter decision gives the Court pause about the fairness of applying non-mutual issue preclusion here.  Restatement (Second) of Judgments § 29 cmt. g (Am. L. Inst. 1982) ("The circumstances attending the determination of an issue in the first action may indicate that it could reasonably have been resolved otherwise if those circumstances were absent."); cf. Jack Faucett, 744 F.2d at 126 (preclusion inappropriate where "important, material evidence can be introduced in the current trial that was unavailable in the previous trial"); but see id. (noting that this factor is most relevant when evidence was not previously available to party "without fault of his own" (quoting Blonder-Tongue Lab'ys v. Univ. of Ill. Found., 402 U.S. 313, 333 (1971))).

have not met their burden of establishing that one of FSIA's exceptions to sovereign immunity applies in this case.  See Foremost-McKesson, 905 F.2d at 447 (explaining that plaintiff "bears the burden of asserting facts sufficient to withstand a motion to dismiss regarding the agency relationship").  Plaintiffs ask for leave to amend their complaint so that they may bolster their alter ego allegations.  See Opp. to Zimbabwe MTD at 36–37; Opp. to ZMDC MTD at 4 n.1.  Leave to amend should be freely granted when justice requires it, provided that amendment would not be futile.  Wilson v. Geithner, 968 F. Supp. 2d 275, 280 (D.D.C. 2013).  Plaintiffs propose that they could amend their complaint to include the facts identified in Funnekotter as well as other developments that reinforce their theory of financial interdependence between ZMDC and the Republic.  See Opp. to Zimbabwe MTD at 36.

As described above, Plaintiffs proposed amendment would need to do more than show merely that the Republic owns a majority of ZMDC, appoints its Board of Directors, regulates its activities, and created it by statute.  See Transamerica, 200 F.3d at 847–53.  The Court could, nevertheless, envision factual allegations that might tip the balance in Plaintiffs' favor.  The current pleadings, for example, offer no factual allegations to support or describe the extent to which the Republic "approves significant actions" of ZMDC or requires ZMDC to function as its piggy bank. See Compl. ¶ 15.  But if Plaintiffs can plead non-conclusory factual allegations that the Republic has exercised "day-to-day" control over ZMDC's operations above and beyond its role as a regulator or that the affairs of the two entities are "so intermingled that no distinct corporate lines are maintained," then the Court may yet find a basis to conclude that ZMDC's actions here were attributable to the Republic.  Transamerica, 200 F.3d at 849–51 (quoting Deena Artware, 361 U.S. at 403).  The Court therefore will dismiss Plaintiffs' complaint as to the

Republic without prejudice so that Plaintiffs may have the opportunity to bolster their factual allegations along the lines described in this opinion.[6]

B.  ZMDC

The Court's conclusion that the complaint's alter ego allegations are insufficient also warrants dismissal as to ZMDC, although for a different reason: personal jurisdiction.  See Forras v. Rauf, 812 F.3d 1102, 1105 (D.C. Cir. 2016) (explaining that a court may "turn[] directly to personal jurisdiction" when that issue is "straightforward" and "present[s] no complex question" but resolving subject matter jurisdiction would be complicated (quoting Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 588 (1999))).

"Whenever a foreign sovereign controls an instrumentality to such a degree that a principal-agent relationship arises between them, the instrumentality receives the same due process protection as the sovereign: none." GSS, 680 F.3d at 815.  In that situation, the personal jurisdiction rule that applies to sovereigns applies to the instrumentality as well—"subject matter jurisdiction plus service of process equals personal jurisdiction."  Id. at 811 (quoting Price, 294

---

[6] Although they rely heavily on Funnekotter, the Court reminds Plaintiffs that they must heed this Circuit's explanations in Foremost-McKesson, Transamerica, and other cases concerning what allegations are sufficient and insufficient to displace the presumption of juridical separateness.  Additionally, the Court acknowledges Plaintiffs' request for jurisdictional discovery on ZMDC's alter ego status.  See Opp. to ZMDC MTD at 21 n.8.  "[C]arefully controlled and limited" jurisdictional discovery along the lines set forth in that request may well be appropriate after Plaintiffs have had the opportunity to amend their complaint.  Phoenix Consulting, 216 F.3d at 40.  Whether to permit such discovery now is a close question.  But the "court should allow for limited jurisdictional discovery" only if "a plaintiff shows a nonconclusory basis for asserting jurisdiction and a likelihood that additional supplemental facts will make jurisdiction proper."  Intelsat Glob. Sales & Mktg., Ltd. v. Comm'ty of Yugoslav Posts Tels. & Tels., 534 F. Supp. 2d 32, 34 (D.D.C. 2008).  Because in its present form, the complaint does not allege sufficient facts "upon which jurisdiction could be found after discovery is completed," id. (citation omitted), the Court will refrain from imposing the burden of jurisdictional discovery until after Plaintiffs have filed amended pleadings, should they so choose.

F.3d at 95).  "On the other hand, if an instrumentality does not act as an agent of the state, and separate treatment would not result in manifest injustice" under <u>Bancec</u>, then "the instrumentality will enjoy all the due process protections available to private corporations," including the requirement of "minimum contacts" with the relevant forum.  <u>Id.</u> at 815, 817. Plaintiffs' theory for personal jurisdiction over ZMDC is premised on their alter ego theory. That is, because ZMDC is the Republic's alter ego, Plaintiffs assert, no showing of minimum contacts is necessary.

For the reasons just explained, the Court cannot say that Plaintiffs' current complaint adequately alleges the existence of an alter ego relationship between ZMDC and the Republic. Because the complaint includes no other allegations to support personal jurisdiction over ZMDC, <u>see</u> Compl. ¶ 11, the Court must dismiss the complaint against it as well.  As with the Republic, however, the Court will dismiss the complaint as to ZMDC without prejudice, with the understanding that more fulsome alter ego allegations may create a basis to conclude that ZMDC was, in fact, the Republic's alter ego.[7]

C. The Chief Mining Commissioner

Last, the Court comes to the allegations against the Chief Mining Commissioner. Because the Commissioner actually participated in the arbitration against Plaintiffs in Zambia, Plaintiffs' subject matter jurisdiction theory as to the Commissioner does not turn on whether ZMDC was the Commissioner's alter ego.  The Court, therefore, will begin by deciding whether an exception to sovereign immunity under the FSIA applies to the Commissioner and will then address Defendants' arguments concerning personal jurisdiction and failure to state a claim.

