## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Amaplat Mauritius Ltd.,
c/o CKLB International Management Ltd.,
P.O. Box 80, Felix House, 24 Dr. Joseph
Riviere Street, Port Louis 11602, Mauritius;
and

Amari Nickel Holdings Zimbabwe Ltd.,
c/o CKLB International Management Ltd.,
P.O. Box 80, Felix House, 24 Dr. Joseph
Riviere Street, Port Louis 11602, Mauritius,

    Plaintiffs,

  v.

Zimbabwe Mining Development Corporation,
90 Mutare Road, Msasa, Harare, Zimbabwe;

The Chief Mining Commissioner, Ministry of
Mines of Zimbabwe,
6th Floor, ZIMRE Centre, Cnr. Leopold
Takawira Street/Kwame Nkrumah Avenue,
Private Bag 7709, Causeway, Harare,
Zimbabwe;

and the Republic of Zimbabwe,
c/o Head of the Ministry of Foreign Affairs,
Ministry of Foreign Affairs, P.O. Box 4240,
Munhumutapa Building, Cnr. Samora Machel
Avenue/Sam Nujoma Street, Harare,
Zimbabwe

    Defendants.

Civil Action No. 1:22-cv-00058-CRC

## AMENDED COMPLAINT

Plaintiffs Amaplat Mauritius Ltd. ("Amaplat") and Amari Nickel Holdings Zimbabwe

Ltd. ("Amari," and together with Amaplat, "Plaintiffs"), by their attorneys, Steptoe & Johnson

LLP, allege upon personal knowledge as to their own acts and upon information and belief as to

all other acts, as follows:

## I.      NATURE OF THE ACTION

1.      This is an action to recognize and enforce the judgment of the High Court of Zambia, at the Commercial Registry at Lusaka, dated August 9, 2019, No. 2019/HPC/ARB/No. 0337 (the "Judgment"), in favor of Plaintiffs and against Defendants Zimbabwe Mining Development Corporation ("ZMDC") and the Chief Mining Commissioner, Ministry of Mines of Zimbabwe (collectively, "Judgment Defendants," and, together with the Republic of Zimbabwe, "Defendants'"), pursuant to the Uniform Foreign-Money Judgments Recognition Act, D.C. Code § 15-361, *et seq.*  The Judgment recognized and enforced an arbitral award entered in favor of Plaintiffs and against Judgment Defendants, which are instrumentalities of and alter egos of the Republic of Zimbabwe (the "Republic"), under the terms of two arbitration agreements. The arbitration agreements provided for final and binding resolution of all disputes by international arbitration under the ICC International Court of Arbitration Rules (the "ICC Rules"), in which the ICC International Court of Arbitration set the place of the arbitration as Zambia.

2.      The arbitral award concerns Defendants' breaches of two memoranda of understanding concerning mining concessions in Zimbabwe ("MOUs").  The arbitral tribunal found that the Judgment Defendants breached those MOUs by, inter alia, expropriating the concessions causing millions of dollars in damages to the Plaintiffs.  The arbitral tribunal found in favor of the Plaintiffs and ordered the Judgment Defendants to pay approximately US$50 million plus interest.

3.      Defendants failed to pay the amounts due under the arbitral award and have similarly failed to satisfy the Judgment that the Zambian court issued based on the arbitral award. Following the issuance of the arbitral award, Plaintiffs engaged in extensive negotiations with Defendants, through the Zimbabwean government, with the aim of achieving a mutually agreeable resolution regarding the Defendants' compliance with the arbitral award. Defendants'

representatives in the Zimbabwean government repeatedly represented that they would pay the amounts due and recognized the award sum as a public debt.  They even represented that specific assets of the Republic of Zimbabwe and ZMDC would be designated to guarantee the debt owed to the Plaintiffs.  But despite aiming to finalize these amicable negotiations by the end of 2021, Defendants never failed to fulfill their commitments. As such, Plaintiffs now seek to enforce their rights in this Court.

## II.     JURISDICTION AND VENUE

4.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1330(a) because this is a "nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement."

