# Exhibit A



**International Chamber of Commerce**
*The world business organization*

**International Court of Arbitration • Cour internationale d'arbitrage**

# AWARD

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

**ICC International Court of Arbitration  •  Cour internationale d'arbitrage de la CCI**
38 Cours Albert 1er, 75008 Paris, France
Tel +33 (0)1 49 53 28 28  Faxes +33 (0)1 49 53 29 29 / +33 (0)1 49 53 29 33
E-mail arb@iccwbo.org  Website www.iccarbitration.org

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 17720/ARP/MD/TO

**1.** AMAPLAT MAURITIUS LIMITED

(Mauritius**)**

**2.** AMARI NICKEL HOLDINGS ZIMBABWE LIMITED

(Mauritius)

vs/

**1.** ZIMBABWE MINING DEVELOPMENT CORPORATION

(Zimbabwe)

**2.** THE CHIEF MINING COMMISSIONER, MINISTRY OF MINES, ZIMBABWE

(Zimbabwe)

This document is an original of the Final Award rendered in conformity with the
Rules of Arbitration of the ICC International Court of Arbitration.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN  8000

<u>IN THE MATTER OF AN INTERNATIONAL CHAMBER OF COMMERCE ARBITRATION CASE NO. 17720/ARP/MD/TO</u>

<u>UNDER THE ICC RULES OF ARBITRATION 1998</u>

BETWEEN:

|   |   |   |
|---|---|---|
| 1. | AMAPLAT MAURITIUS LIMITED | |
| 2. | AMARI NICKEL HOLDINGS ZIMBABWE LIMITED | |
| | | **Claimants** |

- and –

|   |   |   |
|---|---|---|
| 1. | ZIMBABWE MINING DEVELOPMENT CORPORATION | |
| 2. | THE CHIEF MINING COMMISSIONER, MINISTRY OF MINES, ZIMBABWE | |
| | | **Respondents** |

# FINAL AWARD

Place of arbitration: Lusaka, Zambia

**Tribunal:**
**Mr Chikwendu Madumere**
**Professor Doug Jones**
**Mr Stuart Isaacs QC**

**12 January 2014**

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

2

# INDEX

|  |  | Paragraphs |
|---|---|---|
| I. | THE PARTIES AND THEIR LEGAL REPRESENTATIVES | 1-4 |
| II. | BACKGROUND | 5-9 |
| III. | ARBITRATION CLAUSE AND PROPER LAW | 10-11 |
| IV. | PROCEDURAL HISTORY | 12-88 |
| V. | THE TRIBUNAL'S JURISDICTION | 89-91 |
| VI. | LIABILITY | 92-182 |
| 1. | The Claimants are not shareholders in Zimari Nickel and Zimari Platinum | 93-104 |
| 2. | Absence of ZMDC board approval for the conclusion of the MOUs | 105-123 |
| 3. | Absence of ministerial approval for the conclusion of the MOUs | 124-145 |
| 4. | Failure to comply with condition precedent in Article 9 of the Nickel MOU | 146-151 |
| 5. | Illegality | 152-175 |
| 6. | Absence of any joint venture agreement | 176-178 |
| 7. | Cancellation of the MOUs | 179-182 |
| VII. | THE RELIEF CLAIMED | 183-212 |
| 1. | Platinum claim | 186-203 |
| 2. | Nickel claim | 204-212 |
| VIII. | INTEREST | 213-216 |
| IX. | COSTS | 217-226 |
| X. | AWARD | 227 |

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
..............................................
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN  8000

3

<u>IN THE MATTER OF AN INTERNATIONAL CHAMBER OF COMMERCE</u>
<u>ARBITRATION CASE NO. 17720/ARP/MD/TO</u>

BETWEEN:

|     |     |
| --- | --- |
| 1. | **AMAPLAT MAURITIUS LIMITED** |
| 2. | **AMARI NICKEL HOLDINGS ZIMBABWE LIMITED** |

<u>**Claimants**</u>

- and –

|     |     |
| --- | --- |
| 1. | **ZIMBABWE MINING DEVELOPMENT CORPORATION** |
| 2. | **THE CHIEF MINING COMMISSIONER, MINISTRY OF MINES, ZIMBABWE** |

<u>**Respondents**</u>

# FINAL AWARD

## I. THE PARTIES AND THEIR LEGAL REPRESENTATIVES

1.      The First Claimant is Amaplat Mauritius Limited (**"Amaplat"**), a company incorporated under the laws of Mauritius. The Second Claimant is Amari Nickel Holdings Zimbabwe Limited (**"Amari"**), also a company incorporated under the laws of Mauritius. Amari is a wholly-owned subsidiary of Amari Resources International Limited, an international resource investment company focused on exploration and mining in sub-Saharan Africa. The Claimants have their principal place of business at Amari, 3rd Floor, Melrose Boulevard, Melrose Arch, Johannesburg, South Africa. The Claimants are represented in these proceedings by Advocates Neil Lazarus SC and Saul Miller and by Bernadt Vukic Potash & Getz Attorneys (**"BVPG"**), 11th Floor No. 1 Thibault Square, Cape Town 8001, Republic of South Africa.

2.      The First Respondent is Zimbabwe Mining Development Corporation (**"ZMDC"**), a body corporate established under the Zimbabwe Mining Development Corporation Act (Cap. 21:08) of the Republic of Zimbabwe (**"the Act"**) having its address at Ground Floor, MMCZ Building, 90 Mutare Road, Msasa, Harare, Zimbabwe. ZMDC's business includes investing in mining and mining development on behalf of the Government of Zimbabwe. The Second Respondent is The Chief Mining Commissioner (**"the Chief Mining Commissioner"**), Ministry of Mines, Zimbabwe, having his address at 7th Floor, Zimre Centre, Private Bag CY 7709, Causeway, Harare, Zimbabwe. The Respondents are represented in these proceedings by Mutamangira & Associates (Mr Jacob Mutevedzi) Clairwood Chambers, 38 Clairwood Road, Alexandra Park, Harare, Zimbabwe.

## II. RELEVANT BACKGROUND

3.      ZMDC hold 45% of the shares in Zimari Nickel (Pvt) Ltd (**"Zimari Nickel"**), a joint venture company incorporated by those parties to prospect for nickel and develop a mine pursuant to a Memorandum of Understanding between Amari Holdings Ltd (**"Amari BVI"**), a company incorporated in the British Virgin Islands, and ZMDC dated 22 November 2007 (**"the Nickel MOU"**). According to the Claimants, Amari holds 55% of the shares in Zimari Nickel but this is disputed by the Respondents.

4.      By a Deed of Novation dated 6 June 2008 between Amari BVI, Amari and ZMDC (**"the Deed of Novation"**), with effect from 1 May 2008 Amari BVI was released and discharged from its rights and obligations pursuant to the Nickel MOU upon Amari's undertaking to Amari BVI and ZMDC to perform Amari BVI's obligations pursuant to the

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

..........................................

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

4

Nickel MOU and be bound by its terms and conditions as if Amari had been the original party to the Nickel MOU in place of Amari BVI. By clause 3.1 of the Deed of Novation, Amari BVI and ZMDC acknowledged that Amari would be solely entitled to the entire rights and benefits under the Nickel MOU as if Amari were the original party to it in place of Amari BVI.

5.      ZMDC holds 50% of the shares in Zimari Platinum (Pvt) Ltd (**"Zimari Platinum"**), a joint venture company incorporated by those parties to prospect for various metals and develop a mine pursuant to a Memorandum of Understanding between Amaplat and ZMDC dated 25 July 2008 (**"the Platinum MOU"**). According to the Claimants, Amaplat holds 50% of the shares in Zimari Platinum but this is disputed by the Respondents.

6.      The Nickel and the Platinum MOUs (together **"the MOUs"**) were concluded by Mr Michael Nunn on behalf of Amari BVI and Amaplat respectively and by Mr Dominic Mubayiwa, at the time ZMDC's Chief Executive Officer, on ZMDC's behalf.

7.      By a letter dated 10 November 2010 from ZMDC to the Claimants, ZMDC *inter alia* noted that there was "*a corrupt relationship which unduly influenced the signing of the [Platinum MOU]*"; stated that there was "*no Joint Venture Agreement regulating our relationship*"; and concluded that:

> "*As a result of the above, we advise you that your conduct is unacceptable, improper and directly undermines the basic tenets of corporate governance principles which we so cherish and adhere to. It contravenes the Zimbabwean laws and we reserve the right to report you for prosecution. Your conduct goes to the core of our relationship and as such we are no longer prepared to engage yourselves for negotiations to the next stage of a Joint Venture Agreement. In fact out relationship terminated for both platinum and nickel properties.*"

8.      By a letter dated 22 November 2010 in reply, the Claimants *inter alia* disputed ZMDC's allegations and its entitlement to terminate the MOUs and maintained that those agreements were legally binding and of full force and effect. By a letter dated 13 January 2011, the Claimants informed ZMDC that it would have no choice but to enforce their legal rights in the continuing absence of any undertaking from ZMDC that it would take no steps to prejudice the Claimants' rights pending the final determination of arbitration proceedings.

9.      By letters dated 14 January 2011, ZMDC reiterated its position that the MOUs had been "*cancelled*" and notified the Claimants forthwith to stop any exploration activities and to vacate the site.

## III. ARBITRATION CLAUSE AND PROPER LAW

10.     Article 11 of the Nickel MOU and Article 9 of the Platinum MOU provide that:

> "*In the event of a dispute or disputes arising, such disputes, controversies or differences between the Parties, which may arise out of or in relation to the MOU, and which cannot be settled by the Board, the parties shall first try to resolve it amicably through negotiation. In the event that no settlement can be reached through negotiation in reasonable time, any Party may submit the dispute to the ICC International Court of Arbitration in Paris for arbitration in accordance with the procedural rules of arbitration of the said Arbitration Court in effect at the time of applying arbitration, the award of which shall be final and binding upon the Parties. The language in Arbitration shall be in English.*"

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

................................................

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

5

11.    In accordance with Article 12.7 of the Nickel MOU and Article 10.8 of the Platinum MOU, the present dispute is to be determined under the laws of Zimbabwe.

## IV. PROCEDURAL HISTORY

12.    On 2 February 2011, the Secretariat of the International Court of Arbitration (**"the Secretariat"**) received from the Claimants a Request for Arbitration and attached a Statement of Claim dated 31 January 2011 (**"the Request"**). On 15 February 2011, the Secretariat served the Request on the Respondents.

13.    The arbitration clauses did not specify the number of arbitrators. By paragraph 9 of the Request, the Claimants requested the appointment of a Sole Arbitrator.

14.    By a letter dated 2 March 2011, the Claimants requested that the arbitration take place in Gabarone, Botswana.

15.    By a letter dated 10 March 2011 from Mutamangira & Associates, the Respondents stated that they objected to the appointment of a Sole Arbitrator and requested the appointment of three arbitrators.

16.    On 22 March 2011, the Respondents sent by email to the Secretariat the "*First and Second Respondent's* [sic] *Statement of Opposition* dated March 2011 (**"the Answer"**), together with a covering letter dated 17 March 2011. The Answer was a revised version of a document previously emailed to the Secretariat on 18 March 2011.

17.    On 29 March 2011, the Secretariat invited the Respondents to comment on the Claimants' proposal that the place of arbitration be Gabarone.

18.    On 31 March 2011, the Respondents "*recommended*" that the place of arbitration be Namibia and stated that, in the absence of agreement between the parties on that issue, the place of arbitration should be determined by the International Court of Arbitration of the ICC (**"the Court"**).

19.    In circumstances where the parties were unable to agree on the number of arbitrators and on the place of the arbitration, on 12 May 2011, the Court decided *inter alia*:

    (1)    pursuant to Article 8(2) of the Rules of Arbitration in force as from 1 January 1998 (**"the Rules"**), that the matter would be submitted to three arbitrators;

    (2)    pursuant to Article 14(1) of the Rules to fix Lusaka, Zambia, as the place of the arbitration.

20.    Also on 12 May 2011, the Claimants served a Notice of Amendment to the Statement of Claim.

21.    On 25 May 2011, the Claimants served the Amended Statement of Claim dated 25 May 2011.

22.    In May 2011 (the precise date in May 2011 is unclear), the Respondents served an Amended Statement of Opposition (the **"Amended Answer"**).

23.    On 29 August 2011, the Claimants served a Replication (**"the Reply"**) and Notice of Amendment to the Statement of Claim each dated 29 August 2011.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

.........................................................................

