## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Amaplat Mauritius Ltd., *et al*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Case No. 1:22-cv-00058-CRC |
| | ) | |
| Zimbabwe Mining Development | ) | |
| Corporation, *et al*, | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION TO DISMISS BY THE CHIEF MINING COMMISSIONER OF THE MINISTRY OF MINES, THE REPUBLIC OF ZIMBABWE, AND <u>ZIMBABWE MINING DEVELOPMENT CORPORATION</u>

Defendants, the Chief Mining Commissioner of the Ministry of Mines of Zimbabwe (the "Commissioner"), Republic of Zimbabwe ("Zimbabwe"), and Zimbabwe Mining Development Corporation ("ZMDC), by and through their undersigned counsel, hereby moves to dismiss the Amended Complaint filed by Amaplat Mauritius Ltd. ("Amaplat") and Amari Nickel Holdings Zimbabwe Ltd. ("Amari"), and in support thereof, state as follows:

## INTRODUCTION

Despite having another opportunity to make their claims, Plaintiffs have chosen to rely largely on their own interpretation of the relevant Zimbabwean statutes, news articles devoid of facts, and contradictory allegations. Other new allegations are bare assertions with no support or fall outside the relevant time period for the *alter ego* analysis. Given the extensive time taken to prepare the Amended Complaint and the guidance provided by this Court, it is increasingly obvious that there is no substance to Plaintiffs' allegations. This Court should therefore dismiss the Amended Complaint with prejudice.

## RELEVANT BACKGROUND

In 2007 and 2008, Plaintiffs, Amaplat and Amari each concluded a memorandum of understanding (the "MOUs") with ZMDC to incorporate joint ventures to prospect nickel and platinum deposits and develop mines. *See* ECF No. 1-1 at ¶¶ 3-4.  The MOUs include arbitration clauses which permit a party to submit a dispute to the ICC International Court of Arbitration ("ICC").

Invoking the arbitration clauses, Plaintiffs initiated arbitration proceedings against ZMDC on February 2, 2011. They claimed that ZMDC breached its allegations by attempting to terminate the MOUs on the grounds of corruption in their making. *See id*., ¶7. Although the Commissioner

was not a party to the MOUs, and Plaintiffs made no claim against the Commissioner, it was named a respondent in the arbitration proceedings. *See id.*, ¶ 2.

Between September 2011 to October 2011, the ICC constituted an arbitration tribunal composed of Judge Meyer Joffe, Mr. James Prince Mutizwa, and Mr. Stuart Issacs QC (the "Tribunal").

On January 12, 2014, the Tribunal issued an award in favor of Plaintiffs (the "Award"). It held that ZMDC's purported cancellation of the MOUs amounts to a repudiatory breach of the MOUs, which came to an end with Plaintiffs' initiation of the arbitration. *See id.*, ¶181. The Tribunal then ordered ZMDC to pay Plaintiffs damages in the sum of $46,782,000 and interest on these damages. *See id.*, ¶227. Although the Tribunal did not find the Commissioner liable for the breach of the MOUs, it ordered it, together with ZMDC, to pay Plaintiffs' legal costs, expenses, and arbitration costs in the amount of $3,120,583.74.

On July 19, 2019, Plaintiffs sought to register and enforce the Award before the Zambian High Court against ZMDC and the Commissioner. *See* ECF No. 1-5. The following month, the High Court issued an *ex parte* "Order for leave to Register and Enforce the Final Arbitration Award" (the "Order"). The High Court prohibited Plaintiffs from enforcing the Award until they served the Order on ZMDC and the Commissioner within 30 days from its issuance. *See* ECF 1-5 at ¶ 2. To date, Plaintiffs have served neither ZMDC nor the Commissioner.

On January 10, 2022, Plaintiffs filed a complaint, seeking to enforce the Order under the D.C. Foreign-Country Money Judgments Recognition Act (the "D.C. Code") against ZMDC, the Commissioner, and Zimbabwe (the "Complaint"). They requested this Court: i) to hold all Defendants jointly and severally liable for the legal costs, expenses, and arbitration fees ordered in the Award; ii) find ZMDC and Zimbabwe liable for the damages awarded to Plaintiffs in the

Award; and iii) order "post-award interest at 5% per annum from January 12, 2014, through the date of entry of the Judgment and post-Judgment interest at the Zambian statutory rate." ECF No. 1, p. 10.

Although Zimbabwe was not a party to the MOUs, the arbitration, or the enforcement proceedings before the Zambian High Court, Plaintiffs argued that the Court should assume jurisdiction over Zimbabwe and enforce the Order against it because it was ZMDC's *alter ego*. Their submission predominantly rested on the Southern District Court of New York's decision in *Funnekotter v Agricultural Development Bank*, No. 13 CIV.1917(CM), 2015 WL 9302560 (S.D.N.Y. Dec. 17, 2015), which found ZMDC to be Zimbabwe's *alter ego*. Plaintiffs argued that the Court should give *Funnekotter* preclusive effect under the collateral estoppel doctrine. *See* ECF No. 28, pp. 21-23. They also insisted that the Court should find an *alter ego* because Zimbabwe: i) is the majority owner of ZMDC; ii) has the power to appoint ZMDC's Board of Directors; ii) "has the power to direct ZMDC's actions;" and iii) "uses ZMDC to pay [its] debts." *See id*., p. 9. Finally, they requested leave to amend the Complaint should the Court find their allegations insufficient to establish *alter ego*. *See id*., p. 36.

Defendants moved to dismiss the Complaint on different grounds. They argued that the Court lacks subject matter jurisdiction because neither the waiver nor the arbitration exceptions under the Foreign Sovereign Immunities Act ("FSIA") apply to actions to enforce a foreign judgment confirming an arbitration award. *See* ECF No. 34, pp. 4-8; ECF No. 29, pp. 5-8. Defendants also made specific objections to each of them. Zimbabwe disputed the Court's subject matter jurisdiction on the ground that it was not a party to the MOUs or an *alter ego* of ZMDC. The Commissioner in turn argued that the Court cannot assume subject matter jurisdiction under the FSIA because it was an individual, not a foreign state. *See* ECF No. 29, pp. 3-5, 11-20.

3

Defendants then challenged the Court's personal jurisdiction. They insisted that the Court cannot exercise personal jurisdiction over them because the FSIA immunity exceptions do not apply. ZMDC and the Commissioner further submitted that the Court cannot assume personal jurisdiction because they were not served with the Complaint, and Plaintiffs have not established that they have minimum contacts with the District of Columbia. Finally, Defendants argued that Plaintiffs, *inter alia*, failed to allege sufficient facts to support their claim that Zimbabwe is an *alter ego* of ZMDC and *vice versa*.

On March 22, 2023, the Court denied the motion to dismiss as to the Commissioner but granted the motion to dismiss as to Zimbabwe and ZMDC (the "Court's Order"). *See* Court Order, ECF No. 38, p. 42. It held that the FSIA applies to the Commissioner because it is a "political division" of Zimbabwe and, thus, "a component of the state." *See id.* at 26. The Court next held that it has subject matter jurisdiction and personal jurisdiction over the Commissioner. While it agreed with Defendants that the arbitration exception under Section 1605(a)(6) does not apply to actions to recognize foreign judgment confirming an arbitration award, it assumed jurisdiction over the Commissioner under the waiver exception in Section 1605(a)(1) because the Commissioner was a party to the arbitration and Zimbabwe is a state party to the New York Convention. *See id.*, pp. 27-30, 35.

On the other hand, the Court held that it lacks jurisdiction over ZMDC and Zimbabwe because Plaintiffs did not demonstrate that Zimbabwe was ZMDC's *alter ego* and *vice versa*. Aside from refusing to give preclusive effect to *Funnekotter*, it found none of Plaintiffs' allegations adequate to establish *alter ego*. *See id.,* pp. 9-18. But the Court granted Plaintiffs leave to file an amended complaint. *See id.*, p. 42.

