**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Amaplat Mauritius Ltd., c/o CKLB International Management Ltd., P.O. Box 80, Felix House, 24 Dr. Joseph Riviere Street, Port Louis 11602, Mauritius; and<br><br>Amari Nickel Holdings Zimbabwe Ltd., c/o CKLB International Management Ltd., P.O. Box 80, Felix House, 24 Dr. Joseph Riviere Street, Port Louis 11602, Mauritius,<br><br>            Plaintiffs,<br><br>   v.<br><br>Zimbabwe Mining Development Corporation, 90 Mutare Road, Msasa, Harare, Zimbabwe;<br><br>The Chief Mining Commissioner, Ministry of Mines of Zimbabwe, 6th Floor, ZIMRE Centre, Cnr. Leopold Takawira Street/Kwame Nkrumah Avenue, Private Bag 7709, Causeway, Harare, Zimbabwe;<br><br>and the Republic of Zimbabwe, c/o Head of the Ministry of Foreign Affairs, Ministry of Foreign Affairs, P.O. Box 4240, Munhumutapa Building, Cnr. Samora Machel Avenue/Sam Nujoma Street, Harare, Zimbabwe<br><br>            Defendants. | Civil Action No. 1:22-cv-00058-CRC |

**PLAINTIFFS' (1) OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT AND (2) CONDITIONAL CROSS-MOTION FOR JURISDICTIONAL DISCOVERY**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   RELEVANT BACKGROUND. ......................................................................... 3

      A.    ZMDC Was Structured to Be Dominated by The Government of Zimbabwe,
            Through the Ministry of Mines. ................................................................ 3

      B.    Plaintiffs' Investment in Zimbabwe. ........................................................ 6

      C.    The Minister of Mines and His Hand-Picked ZMDC Board Chair Take Charge of
            ZMDC and Dismiss Its CEO. .................................................................. 7

      D.    Using Its Control Over ZMDC, Zimbabwe Strips Plaintiffs of Their Mining
            Concessions. .......................................................................................... 8

      E.    Zimbabwe's Further Manipulation of ZMDC. ........................................ 8

      F.    The Arbitration Award Finds Zimbabwe Provided False Testimony. ...... 12

      G.    The Zambian Post-Award Litigation and Judgment. ............................... 14

      H.    Zimbabwe's Continuing Efforts to Defraud ZMDC's Creditors, Including
            Plaintiffs. ............................................................................................. 15

III.  LEGAL STANDARD ..................................................................................... 15

IV.   ARGUMENT .................................................................................................. 16

      A.    Because They Are Alter Egos, This Court Has Subject Matter Jurisdiction Over
            Zimbabwe and ZMDC and Personal Jurisdiction Over ZMDC. ............. 17

            1.    Despite Defendants' Attempts to Ignore Them, The *Bancec* Factors
                  Provide the Test for Alter Ego Status. ........................................ 18

            2.    The *Bancec* Factors Strongly Favor Alter Ego Status. .................. 19

                  a.    Zimbabwe Exercises Total Economic Control of ZMDC. ...... 20

                  b.    Zimbabwe Is Entitled To Any Profits. ................................... 23

                  c.    Zimbabwe Manages ZMDC. ................................................. 24

                  d.    Zimbabwe Is the Beneficiary of ZMDC. ............................... 26

                  e.    Zimbabwe Has Used ZMDC's Corporate Form Inequitably. ... 28

            3.    The Alter Ego Analysis Considers All Relevant Facts, Not Just Those at
                  The Time A Contract Is Signed. .................................................. 29

      B.    In the Alternative, This Court Should Authorize Tailored Jurisdictional
            Discovery. ............................................................................................ 31

      C.    ZMDC's Implied Waiver Extends to Its Alter Ego And To Judgments On
            Arbitration Awards. ............................................................................... 33

      D.    ZMDC Was Properly Served. ................................................................ 34

            1.    Because ZMDC Is An Agency or Instrumentality, Substantial Compliance
                  Plus Actual Notice Suffices. ....................................................... 35

2.    ZMDC Agreed That "Documents In Legal Proceedings" Could Be Served By Hand Delivery At Its Headquarters. ............................................................ 35

3.    Plaintiffs Served ZMDC In Accordance With The MoUs, And ZMDC's Failure to Give Notice of Its Office Move Does Not Avail It. ........................ 37

4.    If The Court Nonetheless Finds Service Ineffective, Dismissal Is Still Inappropriate And The Court Should Authorize Alternate Service Under 28 U.S.C. § 1608(b)(3)(C). ................................................................................. 40

E.    The Amended Complaint States A Claim. ............................................................. 41

V.  CONCLUSION. ...................................................................................................................... 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n*,
　798 F. Supp. 2d 260 (D.D.C. 2011) .................................................................35

*In re Airadigm Commc'ns, Inc.*,
　616 F.3d 642 (7th Cir. 2010) ..........................................................................36

*Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp.*,
　No. 22-CV-58 (CRC), 2023 WL 2603746 (D.D.C. Mar. 22, 2023) ................ *passim*

*Angellino v. Royal Fam. Al-Saud*,
　688 F.3d 771 (D.C. Cir. 2012) ........................................................................36

*Azima v. RAK Inv. Auth.*,
　926 F.3d 870 (D.C. Cir. 2019) ........................................................................37

*Barot v. Embassy of the Republic of Zambia*,
　785 F.3d 26 (D.C. Cir. 2015) ..........................................................................40

*Bazarian Int'l Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.*,
　168 F. Supp. 3d 1 (D.D.C. 2016) ....................................................................41

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*,
　734 F.3d 1175 (D.C. Cir. 2013) ......................................................................16

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
　447 F.3d 411 (5th Cir. 2006) ..........................................................................28

*Creighton Ltd. v. Gov't of State of Qatar*,
　181 F.3d 118 (D.C. Cir 1999) .........................................................................15

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
　932 F.3d 126 (3d Cir. 2019)............................................................................18

*de Csepel v. Republic of Hungary*,
　No. 1:10-CV-01261(ESH), 2020 WL 2343405 (D.D.C. May 11, 2020), *aff'd*,
　27 F.4th 736 (D.C. Cir. 2022).........................................................................18

*Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*,
　225 F. Supp. 3d 18 (D.D.C. 2014) ............................................................36, 39

*First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*,
　462 U.S. 611 (1983) (*Bancec*) .................................................................. *passim*

*Freedom Watch, Inc. v. Org. of the Petroleum Exporting Countries*,
    766 F.3d 74 (D.C. Cir. 2014) .......................................................................41

*Funnekotter v. Agric. Dev. Bank of Zimbabwe*,
    No. 13 CIV. 1917 CM, 2015 WL 3526661 (S.D.N.Y. June 3, 2015) ....................................27

*Funnekotter v. Agric. Dev. Bank of Zimbabwe*,
    No. 13 Civ. 1917 (CM), 2015 WL 9302560 (S.D.N.Y. Dec. 17, 2015)..................1, 17, 18, 30

*GSS Grp. Ltd v. Nat'l Port Auth.*,
    680 F.3d 805 (D.C. Cir. 2012) .............................................................17, 34

*Hashem v. Shabi*,
    No. CV 17-1645 (ABJ), 2018 WL 3382913 (D.D.C. Apr. 26, 2018) ....................................41

*Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*,
    185 F. Supp. 3d 233 (D.D.C. 2016) ...............................................................32

*Int'l Rd. Fed'n v. Embassy of the Democratic Republic of the Congo*,
    131 F. Supp. 2d 248 (D.D.C. 2001) ..........................................................36, 39

*Long v. Home Indem. Co. of New York*,
    169 So. 154 (La. Ct. App. 1936)..................................................................38

*McKesson Corp. v. Islamic Republic of Iran*,
    52 F.3d 346 (D.C. Cir. 1995) ................................................................22, 26

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006) .............................................................................37

*New England Merchants Nat. Bank v. Iran Power Generation & Transmission Co.*,
    495 F. Supp. 73 (S.D.N.Y. 1980) ...............................................................40

*OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*,
    73 F.4th 157 (3d Cir. 2023) ............................................................. *passim*

*Phoenix Consulting, Inc. v. Republic of Angola*,
    216 F.3d 36 (D.C. Cir. 2000) ...............................................................16, 32

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
    No. 18-CV-594 (CRC), 2020 WL 7122896 (D.D.C. Dec. 4, 2020), *aff'd on other grounds*, 27 F.4th 771 (D.C. Cir. 2022) ........................................................2

*Robbins v. S. Gen. Ins. Co.*,
    243 A.2d 686 (D.C. 1968) ......................................................................37

*Rubin v. Islamic Republic of Iran,*
   138 S. Ct. 816 (2018)................................................................................................19

*Ry. Mail Ass'n v. Moore,*
   15 F.2d 547 (4th Cir. 1926) .....................................................................................38

*Saleh v. Al Nahyan,*
   No. CV 20-1168 (ABJ), 2021 WL 7210780 (D.D.C. July 16, 2021)......................41

*Schimmelpennich v. Bayard,*
   26 U.S. 264 (1828)..................................................................................................36

*TIG Ins. Co. v. Republic of Argentina,*
   No. 18-MC-00129 (DLF), 2022 WL 1154749 (D.D.C. Apr. 18, 2022), *order corrected and superseded,* No. 18-MC-00129 (DLF), 2022 WL 3594601 (D.D.C. Aug. 23, 2022)..........................................................................29, 30*

*TMR Energy Ltd. v. State Property Fund of Ukraine,*
   411 F.3d 296 (D.C. Cir. 2005) ...........................................................................21, 24

*Transaero, Inc. v. La Fuerza Aerea Boliviana,*
   30 F.3d 148 (D.C. Cir. 1994) ..................................................................23, 35, 39, 40

*Transamerica Leasing, Inc. v. La Republica de Venezuela,*
   200 F.3d 843 (D.C. Cir. 2000) ..................................................................... *passim*

**Statutes**

28 U.S.C. § 1605.............................................................................................................17

28 U.S.C. § 1608...................................................................................................... *passim*

Mines and Minerals Act 1961 ch. 21:05 § 2 (Zim.)..................................................4, 20

Zimbabwe Mining Develpment Corporation Act 1983 ch. 21:08 § 27 (Zim.).........4, 20, 25

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08, Schedule § 20 (Zim.) ....................................................................................................................5, 25

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08, Schedule § 21 (Zim.) ....................................................................................................................5, 25

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08, Schedule § 22 (Zim.) ....................................................................................................................5, 25

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08, Schedule § 23 (Zim.) ....................................................................................................................5, 25

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08, Schedule § 24
   (Zim.) ..............................................................................................................5, 25

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 § 5 (Zim.)........................5, 24

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 § 6 (Zim.)........................5, 24

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 § 9 (Zim.)........................5, 24

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 § 13 (Zim.).......................5, 24

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 § 20 (Zim.)................5, 20, 27

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 § 23 (Zim.)................4, 20, 27

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 § 25 (Zim.)................4, 21, 27

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 § 27 (Zim.)............................5

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 § 34 (Zim.)................5, 24, 25

Zimbabwe Mining Development Corporation Act 1983 ch. 21:08 § 36 (Zim.).......................5, 25

**Other Authorities**

72 C.J.S. Process § 126 .............................................................................................38

Fed. R. Civ. P. 4(f)(3) ...............................................................................................41

I.      **INTRODUCTION**

Plaintiffs seek to enforce the Zambian court's judgment registering an ICC arbitration award, which found that Zimbabwe Mining Development Corporation, or ZMDC, had unlawfully expropriated the Plaintiff's concessions at the behest of the Government of Zimbabwe. Plaintiffs are entitled to satisfy the judgment against Defendants because ZMDC and Zimbabwe are "alter egos" of one another. *See First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) (*Bancec*); *Funnekotter v. Agric. Dev. Bank of Zimbabwe*, No. 13 Civ. 1917 (CM), 2015 WL 9302560 (S.D.N.Y. Dec. 17, 2015) (previously finding ZMDC and Zimbabwe to be alter egos).