---

[7] Although unlike the Republic, ZMDC did actually litigate the alter ego issue in <u>Funnekotter</u>, the Court still declines to give that decision preclusive effect here, for the other reasons discussed above.

1.  *The Commissioner's Governmental Status*

As a preliminary matter, the Court must determine how to characterize the Chief Mining Commissioner's status and relationship to the sovereign in this case—the Republic of Zimbabwe.  The Commissioner contends that it is an individual, not a state entity, and thus falls entirely outside the scope of the FSIA's definition of a "foreign state" under § 1603(a), which does not include individuals sued in their personal capacity.  See Samantar v. Yousuf, 560 U.S. 305, 319 (2010); see also Zimbabwe MTD at 8–9.  Plaintiffs, in contrast, maintain that the "Commissioner is an office in the Ministry of Mines and Mining Development" and that under Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148 (D.C. Cir. 1994), which sets out the test for distinguishing between a foreign state (and its political subdivisions) and the state's agencies or instrumentalities, the Commissioner "*is* the foreign state—a political organ like a ministry—rather than a commercial agency or instrumentality."  Opp. to Zimbabwe MTD at 24– 25.  The Commissioner responds that the Transaero test, which asks whether an entity's "core functions" are inherently governmental or commercial, does not apply and that the Court should instead analyze this question under the Bancec framework.  Zimbabwe Reply at 4–5, 15.

Whether the Transaero "core functions" test or the Bancec framework applies here is a somewhat murky question.  On the one hand, the Court disagrees with the Commissioner that the Transaero test is limited strictly to interpreting the FSIA's service of process provisions. Zimbabwe Reply at 4–5.  Transaero "interpreted the FSIA's *general definition* of 'agency or instrumentality,'" Jacobsen v. Oliver, 451 F. Supp. 2d 181, 196 (D.D.C. 2006) (quoting Crist v. Republic of Turkey, 107 F.3d 922, 1997 WL 71739, at *2–3 (D.C. Cir. 1997)), and the D.C. Circuit has since applied Transaero to determine "the legal status" of foreign government ministries, such as Iran's Ministry of Foreign Affairs, under other provisions of the FSIA,

Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234–35 (D.C. Cir. 2003).  What's more, by its

own terms, the Bancec analysis seems intended to apply only to "government instrumentalities"

that exist outside of the government itself.  Bancec, 462 U.S. at 623; see id. (describing the

entities at issue there as "separately constituted juridical entities" with "independent status").

Unlike a government itself or one of its political subdivisions, the instrumentalities to which

Bancec accorded a presumption of juridical separateness are government-controlled commercial

organizations "run as a distinct economic enterprise," "created by an enabling statute," "managed

by a board selected by the government," "with the powers to hold and sell property," and

"primarily responsible for [their] own finances."  Id. at 624.  In other words, the government

instrumentalities discussed in Bancec appear to overlap with the "public commercial enterprises"

that Transaero held are separate from "the state itself."  Transaero, 30 F.3d at 152–53.  It would

thus seem appropriate to ask first whether, under Transaero, the Commissioner is a political

subdivision of the Republic—and thus part of "the state itself"—and then, only if the answer to

that first question is no, to ask whether the presumption of juridical separateness set forth in

Bancec applies.  See Foremost-McKesson, 905 F.2d at 446 (explaining that the "FSIA applies to

instrumentalities and agencies of the foreign sovereign, as well as to the state itself," but that

"instrumentalities and agencies are accorded a presumption of independent status" under

Bancec).

     Although this approach seems sensible, there is some basis to believe that the Bancec

framework should govern.  The Commissioner maintains, for instance, that it is a person with

separate legal status who receives due process protections for purposes of personal jurisdiction,

Zimbabwe MTD at 13–14, and the Circuit has explained that Bancec, not Transaero, "guides our

way" in determining whether an entity "is a 'person' within the meaning of the due process

clause." <u>TMR Energy Ltd. v. State Prop. Fund of Ukraine</u>, 411 F.3d 296, 301 (D.C. Cir. 2005).

Additionally, some courts in this district have applied the <u>Bancec</u> analysis to determine whether

an entity is entitled to a presumption of separateness from the sovereign even with regard to

cabinet-level ministries which, under <u>Transaero</u>, would appear to be political subdivisions of the

state.  <u>See</u> <u>Entes Indus. Plants, Constr. & Erection Contracting Co. Inc. v. Kyrgyz Republic</u>, No.

CV 18-2228 (RC), 2020 WL 1935554, at *2–6 (D.D.C. Apr. 22, 2020) (applying <u>Bancec</u>

analysis to Kyrgyz Ministry of Transport and Communications).

Here, the Court believes that the correct framework is likely the <u>Transaero</u> "core

functions" test, as the heart of the parties' dispute is whether the Commissioner falls within a

component of § 1603's definition of "foreign state."  <u>Transaero</u>, 30 F.3d at 151 (asking whether

the Bolivian Air Force was a "separate legal person, corporate or otherwise,"  under

§ 1603(b)(1)).  But, in any event, the Court is confident both that the Commissioner is a

"political subdivision" of the Republic, and thus a component of the state itself under <u>Transaero</u>,

and that the <u>Bancec</u> presumption of juridical separateness does not apply to the Commissioner.

To determine whether an entity "counts as a 'foreign state' or rather as an 'agency or

instrumentality'" under the FSIA, <u>Transaero</u> took a categorical approach of asking "whether the

core functions of the foreign entity are predominantly governmental or commercial."  <u>Id.</u>  This

approach requires the Court to ask whether the entity "is an integral part of a foreign state's

political structure" or, instead, "an entity whose structure and function is predominantly

commercial."  <u>Id.</u> (quoting <u>Segni v. Com. Off. of Spain</u>, 650 F. Supp. 1040, 1041–42 (N.D. Ill.