5.      ZMDC is a foreign state within the meaning of 28 U.S.C. § 1603(a) because it is an agency or instrumentality of, and an alter ego of, the Republic of Zimbabwe.

6.      The Chief Mining Commissioner, Ministry of Mines of Zimbabwe, is a foreign state within the meaning of 28 U.S.C. § 1603(a) because it is an agency or instrumentality of, and an alter ego of, the Republic of Zimbabwe.

7.      The Republic of Zimbabwe is a foreign state within the meaning of 28 U.S.C. § 1603(a).

8.      Defendants are not entitled to immunity under the Foreign Sovereign Immunities Act or any applicable international agreement because the exceptions to foreign sovereign immunity set forth in 28 U.S.C. §§ 1605(a)(1) and 1605(a)(6) are satisfied.

9.      As set forth more fully below, the Judgment arises from an arbitration governed by the New York Convention, which is in force in all countries relevant to this action including

Zambia, Zimbabwe, and the United States, under arbitration agreements made by the foreign state with Plaintiffs.

10.     As set forth more fully below, Defendants waived sovereign immunity by agreeing to arbitrate under the ICC Rules, and by agreeing to and participating in an arbitration governed by the New York Convention in Zambia, which, like Zimbabwe, is and was a party to the New York Convention.  Zimbabwe thereby contemplated enforcement of any arbitral award in any of the other signatory states and waived sovereign immunity.  It is settled law that an action to recognize a foreign judgment based upon an arbitral award is within the scope of such a waiver because the cause of action is so closely related to the enforcement of an arbitral award.

11.     This Court has personal jurisdiction over the Defendants under 28 U.S.C. § 1330(b) because the requirements of 28 U.S.C. § 1330(a) are satisfied and service has or will be made under 28 U.S.C. § 1608.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(f)(4), which provides for venue in this Court for an action "brought against a foreign state or political subdivision thereof."

## III.   THE PARTIES

13.     Plaintiff Amari Nickel Holdings Zimbabwe Ltd. is a company incorporated under the laws of Mauritius.

14.     Plaintiff Amaplat Mauritius Ltd. is a company incorporated under the laws of Mauritius.

15.     Defendant ZMDC is a corporation incorporated under the laws of the Republic of Zimbabwe, an agency or instrumentality of the Republic of Zimbabwe, and an alter ego of the Republic of Zimbabwe.  It was created by the Zimbabwe Mining Development Corporation Act, and by law, the Republic of Zimbabwe appoints its Board of Directors, approves significant

actions, has the power to direct its actions, pays the debts of the Republic of Zimbabwe, and must be majority-owned by the Republic of Zimbabwe.

16.     Defendant Chief Mining Commissioner, Ministry of Mines of Zimbabwe is a governmental office or a governmental corporation sole existing under the laws of the Republic of Zimbabwe, an agency or instrumentality of the Republic of Zimbabwe, and an alter ego of the Republic of Zimbabwe.

17.     Defendant Republic of Zimbabwe is a foreign state.

## IV.   GENERAL ALLEGATIONS

### A.   The Memoranda of Understanding and the Joint Venture

18.     As explained in greater detail in the underlying arbitral award, a true and correct copy of which is attached hereto as **Exhibit A**, on November 22, 2007, ZMDC and Amari Holdings Ltd. ("Amari BVI") entered into a Memorandum of Understanding (the "Nickel MOU"), a true and correct copy of which is attached hereto as **Exhibit B**.

19.     Under the Nickel MOU, Amari BVI and ZMDC agreed to incorporate a joint venture company called Zimari Nickel (Pvt.) Ltd., to prospect for nickel and develop a mine.

20.     On June 6, 2008, Amari, Amari BVI, and ZMDC entered into a Deed of Novation, whereby Amari replaced Amari BVI as the counterparty to the Nickel MOU.  A true and correct copy of the Deed of Novation is attached hereto as **Exhibit C**.

21.     Similarly, on July 25, 2008, ZMDC and Amaplat entered into a Memorandum of Understanding (the "Platinum MOU"), a true and correct copy of which is attached hereto as **Exhibit D**.