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN  8000

6

24.    On 27 September 2011, the Secretary General of the Court, pursuant to Article 9(2) of the Rules, confirmed Judge Meyer Joffe as co-arbitrator upon the joint nomination of the Claimants and confirmed Mr James Prince Mutizwa as co-arbitrator upon the joint nomination of the Respondents.

25.    On 27 October 2011, pursuant to Article 9(3) of the Rules, the Court appointed Mr Stuart Isaacs QC then of 3-4 South Square, Gray's Inn, London WC1R 5HP and now of Berwin Leighton Paisner LLP, Adelaide House, London Bridge, London EC4R 9HA as Chairman of the Tribunal, upon the proposal of the United Kingdom National Committee.

26.    The Amended Statement of Claim was further amended on 9 November 2011.

27.    On 28 November 2011, a procedural meeting was held at the offices of Edward Nathan Sonnenburgs, 150 West Street, Sandown, Sandton, South Africa attended by Mr Lazarus SC and Mr Ian Small-Smith of the Claimants' then attorneys, together with Mr Mark Robert Summers, for the Claimants; and by Mr Itayi Ndudzo and Mr Erik William Morris SC for the Respondents and by the Tribunal as then constituted. The Terms of Reference were signed at that meeting.

28.    At the meeting, the Respondents submitted that the Tribunal should deal with the issue of its jurisdiction as a preliminary issue. That submission was opposed by the Claimants. After deliberation, the Tribunal decided that because the basis for that submission was inextricably linked to the issue of the Respondents' liability, the appropriate course was to decide the issue of jurisdiction at the same time as the substance of the case.

29.    Having taken into account the parties' respective written and oral submissions at the meeting, the Tribunal made Procedural Order 1 of that date which gave directions for the future conduct of the proceedings in accordance with the Procedural Timetable laid down by the Tribunal.

30.    On 15 February 2012, the Claimants served their first memorial.

31.    On 29 March 2012, the Respondents served their defence memorial.

32.    On 15 May 2012 and 21 June 2012, the Tribunal gave its rulings on the Claimants' request for document production made in accordance with paragraph 7 of Procedural Order 1. There was no necessity for the Tribunal to make any ruling on the Respondents' request for document production made in accordance with those provisions.

33.    On 28 May 2012, the Claimants served their reply to the defence memorial.

34.    On 20 June 2012, the Claimants further amended the Amended Statement of Claim.

35.    On 30 June 2012, the Tribunal made Procedural Order 2 which gave further directions for the future conduct of the proceedings.

36.    On 18 and 19 July 2012, a meeting of experts was held in Johannesburg attended by Mr Thomas Alexander Wixley, Mr Philip Le Roux and Mr Henrik Frederik Johannes Theart for the Claimants and Mr René Carlo Hochreiter and Mr Shepherd Alexander Gaihai for the Respondents at which the experts prepared a joint report **("the Joint Report")**.

37.    On 21 July 2012, the Tribunal directed that supplementary experts' reports be dispensed with.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

7

38.     On 23 July 2012, a procedural meeting was held by conference call to consider the future conduct of the proceedings.

39.     By a letter dated 24 July 2012 from the Claimants' attorneys, the Claimants' claim was further amended as follows:

>       (1)     The principal amount of Amaplat's main claim was reduced from US$127,000,000 to US$37,659,000;

>       (2)     The principal amount of Amari's main claim was reduced from US$9,400,000 to US$3,900,000;

>       (3)     In the event that it is found that the Platinum MOU is invalid for any reason or that ZMDC was entitled to terminate it, Amaplat seeks payment of the principal sum of US$4,498,190 and interest by way of restitutionary relief (being the amount invested by Amaplat in the platinum assets owned by Zimari Platinum);

>       (4)     In the event that it is found that the Nickel MOU is invalid for any reason or that ZMDC was entitled to terminate it, Amari seeks payment of the principal sum of US$578,559 and interest by way of restitutionary relief (being the amount invested by Amari in the platinum assets owned by Zimari Nickel).

40.     By Procedural Order 3 dated 24 July 2012, the Tribunal gave directions relating to the preparation for and conduct of the hearing of the arbitration.

41.     On 3 August 2012, after considering the parties' written submissions, the Tribunal directed that written closing submissions should be exchanged simultaneously by 4pm on Tuesday 21 August 2012.

42.     On 6 August 2012, the Claimants served their written opening submissions.

43.     On 7 August 2012, the Respondents served their written opening submissions.

44.     Pursuant to paragraph 8.1 of Procedural Order 1, the hearing of the arbitration took place at the Taj Hotel, Cape Town, Republic of South Africa between 13 and 20 August 2012. The Claimants were represented by Mr Lazarus SC and Advocate Saul Miller and BVPG. The Respondents were represented by Mutamangira & Associates.

45.     On 13 August 2012, the first day of the hearing, the Respondents renewed their submission that the Tribunal should deal with the issue of jurisdiction as a preliminary issue, on the basis that the circumstances had changed since its previous ruling now that it was clear that certain witnesses, namely Mr Amos Midzi, the Minister of Mines and Mining Development at the material times, and Ms Caroline Sandura, the chairperson of ZMDC at the material times, would not be giving evidence at the hearing. That submission was opposed by the Claimants. After deliberation, the Tribunal determined that those circumstances did not justify a departure from its previous ruling that the issue of jurisdiction should be decided at the same time as the substance of the case.[1]

46.     By a letter dated 15 August 2012, Amaplat revised its main claim upwards to US$42,882,000, based on the latest consensus forecast metal prices as at 31 July 2012 and the latest forecast ZAR/USD exchange rates (from the Economist Intelligence Unit).

---

[1] Transcript 13/8/12 p. 38 line 12 to p. 39 line 5.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN  8000

8

47.   At the hearing, oral evidence of fact was given on the Claimants' behalf in the following order by the following persons, each of whom had made an undated statement (and, in the case of Mr Mubayiwa, two undated statements:

(1)   Richard Charles Macdonald Napier, who until March 2011 was the managing director of Amari Resources Holdings Ltd **("Amari Resources Holdings")**, a holding company of Amaplat and Amari, and a director of Zimari Nickel and Zimari Platinum. Amari Resource Holdings' principal shareholder is Amari BVI.

(2)   Thabani Ndlovu, who between August 2005 and June 2008 was the Permanent Secretary at the Ministry of Mines.

(3)   Janet Sakuerwa Mutasa, a chartered accountant and a director of JSM Consulting Private Ltd **("JSM")**, a company that offers professional services for the maintenance of companies' statutory records.

(4)   Beauty Hwindizi, a consultant employed by JSM since 5 May 2008.

(5)   Mr Summers, Amari Resource Holdings' group financial director.

(6)   Tichaona John Muhonde, a qualified lawyer practising in Zimbabwe who was employed at ZMDC in January 2007 as an assistant company secretary and legal advisor and who, in about June 2008, was made ZMDC's company secretary and legal advisor.

(7)   Mr Mubayiwa. Prior to being sent on forced leave in July 2010, Mr Mubayiwa had held the post of ZMDC's Chief Executive Officer since May 2003. Before that, he had been ZMDC's internal auditor between 1985 and 1987, the mine secretary between 1987 and 1989 and had then held positions as the corporate accountant, group chief accountant and finance director/financial controller until his appointment as the Chief Executive Officer.

(8)   Mr Nunn, the executive chairman and a director of Amari BVI, the ultimate holding company of the Amari Group.

(9)   Mr Rhys Ralph, Mr Nunn's personal assistant from March to October 2008 in Amari Services (Pty) Ltd **("Amari Services")**, a company owned by Mr Nunn and Mr Summers through family trusts which became part of the Amari Group in 2009.

48.   The oral expert evidence followed and was given on the Claimants' behalf by the following persons, of whom each made an undated statement:

(1)   Mr Theart, an economic geologist employed by SRK Consulting (South Africa) (Pty) Ltd **("SRK")** who co-authored a report commissioned by Zimari Platinum dated 6 October 2010. Mr Theart's statement exhibited that report.

(2)   Mr Clarkson Mafirakureva Kamurai, a consultant financial mining engineer and the Amari Group's country manager in Zimbabwe between June 2008 and about June 2010. Mr Kamurai gave both factual and expert evidence. He made an undated factual statement and an undated  expert's report which was only signed on 15 August 2012 during the course of his oral evidence

(3)   Mr Neale Goddard, a mechanical engineer employed by DRA Mineral Projects (Pty) Ltd **("DRA")** who, together with Ms Michelle Schroder, a process

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

..............................................
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

9

engineer employed by DRA, prepared the DRA scoping study report on the Serui
platinum mine dated October 2010.

(4)      Ms Schroder, who prepared the DRA Serui Pre-feasibility Study [6/p.192].

(5)      Mr Le Roux, an exploration geologist who until the end of 2010 was
employed in the Amari Group and who was involved in the exploration and pre-
feasibility studies in relation to the nickel and platinum joint ventures pursued by the
Amari Group with ZMDC. Mr Le Roux gave both factual and expert evidence.

(6)      Mr Wixley, a chartered accountant with extensive experience of the provision
of auditing and consulting services. Mr Wixley made statements signed on 15 August
2012.

49.      The witnesses all affirmed to the truth of their evidence.

50.      The parties were unable to agree a timetable for the oral evidence as requested by the
Tribunal. The Tribunal afforded the Respondents considerable latitude to extend the time
proposed by the Claimants for cross-examination by the Respondents of the Claimants'
witnesses, so as to ensure that the Respondents had sufficient opportunity to put their case to
those witnesses.

51.      On the morning of the second day of the hearing, 14 August 2012, following the
conclusion of Mr Summers' cross-examination, the Respondents intimated that they intended
to make a challenge to the Tribunal under Article 11 of the Rules and applied for the
proceedings to be adjourned until that challenge had been determined by the Court. The
application was opposed by the Claimants. Having carefully considered the parties'
submissions on the application, the Tribunal dismissed the application, for the reasons given
at the time.[2]

52.      The Respondents then requested a short adjournment to consider their position and
the Tribunal granted that request. Following that adjournment, the Respondents then took the
decision to withdraw from the proceedings with immediate effect.

53.      The Tribunal, having deliberated, determined in accordance with Article 6(3) of the
Rules to continue with the proceedings in the Respondents' absence.

54.      The hearing then continued with the evidence of Mr Muhonde and the subsequent
factual and expert witnesses referred to above. For the reason just mentioned, their evidence
was not the subject of cross-examination by the Respondents.

55.      Also, for the same reason, no witnesses were called on behalf of the Respondents. In
those circumstances, pursuant to paragraph 6 of Procedural Order 1, the witness statements
served on behalf of the Respondents were not in evidence before the Tribunal.

56.      Following their decision to withdraw from the proceedings, the Respondents
continued to be provided by the Tribunal and the Claimants with the transcripts of the
proceedings, the Claimants' written closing submissions and all other documents supplied by
the Claimants to the Tribunal and were at all times invited by the Tribunal to participate in the
proceedings.

57.      At the start of the third day of the hearing, 15 August 2012, Mr Mutizwa made a
statement to the effect that he had tendered his resignation as an arbitrator and that, while he

---

[2] Transcript 14/8/12 p. 263 line 13 to p. 264 line 10.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

10

recognised that he remained a member of the Tribunal until such time as the Court might accept his resignation, he did not wish to participate in the remainder of the hearing. He therefore left the hearing.

58.     After hearing submissions from the Claimants, and having deliberated, the remaining members of the Tribunal decided, in particular in the light of Article 12(5) of the Rules, that the hearing should proceed.

59.     The Tribunal then proceeded to hear the evidence of Mr Theart and the following witnesses mentioned above.

60.     Pending a decision by the Court on Mr Mutizwa's resignation as an arbitrator, and at his request, he continued to be provided with the transcripts of the proceedings, the Claimants' written closing submissions and all other documents supplied by the Claimants to the Tribunal.

61.     In addition to the written and oral evidence adduced by the parties, the Tribunal also considered the parties' respective memorials and written opening submissions. Following the conclusion of the evidence, on 20 August 2012 the Claimants served written closing submissions and the Tribunal heard oral closing submissions from the Claimants.

62.     At the Tribunal's request, the Claimants provided the Respondents with a copy of their written closing submissions and the transcript of the hearing on 20 August 2012.

63.     The Respondents were invited by the Tribunal to respond to those submissions by 10 September 2012, without prejudice to their challenge to the Tribunal's jurisdiction and to the Tribunal itself, but they did not do so.