On May 24, 2023, Plaintiffs filed an amended complaint seeking to enforce the Order against Zimbabwe, ZMDC, and the Commissioner (the "Amended Complaint").

Defendants now file this Motion to Dismiss the Amended Complaint along with the Second Declaration of Mr. Tinashe C. Chiparo, attached hereto as **Exhibit 1** ("Chiparo Second Decl.").

**ARGUMENT**

## I.   Plaintiffs have failed to establish subject matter and personal jurisdiction by a preponderance of the evidence

On a Fed. Civ. P. Rule 12(b)(1) motion to dismiss, the petitioner must establish the court's jurisdiction "by a preponderance of the evidence." *See* Court Order at 5; *see also Dvorak v. U.S. Dep't of Homeland Sec.*, No. 18-CV-1941 (DLF), 2019 WL 1491743, at *1 (D.D.C. Apr. 3, 2019) (quoting *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011)) (internal quotation marks omitted). Because a Rule 12(b)(1) motion challenges the court's jurisdiction, the court "will subject a plaintiff's complaint to 'closer scrutiny' than on a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Ware El v. Soc. Sec. Admin.*, No. 19CV01684TNMGMH, 2019 WL 5811299, at *2 (D.D.C. Nov. 7, 2019). If the defendant challenges the factual basis of the court's jurisdiction, "the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged but instead must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." Court Order, at 6 (*quoting Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)) (internal quotation marks omitted); *see also Johnson v. BAE Sys.*, Inc., No. 11-CV-2172 (RLW), 2012 WL 13055684, at *1 (D.D.C. Oct. 23, 2012) ("the [c]ourt is not bound to treat all of the plaintiff's allegations as true, but instead may receive and weigh affidavits and other relevant matter to assist in determining the jurisdictional facts.").

5

The Foreign Sovereign Immunities Act ("FSIA") provides the only basis for assuming jurisdiction over foreign states, including their instrumentalities. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989); Court Opinion at 5. Under the FSIA, foreign states are presumed to be immune from suit unless the plaintiff proves that one of the enumerated exceptions in the statue applies. *See* 28 U.S.C.A. § 1604; *see also Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013) ("FSIA begins with a presumption of immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an exception applies.").

The "basic objective of foreign sovereign immunity is to free a foreign sovereign from suit." *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 962 F.3d 576, 584 (D.C. Cir. 2020) (*citing Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S.Ct. 1312, 1317 (2017)) (internal quotation marks omitted). Courts must therefore decide on issues of immunity "as near to the outset of the case as is reasonably possible" and "before the sovereign is required to defend on the merits." *Ibid.*; *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 494 (1983) (holding that questions regarding immunity must be decided "[a]t the threshold of every action."); *Denegri v. Republic of Chile*, No. CIV. A. 86-3085, 1992 WL 91914, at *2 (D.D.C. Apr. 6, 1992) (same); *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000) ("to preserve the full scope of that immunity, the district court must make the critical preliminary determination of its own jurisdiction as early in the litigation as possible; to defer the question is to frustrate the significance and benefit of entitlement to immunity from suit.") (internal quotation marks omitted).

Invoking the immunity exceptions under 28 U.S.C. §§ 1605(a)(1) and 1605(a)(6) of the FSIA, Plaintiffs argue that Defendants are subject to the jurisdiction of this Court. *See* Am. Compl., ¶ 8. For the reasons set forth below, the Court should dismiss the Amended Complaint.

A.     **Plaintiffs cannot overcome the presumption of juridical separateness and therefore cannot establish that Zimbabwe and ZMDC are *alter egos* of each other**

Where a party alleges that an instrumentality is an *alter ego* of a State, a court first assesses whether the instrumentality is the "sort of entity to which the presumption of separation applies,"[1] and, if it is, it then determines if "sufficient grounds exist to disregard [its] presumptive separateness from the" State. *DRC, Inc. v. Republic of Honduras*, 71 F. Supp. 3d 201, 209 (D.D.C. 2014). That presumption can only be displaced by showing that (1) "a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created" or (2) "where recognition of the instrumentality as an entity apart from the state would work fraud or injustice." *See, e.g.,* Court Order at 5-6, (*citing Transamerica Leasing Inc. v. La Republica de Venezuela,* 200 F.3d 843, 847 (D.C. Cir. 2000).

Neither of these two scenarios is present here. Despite obtaining a second opportunity, Plaintiffs have failed to prove that Zimbabwe and ZMDC were *alter egos* during the relevant period, *i.e.*, at the conclusion of the MOUs or during the arbitration. *See* Court Order at 14; *see also TIG Ins. Co. v. Republic of Argentina*, No. 18-MC-00129 (DLF), 2022 WL 1154749, at *8 (D.D.C. Apr. 18, 2022), *order corrected and superseded*, No. 18-MC-00129 (DLF), 2022 WL 3594601 (D.D.C. Aug. 23, 2022) (assessing if Caja (Argentina's instrumentality) was an *alter ego* of Argentina when the underlying contracts between the plaintiff and Caja were made).

---

[1] This Court has already determined that the presumption applies. *See* Court's Memorandum Opinion and Order issued on March 22, 2023, ECF No. 38 ("Court Order").

Zimbabwe and ZMDC have organized their arguments on the issue of *alter ego* below to address the two paths identified by this Court for establishing an *alter ego* relationship despite Plaintiffs' failure to do the same in their Complaint. The manner in which Plaintiffs set out their allegations forced Zimbabwe and ZMDC to speculate, at times, as to which allegations pertained to either the principal-agent or the fraud and injustice prong of the *alter ego* claim.

1.  Plaintiffs cannot show that a relationship of principal and agent exists between Zimbabwe and ZMDC

As noted by the D.C. Circuit and repeated by this Court, there is no principal and agent relationship unless the parent has shown this intent, the subsidiary has consented, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and "the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors." *DRC, Inc.*, 71 F. Supp. 3d at 216; *see also GSS Group Ltd. v. Nat'l Port Authority of Liberia*, 822 F.3d 598, 605-606 (D.C.C. 2016).

This Court has also made other observations relevant to an *alter ego* analysis that are particular to sovereign-owned entities. First, the fact that a state-owned entity may assist in carrying out "policies and goals" on behalf of the sovereign does not establish an *alter ego* relationship. *See, e.g., Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 55 (2d. Cir. 2021). Second, when determining whether "extensive control" exists in the case of a state entity, "a government can wield power not only as [a] shareholder but also as [a] regulator" without erasing the juridical boundaries that exist between the two. *Transamerica Leasing Inc.*, 200 F.3d at 851. Third, it is only when a government exercises control above and beyond its role as a regulator that it has exercised "day-to-day" control over an entity's operations that the separate corporate form can be disregarded. *See id.* To that end, the exercise of a power that is incidental to ownership is not synonymous with control over the

instrumentality's day-to-day operations. Showing control over day-to-day operations is necessary to establish the "extensive control" prong.

In line with the above test, this Court has reiterated the requirements for determining whether the control is so extensive to show that a principal-agent relationship exists, in this case, such that the presumption of separateness is overcome. Court Order at 9. This Court has accepted that the degree of control over the instrumentality must "significantly exceed []the normal supervisory control exercised by any corporate parent over its subsidiary;" that both State and instrumentality act as one, and more importantly, that the relationship of principal-agent is one where the principal has "the right to control the conduct of the agent with respect to matters entrusted to [the agent]." *Id.* at 10 (internal citations omitted). This Court has also reiterated the long-standing position that the control must be more direct beyond "voting a majority of the stock in the subsidiary" or "making appointments to the subsidiary's Board of Directors." *Id.* at 11.