Zimbabwe, principally through the Ministry of Mines, controls all material decisions of ZMDC; functionally it is an extension of the Ministry. That is by design. The Act establishing ZMDC grants the Minister unfettered power over ZMDC's Board and its executives and subsidiaries. It directs ZMDC to always act in the national interest and to pursue government policy. It tasks ZMDC's Board with implementing Ministerial instructions. In practice, Zimbabwe's power over ZMDC is, if anything, even greater than provided by the Act, as the Zimbabwean Government, not ZMDC, decides who wins (and loses) ZMDC's mining concessions—and much more. Most recently, Zimbabwe has used its control over ZMDC to play a shell game with ZMDC's assets with the apparent goal of frustrating ZMDC's creditors.

Both the Zimbabwean Parliament and the broader international community recognize ZMDC and Zimbabwe as interchangeable. The Parliament has complained of direct meddling and political interference by the Ministry in ZMDC's affairs, to the point that "the Secretary of Mines is directly involved in operational issues at," among other nominally juridically distinct entities, "ZMDC." The U.S. Government has repeatedly concluded that Zimbabwe allows ZMDC and other state-owned entities to "function without boards" and has sanctioned ZMDC

1

precisely because it is so closely connected to Zimbabwe's government and its policies. The combined identity of ZMDC and Zimbabwe is further supported here by expert testimony from Sternford Moyo, a respected Zimbabwean lawyer and former President of the International Bar Association, who concludes, based on his extensive experience, that the Minister of Mines exercises control over ZMDC's Board and the company itself.

Faced with the Amended Complaint's detailed allegations, Defendants offer only conclusory denials, ignore the ZMDC Act's plain language, and misstate the settled legal standards when the actual ones are inconveniently unhelpful. They do not even cite *Bancec*, the Supreme Court's leading case on alter ego status. That is because applying the *Bancec* factors clearly leads to a finding of alter ego status here; every one of them points toward domination and inequitable conduct, satisfying each of *Bancec's* alternative routes to alter ego liability.

Defendants make additional arguments, all without merit. As this Court has previously held, a party that agrees to arbitrate in a New York Convention country impliedly waives its sovereign immunity under 28 U.S.C. § 1608(a)(1). *See Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, No. 18-CV-594 (CRC), 2020 WL 7122896, at *6 (D.D.C. Dec. 4, 2020) (holding that Nigeria's submission to arbitration constituted implied waiver of sovereign immunity, regardless of whether arbitration exception applied), *aff'd on other grounds*, 27 F.4th 771 (D.C. Cir. 2022) (finding that arbitration exception applied, and thus declining to reach implied waiver issue). And *Bancec* itself precludes Defendants' argument that this Court should analyze Zimbabwe's waiver differently from its alter ego, ZMDC. Rather, if ZMDC is Zimbabwe's alter ego, then ZMDC's waiver is Zimbabwe's. *See Bancec*, 462 U.S. at 630 (holding that state-owned bank's waiver of sovereign immunity could be attributed to the Cuban Government under equitable veil-piercing principles). Similarly, this Court's prior order held, in

line with other courts, that an implied waiver extends to recognizing a judgment upon an arbitration award. Doc. 38 at 31-35. Finally, ZMDC alone reiterates its prior futile arguments about service. As Plaintiffs previously showed, the domicilium clauses in the Memoranda of Understanding that govern Plaintiffs' investments in Zimbabwe constitute a special arrangement for service under the FSIA, and Plaintiffs complied (and went over and above those clauses) by hand-delivering the summons, complaint, and accompanying materials at ZMDC's headquarters.

In sum, this Court should deny Defendants' motion in its entirety because Plaintiffs have satisfied their burden of production, Defendants' conclusory denials do not satisfy their burden of persuasion, and their remaining arguments are makeweight. However, even if the Court were not yet convinced, D.C. Circuit precedent requires that Plaintiffs be given the opportunity to prove their detailed allegations through jurisdictional discovery. Defendants should not be permitted to evade their liability because they possess the documents that prove the Plaintiffs' case.[1]

## II.      RELEVANT BACKGROUND.

### A.      ZMDC Was Structured to Be Dominated by The Government of Zimbabwe, Through the Ministry of Mines.

Zimbabwe hosts the world's second-biggest platinum and chrome deposits, and large deposits of diamonds, gold, coal, nickel, and iron ore, and the mining industry is key to Zimbabwe's economy. Declaration of Steven Davidson ("Davidson Decl.") Ex. A (International Trade Administration Report). In 1983, as part of a major effort to ensure that Zimbabwe benefited from its natural resources, newly-independent Zimbabwe enacted the Zimbabwe

---

[1] While all the arguments in the motion are relevant only to Zimbabwe and ZMDC, the Commissioner appears to also be identified as a movant. This Court has already held that Plaintiffs stated a claim against the Commissioner, Doc. 38, and to the extent that the motion implicitly contends that the Court's determination should be revisited, that prong of the motion should be denied for the reasons Plaintiffs previously explained, *see* Doc. 28.

Mining Development Corporation Act. Davidson Decl. Ex. B (ZMDC Act). Under Zimbabwean law, mining deposits belong to the state. *See* Davidson Decl. Ex. C (Mines and Minerals Act) § 2. Given this history, ZMDC is widely recognized as an "arm[] of the state" and "a state institution." Davidson Decl. Ex. E at 148, 157.

The ZMDC Act lays out a framework by which ZMDC is subordinated to the Government, from ownership to function, including that:

- Zimbabwe entirely owns ZMDC, and, even if it theoretically wanted to divest majority control, it could not. Davidson Decl. Ex. B (ZMDC Act § 27(2), (5)).

- ZMDC is strictly mandated to follow Government policy:

    It shall be the duty of the Corporation so to exercise—(a) that every application or proposal dealt with by it is considered strictly in accordance with Government economic policy; (b) that all matters relating to the mining industry are carefully reviewed in the national interest; and (c) that generally the activities of the Corporation referred to in section twenty are directed towards implementing Government mining development policy.

    *Id.* § 23.

- The Minister of Mines has the absolute power to direct ZMDC's Board to do whatever the Minister deems "to be requisite in the national interest," and the Board "shall, with all due expedition, comply with any direction" that the Minister gives. *Id.* § 25.

- ZMDC's "functions and duties" are stated in terms of carrying out Zimbabwean government policy and acting "on behalf of the state," and include roles advising the Ministry on policy matters, including "to review annually the general economic conditions and prospects of the mining industry and in particular investment schemes," and "to advise the Minister on all matters connected with

-4-

corporate investments in the mining industry and make recommendations for the proper co-ordination of all investment programmes," *Id.* § 20.

The Minister, moreover, has plenary control over ZMDC's Board:

- MDC's Board and Chairman are appointed by the Minister of Mines. *Id.* § 5.

- The Minister determines their terms of appointment and conditions of appointment, meaning that they serve at the pleasure of the Minister *Id.* § 6.

- The Minister determines their compensation. *Id.* § 13.

- The Minister has broad removal powers on top of this. *Id.* § 9. The Minister must approve the Board's choice of manager. *Id.* § 13.

Similarly, the Board is required to obtain the Government's approval, through the Minister, for a vast range of basic activities, including making investments or loans (*id.* § 34), managing its general reserve account (*id.* § 36(3)), and share transfers (*id.* § 27(4)). As noted in the Schedule to the Act, a vast number of activities, including creating subsidiaries, participating in joint ventures, acquiring property for development or use, providing financial assistance to the mining industry, and creating training or research programs are expressly subject to ministerial approval. (*Id.*, Schedule §§ 20-24.) A significant issue in the arbitration was whether the Minister had approved Plaintiffs' Memoranda of Understanding. Doc. 40-1 ¶¶ 124-145.

These are just the *formal* powers conferred by the Act. In practice, ZMDC's domination by the Ministry is also well-known. Sternford Moyo is an eminent Zimbabwean legal practitioner who has served as President of the International Bar Association and chair of the Zimbabwe Revenue Authority, and has more than 40 years of experience dealing with mining disputes. Moyo Decl. ¶ 1.  He describes the net effect of the provisions giving the Minister powers over ZMDC and its Board as creating a "subordinate board." *Id.* ¶ 6. For example, he recounts an

occasion when "the then chairman of ZMDC had informed a Parliamentary Portfolio Committee for Mines and Energy that the ZMDC board had no control over the subsidiaries of ZMDC." *Id.*. By dominating the Board, "the entire State Corporation [is] under the ultimate control of the minister." *Id.* ¶ 7. The Minister has made decisions about the granting and termination of joint venture agreements. *Id.* ¶ 9. The Minister has had a ZMDC subsidiary pay revenues directly into the Treasury rather than as dividends to ZMDC (presumably in order to evade the claims of ZMDC's creditors). *Id.* ¶ 10. All this has given the Minister of Mines "day to day control" of ZMDC's Board, and thus of the rest of ZMDC. *Id.* ¶ 11.

Even official Zimbabwean reports note the Government's, and in particular the Ministry's, domination of ZMDC. A 2017 Parliamentary report notes that "the ZMDC board is answerable to the Permanent Secretary of Mines and Mining Development." Davidson Decl. Ex. F (2017 Zimbabwean Parliament Portfolio Committee on Mines and Energy Report) at 15. Indeed, the same report notes, under the heading "Political Interference" that "the Secretary of Mines is directly involved in *operational issues* at ZCDC, at MMCZ, *at ZMDC* and at other institutions that a[re] directly linked to the mining industry." *Id.* at 18 (emphasis added) (also lamenting that "there is too much political interference . . . by the Permanent Secretary" and "the current system is porous and being abused.").

B.    **Plaintiffs' Investment in Zimbabwe.**

In 2008, Zimbabwe was struggling with the fallout of a decade of hyperinflation and disinvestment. Davidson Decl. Ex. G at 921. Its primary offering were its abundant mineral deposits. *Id.* So, it turned to international investors in an attempt to stimulate its economy.