1988)).  Citing the Zimbabwe Mines and Minerals Act of 1961, which governs the office of the

Commissioner, Plaintiffs maintain that the Chief Mining Commissioner has "broad

administrative duties, including registering mining claims, issuing regulations, and inspecting

mines, and even judicial or quasi-judicial duties, including resolving mining disputes and issuing injunctions enforceable by contempt."  Opp. to Zimbabwe MTD at 25.  The statute bears out Plaintiffs' characterization of the Commissioner's functions.  Section 343 of the statute creates a "Chief Mining Commissioner" as well as mining commissioners for each mining district in the country.  See Zimbabwe Mines and Minerals Act of 1961, Ch. 21:05 § 343 (updated Dec. 31, 2017), https://zimlii.org/akn/zw/act/1961/38/eng%402016-12-31#.  Commissioners are supervised by the Secretary of the Ministry of Mines and are charged with carrying out the Mines and Minerals Act.  See id. § 341.  According to other provisions of the Act, commissioners may, among other things, hold court and exercise judicial powers, levy fines and jail sentences for contempt, investigate and adjudicate claims and disputes arising under the statute, order parties to conduct surveys of mining areas, issue injunctions, approve applications to prospect land for mining, register and reserve land against mining, and approve and revoke mining licenses.  See, e.g., id. §§ 15, 20, 35, 52, 177, 346, 354, 359.

In light of these duties, which include acting as a governmental administrator, investigator, and adjudicator, the Court concludes the Commissioner is properly understood as a political subdivision of the Republic.  "Any government of reasonable complexity must act through men [and women] organized into offices and departments," Transaero, 30 F.3d at 153, and the Commissioner is just one such office.  Commissioners are appointed by the Secretary of the Ministry of Mines and fall neatly within "the governmental hierarchy."  de Csepel v. Republic of Hungary, 10-cv-1261 (ESH), 2020 WL 2343405, at *9 (D.D.C. May 11, 2020).  Although the Commissioner's duties unquestionably touch upon commercial activity—namely mining—the office does so as a government regulator and adjudicator, not as a market participant or commercial entity.  See Republic of Argentina v. Weltover, Inc., 504 U.S. 607,

614–15 (1992) ("[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA. . . . Thus, a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party.").  The Commissioner's authority to approve licenses, assess fines, order jail terms, and issue injunctions are all powers "so closely bound up with the structure of the state" that the Commissioner must be considered "as the 'foreign state' itself." Transaero, 30 F.3d at 153.

For similar reasons, the Commissioner is not entitled to a presumption of juridical separateness under Bancec.  To determine whether that presumption applies, the Court asks whether the Commissioner bears "the hallmarks of independent instrumentalities identified by the Supreme Court in Bancec," namely "creation by an enabling law that prescribes the instrumentality's powers and duties; establishment as a separate juridical entity with the capacity to hold property and to sue and be sued; management by a government-selected board; primary responsibility for its own finances; and operation as a distinct economic enterprise that often is not subject to the same administrative requirements that apply to government agencies."  DRC, Inc. v. Republic of Honduras, 71 F. Supp. 3d 201, 209 (D.D.C. 2014); accord Entes, 2020 WL 1935554, at *3.  What distinguishes independent instrumentalities under Bancec from the state itself is that instrumentalities are empowered "to manage their operations on an enterprise basis" with "a greater degree of flexibility and independence from close political control than is generally enjoyed by government agencies."  Bancec, 462 U.S. at 624–25.

Here, although the office of the Commissioner was created by the Mines and Minerals Act, "the specific text of that enabling law [is] what matter[s]."  Entes, 2020 WL 1935554, at *4;

see id. at *3 ("[T]he Court does not think that an 'enabling law that prescribes the instrumentalit[y's] powers and duties' counts for much if that establishing law prescribes powers and duties that are strictly controlled by the Government.").  The Commissioner does not have its own "legal personality, its own patrimony and . . . administrative, technical, and financial autonomy."  Id. (quoting DRC, 71 F.3d at 210).  Rather, it is an office appointed by and subject to the close supervision of the Secretary of the Ministry of Mines; under the statute, the Secretary is "vested with authority generally to supervise and regulate the proper and effectual carrying out of this Act by mining commissioners" and "may at his discretion assume all or any of the powers, duties and functions by this Act vested in any mining commissioner, and may lawfully perform all such acts and do all such things as a mining commissioner may perform or do." Zimbabwe Mines and Minerals Act of 1961, Ch. 21:05 § 341.  The Commissioner is not managed by a government-selected board, like a corporation, but rather directly supervised by the Secretary of the Ministry of Mines.  Far from being free to manage its own operations "on an enterprise basis," the Commissioner lacks any "independence from close political control." Bancec, 462 U.S. at 624–25.  Although the Mines and Minerals Act does not specify how Commissioners are paid or funded, there has been "no suggestion that the [Commissioner] raises funds on its own."  Entes, 2020 WL 1935554, at *5.  And, although the Commissioner has the power to sue for license fees, royalties, fines, and other duties payable to the office, and to be sued, Zimbabwe Mines and Minerals Act of 1961, Ch. 21:05 § 366, as with other governmental subdivisions, that fact alone, in the face of close supervision by the Secretary of the Ministry of Mines and an entire statute setting forth in detail the Commissioner's duties and authority, "adds little, if anything, when it comes to the [Commissioner's] autonomy or degree of separation from the state," Entes, 2020 WL 1935554, at *4.  In view of the Commissioner's duties and close

supervision by the state, the Court concludes that, under either <u>Transaero</u> or <u>Bancec</u>, the Commissioner is a political subdivision of the Republic, not an agency or instrumentality entitled to the presumption of juridical separateness.[8]

The foregoing analysis largely forecloses the Commissioner's argument that it is an individual, not a state entity, and thus falls entirely outside the scope of the FSIA's definition of a "foreign state" under § 1603(a).  <u>See</u> Zimbabwe MTD at 8–9.  The Commissioner's argument in this respect is based on <u>Samantar v. Yousuf</u>, 560 U.S. 305 (2010).  There, the Supreme Court held that "[r]eading the FSIA as a whole, there is nothing to suggest we should read 'foreign state' in § 1603(a) to include an official acting on behalf of the foreign state, and much to indicate that this meaning was not what Congress enacted."  <u>Id.</u> at 319.  The Court observed, however, that notwithstanding that rule, "it may be the case that some actions against an official *in his official capacity* should be treated as actions against the foreign state itself, as the state is the real party in interest."  <u>Id.</u> at 325 (emphasis added).  Accordingly, although a plaintiff may not under the FSIA sue a foreign official in his personal capacity "and seek damages from his own pockets," <u>id.</u>, the Court may look to whether the foreign state itself, and not the official personally, is "the real party in interest" and, in that case, apply the FSIA, <u>Odhiambo v. Republic of Kenya</u>, 930 F. Supp. 2d 17, 34–35 (D.D.C. 2013); <u>see</u> <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit

---

[8] In their reply, Defendants assert that the argument that the Commissioner is a part of the state itself is inconsistent with Plaintiffs' complaint, citing paragraph six, which describes the Commissioner as "an agency or instrumentality of, and an alter ego of, the Republic of Zimbabwe."  Compl. ¶ 6.  But the complaint's description of the Commissioner elsewhere, in the "parties" section of the complaint, alleges also that the Commissioner "is a governmental office or governmental corporation sole existing under the laws of the Republic of Zimbabwe."  Compl. ¶ 16.

against the entity. . . . It is *not* a suit against the official personally, for the real party in interest is the entity.").