22.     Under the Platinum MOU, Amaplat and ZMDC agreed to incorporate a joint venture company called Zimari Platinum (Pvt.) Ltd., to prospect for metals including platinum, and develop a mine.

**B.     The Dispute and Arbitration**

23.     ZMDC purported to cancel the MOUs in November 2010.

24.     Both the Nickel MOU (**Exhibit B**), at Article 11, and the Platinum MOU

(**Exhibit D**), at Article 9, contained identical arbitration clauses providing that:

> In the event of a dispute or disputes arising, such disputes, controversies or differences between the Parties, which may arise out of or in relation to the MOU and which cannot be settled by the Board, the parties shall first try to resolve it amicably through negotiation. In the event that no settlement can be reached through negotiation in reasonable time, any Party may submit the dispute to the ICC International Court of Arbitration in Paris for arbitration in accordance with the procedural rules of arbitration of the said Arbitration Court in effect at the time of apply arbitration, the award of which shall be final and binding upon the Parties. The language in Arbitration shall be in English.

25.     The Nickel MOU and Platinum MOU thus constituted an agreement to resolve

disputes by "final and binding" arbitration under the ICC Rules.

26.     Zimbabwe acceded to the New York Arbitration Convention on the Recognition

and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention") on

September 29, 1994.

27.     Zambia acceded to the New York Convention on March 14, 2002.

28.     The arbitration tribunal was constituted under the applicable regime of the ICC

Rules following determination by the ICC Court that the place of the arbitration would be

Lusaka, Zambia.

29.     The Judgment Defendants participated actively in the highly contested arbitration

proceedings before the arbitral tribunal.

30.     However, on the third day of the hearing, the arbitrator who had been nominated

by the Judgment Defendants resigned and the Judgment Defendants refused to appoint a

replacement arbitrator.

31.     After contentious proceedings before the Zambian courts and the ICC Court of

Arbitration over the composition of the panel, a reconstituted arbitral tribunal determined in

accordance with the ICC Arbitration Rules to continue with the proceedings after deliberation on

the issue.

32.     On August 27, 2013, without any explanation, the Judgement Defendants

indicated to the arbitral tribunal that they refused to further participate in the proceedings.

33.     The arbitral tribunal issued a final award on January 12, 2014, finding that it

continued to have jurisdiction over the dispute despite the Judgment Defendant's boycott of the

remainder of the hearing.  The tribunal found that the Plaintiffs successfully demonstrated their

claims.  It ordered US$42,882,000 in damages to Amaplat and US$3,900,000 in damages to

Amari.  The arbitral tribunal also ordered the Judgment Defendants to pay costs and expenses in

the amount of US$2,220,583.74 and US$900,000 in tribunal costs of the arbitration, and interest.

**Exhibit A** at 36.

### C.     **The Zambian Judgment**

34.     Following the resolution of the post-award proceedings in Zambian courts, in

which Zimbabwe challenged the composition of the tribunal and its authority to issue an award,

in Plaintiffs' favor, the High Court for Zambia at the Commercial Registry at Lusaka issued the

Judgment on August 9, 2019—formally, an Ex Parte Order for Leave to Register and Enforce the

Final Arbitration Award, No. 2019/HPC/ARB/No. 0337, under Section 18 of the Arbitration Act,

No. 19 of 2000, and Rules 15 and 16 of the Arbitration (Court Proceedings) Rules, 2001.  A true

and correct copy of the Judgment is attached hereto as **Exhibit E.**

35.     The Judgment directed "that the Plaintiffs be at liberty to enforce in the same

manner as a judgment or order to the same effect the Final Award dated 12th January 2014, of the

Arbitrators: Stuart Isaacs QC, Chairman; Professor Doug Jones AO, as Co-Arbitrator; and

Chikwendu Madumere as Co-Arbitrator appointed pursuant to Clause 11 of the Nickel Memorandum of Understanding dated 22nd November 2007, and Clause 9 of the Platinum Memorandum of Understanding dated 25th July 2007, made between the Plaintiffs and the Defendants." **Exhibit E** at 1-2. Plaintiffs served the Judgment on Defendants on 23 October 2019. Under Zambian law, the Judgment was stayed for 30 days or until the disposition of a timely proceeding to set aside the Judgment. As no party initiated a proceeding to set aside the Judgment, it became final.