64.     On 28 August 2012, the Claimants served an updated schedule of costs which took into account certain costs and expenses not included in the schedule of costs given to the Tribunal on 20 August 2012. On the same date, the Tribunal invited the Respondents to comment on the Claimants' updated schedule of costs. However, the Respondents did not do so.

65.     On 27 September 2012, the Court decided:

    (1)     pursuant to Article 12(1) of the Rules to accept the resignation of Mr Mutizwa;

    (2)     pursuant to Article 11(3) of the Rules, to reject the challenges to Judge Joffe and Mr Isaacs QC;

    (3)     to invite the Respondents to nominate a co-arbitrator in replacement of Mr Mutizwa within 15 days from 28 September 2012.

66.     The Respondents failed to nominate a co-arbitrator in replacement of Mr Mutizwa within that period, that is, by 12 October 2012.

67.     On 15 October 2012, in proceedings brought against the Claimants, Mr Isaacs QC and Judge Joffe, the Respondents obtained *ex parte* from the Zambian High Court an order restraining Mr Isaacs QC and Judge Joffe from proceeding with the arbitration until further order.

68.     On or about 7 November 2012, the Claimants applied *inter partes* to the Zambian High Court to discharge the *ex parte* order made on 15 October 2012.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

..................................
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

11

69.    On 31 January 2013, pursuant to Article 12(4) of the Rules, the Court appointed directly as co-arbitrator on behalf of Respondents Mr Chikwendu Madumere of Madumere & Madumere, 79 Adetokumbo Ademola Crescent Suite 5B, Wuse II, Abuja, Nigeria (tel: +234-8033303677; email: cm@madumereandco.com).

70.    On 10 March 2013, the newly constituted Tribunal, after inviting the parties' submissions, decided to stay the arbitration proceedings until whichever was the earlier of (a) two weeks after the judgment of the Zambian High Court was given on the Claimants' application to discharge the *ex parte* order and (b) 11 May 2013, at which time the Tribunal would review the position.

71.    On 8 May 2013, the Tribunal, having noted with regret that the Zambian Court had yet to give judgment in respect of the Claimants' application to discharge the *ex parte* order, decided to extend the stay until whichever was the earlier of (a) two weeks after the judgment of the Zambian High Court was given on that application and (b) 11 July 2013, after which the Tribunal would review the position.

72.    On 21 June 2013, Judge Joffe tendered his resignation as the co-arbitrator on the Claimants' behalf.

73.    On 4 July 2013, the Court decided pursuant to Article 12(1) of the Rules to accept Judge Joffe's resignation.

74.    On 11 July 2013, the stay of the proceedings came to an end, without the Zambian High Court having given judgment on the Claimants' application to discharge the *ex parte* order. At the time of this Final Award, the Zambian High Court has, so far as the Tribunal is aware, still not given judgment on the Claimants' application to discharge the *ex parte* order.

75.    On 12 July 2013, pursuant to Article 9(2) of the Rules, the Secretary General confirmed Professor Douglas Jones of Clayton Utz, Level 15, 1 Bligh Street, Sydney NSW 2000, Australia (tel: +61 2 9353 4120; fax +61 2 8220 6700; email: *djones@claytonutz.com*) as co-arbitrator in replacement of Mr Joffe, upon the Claimants' joint nomination.

76.    On 14 July 2013, the Respondents pursuant to Article 14(1) of the Rules challenged the appointment of Professor Jones.

77.    On 25 July 2013, the Court decided pursuant to Article 11(3) of the Rules to reject the challenge to Professor Jones as co-arbitrator and also decided pursuant to Article 12(2) of the Rules not to initiate replacement proceedings against Mr Madumere.

78.    On 27 July 2013, the Tribunal invited submissions from the parties on the future conduct of the proceedings.

79.    On 24 August 2013, following consideration of written submissions from the parties contained in a letter dated 1 August 2013 sent on the Claimants' behalf and an email dated 29 July 2013 sent on the Respondents' behalf, the Tribunal informed the parties *inter alia* that:

    (1)    the arbitration proceedings would continue;

    (2)    its provisional view was that the proceedings should be conducted on the basis of the existing record of the proceedings at the August 2012 hearing and without the need for the oral evidence given at that hearing to be reheard but that it wished to have the benefit of further oral submissions from the parties' counsel, in particular so that those members of the Tribunal who were not present at the previous

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

hearing would have the opportunity to clarify directly with the parties any matters relating to the evidence given and legal submissions made and to afford the Respondents the opportunity to make submissions on the substance of the case;

(3)     it required the Claimants to prepare a full hearing bundle for the hearing;

(4)     it proposed to hold a hearing in London on 4 and 5 November 2013 and requested the parties to confirm their availability for that hearing and, if not convenient to them, to propose alternative dates/venue for the hearing.

The Tribunal requested the parties to provide their comments on its proposals by 2 September 2013.

80.     By a letter dated 27 August 2013, the Respondents stated that they intended to take no part in the proceedings.

81.     By a letter dated 28 August 2013, the Claimants confirmed their availability for a hearing in London on 4 and 5 November 2013 and that they would provide a full hearing bundle for the hearing to the Respondents, should they require it. On the same day, the Tribunal directed that the Claimants should provide a full hearing bundle to the Respondents in any event.

82.     On 4 September 2013, the Tribunal gave directions in relation to the hearing in London on 4 and 5 November 2013. In particular, the Tribunal requested that, as the hearing, the parties should identify in their submissions the materials in the record of the previous hearing on the basis of which the Tribunal was being ask to determine the case; and update the Tribunal on matters since the August 2012 hearing and on any aspects of their respective cases which required to be updated.

83.     On 30 October 2013, the Tribunal confirmed that it looked forward to meeting with the parties at the hearing fixed to start on 4 November 2013. The Claimants confirmed their participation in the proceedings; the Respondents confirmed that their position to the effect that they would be taking no part in the proceedings because they regarded them as a nullity remained unchanged.

84.     The hearing of the arbitration took place on 4 November 2013 at the International Dispute Resolution Centre, 70 Fleet Street, London EC4Y 1EU. The Claimants were represented by Mr Lazarus SC and Mr Miller. Mr Nunn was also present. The Respondents did not appear and were not represented. The hearing was transcribed and a copy of the transcript was emailed to the Respondents by the Tribunal the same evening.

85.     Following the hearing, and as directed by the Tribunal at the hearing, on 18 November 2013 the Claimants provided to the Tribunal and the Respondents their written submissions in response to queries from the Tribunal during the hearing and an updated summary of legal expenses.

86.     On the same day, the Tribunal afforded the Respondents the opportunity by 3 December to respond to the materials provided by the Claimants. However, no response was received from the Respondents.

87.     On 4 December 2013, pursuant to Article 22 of the Rules, the Tribunal declared the proceedings closed. On 12 December 2013, the Tribunal reopened the proceedings for the limited purpose of address the specific issue whether the Claimants, as they submitted in their letter of 12 December 2013, should be entitled to recover the

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

13

additional sum of US$45,000 in respect of the final tranche of the advance of costs which the Respondents had failed to pay and which the Claimants have paid in substitution; and requested the Respondents to provide any reply submissions by no later than midday Johannesburg time on 16 December 2013. No such submissions were received. On 16 December 2013, the Tribunal again declared the proceedings closed.

88.     The time limit for rendering the Final Award is 28 February 2014, in accordance with the Court's decision on 12 September 2013 pursuant to Article 24(2) of the Rules to extend the time limit to that date.

## V. THE TRIBUNAL'S JURISDICTION

89.     At all material times, the Respondents maintained that the Tribunal lacks jurisdiction to determine the dispute between the parties.

90.     The grounds for the Respondents' submission that the Tribunal lacks substantive jurisdiction are that:

> (1)     The Nickel MOU lapsed on 31 December 2007 pursuant to Article 9 thereof and became of no force or effect; and the arbitration provisions in Article 11 thereof are an integral part of the Nickel MOU which also lapsed and consequently became of no force or effect.[3]

> (2)     The MOUs are invalid and tainted with illegality under the laws of Zimbabwe for non-compliance with the mandatory provisions of the Act which required that any agreement entered into by ZMDC must be approved by the Minister of Mines and Mining Development (**"the Minister"**). To give effect to the arbitration clause of an agreement tainted with illegality is to grant specific performance of the illegal agreement and it is contrary to the public policy of the Republic of Zimbabwe effectively to grant such specific performance.[4]

> (3)     Clause 5 of the Deed of Novation confers exclusive jurisdiction on the courts of England and Wales in respect of disputes or claims arising out of or in connection with the subject matter of the Deed of Novation.[5]

91.     For the reasons set out below in Section VI, which deals with liability, and for those given at the time of the previous hearing,[6] the Tribunal rejects the Respondents' submission and determines that it has substantive jurisdiction to determine the present dispute.

## VI. LIABILITY

92.     The Respondents disputed liability under the MOUs on seven grounds:

> (1)     the Claimants are not shareholders in Zimari Nickel and Zimari Platinum;

> (2)     the absence of ZMDC board approval for the conclusion of the MOUs;

---

[3] Amended Answer §9.

[4] *Ibid.*, §10.

[5] Transcript 13/8/12 p. 30 line 14 to p. 31 line 16.

[6] *Ibid.*, p.38 line 12 to p. 39 line 5.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

.............................................................

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

14

(3)     the absence of ministerial approval for the conclusion of the MOUs;

(4)     the failure to comply with the condition precedent in Article 9 of the Nickel MOU;

(5)     illegality;

(6)     the absence of any joint venture agreement;

(7)     the MOUs were validly cancelled.

93.     The Claimants submitted that the MOUs remain valid and binding.[7] Alternatively, they submitted that the Respondents have waived any right that they might otherwise have had or else are estopped from contending that the MOUs are not valid and binding as, with knowledge of the purported invalidities on which they now rely, they gave effect to and implemented the MOUs in various respects.[8]

94.     It is convenient to consider each of those grounds in turn.

### 1. The Claimants are not shareholders in Zimari Nickel and Zimari Platinum

95.     At the outset, it is necessary to determine whether the Claimants are shareholders in Zimari Nickel and Zimari Platinum since the Respondents disputed that they are.

96.     The Claimants rely on the respective share certificates and the share register documentation as establishing their respective shareholdings. They point to the fact that two of the four active directors of Zimari Platinum were appointed by Amaplat; and that three of the five active directors of Zimari Nickel were appointed by Amari. They rely on the evidence of Ms Mutasa, who describes in detail in her statement how the Claimants came to acquire their respective shareholdings in Zimari Nickel and Zimari Platinum. In particular, she describes why all the documents relating to those companies of which the authenticity is challenged by the Respondents are in fact authentic. The also rely on the evidence of Ms Hwindizi.

97.     The Respondents' submission, set out in paragraph 33 of the Amended Answer, is that no allotment of shares was ever made and that, in consequence, only the initial subscribers hold shares. The basis for that submission is to be found in affidavits dated 21 January 2011 and 3 February 2011 of Tinashe Collins Chiparo, ZMDC's company secretary and legal advisor, which were served on behalf of the Respondents. Although, for the reason already mentioned, those affidavits were not in evidence before the Tribunal, Mr Chiparo deposes to the fact that he was advised by JSM that there never was any allotment of shares and that the only registered shareholders are the initial subscribers. He alleges that the register of allotments for the two companies and the information recorded in them and the relevant share certificates are fabricated. The Respondents submitted that without the production of public documents bearing the seal of the Registrar of Companies the Claimants cannot establish their status as shareholders and that their claims must therefore fail.

98.     When the Respondents' allegations were put to Ms Mutasa in her oral evidence in chief, she took issue with them. She stated that the share certificates were issued in the

---

[7] Reply §15.

[8] *Ibid.*, §4, 5 and 16.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

15

Claimants' favour and in ZMDC's favour were issued "*in line with the Zimbabwean Investment Licences that were presented to us*"[9] and denied that the share register was the product of any fraudulent conspiracy between the Amari Group and JSM, stating that "*we simply prepared the share registers at each point that the share register had to be updated ... so we didn't like prepare it in retrospect, we prepared it as we prepared returns that had to be submitted to the Registrar of Companies*".[10] Her evidence to the above effect was maintained in cross-examination.