This Court has found that the allegations of the original complaint concerning that ZMDC "was created by the Zimbabwe Mining Development Corporation Act, and by law the Republic of Zimbabwe appoints its Board of Directors, approves significant actions, has the power to direct its actions, [sic] pays the debts of the Republic of Zimbabwe, and must be majority-owned by the Republic of Zimbabwe" to be insufficient to show that ZMDC is the Republic's *alter ego. Id.* at 11. The Court noted that "[t]he complaint does not describe what "significant actions" the Republic must approve, how extensive that alleged authority is, or whether that authority "represents the exercise of [the Republic's] authority as shareholder rather than its exercise as a governmental power in the ordinary course of regulation." *Id.* at 11.

Plaintiffs' second attempt to establish an *alter ego* relationship fails for similar reasons set forth in this Court's decision of March 22, 2023. Plaintiffs' additional allegations continue to fail

to show that a principal-agent relationship exists. While the allegations have increased beyond a single paragraph, they are more of the same in substance and fail to show that the Republic exercises day-to-day control over ZMDC.

For a majority of the new allegations concerning this element of *alter ego*, Plaintiffs have relied almost entirely on cherry-picking the provisions of the ZMDC Act[2] to allege that the "Government completely controls ZMDC. . ." *See* Am. Compl. at ¶¶ 42-61. None of these are facts that satisfy the legal standard, and all of the allegations fall flat. Many are based on self-serving interpretations or assumptions of the provisions of the ZMDC Act, intentionally ignoring those provisions that defeat their argument. Other allegations simply reiterate actions that are inherent in a relationship between a state-owned entity and the sovereign or pertain to issues that do not concern or identify the relevant time period (*e.g.*, the time of execution of the MOUs or the arbitration proceedings). Plaintiffs also make several allegations that the Republic instructed or directed ZMDC, without confirming whether ZMDC acted as a result of those alleged instructions or directions. *See, e.g.,* Am. Compl. ¶ 60.[3] Lastly, Plaintiffs rely on contradicting evidence and allegations based on speculation as to a future event. *See, e.g.,* Am. Compl. at ¶ 44, 69-71. In sum, none of the allegations demonstrate any day-to-day control or control so extensive as to show the existence of the principal-agent relationship.

---

[2] Plaintiffs have not included the ZMDC Act as an Exhibit to their Amended Complaint. For purposes of this Motion, the Defendants have relied on Exhibit 3 attached to their Reply in Support of their Motion to Dismiss. *See* ECF No. 29-3.

[3] As to any allegations concerning the termination of Plaintiffs' alleged "joint venture," this is contradicted by the underlying Award which finds that there was an absence of a joint venture agreement between ZMDC and Plaintiffs. Am. Compl. ECF No. 40-1 at 177. Further, there is no allegation in the Award that the Government, rather than ZMDC, terminated the contracts at issue further contradicting the allegation in the Amended Complaint. *See generally,* Am. Compl., ECF No. 40-1.

Plaintiffs continue to harp on the ownership structure of ZMDC (Am. Compl. ¶ 45) and the appointment and composition of board members to argue "complete" government control. Am. Compl. ¶¶ 49-52. This Court has already discarded that the majority ownership of a state entity by the government, a key feature of a state-owned entity, and the appointment of board members by the government are insufficient to overcome the presumption of separateness. ECF No. xxx at x. While the Ministry of Mines appoints members of the Board, this does not change the legal independence bestowed on ZMDC through the ZMDC Act. *See DRC, Inc.*, 71 F. Supp. 3d at 212. These types of allegations do not further Plaintiffs' claim, because as this Court has already noted, "[a] sovereign does not create an agency relationship merely by owning a majority of a corporation's stock or by appointing its Board of Directors." *Transamerica Leasing, Inc. v. Venezuela*, 200 F.3d 843, 849 (D.C. Cir. 2000); *see also TIG Ins. Co*, 2022 WL 1154749 at 9; *DRC, Inc.*, 71 F. Supp. 3d at 215.

Moreover, while Plaintiffs attempt to argue that the board members "serve at the pleasure of the Minister" (ECF 40 at ¶ 50), this is nothing more than a conclusory statement contradicted by the text of the ZMDC Act. Plaintiffs ignore the express limitations on the Minister's power of removal. Specifically, Section 9 specifies that the Minister may remove a board member only in three scenarios: (a) if they are guilty of improper conduct as member; (2) have failed to comply with the conditions of office or (c) if mentally or physically incapable of efficiently performing their duties as a member. *See also,* Chiparo Second Decl. at ¶ 8. There are also limitations on whom the Minister can appoint as Board members (ZMDC Act, Section 7), and no Board member can serve for a period exceeding three years. ZMDC Act ¶ 6(1). Citations to the ZMDC Act are plainly insufficient, and the power over the board members is not absolute as Plaintiffs wrongly attempt to portray. Am. Compl. at ¶ 50-54.

The allegations that the current Board has members that have served on other government boards or that officers of the Public Service can attend meetings or join the Board are irrelevant for an *alter ego* analysis. *See* Am. Compl. at ¶¶ 52-53. There is no allegation that the Board is completely composed of government employees such that its separate function should be disregarded or that officers of the Public Service vote and can override the decision of the Board. *See id.* Indeed, the officers of the Public Service have no voting rights. ZMDC Act §14. In sum, there is nothing in the power of appointment or the board composition as pled in the Amended Complaint that supports an *alter ego* relationship. Court Order at 11.

Plaintiffs also resort to making contradictory allegations concerning the Board. Despite citing an article that shows the appointment of individuals to the Board of ZMDC (Ex. I), Plaintiffs also rely on a State Department article to claim that Zimbabwe has allowed ZMDC to function without boards. Am. Compl. at ¶ 44, citing to Ex. H, ECF No. 40-8. This Court should disregard these contradictory allegations. *See, e.g., Nehbor v. Yahoo!, Inc.,* 391 F. Supp. 2d 181, 187 (D.C.C 2005) (dismissing claims based on contradictory statements).

Plaintiffs make a series of allegations concerning the Minister's power, including that the Minister has the power to investigate and order reports from ZMDC. Am. Compl. at 54-55. Neither of these actions establishes extensive control. *See, e.g., Gater Assets Ltd.,* 2 F.4th at 57-58 (declining to find that the government's investigations were sufficient to establish extensive control since a government's power to investigate "is not remarkable"). Plaintiffs have failed to cite any investigation or request for a report, let alone any action in this regard that goes beyond the government's role as a regulator. *Transamerica Leasing Inc.,* 200 F.3d at 851. Plaintiffs also allege that the Minister must approve ZMDC's General Manager but fail to allege that the Minister

exercises any further control over the General Manager, besides appointment approval that would support a showing of excessive control or day-to-day control over ZMDC's operations.

In an attempt to bolster their arguments, Plaintiffs resort to misconstruing the ZMDC Act to claim that the "Minister [has] the absolute right to overrule any decision of the Board based on the Minister's view of the public interest." Am. Compl. at 54. There is no provision that supports this interpretation. To the contrary, Section 25(1), which Plaintiffs cite, only allows the Minister, "*after* consultation with the Board to give the Corporation such directions of *general* character relating to the exercise by it of its functions, duties and powers as appear to the Minister to be in requisite in the national interest." ZMDC Act, Section 25(1)(emphasis added). In any event, Plaintiffs have not cited a single instance of the Minister overriding a Board decision, even for reasons of public interest.