Among those investors were Plaintiffs. Plaintiffs entered into two memoranda of understanding with ZMDC to form joint venture companies to mine nickel and platinum. Docs. 40-2 & 40-4.

**C.      The Minister of Mines and His Hand-Picked ZMDC Board Chair Take Charge of ZMDC and Dismiss Its CEO.**

The Minister is bestowed great authority by the ZMDC Act. It includes the power to select the members of the ZMDC Board and to make decisions that may run counter to the interests of ZMDC. In June 2010, the then-Minister for Mines appointed a close political ally (whom he has consistently appointed to boards and committees at prior and subsequent ministries) as Chair of ZMDC's Board. Davidson Decl. Ex. H (discussing Minister Mpofu's repeated appointment of Chair Masimirembwa) & Ex. I (same). News reports indicate that the appointment was intended to secure a Board loyal to the Minister amid political fractioning. Davidson Decl. Ex. J (discussing rationale behind dismissal and replacement of the entire ZMDC Board); Ex. K at 3 (Minister "appointed or influenced the appointment of most of the people to represent government stakes in various companies involved in Marange diamond production and marketing,"). As a result, the Chair was dubbed a "one man board" by the Zimbabwean press. Davidson Decl. Ex. L at 240.

The Minister's new Board replaced the prior Board's appointees with politically loyal appointees. *See* Davidson Decl. Ex. J. For example, the CEO who had been leading ZMDC since 2004 was removed from his position. Subsequent legal proceedings regarding this removal contended that one factor behind the decision was the CEO's refusal to release ZMDC's funds to the Zimbabwean government without first conducting an audit to confirm the existence of profits from which a dividend could be paid. Davidson Decl. Ex. M (Labour Court Judgment) at 2-3. The former CEO—who would later testify as a witness in the arbitration at issue in this case and was found by the arbitrators to be credible—eventually prevailed in both the civil litigation challenging his dismissal and in the dismissal of criminal charges that were filed against him. Davidson Decl. Ex. N (High Court Judgment).

The Minister also directed the ZMDC Board to appoint loyalists (including the Minister's relatives) to the Boards of ZMDC subsidiaries, further cementing his control. Reports indicate that the Minister directed ZMDC to appoint to subsidiary boards Mr. Mpofu's sisters-in-law, his personal assistant, and a nephew. Davidson Decl. Ex. O (International Crisis Group Report) at 4.

### D.    Using Its Control Over ZMDC, Zimbabwe Strips Plaintiffs of Their Mining Concessions.

As relayed at length in the arbitral award, almost immediately, the Minister, guiding the newly-appointed ZMDC Board, went about stripping companies that had entered into concessions under the prior leadership of their mining rights.

On approximately October 18, 2010, ZMDC told Plaintiffs' managing director on a telephone call that they had some queries about Plaintiffs' relationship with the former CEO. Davidson Decl. Ex. P (October 19, 2010 Letter from Amari to ZMDC.) Plaintiffs responded the next day offering to assist and cooperate with any queries and asked for specific questions in writing. *Id.* The day after that, the Chair personally met with Plaintiffs' principals and told them that a "disciplinary hearing" would be held less than a week later on October 26, 2010. Davidson Decl. Exs. Q (October 25, 2010 Letter from Amari to ZMDC) & R (October 25, 2010 Letter from Nunn to ZMDC); Ex. S (Summers Affidavit) ¶¶ 33-41. On November 10, 2010, the Acting General Manager of ZMDC, whom the Chair had personally appointed, sent a letter to Plaintiffs revoking the mining rights and threatening criminal charges against Plaintiffs. Davidson Decl. Ex. T (November 10, 2010 Letter from ZMDC to Amari). The Minister and the Permanent Secretary of the Ministry were copied on the letter. *Id.*

### E.    Zimbabwe's Further Manipulation of ZMDC.

Zimbabwean government interference in ZMDC's day-to-day operations has been longstanding. A 2013 report of a Zimbabwean Parliamentary Committee discussed events around

the same time that Plaintiffs' investments were expropriated. It found that two diamond mining concessions had been awarded by ZMDC at the direction of the Minister to companies with no experience in diamond mining; the Minister testified that the Minister was "directed to go that way and that is the way it is," and neither he nor ministry officials would disclose who actually directed them to make the selection decision. Davidson Decl. Ex. U at 6, 13 (2013 Parliamentary Report). The Committee concluded that "ZMDC seemed to have been coerced into accepting these two companies." *Id.* at 14.

Similarly, the Committee found that—despite the ZMDC Act on its face empowering the Minister to appoint only ZMDC's Board and the Board being tasked with appointing directors of subsidiaries, the Minister had stated that he considered any Board-selected subsidiary director appointments to be void and made the appointments himself: "The ZMDC Board was rendered powerless when it came to the selection and appointment of members who sit on its subsidiary companies. It's [sic] only function is to regularise the appointments made by the Minister." *Id.* at 15. The Committee noted that "[t]his is probably one of the reasons why the ZMDC Board has little control and information over its subsidiary companies, namely Mbada, Anjin and DMC." *Id.* at 15-16. The report found that ZMDC subsidiaries took direct instructions from the Ministry without consulting ZMDC. *Id.* at 16.

Since that report, ZMDC has continued to be separate in name only from the Government. Just as the Minister at the time of the expropriation of Plaintiffs' concessions had appointed his own ZMDC Board when he took over the Ministry, when he was transferred to a different department in December 2013, the new Minister of Mines dissolved ZMDC's entire Board. Davidson Decl. Ex V. Widespread reports indicated that ZMDC's assets and those of its subsidiaries were being used to benefit individuals closely connected with the Zimbabwean

government. *E.g.*, Davidson Decl. Ex. W at 3. Further Parliamentary reports continued to find that the Ministry was directly managing other ZMDC subsidiaries too—in some cases, having the Permanent Secretary of the Ministry as acting chair of subsidiaries' boards. Davidson Decl. Ex. F at 7.

Zimbabwe has consistently used ZMDC assets for state purposes. For example, Zimbabwean ministers concluded a deal whereby ZMDC would award a mining concession— including some of the Darwendale platinum rights that Plaintiffs had been awarded—to a Russian conglomerate including state-owned weapons manufacturer Rostec and state foreign affairs bank Vnesheconombank, and in return Zimbabwe's military would receive Russian aircraft. The deals with Russia for ZMDC assets were negotiated at the highest level, including Zimbabwe's Minister of Foreign Affairs meeting with Russia's Foreign Minister and Minister of Industry and Trade. Davidson Decl. Ex. X (Zimbabwean news report on deal, mentioning Plaintiffs' claim); Davidson Decl. Ex. Y (Russian news report on deal). ZMDC also awarded highly valuable concessions to Zimbabwe's armed forces, suggesting its mining assets are used to support the military. Davidson Decl. Ex. Z

The U.S. Government's position has long been that ZMDC is dominated by the Government of Zimbabwe. Executive Order 13469, originally issued on July 25, 2008 and continually renewed since, authorizes sanctions against "senior official[s] of the Government of Zimbabwe" and persons "owned or controlled by, directly or indirectly, the Government of Zimbabwe or an official or officials of the Government of Zimbabwe," among others. Davidson Decl. Ex. AA § 1(a). That same day, the Department of the Treasury designated numerous Zimbabwean parastatals, including ZMDC, for their role in "the undermining of democratic processes and institutions." Davidson Decl. Ex. BB (2008 Treasury Press Release). The press

release announcing the designations noted ZMDC's role in acting "on behalf of the Government of Zimbabwe" in "planning, coordinating and implementing mining projects." *Id.* OFAC has stated that it consistently reviews SDNs for whether they should continue to be designated, meaning that the U.S. Government continues to believe that ZMDC is used by the Government of Zimbabwe to undermine democratic processes and institutions. *See, e.g.*, Davidson Decl. Ex. CC (2022 Treasury Press Release) (discussing review process); Davidson Decl. Ex. DD (2009 Treasury Remarks to Congress); Davidson Decl. Ex. EE (State Department Press Release) ("The Zimbabwe sanctions program is a policy-driven program that targets human rights abusers and those who undermine democratic processes or facilitate corruption. . . . Sanctions are not intended to be permanent but to incentivize change.").

The U.S. Government has specifically noted instances in which ZMDC has failed to comply with basic corporate formalities. U.S. State Department reports have for years cited ZMDC's lack of a real Board as an example of issues with Zimbabwe's state-owned enterprises. Davidson Decl. Ex. FF-LL (State Department Investment Climate Statements for Zimbabwe) ("SOEs should have independent boards, but in some instances, such as the Zimbabwe Mining Development Corporation (ZMDC), the government allows the entities to function without boards.")[2] The Government's misuse of ZMDC is a core basis for continuing sanctions against it. *E.g.*, Davidson Decl. Ex. MM at 3 (State Department Congressional Testimony) ("We are concerned about ongoing reports that diamond mining entities in Zimbabwe are being exploited by people in senior government and military positions for personal gain, that revenues from those enterprises are being diverted for partisan activities that undermine democracy.").

---

[2] Adding credibility to this report, Zimbabwe's own Parliament noted that other parastatals have either no legally constituted board or boards consisting of only one person, sometimes a Ministry official. Davidson Decl. Ex. F at 12, 15.

**F.      The Arbitration Award Finds Zimbabwe Provided False Testimony.**

The Memoranda of Understanding (MOUs) that governed Plaintiffs' investments
provided for arbitration before the International Chamber of Commerce's Court of Arbitration.
Doc. 40-2 at Art. 11; Doc. 1-4 at Art. 9. All relevant countries in this case are parties to the New
York Arbitration Convention on the Recognition and Enforcement of Foreign Arbitral Awards,
June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3.[3] After ZMDC unsuccessfully sought to
terminate the MoUs, Plaintiffs filed for arbitration against ZMDC and the Commissioner of
Mines before the ICC Court which, after contested proceedings, ordered that the Tribunal be
seated in Zambia. Doc. 40 ¶ 28. ZMDC further submitted to the arbitration in Zambia by signing
the Terms of Reference, which expressly provided that "[b]y signing these Terms of Reference,
the parties acknowledge that they agree to submit to this arbitration and expressly waive any
procedural objections they may have with respect to known events, including the appointment of
the Tribunal." Doc. 28-2 at Ex. 1 § 8.1. The Terms of Reference also agreed that the Tribunal
would have the authority to decide its own jurisdiction. *Id.* § 6.2(1). The arbitration proceeded to
a hearing on the merits. Doc. 40 ¶¶ 29-30; Doc. 30 at 3.