Especially in light of the Court's conclusion that the Commissioner is an office established as a political subdivision of the Republic, the Court reads Plaintiffs' claims against the Commissioner not as a suit against a particular commissioner in his personal capacity but rather as a suit against the office.  In fairness to the Commissioner, the complaint does not, in so many words, expressly state that the Commissioner is sued in its official capacity.  But the complaint identifies no particular individual being sued; instead, it identifies the defendant as the office of the "Chief Mining Commissioner, Ministry of Mines of Zimbabwe," and locates the Commissioner at the address of the Ministry of Mines and Mining Development, not the address of any particular mining commissioner.  See Compl. at 1; Ministry of Mines Directory, https://www.miningrb.co.zw/business-directory/industry-bodies/regulatory-stautory-bodies/ministry-of-mines-hq.html (last visited Mar. 22, 2023); see Nnaka v. Fed. Republic of Nigeria, 238 F. Supp. 3d 17, 30–31 (D.D.C. 2017) (treating suit containing allegations "concerning the conduct of at least three different Nigerian Attorneys General" during different time periods as brought against the office, not any individual, under Samantar).  Plaintiffs also explain in their briefing that they seek money out of the public fisc, not out of a particular commissioner's pocket.  See Samantar, 560 U.S. at 325.  Because, as just explained, the office of the Commissioner is a political subdivision of the Republic and thus a component of the state itself, and because the complaint identifies no individual to be held personally liable, the Court construes Plaintiffs' suit as not brought against the Commissioner personally but rather against the governmental office of Chief Mining Commissioner.

2. *Subject Matter Jurisdiction*

Having concluded that the Commissioner falls within § 1603's definition of a foreign state, the Court will have subject matter jurisdiction only if one of the FSIA's exceptions to sovereign immunity applies.  28 U.S.C. § 1330(a).  Citing the Commissioner's active participation in the Zambian arbitration and agreement to the arbitrators' Terms of Reference, which confirmed its submission to the arbitration, Plaintiffs contend that either § 1605(a)(1)'s waiver exception or § 1605(a)(6)'s arbitration exception applies here.  The waiver exception applies when "the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver."  Id. § 1605(a)(1).  The arbitration exception applies when an "action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit [certain disputes] to arbitration" or "to confirm an award made pursuant to such an agreement to arbitrate" if "the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards."  Id. § 1605(a)(6).  The Court will begin by addressing the applicability of the arbitration exception but will ultimately apply the waiver exception.

a.   The Arbitration Exception

At first blush, § 1605(a)(6)'s arbitration exception seems like a prime candidate for establishing subject matter jurisdiction in this case.  Plaintiffs' claims arise from their enforcement of the arbitration agreements contained in the MOUs signed with ZMDC in 2007 and 2008.  The Zambian judgment they seek to enforce under the D.C. Judgments Recognition Act was made "pursuant to [the parties'] agreement to arbitrate," 28 U.S.C. § 1605(a)(6), and

both sides agree that the Zambian arbitration and award were governed by the New York Convention, an international treaty that applies "to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought," New York Convention, art. I(1); <u>see id.</u> art. III (signatory states "shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the" Convention).  All three countries implicated in this case—Zimbabwe, Zambia, and the United States—are signatories to the New York Convention.  <u>See</u> Contracting States, New York Arbitration Convention, https://www.newyorkconvention.org/countries (last visited Mar. 22, 2023).

Plaintiffs' invocation of the arbitration exception runs into a textual roadblock, however. As the Commissioner points out, § 1605(a)(6) covers only actions brought "either to enforce an agreement" to arbitrate or "to confirm an award made pursuant to such an agreement."  28 U.S.C. § 1605(a)(6).  But Plaintiffs' action is not one to enforce the MOUs or to confirm the Zambian arbitral award through the relevant provision of the Federal Arbitration Act ("FAA"), which implements the New York Convention and permits the filing of applications to confirm arbitral awards falling under it.  <u>See</u> 9 U.S.C. § 207.  Rather, Plaintiffs have brought an action under the D.C. Judgments Recognition Act to recognize and enforce the Zambian judgment, which itself confirms the underlying arbitral award.

Although this may seem like a fine distinction, the D.C. Circuit has held otherwise.  <u>See</u> <u>Commissions Import Export S.A. v. Republic of the Congo (Comimpex)</u>, 757 F.3d 321 (D.C. Cir. 2014).  In <u>Comimpex</u>, the court held that the three-year statute of limitations on bringing actions to confirm arbitral awards under Chapter 2 of the FAA did not preempt the longer statute

of limitations of the D.C. Judgments Recognition Act to recognize a foreign court judgment.  Id.

at 333.  In so holding, Comimpex repeatedly emphasized that courts "have long recognized the

conceptual difference between arbitral awards and foreign court judgments on arbitral awards."

Id. at 330.  "Although an arbitral award and a court judgment enforcing an award are 'closely

related,'" the Court explained, "they are nonetheless 'distinct' from one another," as are the

causes of action relating to them.  Id.  While actions to confirm arbitral awards and actions to

enforce foreign judgments that themselves confirm arbitral awards both advance the "federal

policy in favor of arbitral dispute resolution," id. (quoting Mitsubishi Motors Corp. v. Soler

Chrysler-Plymouth, Inc., 473 U.S. 614, 631 (1985)), the court concluded that the "text of the

Foreign Arbitral Awards Convention Act and the circumstances of its enactment" indicated that

"Congress did not intend to speak beyond the recognition and enforcement of arbitral awards,"

leaving judgment recognition actions untouched, id. at 329.  Here, although the Court is

interpreting § 1605(a)(6), not § 207 of the FAA, both provisions refer only to actions to

"confirm" arbitral awards, not to a distinct cause of action to recognize foreign judgments.  For

the reasons explained in Comimpex, the Court cannot cast aside the distinction between those

two types of actions merely because they involve a similar subject matter.[9]

　　　Plaintiffs provide no basis to disregard Comimpex.  Instead, they cite only one case to

support their argument that the FSIA's arbitration exception covers the recognition of foreign

judgments—Continental Transfer Technique Ltd. v. Federal Government of Nigeria, 697 F.