36.     Zambian law provides for a 12-year statute of limitations for an action on a judgment, which accrues on the date that the judgment becomes enforceable.

37.     Accordingly, the Judgment is valid and enforceable in Zambia.

**D.     Failed Negotiations between the Parties**

38.     The parties participated in settlement discussions after the issuance of the Judgment, including two years of negotiations with the Reserve Bank of Zimbabwe, the Permanent Secretary of the Ministry of Mines & Mining Development, and the Attorney General.

39.     On 12 January 2021, the Plaintiffs sent a letter to the Defendants highlighting their failure to pay the amounts due under the award and Judgment and noting that the arbitral award is a public debt has been acknowledged as such by the Attorney-General and the Minister of Mines & Mining Development. A copy of that letter is attached hereto as **Exhibit F**. The Defendants failed to make any payment.

40.     Another letter later that year produced similar results. A copy of that letter is attached hereto as **Exhibit G**. Accordingly, Plaintiffs are forced to pursue this action to enforce the Judgment.

### E.   ZMDC and the Republic Are Alter Egos

41.     As set out at length below, ZMDC and the Republic are alter egos under the longstanding test set forth in *First National City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611 (1983), commonly known as *Bancec*, ZMDC is completely dominated by the Republic—it is wholly owned and managed by the Republic, its profits go to the Republic, it is required to pursue government policy, and it is frequently used for plainly sovereign purposes such as financing weapons deals. Similarly, treating the Republic and ZMDC as separate would result in fraud and injustice, because, among other things, the Republic has been playing a shell game, moving ZMDC's assets to other state-owned entities to try to make it harder for creditors to identify and collect, taking assets out of ZMDC when it sees fit for its own purposes even though ZMDC is not satisfying its debts as they come due, and giving away ZMDC's assets at below value for sovereign purposes such as funding military expenditures.

### 1.   Under the ZMDC Act, ZMDC is Completely Controlled and Owned by the State and Must Pursue Government Policy

42.     ZMDC is, by design, completely controlled by the Republic and required by law to do whatever the Republic deems to be in its national interest, even where that is contrary to its own financial or other interests or the interests of its creditors.

43.     Under the Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 ("ZMDC Act"), which has long governed and continues to govern ZMDC's existence, the Government completely controls ZMDC and it must pursue Government policy as dictated by the Government. The purpose of ZMDC as well as the legislation have been unaltered since the Court examined the provisions of the ZMDC Act and held that it is an alter ego of the Republic. *Funnekotter v. Agric. Dev. Bank of Zimbabwe*, No. 13 CIV.1917(CM), 2015 WL 9302560 (S.D.N.Y. Dec. 17, 2015). Defendant ZMDC was structured to be dominated and controlled by

the Republic.

44.     Indeed, at one point in 2022, the U.S. State Department's Investment Climate Statement for Zimbabwe indicated that the Republic was directly running ZMDC without any board at all. **Exhibit H** ("SOEs should have independent boards, but in some instances such as the recent case of the Zimbabwe Mining Development Corporation (ZMDC), the government allows the entities to function without boards."). The State Department also observed that state-owned enterprises in Zimbabwe have limited financial data available. *Id.* As here, that allows their assets to be fraudulently transferred to evade their debts.

45.     The ZMDC Act mandates that the Republic is to own no less than 51% of the shareholding in ZMDC and cannot divest more than 49% of its shareholdings. ZMDC Act § 27(5). Even if such a divestiture of a minority interest occurred, which it has not, it would require the approval of both the Minister for Mines and the Minister for Finance. ZMDC Act § 27(2) & (5).

46.     The ZMDC Act emphatically states that the purpose of ZMDC is to act on behalf of the State. Its "functions and duties" are "to invest in the mining industry in Zimbabwe on behalf of the State," "to plan, co-ordinate and implement mining development projects on behalf of the State," "to engage in prospecting, exploration, mining and mineral beneficiation programmes," "to encourage and undertake the formation of mining co-operatives," "to render assistance to persons engaged in or about to engage in mining," "to review annually the general economic conditions and prospects of the mining industry and in particular investment schemes," "to advise the Minister on all matters connected with corporate investments in the mining industry and make recommendations for the proper co-ordination of all investment

programmes," and "to carry out any other functions and duties which may be imposed upon the Corporation by any enactment." ZMDC Act § 20.