99.     In her witness statement, Ms Hwindizi states that she told Mr Chiparo that the Claimants had not been allotted shares in Zimari Nickel and Zimari Platinum because the shares had been *transferred* to them (and to ZMDC). She denied having ever advised him that the initial subscribers were the only, or remaining shareholders in those companies. She also confirmed the authenticity of all the documents relating to them. In her oral evidence in chief, she elaborated on the circumstances of Mr Chiparo's inspection of the companies' files which were under her custody and control. She confirmed that, contrary to Mr Chiparo's position, the documents were not missing from the companies' files at the time of the inspection and only subsequently created.[11] She repeated that evidence in cross-examination.[12]

### Tribunal's discussion and conclusion

100.     Based on the evidence of Ms Mutasa and Ms Hwindizi, which the Tribunal accepts, the Tribunal finds by a majority that the share certificates and the share registration documentation adduced on the Claimants' behalf are authentic and establish the Claimants' respective shareholdings in Zimari Nickel and Zimari Platinum respectively. The evidence contradicts the Respondents' position that only the initial subscribers for the shares in those companies hold shares.

101.     There is no basis for the Respondents' submission that the documentation was fabricated – a most serious allegation which would place JSM as a co-conspirator with the Claimants in an attempt to mislead the Tribunal. In the light of the evidence, the Tribunal has no hesitation in rejecting it. The submission is based on Mr Chiparo's position that the documentation in question must have been created after the event since it was not to be found when he inspected the companies' files. However, the Tribunal accepts the evidence that the documentation was in the companies' files at the time of his inspection and so finds. Therefore, there is no factual basis for the Respondents' submission.

102.     The Tribunal also rejects the Respondents' submission that the Claimants' status as shareholders cannot be established without the production of public documents bearing the seal of the Registrar of Companies. No authority was put forward in support of that submission and the available evidence referred to above is, in the Tribunal's view, conclusive.

103.     However, a minority of the Tribunal does not accept Ms Mutasa's and Ms Hwindizi's evidence as establishing that the share certificates tendered before the Tribunal are indeed those of the two companies or that the requirements of the Zimbabwe Companies Act relating to the issue of share certificates have been fulfilled. The minority therefore considers that the Claimants have not, on the evidence, proved their respective shareholdings in Zimari Nickel and Zimari Platinum.

---

[9] Transcript 13/8/12 p. 150 lines 8-11.

[10] Transcript 13/8/12 p. 150 line 12 to p. 151 line 1.

[11] *Ibid.*, p. 173 line 2 to p. 176 line 24.

[12] *Ibid.*, p. 184 line 2 to p. 185 line 20; p.194 lines 17-25.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN  8000

16

104.    The Tribunal therefore concludes by a majority that Amari holds 55% of the shares in Zimari Nickel; and that Amaplat holds 50% of the shares in Zimari Platinum.

## 2. Absence of ZMDC board approval for the conclusion of the MOUs

105.    The Respondents submitted that the ZMDC board did not approve the conclusion of the MOUs. The basis for that submission is to be found in Mr Chiparo's affidavit dated 21 January 2011, where he deposes that he did not find amongst the board minutes for the years 2006 to 2010 any board resolution authorising the signing of the MOUs.

106.    However, the Claimants rely on the minutes of the relevant ZMDC board meetings produced by them and the evidence of Mr Mubayiwa and Mr Muhonde to demonstrate that board approval was given for the conclusion by ZMDC of the MOUs.

107.    On 1 November 2007, the ZMDC board resolved to conclude the Nickel MOU. The minutes of the board meeting on that date, at which Mr Mubayiwa was present and Mr Muhonde was in attendance, record a discussion about the Nickel MOU which concluded in a resolution:

> "THAT the MOU be and is hereby approved subject to management renegotiating the shareholding structure giving ZMDC a minimum of 40% and a maximum of 50%"

It is common ground that ZMDC did acquire a 45% shareholding.

108.    On 25 July 2008, the ZMDC board resolved, at an extraordinary meeting called for the purpose, to conclude the Platinum MOU. The minutes of the board meeting on that date, at which again Mr Mubayiwa was present and Mr Muhonde was in attendance, record a discussion about the Platinum MOU after which the board resolved that:

> "1.    ... authority for ZMDC to enter into a Platinum Joint Venture Agreement with Amaplat be and is hereby granted.
>
> 2.    The Chief Executive Officer, Mr. Dominic L. Mubayiwa be and is hereby authorized to negotiate, conclude and sign the said Joint Venture Agreement."

109.    In this context, on 15 May 2012 the Tribunal inter alia ordered the production by ZMDC of all agendas and minutes of ZMDC's board meetings between 1 January 2006 and 31 December 2010. On 21 June 2012, the Tribunal confirmed its previous order, except in relation to the board minutes already exhibited to Mr Muhonda's statement. On 27 June 2012, the Respondents stated that there were no further minutes capable of being produced pursuant to the Tribunal's order.

110.    Mr Mubayiwa was the person responsible at ZMDC for overseeing all of its joint ventures. As the minutes show, he attended the relevant board meetings. In his first witness statement, Mr Mubayiwa states that, following the grant of ministerial approval:

> "15.    ... the board resolved to conclude the Nickel MOU ... and authorised me to execute the Nickel MOU on its ZMDC's] behalf.
> 16.    I signed the Nickel MOU on 22 November 2007 and Nunn signed the MOU on behalf of Amari Holdings Limited on the same date.
> 17.    The approval required by the board of the ZMDC as contemplated in article 9.1.1 of the Nickel MOU was obtained prior to 31 December 2007.
> 18.    The ZMDC board approved the Platinum MOU in the same manner as it approved the Nickel MOU. The following occurred:

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

17

...

    18.5    *After having received the Minister's approval as required by law, the ZMDC board resolved to conclude the Platinum MOU and authorised me to do so on behalf of the ZMDC.*

    19.    *On 25 July 2008 I signed the Platinum MOU on behalf of the ZMDC and Nunn signed this agreement on behalf of Amaplat ... ."*

111.    In his oral evidence, Mr Mubayiwa confirmed that evidence.[13]

112.    Mr Muhonde was also in attendance at the relevant board meetings. In his witness statement, he refers to the fact that, like Mr Muhonda, he was sent on forced leave from ZMDC in July 2010 and subsequently had the laptop belonging to ZMDC which he had used while working there removed from his home by a security officer. He says that when the laptop was returned to him, the contents of the hard drive had been wiped but that he had previously backed up its contents to an external hard drive which he had at home. It was from that external hard drive that he was able to produce copies of the agenda for the ZMDC board meeting on 25 July 2008 and the minutes of the ZMDC board meetings that were in evidence before the Tribunal, together with other documents sent to or by him or on which he had worked.

113.    Mr Muhonde substantially corroborated Mr Mubayiwa's evidence. In particular, with regard to paragraphs 5 and 6 of the minutes of the 1 November 2007 board meeting concerning the Nickel MOU, he says in his witness statement:

    "22.    *... The ZMDC board expressed their reservations regarding Morgan Hill obtaining a stake in the venture, which did not appear appropriate to the ZMDC board. The ZMDC board approved the conclusion of the MOU subject to management renegotiating the shareholding structure in terms of which the ZMDC obtained a minimum of 40% shareholding and a maximum 45% shareholding in the joint venture entity.*

    23.    *Subsequent to this meeting, Mubayiwa told me that the ZMDC's shareholding had to be 45%.*

    24.    *I made the changes to the draft MOU presented to the board. I removed the references to Morgan Hill and changed the shareholding that ZMDC was to receive to 45%, with Amari to receive the remaining 55%.*

    25.    *I wrote a letter to Cockhead* [Amari's in-house legal representative] *in which I informed her of the outcome of the ZMDC board meeting on 1 November 2007.*"

114.    With regard to the 25 July 2008 board meeting concerning the Platinum MOU, Mr Muhone produced with his witness statement the agenda for the meeting and the minutes of it which he took. His evidence, in paragraph 35 of his witness statement, is that, as set out in the minutes, the board resolved to approve the conclusion of the Platinum MOU and authorised Mr Mubayiwa to conclude it on ZMDC's behalf.

115.    Mr Muhone confirmed and elaborated on that evidence in his oral evidence. In particular, he described the process for minute taking; the procedure once board minutes were

---

[13] Transcript 14/8/11 p. 312 line 6 to p. 313 line 11.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

.....................................................

**MICHIEL HEYNS**
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

18

signed, which included the pasting of a copy of the signed minutes into the minute book, which was left behind by him at ZMDC when he was suspended from his employment; and the documents stored on and deleted from his laptop and the back up on his external hard drive. In particular, he confirmed that he printed the minutes of the relevant board meetings from his back up and was satisfied that they were an accurate record of what took place at those meetings. [14]

116.    There is other evidence, for example in Mr Summers' and Mr Muhonde's evidence, that the ZMDC board approved the conclusion of the MOUs. By way of illustration, the Nickel MOU was referred to in a number of subsequent board meetings on 22 November 2007, 7 March 2008, 13 June 2008 and 11 September 2008. Also, the ZMDC board meeting at which the Platinum MOU was approved was followed by a signing ceremony and lunch at which the board and representatives of the Amari Group were present.

### Tribunal's discussion and conclusion

117.    The Tribunal finds Mr Mubayiwa's and Mr Muhonde's evidence compelling and accepts it.

118.    The Tribunal prefers that evidence over Mr Chiparo's position that no board minutes authorising the conclusion of the MOUs existed because none could be found in the Ministry's records. Having wiped Mr Muhonde's laptop and having taken the position in these proceedings that there was no relevant documentation to be produced, the Respondents did not anticipate that Mr Muhonde would have been able to print copies of the relevant documentation from the documents backed up on his external hard drive.

119.    There is no reason to conclude that Mr Mubayiwa and Mr Muhonde were not telling the truth and they are to be commended for having done so in the circumstances of this case. Their evidence is consistent with ZMDC's conduct following the conclusion of the MOUs referred to above, which is documented and the evidence about which the Tribunal accepts.

120.    The Tribunal also cannot ignore that Mr Chiparo's evidence in the Zimbabwe High Court Proceedings involved repeated and, in the Tribunal's view, unconvincing denials of the existence of documents which plainly do exist and challenges to the authenticity of documentation, the existence of which the Respondents are unable to deny.

121.    Therefore, the Tribunal finds that ZMDC board approval for the MOUs was given.

122.    It is unnecessary for the Tribunal to rest its conclusion on any adverse inference from the Respondents' failure to produce the originals of the relevant board minutes. The Tribunal is satisfied on the materials which are before it that ZMDC board approval was given.

123.    In the light of the Tribunal's finding that ZMDC board approval was given, it is also unnecessary to consider the Claimants' alternative arguments based on estoppel and waiver.

### 3. Absence of ministerial approval for the conclusion of the MOUs

124.    Section 22 of the Act provides that "*Subject to this Act, the Corporation shall, for the better exercise of its functions, have power to do or cause to be done, either by itself or through its agents, all or any of the things specified in the Schedule, either absolutely or conditionally and either solely or jointly with others.*" The Schedule to the Act sets out ZMDC's powers and identifies which of those powers require the approval of the Minister. The Schedule confers on ZMDC power *inter alia*:

---

[14] *Ibid.*, p. 274 line 9 *et seq.*

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

.........................................

**MICHIEL HEYNS**
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

19

> "20.    With the approval of the Minister, to promote, establish or acquire
> companies or other undertakings and, in connexion with any such company
> or other undertaking-
>
> (a)    to manage it and act as secretary thereof;
>
> (b)    to appoint any person to act on behalf of the Corporation as a
> director thereof or in any other capacity in relation thereto.
>
> 21.    With the approval of the Minister, to acquire an interest in, to provide any
> underwriting or otherwise to assist in the subscription of capital or to
> guarantee the obligations of a company, whether promoted by the
> Corporation or otherwise, engaged in or proposing to establish, expand or
> modernise any undertaking relating to the production, refining, smelting or
> processing of minerals."

125.    The Respondents submitted that there was no ministerial approval for the conclusion
by ZMDC of the MOUs. In paragraph 27 of the Amended Answer, it is stated that ZMDC
"*has had occasion to enquire from the Minister of Mines and Mining Development whether
he, at any time, approved the acquisition of shares in the Respondent companies by the
Corporation. The Corporation has established that no such approval was given by the
Minister. Written confirmation of this fact, from the Minister of Mines, will be furnished*". The
Respondents submitted that ZMDC lacked the capacity to enter into the MOUs, which are
accordingly null and void; and that the MOUs are tainted with illegality and the Claimants
cannot seek specific performance thereof.[15]

126.    The basis for the Respondents' submission is to be found in an affidavit dated 31
January 2011 of Mr Chiparo which again, for the reason already mentioned, was not in
evidence before the Tribunal, and his affidavit dated 3 February 2011. They disclose that the
basis for the Respondents' submission is a letter received from the Minister confirming that
the MOUs were not approved.