Plaintiffs' reliance on the Schedule to the ZMDC Act is equally unavailing. The ZMDC Act expressly provides that that "operations of the Corporation shall, subject to the Act, be controlled by a board . . ." ZMDC Act § 4. While the Minister has approval power for certain actions, Plaintiffs fail to allege, even in a conclusory fashion, that the power goes beyond approval to govern ZMDC's day-to-day operations.

The Schedule (Section 22) of the ZMDC Act outlines the "powers of the corporation," which Plaintiffs conveniently ignore. Am. Compl. at ¶ 57. The corporate powers identified in Schedule 22 show that ZMDC is an independent entity. ZMDC is "capable of suing and being sued" and is further allowed under the Act to alienate property, execute any "negotiable or transferable instruments," make or modify "contracts and enter into suretyships or give guarantees," "associate with, participate in or enter into joint or other ventures with individuals, associations…corporations in the development of the mining industry in Zimbabwe,  and exercise and control issues pertaining to its employees, including employing individuals, suspending or discharging such employees,

selling, constructing, purchasing or leasing dwelling houses and land for purposes of housing employees, among other powers, . ZMDC Act, Schedule, Section 22. Finally, ZMDC is a distinct economic enterprise that is not subject to the same administrative requirements that apply to governmental agencies. ZMDC does not receive any budget from Zimbabwe and "[u]nlike government employees, ZMDC employees are not governed by the Public Service Act 1995" but through other instruments such as the Mining Industry Employment Code. *See* Chiparo Second Decl., ¶ 12. To the extent that certain actions require the approval of the Minister or the Minister of Finance, Plaintiffs have failed to show how those actions demonstrate complete control such that the government exercises day-to-day control over ZMDC's operations.

Like other corporations, ZMDC is responsible for its finances. Its capital consists of "the share capital of the Corporation; and any other moneys or assets that may vest in or accrue to the Corporation as capital." ZMDC Act, §31. Its revenue includes any other cash that "accrues to the Corporation, whether in the course of its operations or otherwise." *See id*., § 32. At the end of each fiscal year, ZMDC is audited by independent auditors registered as public auditors in terms of the Public Accountants and Auditors Act. *See id.*, Art. 40(1)(2). Plaintiffs cite to several provisions purported to be in Section 33 of the ZMDC Act, which Defendants are unable to locate in the ZMDC Act, except a provision set forth in Article 33 which confirms Plaintiffs' allegation that "ZMDC must declare a dividend to pay the Republic any surplus funds." Am. Compl. at ¶ 56 (citing to subsections of ZMDC Act §33 which do not appear in the text of ZMDC Act). In light of this contradiction between the allegations and the text of the ZMDC Act, this Court should disregard those allegations. It is also irrelevant if Zimbabwe allegedly used the dividends it obtained from ZMDC to pay its debts. As a shareholder, Zimbabwe is entitled to dividends if the revenue in a financial year is enough to cover certain expenses. *See* ZMDC Act, Art. 33.

Plaintiffs then turn their focus on the policy reasons for establishing ZMDC and its stated purpose in the ZMDC Act to claim that they show "complete control." *See* Am. Compl., at ¶ 47-48. Plaintiffs go as far as baselessly alleging that "ZMDC is explicitly an organ of Government policy and was created to pursue government's goals regardless of commercial sense" based on the fact that ZMDC, as is the case with State-owned entities, was set up to carry out certain government policy objectives. Am. Compl. at ¶ 47, 48. But the fact that ZMDC is set up to further the Republic's mining policies or goals is not sufficient to overcome the presumption of separateness. *See, e.g., Gater Assets Ltd.,* 2 F.4th at 55. For similar reasons, Plaintiffs' reliance on a 2018 article citing the Minister as stating that the "boards" are executing "key government objectives" is unavailing and irrelevant to the time period at issue. *See* Am. Compl. at ¶ 51 and Ex. I to Am. Compl., ECF No. 40-9 at 3.

Equally irrelevant is any allegation pertaining to an alleged sale of certain mines in 2018 or 2020 or a future plan to transfer or sell ZMDC's assets. *See, e.g.,* Am. Compl. ¶¶ 58-59 (citing to Ex. J, ECF No. 40-10) and ¶¶ 69-71; *see also,* Court Order at 14 (dismissing allegations outside of the relevant time period for the determination of *alter ego* in this case). In any event, the articles cited cast doubt on whether the alleged actions were completed or occurred. *See* Ex. J, Am. Compl., ECF No. 40-10 at 3 (claiming that "[t]he said mines are part of the ZMDC stable and were under judicial management. In is far [sic] as I am aware, this process is yet to be finalized"); *see also,* Ex. K, Am. Compl., ECF No. 40-11 (discussing a plan to allegedly shift ZMDC's assets to "Defold").

To the extent that Plaintiffs rely on allegations concerning ZMDC's SDN designation by OFAC, those allegations fail to support a finding of *alter ego* under the "principal-agent" factor. The SDN designation itself is insufficient to support a finding of *alter ego*. *See e.g., In re 650 Fifth Ave.* (*650 Fifth*), No. 08 CIV. 10934, 2013 WL 2451067 (S.D.N.Y. June 6, 2013). Even if the Court is to

consider the press release[4] Plaintiffs cite, the allegations concerning ZMDC are vague and not specific. *See* Am. Compl. at ¶ 64. There are no details contained in the press release as to how, when, what and where to allow Defendants to understand the allegations against them. In any event, evidence exists to rebut OFAC's press release on this point. In September 2013, EU delisted ZMDC from its list of sanctioned entities.[5] Moreover, ZMDC is subject to not only an internal, but also external audit by the Office of Comptroller & Auditor General, which in 2011 attained autonomous status from the government.[6] *See* Chiparo Second Decl. ¶ 20.

Lastly, Plaintiffs point to the Republic's alleged use of ZMDC's assets to pay sovereign debt. *See* Am. Compl. ¶ 60 (presumably referring to ¶¶ 67 et. seq.). Plaintiffs' allegations on this point are convoluted. They make a vague reference to the Republic ordering ZMDC to pay off a loan using "its share of the proceeds from the mining project." It is unclear from the allegation whether it is referring to ZMDC or the Republic's share of the proceeds. Whether Plaintiffs are referring to ZMDC or Zimbabwe's share of the proceeds, those allegations fail to support a finding of *alter ego*. There is no relevant time period indicated to allow the Court to consider such an allegation (¶ 68), and even if the transaction refers to the one specified in paragraph 75, that transaction occurred in 2019 and falls outside the relevant time period for the determination of the relevant *alter ego* relationship. Court Order at 14 (identifying the relevant period as either when ZMDC entered into the MOUs with Plaintiffs in 2007 and 2008 or when it actually participated in the Zambian arbitration in 2011). For the same reason, this Court should disregard the allegations contained in paragraphs 78-80.

---

[4] Plaintiffs fail to include the press release as an exhibit to the Complaint, providing the Court only with an excerpt as part of their Amended Complaint.

[5] https://2009-2017.state.gov/j/inl/rls/nrcrpt/2016/vol2/253441.htm

[6] https://www.auditorgeneral.gov.zw/about-us/history

Plaintiffs have demonstrated none of the conditions necessary for finding a principal and agent relationship between Zimbabwe and ZMDC. There is no allegation that Zimbabwe instructed ZMDC to conclude the MOUs on its behalf nor is there any claim that ZMDC entered into the MOUs on Zimbabwe's behalf. *See* ECF No. 1, ¶¶ 18-22. Aside from making conclusory assertions of Zimbabwe's involvement in certain "decisions" or "actions" taken by ZMDC, Plaintiffs have also not alleged or proved that Zimbabwe exerted control over ZMDC's day-to-day operations during the critical time, *i.e.*, the conclusion of the MOUs. *See* ECF 28 at 17; *see also TIG Ins. Co*, 2022 WL 1154749 at 9. This is not unexpected. As noted by Mr. Chiparo, ZMDC largely operates without the approval of Zimbabwe or the Minister. *See* Chiparo Second Decl., ¶ 16.