During the merits hearing, by their own account dissatisfied with the Tribunal's
procedural rulings and interpretations of the ICC Court's rules, Doc. 30 at 2, ZMDC's party-
appointed arbitrator submitted his resignation and then declined to participate further in the
arbitration, Doc. 40 ¶¶ 30-32. In 2012, ZMDC briefly obtained an *ex parte* temporary restraining
order from the Zambian High Court staying the arbitration while its assertions that the Tribunal
as incorrectly reconstituted by the ICC Court were litigated in Zambia. Doc. 28-2 at Ex. 2

---

[3] The Secretary-General of the United Nations, as depositary under the Convention, maintains a
list of contracting parties under the Convention at
https://treaties.un.org/pages/ViewDetails.aspx?src=IND&mtdsg_no=XXII-
1&chapter=22&clang=_en.

(October 18, 2012 Order). The Zambian High Court later determined that the temporary restraining order was entered with "no jurisdiction" and had only been entered *ex parte* because "the applicant suppressed material facts and laws from this court thereby misleading it to grant the ex-parte order of injunction." Doc. 28-2 at Ex. 3 (June 19, 2014 Order). It also observed that the proper remedy was to oppose the entry of a judgment based on the award. *Id.*

Correctly understanding that the *ex parte* order was void as in excess of jurisdiction, a preeminent Tribunal—as reconstituted by the ICC Court, Professor Doug Jones A.O., Stuart Isaacs Q.C., and Chikwendu Madumere[4]—resumed, with all proper notice to ZMDC, and completed hearings and issued a Final Award. Doc. 40-1. The Final Award rejected jurisdictional challenges, ordered ZMDC to pay Amaplat US$42,882,000 and ZMDC to pay Amari US$3,900,000, ordered both Respondents (ZMDC and the Commissioner) jointly to pay Plaintiffs' legal costs of US$2,220,583.74 and the costs of the arbitration of US$900,000, and ordered post-award interest at the rate of 5%. Doc. 40-1 at 39.

Notably, the Award found that Mr. Tinashe Chiparo—the same witness upon whom Defendants rely here—was not credible. Zimbabwe had deleted a former ZMDC employee's computer, despite the pending dispute, and Mr. Chiparo claimed that Board minutes approving the MOUs with Plaintiffs did not exist. Doc. 40-1 ¶ 118.The employee, however, had a backup copy, proving that Mr. Chiparo's testimony was inaccurate. *Id.* ¶¶ 118, 120. As the arbitrators put it, "[t]he Tribunal also cannot ignore that Mr. Chiparo's evidence in the Zimbabwe High Court Proceedings involved repeated and, in the Tribunal's view, unconvincing denials of the

---

[4] These are all well-known, experienced arbitrators. Their biographies can be viewed at: https://www.stuartisaacsqc.com/biography, https://www.madumereandco.com/team/, and https://dougjones.info/wp/. All Tribunal members are globally well-known arbitrators and have arbitrated several disputes.

existence of documents which plainly do exist and challenges to the authenticity of documentation, the existence of which the Respondents are unable to deny. *Id.* ¶ 120.

      **G.**      **The Zambian Post-Award Litigation and Judgment.**

      ZMDC and the Commissioner again applied *ex parte* to the Zambian High Court to enjoin enforcement of the award; but the Zambian High Court declined to sign the proposed order. Doc. 28-1 ¶ 13. Proceedings in Zambia were stayed for several years pending Plaintiffs' successful appeal to the Zambian Supreme Court against an order consolidating the two proceedings brought by ZMDC. *Id.*

      After years of post-award litigation were resolved in favor of Plaintiffs, on August 9, 2019, the High Court for Zambia at the Commercial Registry at Lusaka issued the Judgment— formally, an *Ex Parte* Order for Leave to Register and Enforce the Final Award, No. 2019/HPC/ARB/No. 0337, under Section 18 of the Arbitration Act, No. 19 of 2000, and Rules 15 and 16 of the Arbitration (Court Proceedings) Rules, 2001. Doc. 40-5. The Judgment provided that ZMDC and the Commissioner had 30 days after service to move to set aside the Judgment. *Id.* That is Zambia's standard procedure for reducing an arbitral award to judgment: an *ex parte* application is made to register it, which results in a judgment stayed for 30 days after service to allow for a set-aside application. Doc. 28-2 ¶¶ 18, 21.

      On August 16, 2019, Plaintiffs' Zambian counsel, Simeza Sangwa & Associates, contacted ZMDC's and the Commissioner's Zambian counsel, Ms. Dinah Nundwe of the law firm, Ranchhod Chungu Advocates, to ask if the latter would accept service. Doc. 28-2 ¶ 23. The latter confirmed that Ranchhod Chungu Advocates could accept service of the *Ex Parte* Order granting leave to register and enforce the Final Award and the Notice of Registration of the Arbitral Award on behalf of ZMDC and the Commissioner. *Id.* ¶ 24. Accordingly, Simeza Sangwa & Associates sent a copy of the *Ex Parte* Order granting leave to register and enforce

the Final Award and the Notice of Registration of the award on August 19, 2019. *Id.* ¶ 24. No application to set aside the Judgment was ever filed—within or outside of the 30-day period after service. *Id.* ¶ 27. The Judgment is thus valid and enforceable in Zambia. Indeed, even Defendants do not claim that they were unaware of the judgment—so any attempt to vacate the judgment in Zambia or to seek to file its set-aside application out of time would fail for lack of diligence in moving.

### H.    Zimbabwe's Continuing Efforts to Defraud ZMDC's Creditors, Including Plaintiffs.

Zimbabwe has, in the meantime, engaged in a process to attempt to evade Plaintiffs' award and judgment. As Sternford Moyo notes, ZMDC subsidiaries paid money directly to the Treasury, rather than having funds pass through ZMDC where creditors might be able to lay claim to it. Moyo Decl. ¶ 10. And, most recently, Zimbabwe has recently contemplated a specific plan to have the President order the transfer of ZMDC's mining rights to a new state-owned entity called Defold. Davidson Decl. Ex. NN (News Report). Notably, these reports have indicated that the Government has the power to reallocate ZMDC's assets even if ZMDC itself does not approve. *Id.* Press reports show that the plan is specifically motivated by evading the judgments against ZMDC, including Plaintiffs' one. *Id.* And Zimbabwean government documents that have become public confirm that Zimbabwe is transferring assets to Defold. Davidson Decl. Ex. OO (4/14/22 Memorandum re Transfer of ZMDC Shareholding to Defold).

## III.   LEGAL STANDARD

Where, as here, a suit "involves claims against a foreign nation, the FSIA provides the framework for determining subject matter jurisdiction." *Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp.*, No. 22-CV-58 (CRC), 2023 WL 2603746, at *3 (D.D.C. Mar. 22, 2023) (citing *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 121 (D.C. Cir 1999). "[T]he

FSIA begins with a presumption of immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an exception applies." *Id.* (quoting *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013)). But—as Defendants fail to acknowledge, despite this Court's prior ruling—this is a burden of production, and "[o]nce the plaintiff has made that threshold showing, however, 'the sovereign bears the ultimate burden of persuasion to show that the exception does not apply.'" *Id.* (quoting *Bell*, 734 F.3d at 1183).

Where defendants challenge only the legal sufficiency of jurisdictional allegations, the Court takes the factual allegations as true and determines as a matter of law whether they satisfy any of the exceptions to immunity. *Id.* But if the motion "presents 'a dispute over the factual basis of the court's subject matter jurisdiction under the FSIA' by contesting a jurisdictional fact or raising a 'mixed question of law or fact,'" the court "'must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss.'" *Id.* (quoting *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).

## IV.    ARGUMENT

For the most part, Defendants' motion rests on factual denials of the complaint's allegations that ZMDC and Zimbabwe are alter egos—and thus that ZMDC's indisputable implied waiver of sovereign immunity by agreeing to arbitrate as a state party to the New York Convention extends to Zimbabwe as its alter ego, on the one hand, and that ZMDC is treated as the state for personal jurisdiction purposes, on the other.

The Amended Complaint's alter ego allegations are supported by ample evidence: ZMDC has always been completely controlled by Zimbabwe. This was intentional, as the Act establishing it was designed for the Ministry to have extensive control. And in practice, the

Government has often disregarded the structures of the Act to exert still further control. Additionally, the arbitration award in this case demonstrates that the Ministry's control directly led to the award and judgment, as the Minister and the Board chair, whom he hand-picked, attempted to reverse previous mining concessions.

### A.   Because They Are Alter Egos, This Court Has Subject Matter Jurisdiction Over Zimbabwe and ZMDC and Personal Jurisdiction Over ZMDC.

As this Court found with regard to the Chief Mining Commissioner, this case falls squarely within the FSIA's implied waiver exception to sovereign immunity, 28 U.S.C. § 1605(a)(1), because Zimbabwe is a party to the New York Convention, and ZMDC agreed to arbitrate in Zambia, which is also a party to the New York Convention. *Amaplat*, 2023 WL 2603746, at *15.[5] That waiver extends to Zimbabwe itself because Zimbabwe and ZMDC are alter egos—meaning that ZMDC's conduct was Zimbabwe's conduct and vice versa. Similarly, because ZMDC, as the state's alter ego, *is* the state, it lacks due process rights and is thus subject to personal jurisdiction in this District.[6]

This Court previously held that the Southern District of New York's holding in *Funnekotter*, 2015 WL 9302560, at *5-6, that Zimbabwe dominated ZMDC and that the two were alter egos was not preclusive. Nonetheless, it is clear that what was true in *Funnekotter* is just as true here—ZMDC is utterly dominated by Zimbabwe. Indeed, this case presents an even

---

[5] As Plaintiffs previously contended, the arbitration exception in the FSIA extends to judgments on awards too and direct the Court to their prior arguments on that issue, but Plaintiffs recognize this Court's contrary ruling and preserve this point for further review.

[6] The FSIA expressly confers this Court with personal jurisdiction over foreign states if process is properly served or waived, and "foreign sovereigns and their extensively-controlled instrumentalities are not 'persons' under the Fifth Amendment's Due Process Clause—and thus have no right to assert a personal jurisdiction defense." *GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 809 (D.C. Cir. 2012); *see also id.* at 814-15 (noting that *Bancec* determines whether an instrumentality is sufficiently distinct from the state itself to have due process rights).

more compelling case for alter ego status than *Funnekotter* because here the facts that gave rise to ZMDC's liability arose from its domination by the Government.

      1.      **Despite Defendants' Attempts to Ignore Them, The *Bancec* Factors Provide the Test for Alter Ego Status.**

As this Court has previously noted, there is a rebuttable presumption that a government instrumentality established as a separate juridical entity should be treated as such for FSIA purposes. *Bancec*, 462 U.S. at 628; *see Amaplat*, 2023 WL 2603746 at *5. That presumption can be rebutted *either* (1) by showing that "a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created" or (2) where recognizing separate existence "would work fraud or injustice." *Bancec*, 462 U.S. at 629; *see Amaplat*, 2023 WL 2603746 at *5. It is settled law that *either* extensive control *or* fraud or injustice will suffice. *E.g.*, *de Csepel v. Republic of Hungary*, No. 1:10-CV-01261(ESH), 2020 WL 2343405, at *10 (D.D.C. May 11, 2020) ("Later courts have interpreted *Bancec* to allow them to disregard separate juridical status when the foreign entity is exclusively controlled by the foreign state *or* where recognizing the separateness of that entity and the foreign state would work fraud or injustice." (internal quotation marks omitted)), *aff'd,* 27 F.4th 736 (D.C. Cir. 2022); *see also Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 847 (D.C. Cir. 2000).