Supp. 2d 46 (D.D.C. 2010)—which they contend held that § 1605(a)(6) provided jurisdiction in

---

[9] The potential applicability of the arbitration exception did not come up in Comimpex because the defendant there has issued commitment letters that "contained an irrevocable waiver of immunity from legal proceedings" and a "commitment to submit all disputes to ICC arbitration in Paris."  757 F.3d at 324–25.

an action under the D.C. Judgments Recognition Act, Opp. to Zimbabwe MTD at 12.

Continental Transfert, however, did not hold that § 1605(a)(6) provides jurisdiction for a claim solely to enforce a foreign judgment.  Rather, the complaint there included both a claim to confirm an arbitral award under the FAA—which plainly falls within the text of § 1605(a)(6)—and a separate claim to enforce a foreign judgment on the same underlying arbitral award.

Cont'l Transfert, 697 F. Supp. 2d at 53–54.  In a single paragraph concerning § 1605(a)(6), in the portion of the opinion concerning the FAA claim, the court stated that Nigeria could not "invoke the defense of sovereign immunity to prevent the enforcement of the arbitral award," citing a decision concerning an action to enforce an arbitral award.  Id. at 56 (citing Creighton Ltd. v. Government of the State of Qatar, 181 F.3d 118, 123–24 (D.C. Cir. 1999)).  The court did not separately address whether the arbitration exception independently applied to the D.C. Judgments Recognition Act claim.  Indeed, on appeal, the D.C. Circuit, while agreeing with the district court that § 1605(a)(6) supplied jurisdiction over the plaintiff's FAA claim, noted that it did not need to "decide whether Section 1605(a)(6) or some other provision of law also provides jurisdiction over" the Recognition Act claim, as the court lacked appellate jurisdiction over that claim.  Cont'l Transfert Technique Ltd. v. Fed. Government of Nigeria, 603 F. App'x 1, 3 n.2 (D.C. Cir. 2015) (unpublished).  The Circuit's express reservation of that question, although not precedential, at least casts some doubt about whether the arbitration exception applies to judgment recognition claims.

In light of Comimpex, and without any countervailing authority to suggest that an action to enforce a foreign judgment falls within the text of § 1605(a)(6), the Court concludes that the arbitration exception does not apply in this case.

b.  <u>The Waiver Exception</u>

Alternatively, Plaintiffs rely on the FSIA's waiver exception, which provides an exception to sovereign immunity in any case "in which the foreign state has waived its immunity either explicitly or by implication."  28 U.S.C. § 1605(a)(1); <u>see</u> <u>Creighton</u>, 181 F.3d at 122 (waiver must be intentional).

As Plaintiffs note, this Court in another case has endorsed the theory that a foreign sovereign's entry into the New York Convention, "combined with its agreement to arbitrate in the territory of another Convention signatory," may suffice to make out an intentional, implicit waiver of sovereign immunity under § 1605(a)(1).  <u>Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria (P&ID I)</u>, No. 18-CV-594 (CRC), 2020 WL 7122896, at *7–8 (D.D.C. Dec. 4, 2020) (Cooper, J.), <u>aff'd on other grounds,</u> 27 F.4th 771 (D.C. Cir. 2022).  In <u>P&ID I</u>, this Court adopted the Second Circuit's reasoning in <u>Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala</u>, 989 F.2d 572 (2d Cir. 1993), which held that Navimpex, a company owned by the Romanian government, had implicitly waived its immunity under the FSIA because—"knowing that Romania, France, and the United States were all New York Convention signatories—it agreed to an arbitration clause with a German company, then participated in the arbitration in France," <u>P&ID I</u>, 2020 WL 7122896, at *7 (citing <u>Seetransport</u>, 989 F.2d at 574–76, 578–79).  <u>Seetransport</u> reasoned that "when Navimpex entered into a contract with" the plaintiff "that had a provision that any disputes would be submitted to arbitration, and then participated in an arbitration in which an award was issued against it, logically, as an instrumentality or agency of the Romanian Government—a signatory to the Convention—it had to have contemplated the involvement of

the courts of any of the Contracting States in an action to enforce the award."  <u>Seetransport</u>, 989

F.2d at 578–79.

Although the D.C. Circuit had not (and still has not) expressly adopted <u>Seetransport</u>'s

holding as binding Circuit law, this Court noted in <u>P&ID I</u> that it "has come close," referring to

<u>Seetransport</u>'s reasoning as "correct[]" in dicta in one case and concluding in an unpublished

disposition that Ukraine had waived its immunity "from arbitration-enforcement actions in

other" New York Convention signatory states by signing the Convention.  <u>P&ID I</u>, 2020 WL

7122896, at *7–8 (first citing <u>Creighton</u>, 181 F.3d at 123; and then quoting <u>Tatneft v. Ukraine</u>,

771 F. App'x 9, 10 (D.C. Cir. 2019) (per curiam)).  And this Court further explained why

recognizing an implicit waiver when a New York Convention signatory has agreed to arbitrate

disputes in another signatory would support the fundamental policy of the New York

Convention, noting that the "Convention's effectiveness as a stimulant for international

commerce would be reduced if states could avail themselves of the Convention's benefits, then

assert immunity from award-enforcement actions that the Convention expressly contemplates."

<u>Id.</u> at *9; <u>see also</u> <u>id.</u> at *9–10 (explaining why applying <u>Seetransport</u> would not be inconsistent

with Supreme Court and Circuit precedent[10] and would not render the arbitration exception

superfluous).  Accordingly, this Court held that Nigeria had waived its sovereign immunity

under § 1605(a)(1) by signing the New York Convention and subsequently agreeing to arbitrate

within the territory of another Convention signatory.  <u>Id.</u> at *11.