47.     ZMDC is explicitly an organ of Government policy and was created to pursue the government's goals regardless of commercial sense. Section 23 of the Act provides that "[i]t shall be the duty of the Corporation so to exercise—(a) that every application or proposal dealt with by it is considered strictly in accordance with Government economic policy; (b) that all matters relating to the mining industry are carefully reviewed in the national interest; and (c) that generally the activities of the Corporation referred to in section twenty are directed towards implementing Government mining development policy."

48.     Thus, ZMDC is a vehicle for the Government of Zimbabwe to pursue policy goals—central ones for Zimbabwe, whose principal economic resource is its mineral deposits—and it operates as such rather than as a conventional commercial entity.

49.     The ZMDC Act also provides that the Mining Development Board that controls ZMDC "shall consist of not less than five and not more than nine members who shall be appointed by the Minister [of Mines] after consultation with the President and in accordance with any directions the President may give him . . . ." ZMDC Act § 5(1). The Minister appoints one member as chairman and another as deputy chairman. ZMDC Act § 5(2). The Minister also appoints alternates. ZMDC Act § 5(3).

50.     The ZMDC Act ensures that the Government, through the Minister, dictates every aspect of ZMDC's management, including the terms of appointment of the Board members. ZMDC Act § 6(1). There are no specific terms for appointment to the ZMDC Board and indeed a Board member holds office on conditions determined by the Minister, ZMDC Act § 6(2), meaning that the members serve at the pleasure of the Minister. That is reinforced by Section 9

of the ZMDC Act, which provides that the "Minister may require a member to vacate his office if the Minister is satisfied that the member" has committed "improper conduct," "has failed to comply with the conditions of his office fixed by the Minister," or is "mentally or physically incapable of efficiently performing his duties as a member."

51.    The Government routinely exercises this power. And as the Minister for Mines has recognized when making appointments to ZMDC's board, ZMDC, and other similar parastatal entities' "boards will be seized with executing key government objectives". *Chitando appoints new boards for parastals*, NewsDay, (June 1, 2018) (**Exhibit I)**.

52.    The Ministry of Mines has explicitly stated that any appointment to the Board of ZMDC or its subsidiaries other than by the Minister is void. The current Board includes multiple individuals who have previously served as the Government's designees for the boards of other parastatals and a current employee of the Ministry of Mines. Previous boards have included a member of the ruling party's Politburo and the Minister for Mines' permanent secretary.

53.    Under the ZMDC Act, the officers of the Public Service designated by the Minister are entitled to attend meetings and to take part in the proceedings of the Board or of a committee . . . as if they were members thereof, without voting rights. ZMDC Act § 14.

54.    The Minister has the power to require the ZMDC to submit any report the Minister wishes, which may be laid before Parliament. ZMDC Act § 21. The Minister also has the absolute right to overrule any decision of the Board based on the Minister's view of the public interest. Section 25(1) of the ZMDC Act provides that "[t]he Minister may, after consultation with the Board, give to the Corporation such directions of a general character relating to the exercise by it of its functions, duties, and powers as appear to the Minister to be

requisite in the national interest." ZMDC "shall, with all due expedition, comply with any direction" given by the Minister. ZMDC Act § 25(2).

55.     The Minister has broad investigative powers into ZMDC's affairs and the power to obtain court orders compelling compliance with the ZMDC Act. ZMDC Act §§ 42-43. The Minister must approve ZMDC's General Manager. ZMDC Act § 24(1)(a).

56.     By statute, ZMDC must declare a dividend to pay the Republic any surplus funds. ZMDC Act § 33(2). In some instances, it must pay the Republic a dividend out of gross revenues. ZMDC Act § 33(3). The Accountant-General, "on behalf of the Treasury," and the "Governor of the Reserve Bank" has the power to issue certain "instructions" and "directives" to ZMDC, and the Corporation must comply with such instructions or directives. ZMDC Act § 33(5)-(7). Violation of certain of these provisions is a criminal offense. ZMDC Act § 33(8)-(9).