127.    The Claimants submitted that the Minister's approval was obtained; and that the
Respondents are in any event estopped from contending that such approval was not
obtained.[16] The Claimants did not pursue at the hearing on 4 November 2013 an argument
which they originally advanced in paragraphs 75 and 76 of their written closing submissions
that the Minister's approval was not required and were prepared to proceed on the assumption
that such approval was required.[17]

128.    The Claimants rely on the evidence of Mr Mubayiwa to demonstrate that shareholder
approval was given for the conclusion by ZMDC of the MOUs.

129.    In his first witness statement, Mr Mubayiwa states:

> "14.    In accordance with the standard procedures followed at the ZMDC relating
> to the conclusion of joint venture agreements which I outlined previously, the
> board authorised Caroline Sandura ('Sandura'), the Chairperson of the
> ZMDC, to seek permission of the Minister of Mines and Mining Development,
> Amos Midzi at that time, for the ZMDC to conclude the Nickel MOU and
> hence for the ZMDC to acquire shares in the intended joint venture company.

---

[15] Reply §25 to 28.

[16] *Ibid.,* §12 to 14.

[17] Transcript 4/11/13 p. 37 lines 11-17.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
..............................................
MICHEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

15.     The Minister granted the ZMDC the required approval. I was informed of this decision in a letter from the Minister. This letter was sent to me by Thabani Ndlovu ('Ndlovu'), the then Permanent Secretary in the Ministry of Mines and Mining Development on behalf of the Minister. ...

...

18.     The ZMDC board approved the Platinum MOU in the same manner as it approved the Nickel MOU. The following occurred:

...

18.3    The ZMDC board authorised Sandura to seek the approval of the Minister to conclude the Platinum MOU and hence to acquire shares in the intended joint venture vehicle.

18.4    The Minister granted the ZMDC the required approval. I was informed of this decision in a letter from the Minister. This letter was sent to me by Ndlovu, the then Permanent Secretary in the Ministry of Mines and Mining Development... ."

130.    In his oral evidence, Mr Mubayiwa confirmed that evidence.[18]

131.    Mr Muhonde substantially corroborated Mr Mutayiwa's evidence.

132.    The Claimants also rely in this context on Mr Ndlovu's evidence. In paragraph 3 of his affidavit in the Zimbabwe High Court proceedings, he states in terms that Mr Midzi "approved in his official capacity the two MOUs in terms of the law and instructed me to communicate the approvals in writing to ZMDC, which I did and such written communication is in the relevant files at the Ministry". He therefore expresses surprise at the statement in a letter dated 28 January 2011 from the Acting Secretary of Mines that no record had been found in the Ministry of Mines and Mining Development of any such approvals and that consequently the Ministry's view was that such approval was never granted. According to Mr Ndlovu, "at the time I left the Ministry, the approvals were certainly in the ZMDC file. I would expect these files to be still at the Ministry. If nothing unprocedural and irregular happened to those files they should certainly be at the Ministry. Be that as it may, I do confirm again that the then Minister approved the MOUs in terms of the law and accordingly the conclusion reached by the acting Permanent Secretary is actually incorrect. I confirm also that the written approvals were sent to ZMDC's Chief Executive Officer, Mr Dominic Mubawiya at the relevant time and he did receive them".

133.    In his oral evidence, Mr Ndlovu stated, in relation to the Nickel MOU, that:

"The Minister told me to write a letter to the ZMDC and I wrote a letter to the effect that the Minister had approved the MOU for the joint venture between ZMDC and Amari, and I did that and sent the letter to ZMDC and then gave a copy to the Minister and kept another copy in my office ... in the file that was marked ZMDC Correspondence. ... What I wrote in the letter was to the effect that in terms of the ZMDC Charter [the Act], the Minister had approved of the joint venture between ZMDC and Amari. And therefore they could proceed and put all the processes in place."[19]

---

[18] Transcript 14/8/12 p. 312 line 6 to p. 313 line 11.

[19] Transcript 13/8/12 p. 112 line 9 to p. 114 line 15.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

21

He further stated that the same was done in relation to the Platinum MOU.[20] In cross-examination, he also referred to an affidavit by Mr Mutzi made in the Zimbabwe High Court Proceedings, of which a copy was in the hearing bundles in the present proceedings, in which Mr Mutzi himself expressly confirmed that he approved the MOUs.

**Tribunal's discussion and conclusion**

134.    The Tribunal again finds the evidence of Mr Mubayiwa and Mr Muhonde and that of Mr Ndlovu compelling and accepts it.

135.    The Tribunal prefers that evidence over Mr Chiparo's position which, in the light of the other evidence, is not credible. The Tribunal is unable to accept that the documentation relating to the grant of ministerial approval for the MOUs is not, or was not at one time, retained at the Ministry.

136.    The Respondents sought to rely on the fact that the Claimants have adduced no evidence from Mr Mitzi that he authorised the conclusion of the MOUs. It is perhaps unsurprising that Mr Mitzi did not give evidence before the Tribunal on the Claimants' behalf but it does not follow that, in his absence and that of Ms Sandura as witnesses, the Claimants are incapable of establishing that ministerial approval was given on the basis of the evidence referred to above.

137.    The Respondents submitted that the evidence relied on by the Claimants was inadmissible hearsay in terms of the Zimbabwean Civil Evidence Act ("the CEA"). Section 27 is concerned with first hand hearsay evidence. Under section 27(1) of the CEA, subject to the provisions of the section evidence of a statement made by any person, whether orally or in writing or otherwise, is admissible in civil proceedings as evidence of any fact mentioned in the statement if direct oral evidence by that person of any fact would be admissible in those proceedings. Under section 27(3)(a) of the CEA, if such a statement is not contained in a document, no evidence of it is admissible unless given by a person who saw, heard or otherwise perceived the statement being made; under section 27(3)(b), if such a statement is contained in a document, no evidence of it is admissible except the document itself, or a copy of the document if such copy is itself admissible. Under section 27(4) of the CEA, in estimating the weight, if any, to be given to evidence of such a statement, the court must have regard to all the circumstances affecting its accuracy and, in particular, to whether or not the statement was made at a time when the facts contained in it were or may reasonably be supposed to have been fresh in the mind of the person who made the statement and whether or not that person had any incentive or might have been affected by the circumstances, to conceal or misrepresent any fact. Under section 27(5) of the CEA, the section is not to be construed as limiting any provision of the CEA or any other law providing for the admissibility of statements made by persons who are not called as witnesses to testify to such statements.

138.    Assuming for present purposes in the Respondents' favour that the CEA has any application to the present arbitration proceedings, the Tribunal is satisfied that the evidence relied on by the Claimants is admissible under section 27 of the CEA. Mr Ndlovu is a person who heard Mr Midzi approve the MOUs and instruct Mr Ndlovu to communicate those approvals in writing to ZMDC. Section 27(3)(a) of the CEA therefore applies. Mr Ndlovu's evidence that he did comply with the Minister's instructions by writing to the ZMDC in the terms stated and that the letters were in the ZMDC file at the Ministry at the time he left is direct evidence by Mr Ndlovu and not therefore evidence to which section 27 of the CEA applies at all. The same is true in respect of Mr Mubayiwa's evidence that he received the letters from Mr Ndlovu.

---

[20] *Ibid.*, p. 114 line 16 to p. 114 line 13.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

................................................................

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

22

139.    The Tribunal is also satisfied that full weight should be attributed to the hearsay evidence of Mr Ndlovu. There is no reason to doubt its accuracy. In particular, applying the considerations expressly referred to in section 27(4) of the CEA, the statement was plainly made at a time when the facts contained in it were fresh in the Minister's mind and the Minister had no incentive or other reason to conceal or misrepresent any fact. Mr Ndlovu was, as the permanent secretary, the person whose job it was to communicate with third parties on the Minister's behalf. Also, Mr Midzi had, in earlier proceedings in the Zimbabwe High Court, made an affidavit in which he had expressly confirmed that he authorised the conclusion of the MOUs.

140.    The Tribunal must, however, express its view that the CEA has no application to the present arbitration proceedings. Under section 2(1) of the CEA itself, "*civil proceedings*" are defined to mean "*proceedings which are not criminal in nature and which are before the Supreme Court, the High Court, a magistrates court or any other court to which the strict rules of evidence apply*". The definition of civil proceedings therefore does not include the present arbitration proceedings. Also, section 27(4) of the CEA is concerned with the weight to be afforded by the "*court*" to hearsay evidence falling within section 27(1). Although the expression "*court*" is defined in section 2(1) of the CEA to include a tribunal, on the proper construction of those provisions the Tribunal considers that the expression "*tribunal*" does not extend to an arbitral tribunal, in particular one dealing with an international commercial arbitration such as the present arbitration. Further, even if, contrary to that view, the Tribunal were a "*court*", it would not be one to which the strict rules of evidence apply, for the reason mentioned next.

141.    In accordance with paragraph 5 of Procedural Order 1, the Tribunal adopted the IBA Rules on the Taking of Evidence in International Commercial Arbitration 2010 (**"the IBA Rules"**) as general guidelines in this arbitration. Under Article 9(1) of the IBA Rules, it is for the Tribunal to determine *inter alia* the admissibility and weight of evidence, unconstrained by the procedures which may govern domestic litigation in any jurisdiction. Also, paragraph 7.10 of the Terms of Reference provides *inter alia* that where the Rules are silent, the applicable procedural rules to be followed in these proceedings shall be such rules as may be agreed on from time to time by and between the Tribunal and the parties and, failing such agreement, as may be determined by the Tribunal. It follows from those provisions that the strict rules of evidence and the CEA do not apply to the present proceedings.

142.    In short, whether in application of the CEA or by virtue of its own powers under the IBA Rules and pursuant to the Terms of Reference, the Tribunal determines that the hearsay evidence relied on by the Claimants is admissible in these proceedings and that full weight should be given to it.

143.    Therefore, the Tribunal finds that the Minister's approval for the MOUs was given.

144.    It is unnecessary for the Tribunal to rest its conclusion on any adverse inference from the absence of the letters written by Mr Ndlovu on the Minister's instructions. The Tribunal is satisfied on the materials which are before it that ministerial approval was given.

145.    In the light of the Tribunal's finding that ministerial approval was given, it is also unnecessary to consider the Claimants' alternative arguments based on estoppel and waiver.

**4. Failure to comply with the condition precedent in Article 9 of the Nickel MOU**

146.    The Nickel MOU provided *inter alia*:

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

23

"**8.    DATE OF COMMENCEMENT AND DURATION**
*This MOU shall commence on the Effective Date and supercedes* [sic] *any other prior documents relating to the matters specified herein and shall, subject to the provisions of this MOU:*

*8.1    be binding on the Parties upon signature hereof by each of the Parties; and*

*8.2    be superseded by comprehensive subscription and shareholder/joint venture agreements which shall incorporate the terms and conditions contained herein.*

**9.    CONDITION PRECEDENT**

*9.1    This MOU excluding 9 and 11, is subject to fulfilment or waiver of the following condition precedent;*

*9.1.1    the Parties obtaining necessary board and/or shareholder approval to this MOU.*

*9.2    The parties shall use their best endeavours to fulfil or waive the above conditions precedent on or before 31 December 2007 in full, or such later date as the Parties may agree in writing, failing which the MOU will lapse and be of no force and effect and no Party shall have a claim against the other as a result of the failure of such condition precedent.*"

147.    The Respondents submitted, in reliance on Mr Chiparo's affidavit evidence given in the Zimbabwe High Court proceedings, that the condition precedent in Article 9 was not fulfilled since the necessary board and shareholder written approval on or before 31 December 2007 was not secured for it. Consequently, the Effective Date of the Nickel MOU never arose and the Nickel MOU never became operative or else lapsed after that date.[21] By Article 1 of the Nickel MOU, the "*Effective Date*" was defined to mean "*3 business days after fulfilment or waiver of the condition precedent as contemplated in 9*".

148.    The Respondents also submitted that the Deed of Novation did not change that position since it purported to supplement the Nickel MOU which, at the time the Deed of Novation was executed, had already lapsed or become void.

149.    The Claimants submitted that the necessary board and shareholder approval was secured in respect of the Nickel MOU. Alternatively, ZMDC is estopped from relying on any failure to secure such approval as a result of its failure to use its best endeavours to procure it;[22] and the Respondents have waived any right that they may otherwise have had or else are estopped from contending that such approval was not obtained.[23] Also, the Deed of Novation constituted an express or implied renewal of the Nickel MOU such that a new agreement on identical terms to the Nickel MOU (as supplemented by the Deed of Novation) came into existence.[24]

---

[21] Amended Answer §11 to 16.