For the above reasons, this Court should find that Plaintiffs have fail to show the existence of an alter-ego relationship between ZMDC and Zimbabwe that would support a finding of jurisdiction in this case.

> 2. Plaintiffs have not shown that respecting ZMDC's separate corporate personality would result in fraud or injustice

Plaintiffs have also failed to establish *alter ego* under the fraud or injustice prong. To pierce an instrumentality's corporate veil under this prong, there must be proof that the sovereign abused the instrumentality's corporate form "to perpetrate fraud or injustice" during the relevant period. *See Alkanani v. Aegis Def. Servs., LLC,* 976 F. Supp. 2d 1, 8 (D.D.C. 2013)*; see also TIG Ins. Co.*, 2022 WL 1154749, at *10 (refusing to find *alter ego* under the second prong because the plaintiff presented no evidence that, at the time of the relevant period, Argentina manipulated its state-owned company, Caja, to obtain a benefit without risk); *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 417 (5th Cir. 2006) (finding fraud or injustice where Turkmenistan, during the relevant period, dissolved a state-owned company that was a party to a joint venture agreement with plaintiff

and replaced it with another state-owned company with small initial capital and immunity from seizure.). Here, there is none.

Lacking evidence, Plaintiffs resort to hyperbole and conclusory allegations. They allege that ZMDC is "undercapitalized" and that Zimbabwe "has been playing a shell game," moving ZMDC's assets to "defraud its creditors," and using ZMDC's assets "as it sees fit." *See* Am. Compl., ¶ 41. To make their case, Plaintiffs point to allegations in news articles that allegedly occurred between 2017-2022. *See e.g.*, ECF No. 28-4, Ex. 2 (referring to alleged bid for sale of ZMDC's mine assets in 2018); ECF No. 28-4, Ex. 3 (referring to alleged sale of ZMDC's assets in 2022); Am. Compl., ECF No. 40-10 (referring to Landela Investment Ltd.'s alleged assessment of the Jena Mine in 2020); Am. Compl., ECF No. 40-11 (referring to Zimbabwe's alleged plan in 2022 to transfer ZMDC's interest in Kamativi Tine Mines.); Am. Compl., ECF No. 40-12 (referring to alleged transfer of treasury bills to Sakunda Holdings Ltd. and Landela Investments Ltd. in 2019); Am. Compl., ECF No. 40-13 (referring to the Ministry of Mines' alleged decision in 2019 to settle ZCDC's debt); Am. Compl., ECF No. 40-14 (referring to alleged arms-for-minerals deal between Zimbabwe's military and China in 2017). These allegations are irrelevant as they fall outside the relevant period.

Plaintiffs' allegations also fail for the following four separate reasons that are further elaborated below. First, the allegation that ZMDC is undercapitalized is conclusory and immaterial as this alone does not prove that Zimbabwe abused ZMDC's corporate form to commit fraud or injustice. There are also no facts to support this bare assertion. Second, there is no evidence that Zimbabwe planned to move ZMDC's assets to another company or that it crafted such a plan to defraud creditors. Again, these are nothing more than empty statements with no support. Third, a disregard of an instrumentality's corporate formality without the intention to commit fraud or injustice is insufficient to establish the second element. In any event, there no evidence that

Zimbabwe improperly used ZMDC's assets. Fourth, and finally, the allegation that ZMDC awarded mining concessions to senior government officials and the claim that President Emmerson Mnangagwa's advisor, Mr. Kuda Tagwirei, "may have been arbitrarily awarded" mining rights in state-owned mines are, aside from being false, irrelevant because they do not prove that Zimbabwe abused ZMDC's corporate form.

      a. *Undercapitalization and past payment defaults are irrelevant for the purpose of establishing the second prong*

Plaintiffs have presented no evidence that ZMDC is undercapitalized, but even if that is the case, it is insignificant. "Inadequate capitalization after incorporation" is only relevant "if the capital was removed as part of a fraudulent conveyance scheme." Even "[i]n such a scheme, the inappropriate transfer of assets and not the level of capitalization would be the prevailing factor in determining whether to pierce the corporate veil." *See Gater Assets Ltd.*, 2 F.4th at n. 16 (*citing NLRB v. Bolivar-Tees, Inc.*, 551 F.3d 722, 730 n.7 (8th Cir. 2008). Although Plaintiffs claim that ZMDC is "undercapitali[zed]," and has "consistently failed to meet its financial obligations…both during the pendency of the arbitration and after the arbitral award was issued," there is no allegation, let alone proof, that this was a result of a fraudulent transfer of assets. *See* Am. Compl., , ¶ 67.

      b. *There is no evidence that Zimbabwe moved ZMDC's assets to Defold Mine or that it moved those assets to shield them from creditors*

Plaintiffs have again failed to substantiate their claims that Zimbabwe abused ZMDC's corporate form to defraud creditors. Citing to a news article, Plaintiffs argued in their Complaint that the Court should treat Zimbabwe as an *alter ego* of ZMDC because it "may dissolve ZMDC and transfer its assets to a different state-owned entity." ECF No. 28, p. 10. The Court ruled that the allegation is insufficient to establish *alter ego* under the fraud or injustice theory. *See* ECF No. 38, p. 13, n.4. Plaintiffs then reiterate their claim in the Amended Complaint without much more support.

Turning to another news article, they insist that Zimbabwe has a "scheme" to move ZMDC's assets to Defold Mine to defraud ZMDC's creditors. *See* Am. Compl., ¶ 70.

Zimbabwe would have no incentive of taking such measure as only ZMDC is responsible to its creditors. It is thus unsurprising that Plaintiffs, beyond citing to inadmissible hearsay statements in a news article, present no evidence that Zimbabwe planned to transfer ZMDC's interests in Kamativi Tin Mines (Pvt) Ltd and Todal (Pvt) Ltd to Defold Mine to defraud its creditors. *See* Am. Compl., ECF No. 40-11, p.3; *Welborn v. Internal Revenue Serv.*, 218 F. Supp. 3d 64, 80 (D.D.C. 2016) ("when considering a motion to dismiss for lack of subject matter jurisdiction, a court cannot rely on conclusory or hearsay statements contained in the affidavit."); *see also Beydoun v. Wataniya Restaurants Holding, Q.S.C.,* 768 F.3d 499, 506 (6th Cir. 2014) ("[i]n general, it is improper for a court to consider hearsay statements when ruling on a motion to dismiss."). There is also no proof that Zimbabwe executed the alleged plan to transfer the assets. Rather, the news article suggests that ZMDC, exercising its autonomy, strongly rejected the alleged plan. *See* Am. Compl., ECF 40-11, pp.3, 5-6.

### c.   *Plaintiffs cannot satisfy the second element by merely alleging breach of corporate formalities*

"Proof of the first element [of *alter ego*] is not proof of the second." *Fed. Trade Comm'n v. Noland*, No. CV-20-00047-PHX-DWL, 2021 WL 289659, at *4 (D. Ariz. Jan. 28, 2021). A disregard of corporate formality, in the absence of a fraudulent or wrongful intent, is not sufficient to establish the second element. *See Bd. of Trustees, Sheet Metal Workers' Loc. Union 102 Health Ben. Fund v. Gibson Bros.*, No. 820329, 1982 WL 2079, at *6 (D.D.C. Oct. 27, 1982) (holding that CGI's failure to respect GBI's corporate formalities is not sufficient to prove "fraud or injustice on the part of CGI."); *see also Fed. Trade Comm'n v. Noland*, 2021 WL 289659, at *4 (noting that disregard of corporate

formalities and commingling of funds "shed no light on the second element," which requires a showing that observing the entity's corporate personality would "result in fraud or injustice.").