*Bancec*'s first route can be satisfied *either* by showing control that "significantly exceeds the normal supervisory control exercised by any corporate parent over its subsidiary and, indeed, amounts to complete domination of the subsidiary" *or* by showing the elements of a common law agency. *Transamerica*, 200 F.3d at 848-49; *see also Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 143 (3d Cir. 2019) ("The most persuasive interpretation of the various approaches is by the D.C. Circuit . . . These examples of control are disjunctive. Only one method of domination needs to be shown."). Defendants attempt to argue that *only* the

-18-

Restatement elements of common law agency count, *see* Doc. 42 at 8, but *Transamerica* holds precisely the opposite; complete domination is another route.

The Supreme Court has noted a number of factors developed initially by lower courts to guide this analysis: "Whether a state instrumentality is so closely tied to the sovereign that it may be the state's alter ego depends on a number of factors, including the level of the government's economic control over the entity, whether the entity's profits go to the government, the degree to which government officials manage the entity or its daily affairs, whether the government is the real beneficiary of the entity's conduct, and whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations." *Amaplat*, 2023 WL 2603746 at \*5 (citing *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823 (2018)). While these factors are not a "mechanical formula," *Bancec*, 462 U.S. at 630, courts use them "to aid their analysis" and as "a rough analogy to American corporate law veil piercing," *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 168 (3d Cir. 2023).

Oddly, and despite this Court having referred to it extensively in its prior opinion, Defendants' motion never actually cites *Bancec* or acknowledges it as the governing test for alter ego status. Instead, Defendants seem to engage in a free-form argument unconstrained by any of these factors. Doc. 42 at 8-24. That is presumably because Defendants recognize that the *Bancec* factors weigh quite strongly against them.

### 2. The *Bancec* Factors Strongly Favor Alter Ego Status.

Applied here, the *Bancec* factors compel a finding of alter ego status. Even as a matter of its founding statute, ZMDC is under tight control and must seek ministerial approval of routine activities. Zimbabwe gets any profits from ZMDC. And in fact, the Government pervasively exercises its control—and exercises even more control than the statute contemplates. It directs ZMDC's assets toward completely unrelated foreign policy goals and toward enriching

government insiders. And it is defrauding ZMDC's creditors by directing improper dividends and plotting how to keep ZMDC's assets out of creditors by playing exactly the sort of shell game with state-owned entities that *Bancec* and its progeny condemn.

a.     **Zimbabwe Exercises Total Economic Control of ZMDC.**

Zimbabwe's pervasive economic control over ZMDC aligns precisely with the level of government domination courts have consistently held sufficient to establish alter ego status. In *OI*, for example, the Court pointed to Venezuelan law making oil deposits government property, reservation of state control over extraction, a mandate for the state to maintain ownership of PDVSA, and examples of "not merely aspirational" government control over PDVSA's activity. 73 F.4th at 172.

Every one of those is present here too. Zimbabwe vests all mineral rights in the President. Davidson Decl. Ex. C (Mines and Minerals Act 1961 ch. 21:05 § 2). Like PDVSA for Venezuela, Zimbabwe must by law maintain ownership of ZMDC; it is a definitively *governmental* corporation rather than one that could be privatized and operate like any other business. Davidson Decl. Ex. B (ZMDC Act) § 27.  ZMDC's mandate is to pursue a long list of purposes that are framed in public policy terms—it not only invests on behalf of the State and helps the state plan and implement mining projects, but also assists people engaged in or planning to engage in mining and prepares economic and policy reports for the Ministry. *Id.* § 20. Reflecting the fact that it operates much more like an executive department of the government than a normal company, it is mandated by its organic statute to conform to "Government economic policy," the "national interest," and "Government mining development policy." *Id.* § 23.[7] And, in any event, the Minister of Mines has the absolute power to direct

---

[7] Defendants' response is merely to say that policy goals alone are not sufficient to establish alter ego status, Doc. 42 at 15, but that certainly does not make them *irrelevant* given the abundant

ZMDC's Board to do whatever the Minister deems "to be requisite in the national interest," and

the Board "shall, with all due expedition, comply with any direction" that the Minister gives. *Id.*

§ 25.[8] The Schedule to the Act requires ministerial approval of, among other things, every joint

venture ZMDC enters into, as was discussed in the Award. That is the type of control one

expects from a department within a ministry, not an independent entity. Much like PDVSA is to

Venezuela, ZMDC is thus, in Zimbabweans' eyes, an "arm[] of the state" and "a state

institution." Davidson Decl. Ex. E. Those statutory provisions, notably, are strikingly similar to

those in *TMR Energy Ltd. v. State Property Fund of Ukraine*, where the D.C. Circuit held that

statutes tasking an entity with "implement[ing] national policies" gave "plenary control" to the

Government to the point that the entity was "an agent of the State, barely distinguishable from an

executive department of the government." 411 F.3d 296, 301-02 (D.C. Cir. 2005).[9]

---

evidence of deep control by Zimbabwe through the Ministry.

[8] Defendants argue that the Act's reference to directions "of a general character" constrains what the Minister can tell ZMDC to do. That is plainly wrong, because the evidence shows that the Minister makes very specific directions, including directing ZMDC as to which companies to award contracts to. *See* Davidson Decl. Ex. U at 13-15 (2013 Parliamentary Committee Report) (discussing Minister's directions to award joint ventures); Davidson Decl. Ex. F at 15, 18 (discussing interference and micromanagement by Permanent Secretary of Ministry).

[9] While Defendants make a conclusory assertion that pointing to these provisions ignores other provisions of the Act, the fact is that these are points that the D.C. Circuit found compelling in *TMR*. It is hardly newsworthy that a corporation has normal corporate powers—that is likely the case for almost every alter ego. Doc. 42 at 13-14. The point is whether Zimbabwe controls how ZMDC uses those powers. In other words, it is Zimbabwe's power over ZMDC that matters, not what powers ZMDC has itself.

Nor does it say anything about who controls ZMDC if its employees are exempt from certain civil service rules. *Id.* at 14. Likewise, Defendants point to sections of the Act requiring ZMDC to have corporate accounts—but again, that says nothing about what actually happens in practice. As discussed elsewhere, what happens in practice is that ZMDC's operating subsidiaries pay the Treasury directly to avoid funds passing into ZMDC, and ZMDC's most valuable assets—its mining rights—are given away for state purposes or transferred into other entities to defraud creditors.

Nor is that control merely theoretical. The Ministry's control over ZMDC has been exercised consistently and pervasively. Around the same time that Defendants were expropriating Plaintiffs' investments, the Minister ordered ZMDC to award diamond concessions to inexperienced companies based on a direction from a person whose name he refused to disclose even to the legislature. Davidson Decl. Ex. U at 14 ("I was a new Minister and directed to go that way and that is the way it is"). Even Zimbabwe's Parliament has expressed concern at "political interference" at ZMDC and has noted that "the ZMDC board is answerable to the Permanent Secretary of Mines and Mining Development." Davidson Decl. Ex. F at 15. And it has made clear that "the Secretary of Mines is directly involved in *operational issues . . . at ZMDC.*" *Id.* at 18. That precisely echoes the legal standard for alter ego status: in *Transamerica*, the D.C. Circuit explained that a key fact in *McKesson* had been that "Iran *directly controlled routine business decisions*." 200 F.3d at 853 (emphasis added).

The control is all-encompassing. Zimbabwean Parliamentary reports have consistently found that the Ministry, rather than ZMDC, controls companies nominally set up as ZMDC subsidiaries. Davidson Decl. Ex. U at 15-16; Davidson Decl. Ex. F at 15. Indeed, the 2013 report indicated that the Ministry had ignored the law even when appointing ZMDC Board members. Davidson Decl. Ex. U at 26. Likewise, Sternford Moyo, a titan of the Zimbabwean legal profession with decades of mining experience, explains that ZMDC has a "subordinate board" that has "no control" over companies that are purportedly ZMDC's subsidiaries. Moyo Decl. ¶ 6. ZMDC is thus under the "ultimate control" of the Minister, *id.* ¶ 7, who makes decisions about whether ZMDC grants or terminates joint venture agreements, *id.* ¶ 9, who diverts revenue from ZMDC subsidiaries to the Treasury instead of ZMDC, *id.* ¶ 10, making ZMDC unable to pay its

bills, and in general exercises "day to day control" over ZMDC's Board and thus over ZMDC, *id.* ¶ 11.

Similarly, the pervasive evidence of ZMDC's assets being diverted for policy purposes—like arms deals with Russia and China or compensating government officials—gives strong evidence that Zimbabwe regards ZMDC as a branch of the government subject to its total and plenary control rather than anything approaching a quasi-independent business. *E.g.*, Davidson Decl. Exs. X, Y, Z. Normal companies distinct from the state do not engage in fundamentally sovereign acts like military spending. *See Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994) (holding that military forces are categorically governmental rather than commercial). Nor do they fund the government's obligations while unable to pay their own debts. In short, what the government says at ZMDC goes. In too many ways to count, the Ministry exercises control over ZMDC—as ZMDC's organic act expressly empowers the Ministry to do. That is not, as Defendants claim, Doc. 42 at 9, acting like an ordinary shareholder or an ordinary regulator. It is not voting for directors who then manage the company distinct from its shareholders—it is dominance with a board who act as rubber stamps if they act at all. It is not passing generally-applicable regulations or considering applications under some defined standard—it is controlling any decision that the Ministry wants to control, including critical issues like selecting joint venture partners and terminating concessions.

b.    **Zimbabwe Is Entitled To Any Profits.**

This inquiry is, as in *OI*, "[n]ot" a "complicated inquir[y]." 73 F.4th 172-73. It is undisputed that Zimbabwe gets any profits that ZMDC makes. But as *OI* notes, profits are not limited to formal dividends, but also include disguised profits in the form of "taxes and royalties, sometimes at an artificially high rate." *Id.* at 173. That is precisely what occurs with ZMDC: to enrich the Treasury and keep assets away from ZMDC's creditors, revenues are taken directly

-23-

from subsidiaries rather than going to ZMDC first. Moyo Decl. ¶ 10. Zimbabwean litigation also shows that Zimbabwe takes money from ZMDC without verifying that ZMDC has any profits to distribute. Davidson Decl. Ex. M. In other words, Zimbabwe is not limited to mere dividends based on its shareholding, but takes whatever it can get.

c.   **Zimbabwe Manages ZMDC.**

Similarly—and in many ways acting as the enforcement mechanism for Zimbabwe's economic control over ZMDC—Zimbabwe both determines who ZMDC's management will be and, critically, engages frequently in direct management of ZMDC and its subsidiaries. In *OI*, the court held that both of these things establish management, as well as noting that excessive entanglement with "military leaders and high government officials" weighs in favor of alter ego status. 73 F.4th at 173. Similarly, in *TMR*, the SPF Chairman was an appointee of the President and the entire board had to be approved by the government. 411 F.3d at 302. Indeed, far more under the Act requires the Minister's approval than the features identified in *TMR*. *Id.*

One could deem this factor satisfied by the fact that the Minister appoints the Chairman (with the approval of the President), appoints ZMDC's Chairman and the rest of the Board. *Id.* § 5. The Minister determines their terms of appointment and conditions of appointment, meaning that they serve at the pleasure of the Minister. *Id.* § 6.[10]  The Minister determines their compensation. *Id.* § 13. The Minister has broad removal powers on top of this. *Id.* § 9. The Minister must approve the Board's choice of manager, which in practice means that the Board picks whoever the Minister wants. *Id.* § 13. Similarly, the Board is required to obtain the

---

[10] Defendants contend that Board members can only be removed for cause, but the broad and discretionary terms of the Act make clear that whatever the Minister determines is grounds for removal will suffice—and, regardless, Ministers have on repeated occasions fired the entire ZMDC Board, making clear that they view their removal power as plenary. Davidson Decl. Exs. J, V.