---

[10] For instance, this Court explained why <u>Argentine Republic v. Amerada Hess Shipping</u>
<u>Corp.</u>, 488 U.S. 428 (1989), did not preclude the <u>Seetransport</u> theory, because, "[i]n contrast to
the agreements at issue" there, the "New York Convention does contemplate the availability of a
cause of action in U.S. courts," a difference the D.C. Circuit recognized in <u>Creighton</u>.  <u>P&ID</u>,
2020 WL 7122896, at *9.

In response to Plaintiffs' reliance on P&ID I, Defendants (fairly) observe that the D.C. Circuit indicated some caution about the Seetransport theory on appeal in Process & Industrial Developments Ltd. v. Federal Republic of Nigeria (P&ID II), 27 F.4th 771 (D.C. Cir. 2022). Specifically, the assigned panel "requested additional briefing by the United States as amicus curiae, inviting it to provide its views on whether the United States, as a party to the New York Convention, impliedly waives sovereign immunity from actions seeking recognition and enforcement of foreign arbitral awards in the courts of other New York Convention states by becoming a party to the Convention and agreeing to arbitrate a dispute in a Convention state." 27 F.4th at 775 n.3.  The United States responded with an amicus brief arguing that, because the more specific arbitration exception applied in P&ID, applying the more general waiver exception would run counter to canons of statutory construction and could render superfluous subparagraph (D) of the arbitration exception, which permits application of the arbitration exception in cases to confirm arbitral awards in which the waiver exception "is otherwise applicable."  Brief of the United States as Amicus Curiae at 10–11, P&ID II, 27 F.4th 771 (D.C. Cir. 2022) (No. 21-7003), 2022 WL 190972, at *10–11; see id. at 13 (theorizing that one "plausible construction" of § 1605(a)(6)(D) "is that it reflects Congress' intent to require that a court exercising jurisdiction to enforce an arbitration agreement or arbitral award on the basis of implied or express waiver do so only where the threshold requirements of the arbitration exception have been met").  As to the possible implications of the Seetransport implicit-waiver rule, the United States acknowledged its "interest in the vitality of the New York Convention and in the ability of its courts to enforce covered arbitral awards" but expressed some concern that not all foreign courts might "exercise restraint in construing implied waivers."  Id. at 14–15.  Noting these concerns "and the ready applicability of the arbitration exception" in that case, the Circuit found "it unnecessary to wade

into the murky waters of the waiver exception" and affirmed on the basis of the arbitration exception alone.  P&ID II, 27 F.4th at 775 n.3.

The Court acknowledges the concerns of the United States expressed in P&ID II and therefore wades into the waiver exception's murky waters with due caution.  But here, because the Court has concluded that Plaintiffs' claim falls outside the arbitration exception, many of the statutory interpretation concerns raised by the United States in P&ID, which were premised on the overlapping availability of the arbitration exception there, are not present.  For instance, the United States voiced a concern that "[t]raditional canons of statutory construction suggest that the arbitration exception was intended to displace the waiver exception" as to "arbitration agreements and arbitral awards *that come within its ambit*."  Brief of the United States as Amicus Curiae at 10, 2022 WL 190972, at *10 (emphasis added).  If the Court is correct that judgment-recognition actions, as a rule, fall outside the arbitration exception's ambit, then this statutory construction problem is avoided.  Additionally, although P&ID II opted to apply the arbitration exception rather than the waiver exception, nothing in that decision purported to abandon the Circuit's favorable citations to Seetransport in other cases.  See Creighton, 181 F.3d at 123; Tatneft, 771 F. App'x at 10.

Accordingly, the Court sees no present impediment to concluding that the waiver exception applies here.  As in Seetransport, the Republic of Zimbabwe, of which the Commissioner is a political subdivision, is a signatory to the New York Convention.  And although the Commissioner did not sign the 2007 and 2008 MOUs which contained an arbitration agreement, the Commissioner subsequently "participated in an arbitration in which an award was issued against it" in another New York Convention signatory, Zambia.  Seetransport, 989 F.2d at 579.  And, if the Commissioner's participation in the arbitration alone was

insufficient, Plaintiffs add that the Commissioner also agreed to the Terms of Reference governing the arbitration, acknowledging that it "agree[d] to submit to this arbitration and expressly waive any procedural objections [it] may have with respect to known events, including the appointment of the Tribunal." Sangwa Decl., Ex. 1 § 8.1. Lest there be any doubt, the Terms of Reference themselves state that "[e]ach original of the Terms of Reference forms an original arbitration agreement for the purposes of Articles II and IV(1) of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards." Id. § 10.3. The Commissioner's agreement to arbitrate in the territory of another Convention signatory, combined with Zimbabwe's entry in the Convention, "is strong evidence that [the Commissioner] intended to subject itself to the jurisdiction of U.S. courts in an action such as this one." P&ID I, 2020 WL 7122896, at *8. The Court therefore holds that it has subject matter jurisdiction under the FSIA's waiver exception.

Defendants briefly contend that the waiver exception does not apply because "the New York Convention governs enforcement of arbitration awards, not enforcement of foreign judgments," citing Comimpex. Zimbabwe MTD at 11. Although that distinction was sufficient to take this case outside of the arbitration exception, which is expressly limited to cases brought to enforce arbitration agreements or confirm arbitral awards, it does not preclude the application of the waiver exception. Indeed, Seetransport applied under exactly these circumstances. Although Seetransport involved both a claim to enforce an arbitration award and a claim to recognize a foreign judgment enforcing the award, 989 F.2d at 575, the court determined that the claim seeking enforcement of the award under FAA § 207 was time-barred, id. at 581. Even after the § 207 claim was dismissed, however, the court held that it had subject matter jurisdiction over the judgment-recognition claim under the FSIA's waiver exception. Id. at 582–

83.  The court noted "that unlike the recognition of arbitral awards, which is governed by federal

law, the recognition of foreign judgments is governed by state law" at least "as to most

substantive aspects."  Id. at 582.  The "cause of action to enforce the foreign judgment"

nevertheless fell "within the scope of Navimpex's implicit waiver of sovereign immunity"

because "the cause of action is so closely related to the claim for enforcement of the arbitral

award."  Id. at 582–83.