57.     A Schedule to the Act provides that numerous basic aspects of ZMDC's governance, including asset dispositions or leases, agreements with other government entities, issuing debt, issuing bonuses, creating or acquiring subsidiaries, providing financial assistance, and creating training or research schemes require approval from the Minister for Mines, and in some cases the Minister for Finance.

58.     In summary, The Republic's control of ZMDC is thus total. Every member of the Board is appointed and can be removed by the Minister and the General Manager is approved by the Minister, and all of them are expressly charged with pursuing government policy and must follow directions from the Minister. Indeed, directors of ZMDC or its subsidiaries have frequently also held senior positions in Zimbabwe's governing party or the Ministry of Mines. That control is routinely exercised in practice. For example, in 2018 and 2020, ZMDC's professional management opposed selling certain mines partially or wholly owned, but the

Government required it to do so.

59.     In 2020, the Government announced the acquisition of State-run gold mines by

one of President Emmerson Mnangagwa's advisors, Kuda Tagwirei. Tagwirei also bought

several gold mines owned by the government through the ZMDC. *Workers Union Welcomes*

*Tagwirei Take Over Of Govt Owned Gold Mines*, NewsZimbabwe, (July 6, 2020) (**Exhibit J**).

60.     The Government has also repeatedly directed ZMDC to strip the concessions of

joint venture partners who have fallen out of political favor, including Plaintiffs.

61.     Furthermore, on numerous occasions, the Government has exercised its control

over ZMDC to pay sovereign debts as detailed below.

2.     **The United States' Zimbabwe Sanctions Regulations Make ZMDC an SDN Precisely Because It Is The Republic's Pocket Book**

62.     Since July 25, 2008, ZMDC has been classified as a Specially Designated

National ("SDN") under the Zimbabwe Sanctions Regulations. *See* 31 C.F.R. Part 541 and

Executive Orders 13,288, 13,391, and 13,469.[1]

63.     The U.S. Department of the Treasury identified ZMDC as a "parastatal" in its

press release announcing the designation.

64.     The Press Release stated that:

> Today's designations include a number of Zimbabwean parastatals and entities that are owned or controlled by the Government of Zimbabwe. Robert Mugabe, his senior officials, and regime cronies have used these entities to illegally siphon revenue and foreign exchange from the Zimbabwean people. Treasury's designations today include . . . the Zimbabwe Mining Development Corporation (a.k.a. ZMDC), involved in investment in the mining industry in Zimbabwe, and in planning, coordinating and implementing mining projects on behalf of the Government of Zimbabwe.

---

[1] Plaintiffs and their counsel have given notice to OFAC of this suit to comply with those regulations.

65.     Thus, the United States' foreign policy recognizes that ZMDC is the Republic's pocket book.

66.     And as noted above, the State Department's 2022 Investment Climate Report for Zimbabwe stated that the Republic for some time directly ran ZMDC without a board.

        3.      **ZMDC's Assets Are Used To Pay the Republic's Debts and For Plainly Sovereign Purposes Like Military Funding and Procurement, Even As It Fails To Satisfy Its Own Debts**

67.     ZMDC has a history of nonpayment of its debts stretching back decades, including the failure of most of its mines in the early 2000s. In addition to the Award, it has judgments against it domestically for unpaid obligations. Numerous of its mines are idle due to undercapitalization. Its defaults have been bad enough to require repeated discussions with the Public Debt Management Office. In short, it has consistently failed to meet its financial obligations, neglecting to make timely payments for debts, both during the pendency of the arbitration and after the arbitral award was issued.

68.     The Republic has nevertheless directed ZMDC to repay a loan owed by the Republic using its share of proceeds from a mining project, including during times when ZMDC has not been paying its debts as they fall due.