[22] Reply §8.

[23] *Ibid.*, §9 and 10.

[24] *Ibid.*, §11.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

24

150.    As the Tribunal has already concluded, the necessary board and shareholder approval to the Nickel MOU was given.

151.    It is, in those circumstances, unnecessary to consider the Claimants' alternative arguments based on estoppel, waiver and the Deed of Novation.

### 5. Illegality

152.    The Respondents submitted that ZMDC was entitled to repudiate the MOUs on the ground of illegality since they were procured by reason of a corrupt relationship between its General Manager and the Claimants. They submitted that this position is not saved in respect of the Nickel MOU by the Deed of Novation.[25]

153.    The allegation of corruption, of which the burden of proof rests on the Respondents, is based on email correspondence between Mr Ralph and Mr Mubayiwa and concerns the purchase and transportation for Mr Mubayiwa by Amari Services of a quantity of Italian tiles and toys for his children prior to Mr Mubayiwa signing the Platinum MOU on ZMDC's behalf, without the knowledge or approval of the ZMDC board or the Minister. The Respondents allege that Mr Mubayiwa has since been dismissed from his post following a disciplinary proceedings at which he was found guilty of misconduct. Mr Mubayiwa gave written and oral evidence about his suspension and the disciplinary proceedings. In relation to the latter, his evidence is that following a successful application by him to the Labour Court in Zimbabwe for a review of the disciplinary proceedings on the grounds of substantive irregularity, which was not opposed by ZMDC, he was ordered to be reinstated but that the Labour Court's decision was being appealed by ZMDC.

154.    The Claimants submitted that there was no corrupt relationship between ZMDC's General Manager and the Claimants which entitled ZMDC to repudiate the MOUs.[26] They rely on the facts that they were not a party to and were unaware at the time of the assistance given by Mr Nunn (through Amari Services) to Mr Mubayiwa; that such assistance was in any event entirely proper and not attributable to the Claimants; that it played no role in the conclusion of the MOUs; and that the decisions by ZMDC to conclude the MOUs were taken by its board and shareholders and not by Mr Mubiyiwa.

155.    Mr Mubayiwa wholeheartedly refuted the allegation that there existed any corrupt relationship between him and either the Amari Group or Mr Nunn, which Mr Mubayiwa considered was being made in bad faith against him. In view of the seriousness of the allegation, it is important to set out in some detail Mr Mubayiwa's answer to it.

156.    In relation to the tiles, Mr Mubayiwa's evidence in his first witness statement is that:

> "37.1    With a board approved loan from the ZMDC, I was building a new house in Zimbabwe. The loan was approved because it was thought that it would be more appropriate for the CEO of the ZMDC to live in a better area than the area in which I was previously living.
>
> 37.2    I needed to purchase tiles for my new house and could not find tiles that I liked in Zimbabwe. As I was travelling frequently to South Africa, I thought I would look for tiles in South Africa.

---

[25] Amended Answer §17 to 24 and 35.

[26] Reply §19 and 20.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

.....................................................

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

25

37.3    Whilst I was on a business trip to Johannesburg in May 2008, I told Nunn that I wanted to look for tiles for my house. Nunn said I could phone Rhys Ralph, his personal assistant, to drive me around to look for the tiles.

37.4    I contacted Ralph and made arrangements to meet him.

37.5    I met up with Ralph and we went to Union Tiles and to CTM. I could not find tiles that I liked at either of these places. Ralph then telephoned his mother to ask for suggestions of other places to source tiles. She suggested Italtile, where I found Fabian Bianco tiles that I liked.

37.6    I was unable to purchase the tiles there and then. I only had with me US$9000 and a relatively small amount of South African Rands. I was under time pressure to get to the airport and did not have time to exchange these dollars for rands. Furthermore, Italtile could not tell me whether they had stock of the 200 square meters I required. They said that they would have to try and source these tiles from their other stores. The price that I would have to pay would obviously depend on the quantity of tiles [that] were available. Italtile said that they would contact Ralph and tell him whether they could successfully source the tiles.

37.7    Before I left Johannesburg, I explained to Nunn what had happened at Italtile. I gave him the US$9000 to cover the cost of the tiles and the R25 000.00 that he had advanced to me.

37.8    Ralph later informed me that Italtile had sourced the quantity of tiles that I wanted.

37.9    Nunn said to me not to worry about the transport of the tiles because he was sending a container to Zimbabwe in any event.

37.10   The price of the tiles was R41 819.05 from Italtile. "

157.    In relation to the toys for his children, his evidence in his first witness statement is that:

"38.1    After I had found the tiles and subsequent to meeting with Nunn, I was being taken to the airport by Ralph. I wanted to purchase a present for my daughter and Ralph took me to a doll shop where I bought a doll for my daughter. The doll was called Dindy and it came with a birth certificate. I paid for the doll with Rands that I had on me."

158.    Mr Mubayiwa expanded on that evidence in his oral evidence, during which he explained the contents of his email exchanges with Mr Ralph from which the Respondents' allegation of corruption derives.[27] In answer to questions from the Tribunal, it was highlighted to Mr Mubayiwa that he appears to have slightly overpaid Mr Nunn by handing him US$9,000 but Mr Mubiyawa was untroubled, first because their relationship was based on trust and, second, because he had made provision in his own mind for there being a cost involved in the transportation of the tiles to Zimbabwe.[28]

---

[27] Transcript 14/8/12 p. 314 line 10 to p. 323 line 23.

[28] Ibid., p. 323 line 25 to p. 326 line 12.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
.................................................
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

26

159.    Mr Mubayiwa's evidence, in so far as it related to Mr Ralph, was confirmed by Mr Ralph in his witness statement and in his oral evidence.[29]

160.    Mr Mubayiwa, in paragraph 39 of his first statement, drew attention to the fact that at the time of his purchases, the Nickel MOU had long been signed and that the only outstanding matter in respect of the Platinum MOU was the grant of ministerial approval.

161.    In paragraphs 5 and 6 of his witness statement and in his oral evidence,[30] Mr Nunn confirms that he had instructed Mr Ralph to assist Mr Mubayiwa in the purchase of the tiles. He says that it was Amari Services which provided this assistance; that the Amari Group, of which Amari Services was not at the time a part, was unaware of the assistance; that the assistance was unconnected with the conclusion of the MOUs; and that the Nickel MOU had long been concluded by the time the assistance was given. His understanding at the time was that the ZMDC board had already approved the conclusion of the Platinum MOU and that only the formal ministerial approval was awaited.

162.    Mr Summers gave oral evidence in chief about Italtile's quotation dated 28 May 2008 for the tiles in the sum of ZAR 41,819.05 addressed to Mr Ralph to which Mr Summers and Mr Nunn has affixed their signatures and about the extract from Amari Services' ledger relating to the purchase of the tiles. When asked how their signatures came to be on the quotation, Mr Summers said that the approval process for all payments required both signatures. A discussion took place between them in which Mr Nunn indicated that the company was assisting Mr Mubayiwa with the purchase and transport of the tiles and that he, Mr Nunn, would take care of the arrangements for paying for the tiles and for obtaining repayment from Mr Mubayiwa. Following their approval of the payment, Mr Summers gave the quotation to his bookkeeper to do the electronic payment to Italtiles, which was done on 30 May 2008. The copy of the electronic payment transfer before the Tribunal included a manuscript annotation made on 30 May 2008 by Mr Summers asking Mr Nunn "*Mike, how do I account for this?*" and a manuscript response the following week by Mr Nunn stating "*I will get cash from him* [Mr Mubayiwa] *(or debit my L/A* [loan account] *in interim).*" A few days later, Mr Nunn gave Mr Summers the sum of US$9,000 which Mr Nunn had received from Mr Mubayiwa. That sum is the equivalent of ZAR 69,210 at the then prevailing exchange rate, which is the amount shown in the entry dated 5 June 2008 under the description "*Goods Received Voucher*" in the Amari Services' ledger. Against the ledger entry is a manuscript annotation showing the exchange rate, which Mr Summers said was made in October 2010 when he was asked by the Claimants' attorneys to prove the receipt of the US$9,000.[31]

163.    The Respondents appeared to take the view that the Amari Services' ledger was capable of "*manipulation and creation*"[32] but it was not alleged or put to Mr Summers in cross-examination that the ledger was not an authentic record of the transactions shown on the relevant extract and, in particular, the entry pertaining to the US$9,000.

164.    In cross-examination, Mr Summers denied that there was anything improper in providing Mr Mubayiwa with assistance in the purchase of the tiles since Mr Mubayiwa was going to repay the monies advanced. He also denied that there was anything improper about

---

[29] *Ibid.*, p. 349 line 8 to p. 352 line 2.

[30] *Ibid.*, p. 334 line 5 *et seq.*

[31] *Ibid.*, p. 216 line 12 to p. 219 line 3.

[32] *Ibid.*, p. 251 line 25 to p. 252 line 9.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

27

the tiles being transported to Zimbabwe in a container which contained goods being transported for the Amari Group, since Amari Services provided logistical services for all the Amari Group companies and sent one container a week to Zimbabwe in return for a handling fee from the companies in question.[33] He also pointed out that the ledger formed part of Amari Services' accounts which were subject to an external audit and a clean audit report.[34]

165.     In paragraphs 8 to 17 of his witness statement, Mr Napier describes how, at a meeting on 20 October 2010 at ZMDC's offices with Mr Godwills Masimirembwa, the then chairperson of the ZMDC, and others, he first became aware of the allegation of corruption resulting from the ZMDC's internal investigations. He records that he told the ZMDC representatives that the Amari Group was unaware of the alleged arrangement between Amari Services and Mr Mubayiwa and that there was no connection at that time between Amari Services and the Amari Group. The meeting ended with him and Mr Nunn, who was also present, agreeing to provide a formal response to the allegations. On 25 October 2010, Mr Napier formally wrote to ZMDC denying any involvement of the Amari Group in the alleged corruption. ZMDC's letter in response dated 10 November 2010 reiterated the allegation of corruption and advised the Amari Group that it should consider the relationship between the parties under the MOUs terminated.

<h3 style="text-align:center">Tribunal's discussion and conclusion</h3>

166.     The Tribunal has considered carefully the evidence of Mr Mubayiwa, Mr Nunn, Mr Ralph and Mr Summers on this important aspect of the case. The Tribunal bears in mind that sections 3(1) and 4 of the Zimbabwe Prevention of Corruption Act (Chapter 9:16) make it an offence *inter alia* for any public officer to engage in a wide range of corrupt practices; and that section 170 of the Zimbabwe Criminal Law (Codification and Reform) Act (Chapter 9:23) makes it an offence *inter alia* for any public officer to obtain a bribe.

167.     The question for the Tribunal is whether the MOUs are, by reason of the alleged corrupt relationship between Mr Mubayiwa and the Claimants, tainted with illegality such as to entitle the Respondents to repudiate the MOUs.

168.     In the Tribunal's view, the allegation of corruption is not well-founded and the Respondents, on whom the burden of proof lies, have failed to establish it.

169.     In the first place, the Tribunal is not satisfied that there was anything improper in the events relied on by the Respondents. Based on the evidence referred to above, which – with the qualification mentioned below - the Tribunal accepts, the Tribunal finds that Amari Services was simply assisting Mr Mubayiwa in the purchase of the tiles and in the advance of Rands 25,000 made to Mr Mubayiwa, without either he or Amari Services having any improper ulterior motive or reason for doing so and, in particular, without any intention to induce or solicit Mr Mubayiwa to act in a way which would or might influence the conclusion of the MOUs. The Tribunal accepts that the tiles (and the toys) were paid for by Mr Mubayiwa and that Amari Services did no more than facilitate their purchase, as a favour to a trusted partner, in circumstances where Mr Mubayiwa was not in possession of sufficient Rands to complete the purchase of the tiles while in Johannesburg, and arrange their transportation to Zimbabwe. The Tribunal also finds that the sum of Rands 25,000 was repaid by Mr Mubayiwa.

170.     In the second place, the events relied on by the Respondents are irrelevant to the conclusion of the Nickel MOU since those events post-dated by a long time the conclusion of

---

[33] *Ibid.*, p. 224 line 22 to p. 227 line 6.

[34] *Ibid.*, p. 236 pp. 2-5.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

28

the Nickel MOU. The Tribunal observes in this context that, in paragraphs 5 and 17 of the Amended Answer, the allegation of illegality was confined to the Platinum MOU, although in paragraphs 25 to 28 and 43 of the Amended Answer the allegation extends to the Nickel MOU as well.