Plaintiffs claim that Zimbabwe allegedly disregarded ZMDC's corporate form on several occasions. Particularly, they submit that Zimbabwe: i) "directed ZMDC to repay a loan owed by the Republic using its share of proceeds from a mining project," ii) took "ZMDC's dividends from its joint ventures directly rather than allowing them to go to ZMDC," iii) "diverted ZMDC's revenues to shell companies controlled by political and military figures," iv) "repeatedly directed ZMDC to strip the concessions of joint venture partners who have fallen out of political favor, including Plaintiffs," and v) directed ZMDC to conclude mining concession agreements with the Zimbabwe National Army and foreign companies. *See* Am. Compl., pp. 68, 73, 75, 77-78, 80. These allegations are insufficient to satisfy the second element as there is no claim or proof that these measures were taken to defraud Plaintiffs or other creditors.

There is also no evidence to support either claim. Citing to news articles, they allege that Zimbabwe instructed ZMDC to conclude arms-for-minerals deals with Chinese and Russian companies. *See id*., ¶ 77. Plaintiffs mischaracterize the articles. Exhibit N does not state that ZMDC, with or without Zimbabwe's direction, concluded arms-for-mineral deals with Chinese companies. Rather, it identifies China North Industries Group Corporation ("Norinco"), which has a joint venture with ZMDC, as the entity that has in the past "been accused of quarterbacking China's arms-for-resources deals" with Iraq and South Sudan. *See* Am. Compl., ECF No. 40-14, p.1. The other appended news article also fails to support the claim that Zimbabwe directed ZMDC to conclude arms-for-minerals deals with Russian investors and Russian state-owned company, Rostec. *See* Am. Compl., ¶ 77. The article, deceivingly titled "arms deal behind platinum project," does not report of any arms-for-minerals deals between ZMDC and the Russian entities. *See* ECF No. 28-4, Ex.1. It instead

speculates of "secret arms deal hidden behind" Great Dyke Investments—a joint venture between Pen East mining company and a Russian consortium composed of Rostec, VI Holdings, and Vnesheconombank. *See id*., p. 2. But even that assumption is not based on evidence but on Zimbabwe representatives' alleged participation in an "arms expo" held in South Africa and Mr. Denis Mantrouv's involvement in the joint venture as the chairperson of Rostec supervisory board. *See id*., pp 2-3.

Similarly, there is no evidence that Zimbabwe directed ZMDC to sell its interests in the Kamativi lithium concession to the Zimbabwe National Army or to "award a diamond mining concessions to a company in the United Arab Emirates ("UAE")." *See* Am. Compl., ¶¶ 75, 78. As Mr. Chiparo noted, ZMDC still maintains its interest in Kamativi Tin Mines and the Kamativi dump. *See* Chiparo Second Decl. at ¶ 22. The article cited by Plaintiff does not refute Mr. Chiparo's declaration. Even if there was a plan to dispose these assets, the article notes that it was aborted because it did "not attract [] enough quality bids." ECF No. 28-4, Ex.2, p. 1. Plaintiffs' claim with respect to ZMDC's deal with a UAE company also lacks any support. Contrary to their allegation, the appended article only claims that the Ministry of Mines, not ZMDC, "committed" to satisfy Zimbabwe Consolidated Diamond Company's ("ZCDC") debt to a UAE company by selling a diamond parcel. *See* Am. Compl., Ex. N ECF No. 40-13, p.1.

Finally, there is no evidence that Zimbabwe improperly transferred ZMDC's revenues. Plaintiffs refer to the Department of Treasury's press release of July 25, 2008, which alleges that "Robert Mugabe and his senior officials" have used ZMDC to "illegally siphon revenue and foreign exchange from the Zimbabwean people." The allegation is vague and disputed by other evidence. *See* Motion to Dismiss, pp.15-16. Its relevance is also questionable because there is no indication in the press release that the Treasury's findings were based on facts existing during the relevant period.

> d. *The rest of the allegations are irrelevant as they do not establish an abuse of ZMDC's corporate form*

The other allegations in the Amended Complaint are immaterial for proving the second prong. Plaintiffs claim that: i) ZMDC "on a number of occasions awarded concessions to companies owned by senior government figures," and ii) Mr. Tagwieri "<u>may</u> have been arbitrarily awarded" mining rights in State-owned mines. *See* Am. Compl., ¶¶ 74, 79. The Court should disregard these allegations because they do not prove an abuse of ZMDC's corporate form. *See Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*, 713 F. Supp. 2d 267, 283 (S.D.N.Y. 2010) ("abuse of the corporate form must be clearly demonstrated to justify holding the subsidiary liable for the debts of its sovereign parent.").

It should also dismiss the allegations because they are inaccurate. ZMDC cannot and has not granted mining concessions to any entity. *See* Chiparo Second Decl. at ¶ 21. Such authority lies with the Ministry of Mines. Plaintiffs cite two news articles discussing Anjin Investment ("Anjin") to argue otherwise. Exhibit O describes Anjin as "a joint venture company incorporated by Chinese construction giant Anhui Foreign Economic Construction Group (AFECC) and Matt Bronze Enterprises (Pvt)." Am Compl., ECF No. 40-15, p.3. It notes that ZMDC has no relation to Anjin. *See id*., p. 2 ("Anjin is not related to the ZMDC"). Contradicting Exhibit O, Exhibit P alleges that ZMDC and the Zimbabwe Defence Industry ("ZDI") have some stake in Anjin. *See* ECF Am. Compl., ECF No. 40-16, p. 1. But neither of the articles suggests that ZMDC awarded mining concessions to Anjin. Nor do they claim that Anjin is owned by "senior government figures." While Exhibit O alleges that Zimbabwe government officials are board members of Anjin, it does not claim that these officials own the entity. Am. Compl., ECF No. 40-15, p.5, Table 1 (describing certain government officials as "members" of Anjin).

For a similar reason, the Court should ignore Plaintiffs' claim with respect to President Emmerson Mnangagwa's advisor, Mr. Kuda Tagwirei. Plaintiffs have presented nothing that supports their speculation that Mr. Tagwieri "may have been arbitrarily awarded" mining rights.

### B.    This Court cannot assume subject matter jurisdiction under the waiver exception in 28 U.S.C. §1605(a)(1)

Section 1605(a)(1) allows a court to assume jurisdiction over a foreign sovereign where the sovereign waives its immunity explicitly or implicitly. The D.C. Circuit and other sister circuit courts have construed the implied waiver exception narrowly. *See Khochinsky v. Republic of Poland*, 1 F.4th 1, 8 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 771 (2022); *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 691 (D.C. Cir. 2022) ("this circuit has followed the virtually unanimous precedents construing the implied waiver provision narrowly.") (internal quotation marks omitted); *Cabiri v. Gov't of the Republic of Ghana*, 165 F.3d 193, 201 (2d Cir. 1999). To assume jurisdiction under the waiver exception, "the waiver must be clear and unambiguous." *TIG Ins. Co. v. Republic of Argentina*, No. 18-MC-00129 (DLF), 2022 WL 3594601, at *5 (D.D.C. Aug. 23, 2022)

An implied waiver under 28 U.S.C. §1605(a)(1) exists where the foreign sovereign "indicated its amenability to suit" in the United States and the sovereign "subjectively intended" to waive its immunity. *See ibid*; *see also Khochinsky*, 1 F.4th at 8; *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 105 (D.D.C. 2005); *Cabiri v. Gov't of the Republic of Ghana*, 165 F.3d 193, 201 (2d Cir. 1999); *Haven v. Rzeczpospolita Polska*, 68 F. Supp. 2d 947, 953 (N.D. Ill. 1999), *aff'd sub no. Haven v. Polska*, 215 F.3d 727 (7th Cir. 2000); *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 377 (7th Cir. 1985) ("courts rarely find that a nation has waived its sovereign immunity…without strong evidence that this is what the foreign state intended.").