Government's approval, through the Minister, for a vast range of basic activities, including making investments or loans (*id.* § 34), managing its general reserve account (*id.* § 36(3)), and share transfers (*id.* § 27(4)). The Minister must approve every joint venture and a wide range of other decisions. (*Id.*, Schedule §§ 20-24.)

But even that would undersell the true extent of the Ministry's domination of ZMDC. The Government exerted control over the Boards of ZMDC subsidiaries by requiring direct appointment by the Minister, declaring all appointments made by ZMDC's Board void, and using the threat of removal to ensure that the ZMDC Board complied. Davidson Decl. Ex. U at 15-16. The Minister decided who would receive and lose joint venture agreements. Davidson Decl. Ex. U at 13-14; Moyo Decl. ¶ 9. The ZMDC Board at the time thus did not even know what its own subsidiaries were doing because the Minister's appointees were reporting to him directly rather than telling ZMDC's Board what they were doing. *Id.* at 15-16. And multiple subsequent reports have similarly found that the Ministry of Mines directly runs ZMDC subsidiaries and that ZMDC's own board has no control over them. Davidson Decl. Exs. F at 15, 18, Ex. U at 15-16; *see* Moyo Decl. ¶ 6. The Minister's hand-picked appointee was dubbed a "one man board" by the Zimbabwean press—a sign that it was widely known that the formal structure of ZMDC under the Act meant little because the Minister really decided everything that mattered. Davidson Decl. Ex. L at 240. Multiple U.S. Government reports observe that Zimbabwe at times allowed ZMDC to operate without a Board, presumably so that the Minister could directly run the company himself. Davidson Decl. Exs. FF-LL (Investment Climate Reports).

Perhaps most blatantly of all, Zimbabwe's Parliament has discussed "political interference" at ZMDC and has noted that "the ZMDC board is answerable to the Permanent

Secretary of Mines and Mining Development." Davidson Decl. Ex. F at 15. And it has made

clear that "the Secretary of Mines is directly involved in *operational issues . . . at ZMDC*." *Id.* at

18. That is a clear example of the type of "extensive involvement in the day-to-day operations"

of a company that the D.C. Circuit has held is sufficient to show alter ego status. *McKesson*

*Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 352 (D.C. Cir. 1995).

In short, the Ministry exercises extensive management powers over ZMDC, right down to

quotidian matters. ZMDC's Board is so toothless and beholden to the Minister that it cannot

control its own supposed nominees to its subsidiaries' boards, because the Minister picked them

instead. Managerially as well, ZMDC is utterly dominated by the Ministry. This is, in short, not

normal supervisory control by a shareholder or regulator—it is an arrangement where ZMDC's

affairs are "so intermingled" with those of the ministry "that no distinct corporate lines are

maintained." *Transamerica*, 200 F.3d at 849.[11]

### d.    **Zimbabwe Is the Beneficiary of ZMDC.**

Defendants fare no better on the question of who benefits from ZMDC. Courts have

consistently held that both conventional benefits like dividends and less conventional ones such

as patronage positions and the use of company assets for foreign policy purposes count toward

this factor. *See OI*, 73 F.4th at 173 ("Venezuela committed PDVSA to sell oil to Caribbean and

Latin American allies at steep discounts to further Venezuela's policies . . . . Senior members of

the Maduro Regime used PDVSA's aircraft for state purposes."). Courts have also found that a

company that operates for "political goals" is more likely to be regarded as substantively a state

organ rather than an independent company. *Id.* Additionally, when a state awards rights to an

---

[11] Defendants say that ZMDC employees are exempt from certain civil service rules. Doc 42 at 14. It is unclear why that would matter—the point is that the Ministry decides what ZMDC does. If anything, a lack of civil service protections makes it *easier* for the Ministry to dominate ZMDC employees, not harder.

entity on preferential terms, that is indicative that it is not analogous to a normal private company. *Id.* (award of drilling rights for "no consideration").

Again, ZMDC exhibits all the tell-tale signs of domination. As noted above, Zimbabwe does not merely receive a right to dividends, but also extracts funds from ZMDC subsidiaries directly. Moyo Decl. ¶ 10. Normal companies do not have their country's Minister of Foreign Affairs negotiate with Sergei Lavrov and a Russian state-owned arms manufacturer, reportedly for military equipment in exchange for mining rights. Davidson Decl. Exs. X & Y. Normal companies do not assign mining rights to military leaders or party insiders. *E.g.*, Davidson Decl. Ex. Z. Normal companies are not founded by statutes that explicitly task them with pursuing their government's policy goals. *Supra* § II.A.; Davidson Decl. Ex. B §§ 20, 23, 25. And, as Mr. Moyo notes, ZMDC receives preferable terms for its mining rights because it acts on behalf of the state. In all, Zimbabwe treats ZMDC as an "arm[] of the state," precisely because it is one and not a truly distinct company. Davidson Decl. Ex. E at 148.

Finally, the U.S. Government's position is entitled to substantial weight. While not dispositive, "the OFAC SDN designation is one kind of (potentially very persuasive) evidence tending to show alter ego status." *Funnekotter v. Agric. Dev. Bank of Zimbabwe*, No. 13 CIV. 1917 CM, 2015 WL 3526661, at *16 (S.D.N.Y. June 3, 2015).[12] ZMDC is sanctioned as an SDN precisely because it is indelibly associated with the Zimbabwean government and benefits political and military insiders. Davidson Decl. Ex. BB. The United States has consistently monitored and reaffirmed sanctions on ZMDC for 15 years because those conditions have not

---

[12] The case Defendants cite, *In re 650 Fifth Avenue*, similarly holds that SDN status is evidence of alter ego status but not determinative on its own.

changed. Davidson Decl. Exs. CC-EE (State Dep't press release discussing regular review process). In other words, the government and its officials benefit from ZMDC's activities.

    e.  **Zimbabwe Has Used ZMDC's Corporate Form Inequitably.**

  Finally, Zimbabwe has benefited from using ZMDC while using it to avoid its obligations. Zimbabwe—like the United States—promised in the New York Convention to honor arbitration awards. Yet, rather than doing so, it is doing everything it can to render ZMDC judgment-proof—ranging from outright asset transfers to the new Defold entity, Davidson Decl. Exs. NN, OO, to taking cash directly from ZMDC subsidiaries rather than allowing that cash to flow up to ZMDC where ZMDC's creditors might reach it, Moyo Decl. ¶ 10. The fact that the Zimbabwean government has recently discussed moving ZMDC's assets to other entities with the express intent of defrauding ZMDC's creditors is a clear indication that ZMDC is actually managed from above and the Government's diktats matter far more than ZMDC's official management structure. Davidson Decl. Exs. NN, OO.

  Zimbabwe's moves to strip ZMDC of assets for the specific purpose of defrauding named creditors *including Plaintiffs* are a classic example of when fraud or injustice would result from recognizing judicial separateness. *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 417 (5th Cir. 2006) ("[T]he Government's manipulation of Turkmenneft to prevent Bridas from recovering any substantial damage award satisfies the 'fraud or injustice' prong.").

  Here, Plaintiffs have presented evidence of Zimbabwe's shell game with ZMDC's assets, to the point of (at a minimum) exploring in depth a plan to transfer valuable assets from ZMDC to Defold, a different state-owned entity to avoid ZMDC's debts to Plaintiffs. *See* Davidson Decl. Ex. NN. There is substantial evidence of other asset-stripping behavior, including diverting ZMDC's subsidiaries' revenues directly to the Treasury so that ZMDC's creditors cannot reach them, Moyo Decl. ¶ 10, and demanding ZMDC pay cash to Zimbabwe without complying with

requirements to determine that ZMDC actually had any profits to distribute, Davidson Decl.

Ex. M.

Defendants respond only with conclusory denials and a claim that any fraudulent

transfers occurred too late to matter for alter ego status. The former speaks volumes about

whether the transactions alleged were truly above-board; the latter makes no sense, since after a

judgment is the *most* relevant time for fraudulent conveyances. In any event, Defendants' timing

argument is simply wrong, as discussed at length above.

⁂

In short, even at this early stage, the evidence of Zimbabwe pulling the strings at ZMDC

and of Zimbabwe engaging in fraudulent transfers to frustrate Plaintiffs' enforcement of their

judgment is compelling. Zimbabwe treats ZMDC as essentially a mere department of the Mining

Ministry and has used its resources as its own and attempted to shield them from creditors. The

U.S. Government has repeatedly observed the lack of corporate formalities at ZMDC, and

Zimbabwean government sources agree. Davidson Decl. Exs. FF-LL. Defendants' generic

denials do not come close to carrying their burden to rebut Plaintiffs' showing. That is sufficient

to deny the motion to dismiss.

3.   **The Alter Ego Analysis Considers All Relevant Facts, Not Just Those at The Time A Contract Is Signed.**

Defendants principally contend that alter ego status can only be judged at the time that a

contract, here, the Memoranda of Understanding, was signed—in other words, meaning that

Zimbabwe's domination of ZMDC when it *breached* the MOUs, evaded the Award and

Judgment, and dissipated assets do not matter. Doc. 42 at 17. The *sole* authority they cite for this

proposition is *TIG Ins. Co. v. Republic of Argentina*, No. 18-MC-00129 (DLF), 2022 WL

1154749, at *9 (D.D.C. Apr. 18, 2022), *order corrected and superseded,* No. 18-MC-00129

-29-

(DLF), 2022 WL 3594601 (D.D.C. Aug. 23, 2022), an unpublished district court case that held

that the arbitration exception to sovereign immunity did not apply to the sovereign as successor-

in-interest to a defunct state-owned insurer.  Without citing authority, *TIG Ins.* rejected an alter

ego argument on the basis that all the evidence dealt with the post-liquidation period rather than

the time of the original agreement to arbitrate. This case, of course, deals with a different

exception—implied waiver—and, as discussed below, presents evidence of intense government

meddling at times that include when ZMDC submitted to arbitration and signed the terms of

reference.[13]

    But even aside from that, *TIG*'s limitation of the relevant period for an alter ego analysis

is simply wrong. *Bancec* itself involved holding the state liable for setoff and counterclaims

based on its liquidation of the state-owned entity plaintiff *after* the suit was filed—it did not limit

its analysis to when Citibank's Cuban assets were expropriated or the moment the suit was filed.