That the waiver exception might capture a cause of action to enforce a foreign judgment,

even if the arbitration exception does not, makes sense.  Although Plaintiffs bring a claim to

enforce a foreign judgment, this is a "case . . . in which the foreign state has waived its immunity

. . . by implication" by being a New York Convention signatory and agreeing to arbitrate in the

territory of another signatory.  28 U.S.C. § 1605(a)(1).  The arbitration exception's textual limit

to actions "to enforce an" arbitration agreement "or to confirm an award made pursuant to such

an agreement" is absent.  Id. § 1605(a)(6).

In sum, although the arbitration exception to sovereign immunity does not apply in this

case to enforce a foreign judgment, the Court concludes that the waiver exception of

§ 1605(a)(1) does apply.  Because the Commissioner waived its sovereign immunity, the Court

has subject matter jurisdiction over Plaintiffs' claims against it pursuant to the FSIA.[11]

---

[11] The Court observes that this conclusion, combined with the conclusion that the
Commissioner is a political subdivision, and thus a part of, the Republic itself, might suggest an
alternate theory for finding subject matter jurisdiction over the Republic.  If there is no
presumption of juridical separateness between the Commissioner and the Republic, then perhaps
the Commissioner's conduct supporting a waiver of sovereign immunity might also be attributed
to the Republic.  For whatever reason, however, Plaintiffs premised their argument for subject
matter jurisdiction over the Republic exclusively on the Republic's alleged alter ego relationship
with ZMDC, discussed above.  Because it is Plaintiffs' burden to plead subject matter
jurisdiction, and because the parties have not briefed this question, the Court will not sua sponte
find subject matter jurisdiction over the Republic based on its relationship with the
Commissioner.

### 3.   Personal Jurisdiction

Having found that the Commissioner is not entitled to a presumption of juridical separateness from the Republic, and having found subject matter jurisdiction under § 1605(a)(1), the Court also necessarily has personal jurisdiction over the Commissioner.  As already explained, in the context of foreign sovereigns and their political subdivisions, "subject matter jurisdiction plus service of process equals personal jurisdiction."  GSS, 680 F.3d at 811 (quoting Price, 294 F.3d at 95).  Here, Plaintiffs served the Commissioner pursuant to 28 U.S.C. § 1608(a)(3) by "sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state," by international carrier "to the head of the ministry of foreign affairs of the foreign state concerned."[12]  The Court rejects Defendants' contention that the Commissioner must have minimum contacts with this forum, as that argument is premised on the idea, rejected above, that the Commissioner is a person rather than a governmental entity.

### 4.   Failure to State a Claim

Finally, the Court will briefly address Defendants' arguments that the complaint fails to state a claim as to the Commissioner under Rule 12(b)(6).

First, Defendants maintain that Plaintiffs are bound by the New York Convention's three-year statute of limitations under the FAA because the theory for Defendants' waiver of sovereign immunity is in part premised on their New York Convention membership.  Zimbabwe MTD at

---

[12] Defendants suggest this service was improper because the affidavit of service was addressed to "the Ministry of Mines" rather than the Chief Mining Commissioner.  Zimbabwe MTD at 14.  But Plaintiffs' affidavit of service shows that the service was made to the Ministry of Mines "c/o Chief Mining Commissioner" to the address of the Zimbabwean Foreign Minister.  See Return of Service Ex. 1, ECF No. 20-1.  That was sufficient to effect proper service on the Commissioner.

15–19.  This argument fails in light of <u>Comimpex</u>.  There, as discussed above, the D.C. Circuit held that the FAA's three-year statute of limitations for bringing an action to confirm an arbitral award under 9 U.S.C. § 207 does not preempt the longer limitations period to recognize a foreign judgment under the D.C. Judgments Recognition Act.  <u>Comimpex</u>, 757 F.3d at 333; <u>see also</u> <u>Seetransport</u>, 989 F.2d at 582–83 (permitting judgment recognition action to go forward after dismissing related FAA § 207 action as time-barred).  Accordingly, Defendants' contention that if "Plaintiffs seek this Court's jurisdiction under the New York Convention, then they get all of it, including section 207," is plainly incorrect.  Zimbabwe MTD at 16.  Defendants attempt to distinguish <u>Comimpex</u> on the grounds that the foreign state there expressly, rather than implicitly, waived its sovereign immunity and that the arbitral award there had been subjected to scrutiny in other New York Convention jurisdictions as well.  But those considerations had no bearing on the Circuit's conclusion that neither the text nor the legislative history of FAA § 207 "indicate that Congress intended Chapter 2 of the FAA to govern not only arbitral awards but the recognition of judgments as well."  <u>Comimpex</u>, 757 F.3d at 328.

Next, Defendants maintain that Plaintiffs have failed to plead entitlement to post-judgment interest at the Zambian statutory rate and entitlement to attorneys' fees.  Zimbabwe MTD at 21–23.  Plaintiffs addressed only Defendants' arguments regarding entitlement to attorneys' fees in their opposition.  Opp. to Zimbabwe MTD at 37.  Defendants may be correct that, if Plaintiffs prevail, the Zambian statutory post-judgment interest rate will not apply here.  <u>See</u> <u>Cont'l Transfert Technique Ltd. v. Fed. Government of Nigeria</u>, 850 F. Supp. 2d 277, 286–87 (D.D.C. 2012) (applying rate set forth in 28 U.S.C. § 1961(a)); <u>see also</u> D.C. Code §§ 15-367, 28-3302 (stating that a foreign judgment recognized under the D.C. Code is enforceable in the same manner as a judgment rendered in the District of Columbia, and setting forth the District of

Columbia post-judgment interest rate). But the Court has identified some contrary authority as well. See BCB Holdings Ltd. v. Government of Belize, 110 F. Supp. 3d 233, 251 (D.D.C. 2015) (awarding post-judgment interest at rate specified by foreign judgment); United Steelworkers, Loc. 1-1000 v. Forestply Indus., Inc., No. 2:08-CV-281, 2011 WL 1210131, at *1 (W.D. Mich. Apr. 1, 2011) (applying post-judgment interest rate specified in Canadian judgment in Michigan Judgments Recognition Act case). There is also at least some support for Plaintiffs' contention that they should be entitled to attorneys' fees, which were incorporated into the arbitral award underlying the Zambian judgment. See Tahan v. Hodgson, 662 F.2d 862, 867 n.20 (D.C. Cir. 1981) (enforcing a foreign judgment that included an award of attorneys' fees); D'Amico Dry D.A.C. v. Primera Mar. (Hellas) Ltd., 433 F. Supp. 3d 576, 578 (S.D.N.Y. 2019) (permitting award of attorneys' fees in judgment recognition action because fees were provided for in the English judgment being recognized).