69.     Most recently, the Government has developed a plan to shift valuable assets from ZMDC to a different state-owned company, Defold, in order to shield them from creditors. The Treasury approval stated that the assets, including shareholdings in subsidiaries and joint venture companies, would be "transferred," apparently for no value. News reports indicate that the express intention of the transfer was to protect the assets from ZMDC's creditors including Plaintiffs.

70.     News reports from Zimbabwe indicate a blatant scheme to transfer ZMDC's assets to defraud its creditors: "the Zimbabwe government plans to strip assets from its state-

owned mining company to stave off US$467 million in claims from creditors." The reports describe the mining assets as being held by the government "through" ZMDC, and that "the government is shifting some of the company's remaining assets into another vehicle, Defold Mine, hoping to escape legal trouble." As the report puts it, "unable to hive off the debts to the taxpayer, the Ministry of Mines has hatched a new plan; Mines Minister Winston Chitando has ordered that ZMDC's assets be spirited away into a new government company, Defold." The article specifically names Plaintiffs as among the creditors the Government seeks to defraud. **Exhibit K**.

71.     Notably, the Ministry of Mines and the Treasury pushed for this plan despite being advised by ZMDC's board that the transfer would be "illegal" and made clear that the plan was a fraudulent transfer while ZMDC was insolvent: "It is highly unlikely that disposing of the corporation's (or subsidiary's) assets for no consideration and the benefit of another company when it has debts of its own which have not been satisfied can be said to be in its best interests. In fact, the indications appear to be that the corporation's liabilities exceed its assets. This simply means that the corporation is not in a financially viable enough position to make a donation of such magnitude." *Id.*

72.     While taking and using ZMDC's assets, the Republic has repeatedly refused to take on ZMDC's liabilities, making clear that it is defrauding ZMDC's creditors by transferring ZMDC's assets and leaving its liabilities behind.

73.     Additionally, the Republic has several times in the past taken ZMDC's dividends from its joint ventures directly rather than allowing them to go to ZMDC, where creditors could reach them.

74.     News also emerged in 2022 that mining rights in government-owned mines may

have been arbitrarily awarded to an advisor to Zimbabwe's president. Bloomberg, *Tycoon Seen Scoring From Zimbabwe's $3.4 Billion Off-Budget Debt*, 360 Mozambique, (March 24, 2022) (**Exhibit L**).

75.     In 2019, the Ministry of Mines directed ZMDC to award a diamond mining concession to a company in the United Arab Emirates in partial satisfaction of a government debt. *Govt to offset debt with diamonds*, BusinessTimes, (March 14, 2019) (**Exhibit M**).

76.     In 2018, reports indicate that, amid a large-scale sell-off of ZMDC assets, the government "sold" mining rights to the Zimbabwean military.

77.     News reports suggest that the Republic may have conducted numerous other arms-for-mining rights deals with, among others, Russia and China over the last decade and also granted mining rights to the right-hand man of Belarus's dictator to curry favor with Belarus and Russia. In 2017, the Republic directed ZMDC to participate in another arms-for-minerals deal whereby ZMDC gave platinum mining rights to a Chinese company in exchange for weapons from China. *Mugabe lifts lid on arms-for-minerals deal with China*, New Zimbabwe, (February 22, 2017) (**Exhibit N**). The Republic has also repeatedly used ZMDC as a tool of its foreign relations, including, around the same time as Zimbabwe was litigating over the Award, granting mineral rights to a group of Russian investors in return for weapons from the Russian state-owned arms conglomerate Rostec in 2014. Dkt. 28-4 at Ex. 1 ("Arms deal behind platinum project")

78.     The Republic has also directed ZMDC to turn over its interests in a diamond mining joint venture to the Zimbabwe National Army, including during times when ZMDC has not been paying its debts as they fall due. Dkt. 28-4 at Ex. 2 (discussing the purported tender process that awarded mining assets to the Army and "there is no detail given as to the structure

of the ZMDC deals" and "[t]he ZDF's role at Kamativi is also not made clear").