171.     In the third place, the Tribunal finds that, at the time of the events in question, Amari Services was unconnected with the Amari Group and that Amari Services' actions are not attributable to the Amari Group. The Tribunal also accepts Mr Napier's evidence that the Amari Group was not at any material time aware of the events relied on by the Respondents.

172.     In the fourth place, the Tribunal finds that there was no causal link between the events relied on by the Respondents and the conclusion of the Platinum MOU. Even if, contrary to the Tribunal's findings, Mr Mubayiwa had improperly been assisted in the manner alleged by the Respondents, the decision to conclude the Platinum MOU was not that of Mr Mubayiwa, who did not even have a vote on the ZMDC board, but that of the ZMDC board and ZMDC's shareholders. The assistance afforded to Mr Mubayiwa played no role in ZMDC's decision to conclude the MOUs.

173.     In the fifth place, the Tribunal rejects the Respondents' submission that the Amari Services' ledger which showed the credit of the Rand equivalent of US$9,000 was in any way fabricated. The Tribunal accepts Mr Summers' evidence concerning the ledger and, in particular, that the ledger formed part of Amari Services' accounts which were subject to an external audit and a clean audit report.

174.     The qualification referred to in paragraph 169 above is that there are two respects of Mr Nunn's evidence which the Tribunal finds unsatisfactory and is unable to accept. First, Mr Nunn's manuscript note on the Italtile quotation gives the clear impression that he was not then in possession of the US$9,000 which in fact had already been handed to him by Mr Mubayiwa. To that extent, it was misleading. Mr Nunn's explanation, in response to questions from the Tribunal, that he had written the note in those terms because he wanted the option to keep the US$9,000 for himself and to have his loan account with the company debited with that amount instead of paying it into Amari Services' account[35] does not adequately explain the note. Second, there appears never to have been an accounting to Mr Mubiyawa for the overpayment which he made by paying the US$9,000 to Amari Services, about which Mr Nunn had little or no recollection.[36] Mr Nunn's lack of recollection of these events is, in the Tribunal's view, surprising and the apparent absence of any repayment of the difference having been tendered or made to Mr Mubayiwa is not excused by the fact that the amount of the overpayment is relatively small. However, for present purposes, nothing turns on either of those points.

175.     For all those reasons, the Tribunal finds that the allegation that the MOUs are illegal is not established.

### 6. Absence of any joint venture agreement

176.     The Respondents submitted that Article 8 of each of the MOUs envisaged that the parties were obliged to enter into joint venture agreements which incorporate the terms and conditions of the respective MOUs. Article 8 of the Nickel MOU has been quoted in paragraph 146 above. Article 8 of the Platinum MOU is in materially identical terms, except that it also contains a provision in Article 8.3 whereby the Platinum MOU shall "*continue to be of full force and effect and binding on all Parties hereto until such time as the more comprehensive Agreements referred to in 8.2 are concluded*". The Respondents submitted

---

[35] *Ibid.*, p. 338 line 11 to p. 340 line 16.

[36] *Ibid.*, p. 342 line 9 to p. 344 line 4.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
.............................................
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

that the MOUs do not themselves constitute the joint venture agreements referred to and that no joint venture agreement as contemplated by the MOUs was ever entered into.[37]

177.    It is not in dispute that no joint venture agreement as contemplated by the MOUs was ever concluded. However, the question is whether the absence of any such joint venture agreement is of any consequence to the present claims.

178.    In the Tribunal's view, the absence of any joint venture agreement is irrelevant to the present claims. Article 8 of each of the MOUs provided expressly for each to be binding upon signature by the parties and, in due course, to be superseded by a joint venture agreement. In the case of the Platinum MOU, the provisions of Article 8.3 make express that which is implicit in the case of the Nickel MOU, namely that the absence of a joint venture agreement does not render the MOUs invalid or ineffective for the failure of a condition subsequent or for any other reason.

### 7. Cancellation of the MOUs

179.    The Respondents submitted that, by reason of the matters referred to above, they were entitled to cancel the MOUs. For their part, the Claimants submitted that the purported cancellation of the MOUs was invalid and a repudiatory breach of the MOUs which they accepted as bringing the MOUs to an end.

180.    In the light of the conclusions reached by the Tribunal on the matters referred to above, the Tribunal concludes that the Respondents were not entitled to cancel the MOUs and that, in purporting to cancel them, the Respondents were in repudiatory breach of the MOUs.

181.    The Tribunal further concludes that it was clear from the Respondents' conduct referred to in paragraphs 7 and 9 above that the MOUs were at an end and that the Claimants would not be either required or permitted to perform their obligations under them. To the extent that there was any obligation on the Claimants in those circumstances to accept the Respondents' conduct as bringing the MOUs to an end, that occurred when, in the light of the Respondents' position, the Claimants initiated the present arbitration by the issue of the Request.

182.    In the result, ZMDC is liable to the Claimants for breach of the MOUs.

## VII. THE RELIEF CLAIMED

183.    The Tribunal next turns to consider the relief to which the Claimants may be entitled. The issues of interest and costs are considered separately in Sections VIII and IX below respectively.

184.    The Claimants submitted that the purpose of the joint ventures was to prospect for PGMs, base metals and ancillary metals in respect of the Platinum MOU and for nickel in respect of the Nickel MOU, and subject to successful feasibility studies, develop a mine in the area. Accordingly, the Claimants seek damages against ZMDC as the direct and natural consequence of the repudiation of the MOUs as follows: (1) US$42,882,000 for breach of the Platinum MOU, calculated using a DCF valuation model and based on Amaplat's proposed equity holding of 50% in Zimari Platinum; and (2) US$3,900,000 for breach of the Nickel MOU, calculated using the "ounce in the ground" valuation method and based on Amari's proposed equity holding of 55% in Zimari Nickel.

---

[37] Amended Answer §29 to 31.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

30

185.    In the alternative to their damages claim, the Claimants claim that ZMDC has been unjustly enriched at their expense and that ZMDC is liable to make restitution to Amaplat in the sum of US$4,498,190 and to Amari Nickel in the sum of US$578,559, based on the amounts advanced to Zimari Platinum and Zimari Nickel respectively.

<u>**1. Platinum Claim**</u>

186.    The Claimants relied on Mr Wixley's expert evidence. He utilises a DCF model to value the Platinum Project. He gave his opinion that the information provided by Mr Kamurai, Mr Le Roux, SRK Consulting, DRA, BBE Consulting and Fraser Alexander constitute sufficient reliable information and data to permit the use of the DCF valuation methodology.[38]

187.    The Respondents submitted that any award of prospective damages would be speculative because the classification of the minerals does not provide a firm basis for valuation and pre-feasibility reports were not completed. Therefore, the central contention between the Parties was whether the mineral resources can be valued sufficiently to employ a DCF valuation model. Further, the Respondents submitted that the presence of talc and mining on an apparent dip presented additional safety and costs concerns, and that a discount rate of 14% is not appropriate.

188.    Before turning to these contentions in turn, the Tribunal notes that in relation to *application* of the DCF model, a number of matters were agreed between the Claimants' experts and the Respondents' experts. The experts accepted the parameters of the DCF model, including the modifying factors set out in the DRA Mine Scoping Study (except for the error in the grade as reported),[39] mining costs of R424/tonne (subject to the concern regarding talc and dip outlined below),[40] the geological loss,[41] and the prill splits.[42]

**Classification of the Platinum resources**

189.    The Claimants submitted that the DCF valuation model can be used. Mr Theart, as co-author of the SRK Consulting Report, gave evidence that the platinum mineral resources could be classified as "indicated" for zones A and B and "inferred" in respect of zone C.[43] Mr Theart also testified that these deposits could actually qualify as "measured resources" but adopted these classifications as a conservative measure.[44] Mr Kamurai, a mining engineer, gave evidence that notwithstanding that the project was stopped before the pre-feasibility study was completed, there is sufficient information and data to justify the use of DCF valuation methodology.[45]

190.    The Respondents submitted that based on the amount of drilling performed by the Claimants, the Claimants were unable to prove that the platinum resources fell for categorisation either as "indicated" or "measured" resources, and at best, can only be

---

[38] Wixley §2.2.

[39] Joint Report, §1.

[40] *Ibid.*, § 4

[41] *Ibid.*, § 5

[42] *Ibid.*, § 5.

[43] Section 9, SRK Consulting Serui Project Resource Statement October 2010.

[44] Transcript 15/8/12, p. 377 line 12 to p. 378 line 3.

[45] Further Witness Statement for Clarkson Kamurai § 5.1.8.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

categorised as "inferred". Rene Hochreiter, the Respondents' quantum expert, gave evidence that DCF valuations should not be performed on inferred mineral resources.[46] The Respondents submitted that as the platinum tonnage, grade and mineral content have not been verified geologically, there is no basis upon which a valuation of inferred resources can be made.

191.    The Tribunal has noted that Mr Hochreiter had not viewed the SRK report when he had formed his opinion provided in his report. The Claimants referred to the Joint Report as recording Mr Hochreiter's change in position after viewing the SRK report. In particular, the Claimants' position is that the Respondents' experts agreed with the SRK report in relation to the classification of the reserves as "indicated" rather than "inferred", subject only to the concern expressed that the geological loss was 20% rather than 15% before recognising that an additional 5% geological loss was provided by DRA Report.[47]

192.    Mr Goddard, the author of the DRA Scoping Study Report, stated that the step room and pillar was the preferred mining method. Mr Goddard explained that his results could not be reported as a "reserve" because certain work remained incomplete at the time of termination. However based on the work already completed, his experience of other work in the Great Dyke area and his professional skill and knowledge, Mr Goddard gave evidence 'with confidence' that DRA *"would have been in a position to report the results...as a probable mineral reserve (ie a reserve relating to indicated resources in due course"* on completion of his work.[48] The Respondents' contention is that the work which remained incomplete when the project stopped precludes the employment of the DCF valuation methodology. There is otherwise agreement between the Parties' experts that the modifying factors set out in the DRA Mine Scoping Study are adequate.[49]

**Presence of Talc and Apparent Dip**
193.    The Respondents submitted that the presence of talc and mining on an apparent dip would create additional costs. This submission was based on the Respondents' experts' concern about the effect on the unit working cost of the presence of talc both in the metallurgical and the mining aspects, as well as the additional costs associated with mining on apparent dip.

194.    The Claimants submitted that the evidence of Mr Goddard demonstrates that the issue of talc would be overcome by employing the appropriate mining method, being the step room and pillar recommended by Mr Goddard. Mr Goddard noted that where talc was encountered, it was at another mine in the Great Dyke area which had different geology and where a conventional mining method was used.

195.    The Claimants submitted that, based on the evidence of Mr Goddard, Mr Kamurai and Mr Le Roux, apparent dip is not a factor and has no bearing on costs. In particular, Mr Goddard gave evidence that mining was occurring on reef and Mr Le Roux testified that this phase of mining was chosen specifically as the dip would not have a big influence.[50]

---

[46] Response to Claimants' Witness Statement of Thomas Wixley and Further Witness Statements by Philip Le Roux and Clarkson Kamurai by Rene Hochreiter § 4.1.

[47] Transcript 4/11/13 p. 116 line 14 to p. 119 line 3; Joint Report § 1 and 5.

[48] Witness Statement for Neale Goddard § 9.

[49] Joint Report §1.

[50] Evidence of Mr Kamurai, Transcript 15/08/12 p. 401 line 22 to p. 402 line 9; Evidence of Mr Goddard, Transcript 15/08/12, p. 426 line 21 to p. 427 line 9; Evidence of Mr Le Roux, Transcript 15/08/12 p. 460 lines 5 to 15.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

32

**Discount Rate**

196.     The Claimants' position is that a discount rate of 14% calculated by Mr Wixley is appropriate. The Claimants submitted this presents a conservative approach at the top end of the 10%-14% range calculated by Mr Wixley.

197.     The Respondents do not view a discount rate of 14% to be appropriate. The Respondents' experts submitted the appropriate discount rate for a platinum mining operation in Zimbabwe is at least 15% in real terms to take into account the greater country risk of Zimbabwe compared to other mining investment countries such as South Africa.[51] Though 15% is the lower limit, Mr Hochreiter recommended a discount rate of 18%-20% to be appropriate.[52] Further, Shepherd Gaihai provided his opinion that the discount rate should be inflated due to Zimbabwean country risk, noting a discount factor of at least 19% is estimated for Zimbabwe by the Fraser Institute of Annual Survey.[53]

198.     In justifying a lower discount rate, the Claimants relied on the evidence given by Mr Kamurai that there was a consistent supply of power for mining businesses in the Great Dyke area and access to a stable workforce of skilled labour.[54] Mr Wixley presented evidence that government risk had been eliminated as a consequence of the Claimants' joint venture with the Zimbabwean Government and that the Claimants were also effectively exempt from indigenisation laws as a result.[55] Mr Wixley also incorporated equity risk with regard to the fact that this was a green field business venture, took into account the business circumstances in Zimbabwe and had regard to the discount rate applicable to a mining venture of this nature in South Africa.