The Amended Complaint provides no evidence of subjective or objective implied waiver. Plaintiffs argue that Defendants waived their immunity by "agreeing to and participating in an

arbitration governed by the New York Convention in Zambia, which, like Zimbabwe, is and was a party to the New York Convention." Am. Compl., ¶ 10. The Court should reject their claim and find that it lacks jurisdiction over Defendants for the following two reasons. First, Zimbabwe was not a party to the arbitration agreement. Second, neither of Defendants could be deemed to have waived their immunity from the present action because the New York Convention, the foundation of Plaintiffs' implied waiver claim, does not apply to enforcement of a foreign judgment confirming an arbitration award.

**1.  <u>The implied waiver exception does not apply to Zimbabwe because it was not a party to the MOUs</u>**

The waiver exception in Section 1605(a)(1) cannot serve as a basis for assuming jurisdiction against a foreign state that was not a party to the arbitration agreement. *See Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1017 (2d Cir. 1993) ("an agreement to arbitrate in a foreign country, without more, ought not to operate as a waiver of sovereign immunity in United States courts, especially in favor of a non-party to the agreement."); *see also ibid* ("[w]hen the case involves an implied waiver, we think that a court should be even more hesitant to extend the waiver in favor of third parties."); *Zernicek v. Petroleos Mexicanos (Pemex)*, 614 F. Supp. 407, 411 (S.D. Tex. 1985), *aff'd sub nom. Zernicek v. Brown & Root, Inc*., 826 F.2d 415 (5th Cir. 1987) (*citing Maritime Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1100 n. 10 ("courts rarely find that a nation has waived its sovereign immunity, particularly with suits brought by third parties, without strong evidence that this is what the foreign state intended."). Since Zimbabwe was not a party to the MOUs this Court lacks jurisdiction over it.

**2.**  **The implied waiver exception does not extend to either ZMDC or Zimbabwe because the New York Convention only applies to enforcement of foreign arbitration awards**

Plaintiffs do not allege that ZMDC and Zimbabwe subjectively intended to waive their immunity from the present action by participating in an arbitration in Zambia—a party to the New York Convention.[7] To the extent that they are claiming objective intent of waiver, Plaintiffs have presented no action by these entities that can objectively be seen as an intent to waive immunity. They submit that Defendants could have foreseen the present action because an action to enforce a foreign judgment on an arbitral award is "so closely related" to an action to enforce an arbitral award. Am. Compl., ¶ 10. While these actions are indeed related, "they are nonetheless distinct from one another," (*Commissions Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321, 330 (D.C. Cir. 2014)) "as are the causes of action relating to them." *See* ECF No. 38, p. 29. The United States has noted, and the D.C. Circuit has affirmed that the New York Convention, which is at the core of Plaintiffs' implied waiver claim, does not govern a "foreign court judgment confirming an arbitral award." *Commissions Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321, 330 (D.C. Cir. 2014) (*quoting* Amicus United States Brief, p. 14, *Commissions Imp. Exp. S.A*, 757 F.3d 321 (D.C. Cir. 2014) (No. 13-7004). This Court has also recently held that US "courts are not required to accord preclusive effect to foreign judgments in petitions pursuant to the New York Convention." *Blasket Renewable Invs., LLC v. Kingdom of Spain*, No. CV 21-3249 (RJL), 2023 WL 2682013, at *5 (D.D.C. Mar. 29, 2023).

If Plaintiffs admit, as they must, that the New York Convention does not apply to a foreign judgment confirming an arbitration award, their implied waiver claim should be rejected. Neither of

---

[7]  This Court has determined that it can exercise jurisdiction over the Commissioner pursuant to the waiver exception. The Commissioner respectfully disagrees and maintains its right to appeal the decision.

the state parties to the New York Convention could have foreseen waiving their immunity against an action to enforce a foreign judgment on an arbitration award by ratifying a convention that does not apply to such an action. This view is consistent with the Supreme Court's decision in *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 430 (1989) in which it held that "[a] foreign state cannot waive its immunity under § 1605(a)(1) by signing an international agreement that does not mention a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 430 (1989).

Although this Court, as noted in the Order, has previously held that *Argentine Republic v. Amerada Hess Shipping* does not preclude a finding of waiver of immunity in actions to enforce an arbitral award against a foreign state that is a party to the New York Convention, the same cannot be said here. *See* Court Order at 2, n.2 (*citing Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 506 F. Supp. 3d 1, 9 (D.D.C. 2020) *aff'd on other grounds*, 27 F.4th 771 (D.C. Cir. 2022)). In *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, this Court found that Nigeria, a party to the New York Convention, waived its immunity from arbitral award enforcement actions governed under the Convention because the Convention "contemplates the availability" of such actions in the United States. *Ibid*. The Convention requires "each Contracting State [to] recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon." *Id.*, at 8 (internal quotation marks omitted). Relying on this obligation imposed on state parties, the Court held that "Convention signatories presumably know that, under the Convention, arbitral awards will be judicially enforced if they are 'rendered in a state party to the Convention'" *Id.*, at n.4. No such conclusion can be drawn here because State parties to the Convention are not obliged to enforce a foreign judgment of an arbitration award.

**C. This Court cannot exercise subject matter jurisdiction under 28 U.S.C. §1605(a)(6) because Plaintiffs are not seeking enforcement of an arbitration agreement or an arbitration award**

Section 1605(a)(6), known as the "arbitration exception," is also inapplicable. Under Section 1605(a)(6), a court can exercise subject matter jurisdiction over a foreign state only if "the action is brought, either to enforce an agreement made by the foreign state…or to confirm an award made pursuant to such an agreement to arbitrate." 28 U.S.C. §1605(a)(6) (emphasis added). Since Plaintiffs are seeking to enforce the Zimbabwe High Court Judgment and not the MOUs containing the arbitration agreement or the Award, this Court, as it previously noted, cannot assume subject matter jurisdiction based on Section 1605(a)(6). *See* ECF No. 38, pp. 28-29.

**D. The Court lacks personal jurisdiction over Defendants because none of the FSIA immunity exceptions applies**

A court cannot exercise personal jurisdiction over a foreign state unless one of the immunity exceptions provided in 28 U.S.C. §§ 1605–07 applies. *See TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 299 (D.C. Cir. 2005) (citing 28 U.S.C. § 1604. As Defendants earlier explained, none of the immunity exceptions apply so this Court lacks personal jurisdiction over Defendants. *See* Section I(B) and (C).

**1. <u>The Court cannot exercise personal jurisdiction over ZMDC because there is no allegation that it has minimum contacts with the District</u>**

Because a state's agencies and instrumentalities are "persons" for the purpose of the Due Process Clause, a court cannot assume personal jurisdiction over such entities where they lack minimum contacts with the forum. *See* ECF No. 38, p. 18 (*citing GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 815 (D.C. Cir. 2012)).

Plaintiffs have neither alleged nor proved that ZMDC has any contact with the District of Columbia. While they attempt to surpass the minimum contacts requirement by alleging that ZMDC

is Zimbabwe's *alter ego*, they have presented no basis for such a conclusion. There is no allegation or proof that ZMDC exercised extensive control over Zimbabwe or that it abused Zimbabwe's corporate form to commit fraud or injustice.