*Bancec*, 462 U.S. at 631. Cuba could not rely on the fact that the suit had originally been filed by

Bancec before Cuba liquidated it to avoid the consequences of its actions in making Bancec its

pawn.

    The Third Circuit recently expressly rejected the position Defendants adopt here, holding

that the totality of the circumstances determine whether the state and its instrumentality are a

single enterprise. "[T]he totality of the sovereign conduct of Venezuela," it held, "answers the

'when' issue" for the alter ego analysis. *OI Eur. Grp. B.V.*  73 F.4th at 170. "[N]arrowing the

temporal inquiry for alter-ego analysis," it held, "unnecessarily leaves room for manipulation."

---

[13] Defendants attempt to claim that this Court's prior order limited the relevant time period, but it
does nothing of the sort. It simply held that the analysis for the period at issue in *Funnekotter*
might differ from that at issue here, so offensive nonmutual collateral estoppel was
inappropriate. Doc. 38 at 14-15.

*Id.* (internal quotation marks omitted). *Subsequent* conduct could not excuse prior exercise of domination, because "[w]e would invite fraud and injustice—the very concerns carefully cautioned against in *Bancec*—by considering only how a state acts after learning that its actions surrounding an instrumentality are under scrutiny." *Id.* "Nor is exclusive reliance on the time of injury a satisfying approach," it held, because it would invite judgment-evasion where, as in *Bancec* itself, the sovereign could "simply drop vulnerable assets into a new instrumentality." *Id.* The Third Circuit observed that many cases applying *Bancec* had considered prior or later conduct too. *Id.*

This case illustrates precisely why the Third Circuit's approach is right and a holistic analysis is necessary. Before the arbitration, Zimbabwe's domination of ZMDC caused Plaintiffs' injury when the Minister wanted to expropriate their mining rights. And after the Award, Zimbabwe has deprived ZMDC of assets to satisfy it—to the point of contemplating measures (objected to by ZMDC itself) expressly intended to defraud ZMDC's creditors. *All* those facts are relevant to whether the Government ought to have ZMDC's implied waiver and liability applied to it as ZMDC's alter ego.

### B.     In the Alternative, This Court Should Authorize Tailored Jurisdictional Discovery.

But even if this Court believes that the current record is insufficient, the law is clear that Plaintiffs must be given a sufficient opportunity to take jurisdictional discovery of Zimbabwe and ZMDC to prove that the Amended Complaint's alter ego allegations are true. Tellingly, Defendants contend that press reports and even government reports are not enough proof, but do not introduce evidence to contradict them. Plaintiffs are entitled to test Zimbabwe's denials, which are often either conclusory or backed only by the word of a witness whom the arbitrators found perjured himself.

The D.C. Circuit has held that, while a "district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction, but it *must* give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (emphasis added and internal quotation marks and citation omitted). Thus, unless another ground is dispositive of the motion, *id.*, jurisdictional discovery is mandatory. *See also Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 185 F. Supp. 3d 233, 248 (D.D.C. 2016) (jurisdictional discovery is mandatory "if it is possible that the plaintiff could demonstrate the requisite jurisdictional facts sufficient to constitute a basis for jurisdiction").

Here, there is no avoiding the issue of alter ego—it is the sole dispositive ground as to Zimbabwe and also dispositive as to ZMDC unless the Court agrees with its argument regarding the MOUs' service provisions. The Amended Complaint contains detailed allegations of abuses of the corporate form, domination, and efforts to defraud creditors, backed up by extensive publicly-available articles and U.S. Government reports. Defendants' response has largely been to deny the truth of these allegations or to claim that Plaintiffs' *evidence* is insufficient. But overwhelmingly, the evidence that they claim is necessary is in their own possession.

Thus, if the Court is not prepared to deny Defendants' motion altogether, targeted jurisdictional discovery is necessary. Plaintiffs believe that targeted discovery requests and a Rule 30(b)(6) deposition of Zimbabwe and ZMDC as to the following subjects should demonstrate that the alter ego allegations of the Amended Complaint are true:

    (1)    Directions or orders from the Minister, Permanent Secretary, or Ministry to the Board of ZMDC or subsidiary boards;

(2)     Payments from ZMDC or its subsidiaries to Zimbabwe, including whether ZMDC
        had audited financials showing a profit at the relevant time;

(3)     Grants of concessions or joint ventures to (i) Russian or Chinese companies, and
        (ii) companies in which government, party, or military officials have an interest.

(4)     Actual or contemplated transfers or reassignments of mining assets from ZMDC
        to other entities owned or controlled by the State or government officials or their
        relatives;

(5)     The Ministry's involvement in the termination of Plaintiffs' concessions;

(6)     Appointments and removals of Board members of ZMDC and its subsidiaries,
        including the relationship of Board members to the President, Minister,
        Permanent Secretary, or Ministry; and

(7)     The truth of other allegations in government and media reports regarding ZMDC,
        including but not limited to the operational role of the Permanent Secretary of the
        Ministry, whether ZMDC operated without a board, and whether ZMDC had
        control over its own subsidiaries,

**C.      ZMDC's Implied Waiver Extends to Its Alter Ego And To Judgments On
          Arbitration Awards.**

Defendants repeat their prior arguments that the implied waiver exception does not apply

here. Doc. 42 at 25-27. It is unclear if Defendants are merely explaining why the alter ego

analysis is dispositive or are making an argument intended to stand on its own, but to the extent

that they contend that a state-owned entity's implied waiver does not extend to its alter ego,

*Bancec* itself rejects that view, holding that the instrumentality's acts are imputed to the

sovereign where the two are alter egos. "Giving effect to Bancec's separate juridical status in

these circumstances, even though it has long been dissolved, would permit the real beneficiary of

-33-

such an action, the Government of the Republic of Cuba, to obtain relief in our courts that it could not obtain in its own right without waiving its sovereign immunity and answering for the seizure of Citibank's assets—a seizure previously held by the Court of Appeals to have violated international law." 462 U.S. at 632. Thus, Bancec's waiver was Cuba's waiver, so "Citibank may set off the value of its assets seized by the Cuban Government against the amount sought by Bancec." *Id.*; *see also Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000) (the *alter ego* factors identified in *Bancec* "serve also as exceptions to the rule that a foreign sovereign is not amenable to suit based upon the acts of such an instrumentality.").

Similarly, Defendants reiterate their prior argument that an implied waiver by arbitrating in a state that is a party to the New York Convention does not extend to an action recognizing a judgment on the award. This Court rejected that argument before, and was right to do so. *Amaplat*, 2023 WL 2603746, at *15.

### D.    ZMDC Was Properly Served.

Finally, Defendants contend that the Court lacks personal jurisdiction. As to Zimbabwe, the argument is simply that the Court lacks personal jurisdiction because it lacks subject matter jurisdiction. Doc. 42 at 28. As to ZMDC, Defendants' first argument is that this Court lacks personal jurisdiction because ZMDC is not an alter ego and thus possesses due process rights. *Id.* at 28-29. Again, that argument stands or falls with the alter ego analysis; it has no independent vitality. *See GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 809 (D.C. Cir. 2012); *see also id.* at 814-15 (noting that *Bancec* determines whether an instrumentality is sufficiently distinct from the state itself to have due process rights).

That leaves one remaining argument: that ZMDC was not properly served. That argument was raised but not decided on the prior motion to dismiss; as Plaintiffs explained then, ZMDC

was properly served pursuant to the special arrangement for service specified in the MOUs. While acknowledging that 28 U.S.C. § 1608(b)(3)(B) only applies if there is no "special arrangement" for service under 28 U.S.C. § 1608(b)(1), ZMDC entirely ignores the fact that there is a clear special arrangement for service here: the MoUs expressly agree to service of "documents in legal proceedings," not just contractual notices, at the "domicilium *citandi* et executandi." That requires denial of ZMDC's motion.

1. **Because ZMDC Is An Agency or Instrumentality, Substantial Compliance Plus Actual Notice Suffices.**

To start, D.C. Circuit law holds that for agencies or instrumentalities served under Section 1608(b), Congress adopted a substantial compliance standard for service as long as the agency or instrumentality received actual notice. "The authorities generally hold that section 1608(b) may be satisfied by technically faulty service that gives adequate notice to the foreign state." *Transaero*, 30 F.3d at 153. Indeed, "[t]he Committee Report [for FSIA] states that section 1608(a) 'sets forth the exclusive procedures for service on a foreign state,' but contains no such admonition for section 1608(b)." *Id.* at 154. Thus, courts in this district apply a substantial compliance test to service on agencies and instrumentalities as long as the defendant received actual notice. *See, e.g.*, *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 798 F. Supp. 2d 260, 268 (D.D.C. 2011) (substantial compliance standard applies to agencies and instrumentalities).

2. **ZMDC Agreed That "Documents In Legal Proceedings" Could Be Served By Hand Delivery At Its Headquarters.**

That the domicilium clauses here agree to service—thus constituting a special arrangement—is not a close call. The D.C. Circuit has favorably cited a case holding that a "contract provision providing '[a]ll notices, demands, or requests between Sublessor and Sublessee shall be delivered in person, by certified mail, return receipt requested, or by registered mail' and providing addresses for notification constituted 'special arrangement for

-35-

service' under section 1608(a)(1)" *Angellino v. Royal Fam. Al-Saud*, 688 F.3d 771, 777 (D.C. Cir. 2012) (quoting *Int'l Rd. Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 251 (D.D.C. 2001)). This Court has suggested that, at least where a provision refers to notices under a contract, some contemplation of legal process rather just contractual notices may be necessary. *Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*, 225 F. Supp. 3d 18, 23 (D.D.C. 2014) (Cooper, J.).

The provisions here unambiguously refer to service of process, not just contractual notices: they state that "documents in legal proceedings"—not just notices—"may be served" at the specified addresses, or at such other address as may be notified in writing. Doc. 1-2 § 12.8.1; Doc. 1-4 § 10.9.1. And they say that the address is the "domicilium citandi et executandi," a term used in Zimbabwean and South African law that translates as "domicile for being summonsed and execution" and means the address for service of process.[14] Doc. 1-2 § 12.8.2; Doc. 1-4 § 10.9.2; *see also Schimmelpennich v. Bayard*, 26 U.S. 264, 275 (1828) (quoting Amsterdam merchant's use of the variant "domicilium citandi et exequendi" to designate a notary's office as agent for service of process).