In any event, the Court declines to rule definitively on these issues at this stage. Whether Plaintiffs are entitled to attorneys' fees and/or post-judgment interest at all may depend on other factors to be determined later, such as the validity and enforceability of the Zambian judgment. See Harpole Architects, P.C. v. Barlow, 668 F. Supp. 2d 68, 80 (D.D.C. 2009) (noting that "[a]t this early stage of the litigation, [defendant's] motion to strike [plaintiffs'] attorneys' fees request is premature, as later developments may provide a legitimate basis for an attorneys' fees award." (alterations in original) (quoting Pinnacle Airlines, Inc. v. Nat'l Mediation Bd., No. 03–1642, 2003 WL 23281960, at *3 (D.D.C. Nov. 5, 2003))).

Last, Defendants maintain that the Zambian High Court, which issued the judgment enforcing the arbitral award in Plaintiffs' favor, did not have personal or subject matter jurisdiction over Defendants. Zimbabwe MTD at 23–25. For instance, they assert that Plaintiffs

have not sufficiently alleged that the Commissioner had minimum contacts with Zambia and that there is insufficient evidence that the Commissioner was served.  Id.  Citing an expert report, they also maintain that, had Defendants contested the Zambian judgment, the Zambian court likely would have found that the Commissioner was immune there.  Id. at 24.  Based on the argument that the Zambian High Court lacked jurisdiction, Defendants also maintain that enforcement would be repugnant to D.C. public policy.  Id. at 24–25.

These contentions are inappropriate for resolution at this stage.  To state a claim under the D.C. Judgments Recognition Act, Plaintiffs must plead—and here have pleaded—that the foreign country judgment grants or denies recovery of a sum of money and, under the law of that country, is final, conclusive, and enforceable.  D.C. Code § 15-363(a); see Compl. ¶¶ 35–37, 41–46.  Defendants' arguments that the foreign court lacked personal or subject matter jurisdiction over the controversy or that the judgment is repugnant to public policy are affirmative defenses, on which Defendants bear the burden of proof.  D.C. Code 15-364(b)–(d); see also Mohammad Hilmi Nassif & Partners v. Republic of Iraq, No. 117CV02193KBJGMH, 2021 WL 6841848, at *22 (D.D.C. July 29, 2021) (explaining that repugnancy to public policy is an affirmative defense).  A plaintiff is "not required to anticipatorily negate" affirmative defenses in its pleadings.  McNamara v. Picken, 866 F. Supp. 2d 10, 17 (D.D.C. 2012).  Rather, "[a]n affirmative defense may be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint."  Greer v. Bd. of Trs. of Univ. of D.C., 113 F. Supp. 3d 297, 306 (D.D.C. 2015) (quoting Smith–Haynie v. District of Columbia, 155 F.3d 575, 578 (D.C. Cir. 1998)).  That is, the "face of the complaint must conclusively indicate" that the affirmative defense applies.  Newland v. Aurora Loan Servs., LLC, 806 F. Supp. 2d 65, 70 (D.D.C. 2011).

The complaint in this case alleges that the Zambian judgment is final, valid, and enforceable and that it was served on Defendants on October 23, 2019.  Compl. ¶¶ 35–37. Defendants' arguments about the propriety of service abroad go beyond the face of the complaint and are based on conjecture that Plaintiffs never sought leave to serve Defendants with the Zambian High Court's judgment outside of the country.  Kalaluka Decl. ¶ 15. (Plaintiffs, for their part, reply that service was made *inside* the country to Defendants' Zambian counsel. Sangwa Decl. ¶¶ 23–24.)  And Defendants' conclusory arguments that the Zambian court lacked personal and subject matter jurisdiction both go beyond the face of the complaint and misunderstand that Defendants, not Plaintiffs, bear the burden of showing that the foreign court lacked jurisdiction under the D.C. Code.  See D.C. Code § 15-364(b)–(d).  These arguments, if they have any merit, are better addressed at summary judgment, "after further briefing and development of the record." Mohammad, 2021 WL 6841848, at *23 n.18.[13]

---

[13] Kaupthing ehf. v. Bricklayers & Trowel Trades International Pension Fund Liquidation Portfolio, 291 F. Supp. 3d 21 (D.D.C. 2017), does not require a contrary conclusion.  There, the court granted a motion to dismiss a D.C. Judgments Recognition Act claim partially on the basis that the foreign court lacked personal jurisdiction over the defendant.  Id. at 30–33.  The plaintiff objected that it did not need to plead with specificity the foreign court's jurisdiction, but based on cases interpreting a similar New York statute, the court concluded that the party seeking enforcement of the judgment "bears the burden of making a *prima facie* showing that the mandatory grounds for nonrecognition" such as lack of personal jurisdiction "do not exist."  Id. at 32–33 (quoting Wimmer Canada, Inc. v. Abele Tractor & Equipment Co., 750 N.Y.S.2d 331, 332 (2002)).  But Plaintiffs here correctly point out that the D.C. Judgments Recognition Act expressly places on the party resisting enforcement the burden of proving that the foreign court lacked jurisdiction, and the New York statute, at the time of the cases cited in Kaupthing, lacked such an allocation of burden (which has since been added).  See Opp. to Zimbabwe MTD at 30 n.9; N.Y. C.P.L.R. § 5304(c); 2021 N.Y. Sess. Laws Ch. 127 (McKinney) (adding burden provision).  Kaupthing, therefore, is not persuasive.

## IV.   Conclusion

For these reasons, it is hereby

**ORDERED** that [Dkt. No. 23] Defendant Chief Mining Commissioner and Defendant Republic of Zimbabwe's Motion to Dismiss is GRANTED as to the Republic of Zimbabwe and DENIED as to the Chief Mining Commissioner.  It is further

**ORDERED** that [Dkt. No. 30] Defendant ZMDC's Motion to Dismiss is GRANTED.  It is further

**ORDERED** that the Complaint is DISMISSED WITHOUT PREJUDICE as to Defendants ZMDC and the Republic of Zimbabwe.  It is further

**ORDERED** that Plaintiffs are granted leave to file an amended complaint by April 24, 2023.

**SO ORDERED**.

 

 

 

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>March 22, 2023</u>