79.     The revenues diverted from ZMDC while ZMDC was not paying its debts were used, among other things, to finance a new National Defence College in Zimbabwe; additionally, ZMDC has on a number of occasions awarded concessions to companies owned by senior government figures, effectively transferring ZMDC's own assets to the private benefit of regime figures. *See, e.g.*, **Exhibit O** (indicating that the Secretary of Defence, Police Commissioners, ruling party members, the director of Zimbabwe's geological survey, and senior army officers held stakes in a mining concession); **Exhibit P** (indicating that ZMDC awarded a concession to "Zimbabwe Defence Industry (ZDI), a company owned by the country's army").

80.     Thus, the Republic has continually treated ZMDC's revenues as if they were its profits, leaving nothing to pay creditors, and has similarly continually diverted ZMDC's revenues to shell companies controlled by political and military figures.

## V.     CLAIM FOR RELIEF

### COUNT I
### D.C. UNIFORM FOREIGN-COUNTRY MONEY JUDGMENTS RECOGNITION ACT
### D.C. CODE § 15-361 *ET SEQ.*

81.     Plaintiffs repeat and reallege each allegation contained in Paragraphs 1 through 40 above as if fully set forth herein.

82.     The Judgment is a foreign money judgment under the Uniform Foreign-Country Money Judgments Recognition Act, D.C. Code § 15-361, *et seq.*

83.     By providing "that the Plaintiffs be at liberty to enforce in the same manner as a judgment or order to the same effect the Final Award dated 12th January 2014," the Judgment granted recovery of a sum of money as provided in the Final Award. **Exhibit E** at 1.

84.     The High Court for Zambia had jurisdiction over the Judgment Defendants and the subject matter.

85.     The Judgment is final, conclusive, and enforceable under the laws of Zambia.

86.     The Judgment is not for taxes, fines, penalties, divorce, support, maintenance, or other domestic relations matters.

87.     Plaintiffs are accordingly entitled to an order recognizing the Judgment and entering a judgment of this Court thereon that is conclusive and enforceable in the same manner and to the same extent as a judgment of this Court.

88.     Plaintiffs are further entitled to an order recognizing that the Republic of Zimbabwe is the alter ego of the Judgment Defendants and is liable on the Judgment to the same extent as the Judgment Defendants.

89.     Plaintiffs are further entitled to their reasonable attorneys' fees and costs, consistent with the Award's finding that the prevailing party was entitled to recovery of legal expenses and the law of the Republic of Zimbabwe, which is the chosen law of the parties' agreements.

## VI.    PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs request entry of an order and judgment:

(a)     Recognizing and enforcing the Judgment;

(b)     Finding that the Republic of Zimbabwe is the alter ego of the Judgment Defendants;

(c)     Entering judgment against Defendants as provided by the Award, specifically:

(i)     Against ZMDC and the Republic of Zimbabwe and in favor of Amaplat in the amount of US$42,882,000 in damages;

(ii)    Against ZMDC and the Republic of Zimbabwe and in favor of Amari in the amount of US$3,900,000 in damages;

(iii)    Against all Defendants jointly and severally and in favor of Plaintiffs jointly in the amount of US$2,220,583.74;

(iv)    Against all Defendants jointly and severally and in favor of Plaintiffs jointly in the amount of US$900,000;

In each case, with post-award interest at 5% per annum from January 12, 2014 through the date of entry of the Judgment and post-Judgment interest at the Zambian statutory rate;

(d)    Awarding post-judgment interest at the Zambian statutory rate;

(e)    Awarding costs of this action and reasonable attorneys' fees; and

(f)    Awarding such other and further relief as this Court may deem just, proper, and equitable.

Dated:  May 24, 2023                                  Respectfully submitted,


   /s/ Steven K. Davidson   
Steven K. Davidson (D.C. Bar No. 407137)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, D.C.  20036-1795
Telephone:        202 429 3000
Facsimile:         202 429 3902
sdavidson@steptoe.com

Robert W. Mockler
Joseph M. Sanderson
(*pro hac vice*)
Niyati Ahuja
(*pro hac vice*)
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY  10036-7703
Telephone:        212 506 3900
Facsimile:         212 506 3950
rmockler@steptoe.com
josanderson@steptoe.com
nahuja@steptoe.com


*Attorneys for Plaintiffs*