**Tribunal's discussion and conclusion**

199.     The Tribunal finds that the information relied on by Mr Wixley in his DCF model is credible and his methodology is reliable. The breadth and credibility of the Claimants' evidence combined with the conservative approaches adopted by the Claimants' experts leads the Tribunal to accept the classification of the Platinum resources classified as "indicated" for zones A and B and "inferred" for zone C. The Tribunal places some weight on the Claimants' submission that the Respondents' experts agreed to the contents of the SRK report subject to the qualifications regarding geological loss, though it remains mindful that there was no explicitly recorded agreement by the Respondents' experts and no further submissions by the Respondents. Accordingly, the Tribunal finds that the DCF model is appropriate to value the platinum resources.

200.     The Tribunal notes the risks raised by the Respondents regarding mining investment in Zimbabwe. Notwithstanding this, in the Tribunal's view, a discount rate of 14%   is sufficient in these circumstances. In particular, the Tribunal finds it significant that the Claimants had formed a joint venture directly with the Zimbabwean Government itself. With the Government as a party to these mining arrangements, the Tribunal accepts that

---

[51] Joint Report § 3.

[52] Response to Claimants' Witness Statement of Thomas Wixley and Further Witness Statements by Philip Le Roux and Clarkson Kamurai by Rene Hochreiter § 4.4.3.

[53] Response to Claimants' Witness Statement of Thomas Wixley and Further Witness Statements by Philip Le Roux and Clarkson Kamurai by Shepherd Gaihai §17.

[54] Transcript 15/8/12, p. 390 line 6 to p. 394 line 17.

[55] Transcript 15/8/12, p. 498 line 22 to p. 502 line 4.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

33

government risk relating to this venture was eliminated. Risk was further mitigated through the evidence of a consistent power supply and access to a reliable workforce.

201.    The Tribunal is satisfied that there would not be additional cost implications arising from the presence of talc or mining on an apparent dip. In the Tribunal's view, the step room and pillar mining method would overcome the problem of talc, if any, and accepted the Claimants' experts' evidence that mining was not occurring on a dip in this part of the project.

202.    Based on these considerations above, Mr Wixley calculated a total DCF value of US$85,765,000 for the Platinum Project. Based on Amaplat's proposed 50% equity interest in Zimari Platinum, the Tribunal finds by a majority that Amaplat is entitled to US$42,882,000 in damages for ZMDC's repudiation of the Platinum MOU.

203.    However, the minority of the Tribunal considers that, in circumstances where the Claimants have not, on the evidence, proved their respective shareholdings in Zimari Nickel and Zimari Platinum, the Claimants are not entitled to recover damages for breach of the MOUs and that their remedy is confined to payment by ZMDC of the sums invested by them in Zimari Platinum and Zimari Nickel respectively. The minority would therefore have determined that ZMDC was only liable to pay Amaplat the sum of US$4,498,190.

## 2. Nickel Claim

**Valuation Method**

204.    The Claimants' relied on Mr Wixley's "ounce in the ground" valuation in respect of the nickel claim. Provided the nickel resources could be measured at an inferred level, both the Claimants' experts and the Respondents' experts agreed Mr Wixley's valuation methods are appropriate, being the ounce in the ground method and the historical cost method (provided the exploration cost estimates can be substantiated).[56]

205.    The central issue of contention between the parties was whether the nickel resources can be classified as inferred. The Respondents' experts noted that the resource statement on the Nickel Hill project was completed by a reputable company, but that the verification process had not been completed. Therefore the Respondents' experts explained that the nickel resources do not qualify as inferred resources and accordingly, no value can be assigned to those resources.[57]

206.    The Claimants submitted that the nickel resources can be classified as inferred. The Claimants referred to the evidence of Mr Le Roux who relied on the underlying data provided by Prospecting Ventures. Mr Le Roux undertook his own drilling and constructed a three-dimensional model which confirmed the quantum and the grades in the Prospecting Ventures reports. Mr Le Roux gave evidence that the nickel resources could be classified higher, but commented that:[58]

> "If one looked at the drilling spacing and information, this resource would have been able to be classified at a much higher level of confidence, most probably at least at an indicated level but we only to classify it as inferred because the information available is old information and we didn't do all the necessary work to date to verify the old information although all the information that - all the additional that we did proved

---

[56] Joint Report §17.

[57] *Ibid.*, paragraph 16.

[58] Transcript 15/8/12, p. 481 lines 3 to 12.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
.........................................
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

34

*that the information is correct, we needed to do additional work to prove that. So I will be happy that this resource is an inferred resource.*"

207.    Mr Wixley relied on the tonnage and grades presented in the evidence of Mr Le Roux. Mr Le Roux testified that the total tonnage was 23.85 tonnes and the grade was 0.4% for Nickel Hill and 0.5% for Woodridge. Mr Wixley used a value per tonne of US$329 ounce in the ground.

208.    Mr Wixley's approach involved benchmarking the value of the nickel resources against a recent PolyMet Mining Corporation transaction as it contained a similar type of nickel deposit. From there, Mr Wixley applied a 50% discount because the Poly Met asset was a measured and indicated resource, compared to an inferred resource in this instance.[59]

209.    Turning to the alternative present value of historical costs valuation method proposed by the Claimants, Mr Wixley produced a value of between US$4.5 million and US$6 million which is in the ballpark range of the ounce in the ground method, based on Amari's proposed 55% equity interest in Zimari Nickel.[60] The Claimants seek the ounce in the ground method of US$3.9 million, being the lesser of the two valuation methods, based on recommendation of their experts[61] and that it is conservative and reasonable.[62]

**Tribunal's discussion and conclusion**

210.    Having carefully reviewed the submissions of the Claimants and the Respondents, the Tribunal finds that the nickel resources can be classified as inferred. The Tribunal accepts Mr Le Roux's verification of the Prospecting Ventures report and his own drilling and investigations undertaken.

211.    In accordance with Mr Le Roux's evidence[63] and the subsequent agreement of the parties' experts,[64] the Tribunal considers that the "ounce in the ground" method is the appropriate valuation method where the resource is inferred. Accordingly, based on Amari's proposed 55% equity interest in Zimari Nickel, the Tribunal finds by a majority that Amari Nickel is entitled to US$3.9 million in damages for ZMDC's repudiation of the Nickel MOU.

212.    However, for the reasons already stated in paragraph 203 above, the minority of the Tribunal considers that Amari Nickel is not entitled to recover damages and that its remedy is confined to payment by ZMDC of the sum invested by Amari Nickel in Zimari Nickel. The minority would therefore have determined that ZMDC was only liable to pay Amari Nickel the sum of US$578,559.

## VIII. INTEREST

213.    Section 16(6) of the Zambian Arbitration Act 2000 provides that, unless otherwise agreed between the parties, an arbitral tribunal may, in an international arbitration such as the

---

[59] Claimants' Opening Submissions § 42.

[60] Transcript 15/8/12, p. 610 line 18 to p. 612, line 8.

[61] *Ibid.*, p. 485 lines 13 to 21.

[62] Claimants' Closing Submissions § 146.

[63] Further Witness Statement of Philip Le Roux § 30.

[64] Joint Report §17.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF
MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

present, award simple or compound interest in accordance with the law applicable to the arbitration.

214.    On the basis that the law applicable to the arbitration is Zimbabwean law, the Claimants seek an award of simple interest at the rate of 5% *per annum* applicable to judgment debts in accordance with the Prescribed Rate of Interest Notice 2009 and the Prescribed Rate of Interest Act in force in Zimbabwe from the date of this Final Award until payment. In their closing submissions, the Claimants did not advance any claim for interest prior to the date of the award.[65] They also made it clear that they did not seek any higher rate of interest to which they might have been entitled under Zambian law.[66]

215.    The Respondents made no submissions on the question of interest.

216.    The Tribunal thus has a broad discretion with regard to the applicable rate of interest and period for which interest is to run. In its view, the 5% rate of interest claimed by the Claimants and the period for which it is to run are entirely reasonable. In the exercise of its discretion, the Tribunal determines that the principal amounts awarded to the Claimants shall bear simple interest at 5% *per annum* from the date of this award until payment.

# IX. COSTS

217.    The Claimants seek an order that the Respondents pay the Claimants' legal and other costs of the arbitration.

218.    The total sum claimed in respect of the Claimants' costs and expenses is US$2,220,583.74 as set out in their original summary of legal expenses and as updated by the Claimants on 18 November 2013.

219.    The Respondents made no submissions on the question of the Claimants' costs.

220.    The award of costs is governed by Article 31 of the Rules, which provides so far as material:

> "*Decision as to the Costs of the Arbitration*
>
> *1.      The costs of the arbitration shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scale in force at the time of the commencement of the arbitration, as well as the fees and expenses of any experts appointed by the arbitral tribunal and the reasonable legal and other costs incurred by the parties for the arbitration.*
>
> ...
>
> *3.  The final Award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.*"

221.    Accordingly, under Article 31 of the Rules, the Tribunal has broad discretion to allocate costs as it considers appropriate in the circumstances of this case.

---

[65] Claimants' Closing Submissions §158, 159, 162.2 and 162.3; Submissions in response to queries from the Tribunal §11 and 12.

[66] Submissions in response to queries from the Tribunal §10.

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN 8000

36

222.    The Claimants have succeeded in their claims and the Tribunal considers that the general rule that costs follow the event should be applied.

223.    With regard to the amount of the costs claimed, the Tribunal is satisfied that they are reasonable in amount and have been reasonably incurred. In that regard, the Tribunal has taken into account not only the factual and legal complexity of the issues which the parties had to address but also the fact that the Respondents' conduct referred to earlier in this award has led to greater costs being incurred by the Claimants than would otherwise have been the case. In particular, the 4 November 2013 hearing in London and the work involved in preparing for that hearing would not have arisen had the Respondents decided to continue to participate in the arbitration proceedings and have the issue of the Tribunal's jurisdiction determined in accordance with the Rules and the directions given by the Tribunal.

224.    The total advance on costs fixed by the Court is US$900,000, which has been paid in full by the Claimants.

225.    At its session of 19 December 2013, the Court fixed the costs of the arbitration in a total sum of US$900,000 as follows: the ICC's administrative expenses at US$87,918 and the fees and expenses of the Tribunal at US$812,082.

226.    Having regard to the considerations referred to above these costs of the arbitration must also follow the event and, accordingly, be borne by the Respondents.

## X. AWARD

**227.    In conclusion, for the reasons stated and having given due consideration to the evidence and the submissions of the parties, the Tribunal:**

(1)    **declares that it has jurisdiction over the parties' dispute;**

(2)    **orders ZMDC to pay Amaplat damages in the sum of US$42,882,000;**

(3)    **orders ZMDC to pay Amari damages in the sum of US$3,900,000;**

(4)    **orders the Respondents to pay the Claimants' legal and other costs and expenses in the sum of US$2,220,583.74;**

(5)    **orders the Respondents to pay the Claimants the costs of the arbitration referred to in paragraph 225 above in the sum of US$900,000;**

(6)    **orders ZMDC to pay interest on the damages referred to in (2) and (3) and on the Claimants' legal and other costs and expenses referred to in (4) above and the costs of the arbitration referred to in (5) above at the rate of 5% *per annum* from the date hereof until payment;**

(7)    **dismisses all other claims and counterclaims.**

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

...................................................

MICHIEL HEYNS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN  8000

37

Date: 12 January 2014

Place of arbitration: Lusaka, Zambia

...................................................

**Chikwendu Madumere**
**Co-arbitrator**

...................................................

**Professor Doug Jones AO**
**Co-arbitrator**

...................................................

**Stuart Isaacs QC**
**Chairman**

CERTIFIED A TRUE COPY OF THE ORIGINAL HEREOF

...................................................
**MICHIEL HEYNS**
COMMISSIONER OF OATHS
PRACTISING ATTORNEY R.S.A.
18th FLOOR, No 1 THIBAULT SQUARE
CAPE TOWN  8000