### 2.   The Court also cannot assume personal jurisdiction over ZMDC because it was not served with the Complaint or Amended Complaint

Section 1608(b) provides the exclusive methods for serving an agency or instrumentality of a foreign state. *See, e.g., Seramur v. Saudi Arabian Airlines*, 934 F. Supp. 48, 51-52 (E.D.N.Y. 1996). Section 1608(b) sets up a "hierarchical regime for the appropriate methods of service," requiring that a plaintiff attempt the first method or show its unavailability before moving on to the next. *See, e.g., Estate of Hartwick v. Islamic Republic of Iran*, No. 18-cv-1612, 2021 WL 6805391, *8 (D.C.C. Oct. 1, 2021) (identifying a hierarchy in the methods available for service under § 1608(b)). If there is no special arrangement for service between the foreign state agency and the plaintiff, and if the agency does not have any person authorized to receive service of process in the United States, the plaintiff must serve the instrumentality through either one of the following three methods of service: (i) letter rogatory; (ii) "any form of mail requiring a signed receipt;" or (iii) "as directed by order of the court consistent with the law of the place where service is to be made." 28 U.S.C.A. § 1608(b)(3).

Plaintiffs have served neither the Complaint nor the Amended Complaint on ZMDC in accordance with Section 1608(b). On June 10, 2022, they requested the Clerk of this Court to mail through DHL a copy of the Summons and Complaint to ZMDC "pursuant to…28 U.S.C. § 1608(b)(3)(B)." ECF No. 12. On June 13, 2022, the Clerk certified to have mailed the documents to ZMDC in accordance with Plaintiffs' request and attached a DHL receipt of shipment. See ECF 18-3. But Plaintiffs have not filed proof of service. Instead, they filed an affidavit of service on August 18, 2022, indicating that they effected service on ZMDC by "personally hand delivering"

29

the Summons and the Complaint on "Theresa Kanengoni" who allegedly "was a secretary of" ZMDC. *See* ECF 24, ¶¶ 2-4 (emphasis added).

Service through personal delivery is not permitted under Section 1608(b), thus, the Court cannot exercise personal jurisdiction over ZMDC. *See Daly v. Castro Llanes*, 30 F. Supp. 2d 407, 416 (S.D.N.Y 1998) (holding that service through personal delivery is incompatible with 28 U.S.C. § 1608(b)(3)); *McNeil v. United States*, 508 U.S. 106, 113 (1993) (*quoting Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980) ("in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law."); *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152, 104 S. Ct. 1723, 1726, 80 L. Ed. 2d 196 (1984) ("Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants.").

## II.     Plaintiffs have failed to state a claim upon which relief can be granted[8]

This Court has already set forth the applicable standard for reviewing a motion to dismiss for failure to state a claim. *See* Court Order at 6-7. In summary, this Court has reiterated the long-held position that "[t]o survive a motion to dismiss [on the basis of Rule 12(b)(6) motion], a complaint must have sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* This Court has reiterated, however, that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," nor does the Court "assume the truth of legal conclusions." *Id.*

---

[8] The Defendants by filing this Motion to Dismiss do not waive any arguments made in the previously filed Motion to Dismiss (ECF No. 23 and 30), but reserve them based on the text of this Court's Opinion issued on March 22, 2023.

In deciding a motion for failure to state a claim, courts may only consider the allegations in the complaint and exhibits. *United States ex rel. Jenkins v. Sanford Cap., LLC*, No. CV 17-239, 2020 WL 5440551, at *5 (D.D.C. Sept. 10, 2020). Where there is a contradiction between the allegations in the complaint and the exhibits attached, the exhibit generally controls. *See Regan v. Spicer, HB, LLC,* 134 F. Supp. 3d 21, 26 (D.D.C. 2015) (citing 5A Charles Wright & Arthur Miller, *Federal Practice and Procedure: Civil 3d* § 1327, 450–451 (3d ed. 2004).

A.    **The Amended Complaint fails to plead facts sufficient to establish an *alter ego* relationship involving Zimbabwe**

While the standard outlined above is more forgiving than that applicable to allegations for establishing personal and subject-matter jurisdiction, Plaintiffs are still unable to properly allege that Zimbabwe is ZMDC's *alter ego*.

Under the principal-agent theory of *alter ego*, Plaintiffs have failed to allege any facts that support a finding that the government controls ZMDC's day-to-day operations. The allegations as to the Minister's power largely rest on the government's power as a regulator and shareholder. *See* Am. Compl. at ¶¶ xx. To the extent that the allegations purport that the Minister may override the Board's decisions, those allegations are contradicted by the cited articles of the ZMDC Act. *See* ZMDC Act, Section 22. The Minister's approval power, as explained above, is limited only to certain types of transactions and Plaintiffs have not shown that the Board is failing to oversee the operations of ZMDC. To the extent that Plaintiffs allege that ZMDC was operated without a Board, that allegation is contradicted by Plaintiffs' other allegations concerning the Board's composition and should be disregarded. Plaintiffs' allegations concerning the government's transfer or sale of assets or payment of loans fall outside of the relevant period established by this Court in its March Order and therefore are insufficient to support a claim of *alter ego*. Plaintiffs' reliance on the OFAC Press Release provides nothing more than a conclusory allegation that Zimbabwe used entities, including ZMDC,

to "illegally siphon revenue and foreign exchange" without specifying anything further, including the relevant period to which those acts occurred making it difficult for the Court to determine whether those allegations are relevant to the *alter ego* analysis here. As to Plaintiffs' remaining allegations, the Defendants, for the sake of efficiency, refer the Court to their arguments above concerning those allegations.

The alleged facts are also insufficient to establish *alter ego* under the fraud or injustice theory. In its Order, this Court held that the allegation that Zimbabwe "may" transfer ZMDC's assets to another state-owned company is inadequate to establish *alter ego* under the fraud or injustice theory. *See* ECF No. 38, p. 12, n. 4. While Plaintiffs restate this allegation in their Amended Complaint, they have presented nothing to persuade the Court to reach a different conclusion. To the contrary, the additional news article submitted by Plaintiffs further casts doubt as to whether such transfer even took place as it notes that ZMDC fiercely resisted the alleged plan. *See* Am. Compl., ECF No. 40-11, p.3., pp. 5-6.

The allegations that Zimbabwe used ZMDC's assets and directed it to conclude an agreement with local and foreign companies are also insufficient to establish the second element of *alter ego* because there is no indication that Zimbabwe took the alleged actions to commit fraud or injustice. *See* Motion to Dismiss, pp. 20-22. The Court should also reject the allegations because they are contradicted by the appended news articles which the Court must defer to in cases of conflicts between the allegations in the complaint and the exhibits. *See ibid*.

Lastly, Plaintiffs also allege without *any* supporting facts that the Commissioner is an *alter ego* of Zimbabwe. *See* Am. Compl. ¶ 16. Without any supporting facts, this Court should find that any claim as to the existence of an alter-ego relationship between the Commissioner and Zimbabwe fails and should be dismissed.

## CONCLUSION

For the foregoing reasons, Zimbabwe, the Commissioner, and ZMDC request that the Court

grant the Motion to Dismiss and whatever additional relief the Court considers just and proper.

Respectfully submitted,

/s/ Quinn Smith
**GST LLP**
Quinn Smith
DCD Bar No. FL0027
quinn.smith@gstllp.com
Katherine Sanoja
DC Bar No. 1019983
katherine.sanoja@gstllp.com
1111 Brickell Avenue
Suite 2715
Tel. (305) 856-7723

Bethel Kassa
DC Bar 1778957
bethel.kassa@gstllp.com
2600 Virginia Avenue, Suite 205
Washington D.C., 20037

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 6, 2023, I electronically filed this document with the Clerk of the Court of the U.S. District Court of the District of Columbia by using the CM/ECF system, which will automatically generate and serve notices of this filing to all counsel off record. I further certify that I am unaware of any parties who will not receive such notice.


By: /s/ <u>*Quinn Smith*</u>
Quinn Smith