Similarly, the provisions apply to this case because an action to recognize a judgment based on the MoUs is in connection with them. While the rule of the last antecedent[15] means that, in the phrase "documents in legal proceedings or any written notices in connection with this MOU," Doc. 1-2 § 12.8.1; Doc. 1-4 § 10.9.1, "in connection with this MOU" modifies only "any

---

[14] While the term is self-explanatory once translated, publicly available sources also confirm that it means an address for service of process. *E.g.*, *Hay Management Consultants Ltd v. P3 Management Consultants (Pty) Ltd* [2004] ZASCA 116, [2005] 3 All SA 119 (SCA) (translating the term as "a domicilium for service of process and writs of execution").

[15] *See In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 655 (7th Cir. 2010) ("[R]elative and qualifying phrases, grammatically and legally, where no contrary intention appears, refer solely to the last antecedent.").

written notices" and not "documents in legal proceedings," this Court need not resolve the point. "[I]n connection with" is broad language, and an action to domesticate a judgment based on the MoUs is easily "in connection with" them. *Cf. Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) ("in connection with" is given a "broad construction"). Indeed, the D.C. Circuit has held that an "in connection with" forum-selection provision "applies to claims arising from the Agreement *and* from its subject-matter or formation, not just claims connected to the 'contract.'" *Azima v. RAK Inv. Auth.*, 926 F.3d 870, 878 (D.C. Cir. 2019). A judgment on an arbitration award for breach of the contract easily satisfies that test.

3. <strong>Plaintiffs Served ZMDC In Accordance With The MoUs, And ZMDC's Failure to Give Notice of Its Office Move Does Not Avail It.</strong>

And Plaintiffs did what the service provision asked of them. It appears undisputed that Plaintiffs served a "responsible person" by hand during normal business hours. The only slight complication here is that ZMDC moved offices without serving Plaintiffs with a formal document calling itself a change of address notice. That changes nothing, for several independent reasons.

*First*, ZMDC did, in fact, notify Plaintiffs that it had moved: it sent Plaintiffs correspondence listing its new headquarters address as 6 Constantia Avenue. Davidson Decl. Ex. 1. Because the MoUs do not set specific form requirements for changing addresses other than that they are in writing, correspondence listing a new headquarters is sufficient under the MoUs themselves.

*Second*, even if the letters listing the new address were not sufficient to satisfy the contractual provisions themselves, courts have held that a party that learns of a change of address from a party to a contractual notices provision "not only may but must send notice . . . to the new or changed address." *Robbins v. S. Gen. Ins. Co.*, 243 A.2d 686, 688 (D.C. 1968) (discussing

-37-

notice of cancellation of insurance policy where a jury found policyholder had informed the insurer of his new address). Indeed, because service on what is known to be an out-of-date address is unlikely to achieve notice, courts have held that a party with "actual knowledge" of the new address must serve notices there, even where the other party failed to supply the new address in the correct formal manner. *Ry. Mail Ass'n v. Moore*, 15 F.2d 547, 551 (4th Cir. 1926); *see also Long v. Home Indem. Co. of New York*, 169 So. 154, 159 (La. Ct. App. 1936) ("[W]here the insurer has definite knowledge that the assured's address has been changed, it is required to govern itself thereby."). The same rule applies here: Plaintiffs learned that ZMDC's address had changed, so it was not only proper but necessary so that ZMDC would receive actual notice that Plaintiffs serve ZMDC at its new address.

*Second*, if this Court disagrees, then ZMDC—while contractually obligated to have a "responsible person" to accept service at 90 Mutare—failed either to have someone there or to serve a proper change of address notice. As such, it is estopped from relying on its own failures to do what it should have done. *See generally* 72 C.J.S. Process § 126 (collecting cases holding that parties who affirmatively represented their address were estopped from challenging service). Having signed a contract that directed it to serve notice if it changed its address, it *should have* served the formal notice of its office move, and its failure to do so prejudices Plaintiffs because it can unilaterally prevent hand service by keeping no one to receive it at the contractual address. Thus, equity treats as done that which ought to have been done: it. The basis for estoppel is even stronger, indeed, when ZMDC directly communicated with Plaintiffs' Zimbabwean counsel identifying its new offices as the appropriate return address, thus representing that it was now the correct address. Having unilaterally frustrated service at the specified address, if it is deemed to have also failed to sufficiently update its address for service, it cannot now insist that Plaintiffs

do the impossible and hand-serve process on its old address. Otherwise, it could prevent service *at all* by simply refusing to serve formal notice of its updated address.

Indeed, at least one court has found, under analogous circumstances, that it is proper to serve a foreign sovereign at its actual address when it fails to update a contractually-specified address. In *International Road Federation v. Embassy of the Democratic Republic of Congo*, the embassy subleased a property, but never took possession, and the sublease specified service at the subleased property. 131 F. Supp. 2d at 251. While acknowledging that Section 1608(a) of the FSIA (unlike Section 1608(b), the provision that applies to agencies and instrumentalities) requires "strict adherence" to *the Act's* terms the court found that the embassy's failure to take possession precluded it from arguing that the plaintiff should have served an empty building: "because service at the subleased premises would have been senseless, service at the Embassy's primary location satisfied the terms of the special agreement." *Id.* at 251.[16]

**Third**, and regardless, the parties agreed that actual receipt would always suffice. "Notwithstanding anything to the contrary contained or implied in this MOU," it said, "a written notice or communication actually received by one of the Parties from the other Party shall be adequate written notice or communication to such Party." Doc. 40-2 § 12.8.2; Doc. 40-4 § 10.9.2. That encompasses service: that text is contained in a section that deals with "documents in legal proceedings or any written notices," so the word "communication" would be superfluous if it only referred to written notices. It thus plainly includes "documents in legal proceedings," as

---

[16] This Court has previously expressed concern that the *International Road* court applied a "substantial compliance" rather than "strict adherence" standard to Section 1608(a). *Enron*, 225 F. Supp. 3d at 22. While *International Road* expressly stated that it was applying the strict adherence standard to the Act even as it applied equity to the contract, this case in any event involves Section 1608(b), which this Court noted in *Enron* was less unforgiving. *Id.*; *see Transaero*, 30 F.3d at 153 ("The authorities generally hold that section 1608(b) may be satisfied by technically faulty service that gives adequate notice to the foreign state.").

a form of communication. And, since it is undisputed that Defendants received actual notice, that suffices under the contracts.

> 4.  **If The Court Nonetheless Finds Service Ineffective, Dismissal Is Still Inappropriate And The Court Should Authorize Alternate Service Under 28 U.S.C. § 1608(b)(3)(C).**

Finally, it is settled law in this Circuit that it is inappropriate to outright dismiss a case when service may yet be achieved. "[D]ismissal is not appropriate when there exists a reasonable prospect that service can be obtained." *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 29 (D.C. Cir. 2015). Moreover, there is no statutory deadline to serve under the Foreign Sovereign Immunities Act. *Id.*

Rather, this Court should authorize alternate service if it finds that ZMDC has successfully prevented service under the MoUs. Under 28 U.S.C. § 1608(b)(3)(C), the Court may approve any method of service "reasonably calculated to give actual notice" that is consistent with the laws of the place where service is to be made. *Transaero*, 30 F.3d at 154. The chosen method need not be the same way that service would be made in local proceedings—it just cannot violate positive law. *See New England Merchants Nat. Bank v. Iran Power Generation & Transmission Co.*, 495 F. Supp. 73, 78-79 (S.D.N.Y. 1980) ("The language in the FSIA requiring that the mode of service fashioned by the court be 'consistent' with the law of the foreign state, does not require that service be identical to the method prescribed by the foreign state. Rather, the language indicates that the mode of service authorized by the court should not be prohibited under the law of the foreign state."). Plaintiffs have now attempted service under the MoUs, mail service, and DHL service to no avail, and Zimbabwe is not a party to any relevant service treaty.

Accordingly, the Court should authorize alternative service. Specifically, the Court should authorize Plaintiffs to (1) hand-serve a responsible person at ZMDC at its 6 Constantia Avenue address, or any other address identified by ZMDC, during business hours; and (2) serve

ZMDC's counsel in these proceedings as its agent. Many courts have authorized service on counsel in the United States as a form of alternate service on a foreign entity under 28 U.S.C. § 1608(b)(3)(C) or Federal Rule of Civil Procedure 4(f)(3). *See Hashem v. Shabi*, No. CV 17-1645 (ABJ), 2018 WL 3382913, at *5 (D.D.C. Apr. 26, 2018); *Saleh v. Al Nahyan*, No. CV 20-1168 (ABJ), 2021 WL 7210780, at *4 (D.D.C. July 16, 2021); *Bazarian Int'l Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.*, 168 F. Supp. 3d 1, 14 (D.D.C. 2016); *see also Freedom Watch, Inc. v. Org. of the Petroleum Exporting Countries*, 766 F.3d 74, 83 (D.C. Cir. 2014) (remanding to allow the district court to exercise its discretion as to whether to authorize service on counsel in the United States for foreign entity).

### E. The Amended Complaint States A Claim.

Finally, Defendants contend that the Amended Complaint does not state an alter ego claim. Since the standard for defeating a motion challenging subject matter jurisdiction is higher than the standard for stating a claim, this argument has no independent weight. Even if the Court were to believe that any evidence presented in support of Plaintiffs' opposition goes beyond the well-pleaded allegations of the Amended Complaint, the appropriate response would be to grant leave to amend to conform to proof rather than to dismiss for failure to state a claim.

## V. CONCLUSION.

For the foregoing reasons, Defendants' motion to dismiss should be denied. In the alternative, Plaintiffs should be granted leave to take jurisdictional discovery targeted at the allegations of the Amended Complaint and the contentions made in Defendants' motion.

Dated: August 10 , 2023                    Respectfully submitted,


                                             /s/ Steven K. Davidson
                                           Steven K. Davidson (D.C. Bar No. 407137)
                                           STEPTOE & JOHNSON LLP
                                           1330 Connecticut Avenue, NW
                                           Washington, D.C.  20036-1795
                                           Telephone:      202 429 3000
                                           Facsimile:      202 429 3902
                                           sdavidson@steptoe.com

                                           Robert W. Mockler
                                           Joseph M. Sanderson (D.D.C. No. NY0560)
                                           Niyati Ahuja (*pro hac vice*)
                                           STEPTOE & JOHNSON LLP
                                           1114 Avenue of the Americas
                                           New York, NY  10036-7703
                                           Telephone:      212 506 3900
                                           Facsimile:      212 506 3950
                                           rmockler@steptoe.com
                                           josanderson@steptoe.com
                                           nahuja@steptoe.com


                                           *Attorneys for Plaintiffs*