**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| **Amaplat Mauritius Ltd.,** _et al_**,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Case No. 1:22-cv-00058-CRC** |
| ) | |
| **Zimbabwe Mining Development Corporation,** _et al_**,** ) ) | |
| ) | |
| **Defendants.** ) | |
| _____ | |

**<u>REPLY TO PLAINTIFFS' OPPOSITION TO THE MOTION TO DISMISS</u>**

Defendants, the Chief Mining Commissioner of the Ministry of Mines of Zimbabwe (the "Commissioner"), Republic of Zimbabwe ("Zimbabwe"), and Zimbabwe Mining Development Corporation ("ZMDC), by and through their undersigned counsel, hereby file their Reply to Plaintiffs' Opposition to the Motion to Dismiss the Amended Complaint filed by Amaplat Mauritius Ltd. ("Amaplat") and Amari Nickel Holdings Zimbabwe Ltd. ("Amari") (collectively, the "Plaintiffs"), and in support thereof, state as follows:

## INTRODUCTION

To defeat the presumption of separateness, Plaintiffs must come forward with detailed allegations, supported by facts, that show extensive control in day-to-day operations. Plaintiffs fall far short. Faced with the exacting standard in *Bancec*, Plaintiffs resort to overstatement, routinely substituting the word "Zimbabwe" for "ZMDC," or they misstate the terms of the ZMDC Act and the contents of news articles. Plaintiffs' supposed expert follows the trend. Mr. Moyo relies on conjecture and assumption, citing statements never made and vague notions of "judicial notice" that he undermines with his own uncertainty. In reality, this case is Plaintiffs' last gasp at escaping the contracts they signed. Almost 15 years ago, Plaintiffs chose to do business with ZMDC, a sanctioned entity, never once considering Zimbabwe to have any responsibility for the terms and conditions of the MOUs. Plaintiffs tried to make their *alter ego* theory work, bringing similar arguments to the Belgian courts, where they lost and were ordered to pay costs. Plaintiffs have now come to the United States, no longer interested in bringing their *alter ego* claims in other enforcement jurisdictions. This Court should end Plaintiffs' misguided attempt to hold Zimbabwe responsible and grant the motion to dismiss for the reasons below.

## RELEVANT BACKGROUND

### A. Plaintiffs continued to transact with ZMDC, knowing it was a sanctioned entity

The EU and the UK added ZMDC as a sanctioned entity in January 2009. Declaration of Quinn

Smith ("Smith Decl.") **Ex. A** and **Ex**. **B**. These sanctions bind any EU citizen or person transaction business in the EU and UK citizens or subjects with a right to abode in the UK and entities incorporated under the law of any part of the United Kingdom. *Id.* at **Ex. A**. at 1, Article 1. UK sanctions also extend to its overseas territories, including the British Virgin Islands ("BVI"). Smith Decl. **Ex. O.**

Plaintiffs are Mauritian companies but are held or owned by UK nationals or subjects. Michael John Nunn is listed as a director for both Plaintiffs. Smith Decl., **Exs. C, D,** Corporate Records in Mauritius. Nunn appears to be a British subject or national and has lived in the UK. Smith Decl. **Ex. E.** Both Plaintiffs appear to be held by a BVI-registered company by the name of Amari Holdings, Ltd. Smith Decl. **Ex. N.**

Plaintiffs entered the MOUs with ZMDC and continued to transact under the MOUs until January 2011, which was at least two years after the U.S. sanctions were in place.

### B.  ZMDC, not Zimbabwe, terminated the MOUs

The Complaint consistently (and wrongly) refers to Zimbabwe in connection with the Award and the actions that led to the arbitration between ZMDC and Plaintiffs. *See, e.g.,* Am. Compl. at ¶ 2. Throughout their Response, Plaintiffs mislead by referring to Zimbabwe as having terminated the MOUs and provided "false testimony" in the arbitration. Response at 8, 12.

The Award did not determine that Zimbabwe had terminated the MOUs. The Tribunal expressly found that the MOUs were terminated by ZMDC. Ex. ECF No. 40-1 at ¶¶ 7, 9. There is no mention anywhere in the Award of Zimbabwe. *See generally,* ECF No. 40-1. The only mention of the Minister of Mines is about whether the MOUs were ultimately approved by the Minister to be legally valid. *See* ECF No. 40-1 at 18-22. There are no allegations that ZMDC acted under the instruction of the Minister or Zimbabwe in terminating the MOUs, and therefore the Award made no factual or legal findings on the issue. *Id.* No witnesses appeared on behalf of Zimbabwe, so it is impossible that any Zimbabwe

witness provided "false testimony." *Id.*

### C. Zimbabwe was not a party to the MOUs or a participant in the Arbitration Proceedings

Plaintiffs continue to allege that Defendants (which includes Zimbabwe) have failed to pay the amounts under the Award and have similarly failed to satisfy the Judgment that the Zambian court issued based on the arbitral award. Am. Compl. ¶ 3. They also allege that "Defendants waived sovereign immunity by agreement to arbitrate under the ICC Rules, and by agreeing to and participating in an arbitration governed by the New York Convention. . . ." Am. Compl. ¶ 10. It is indisputable that Zimbabwe was not a party to the MOUs nor did it participate in the Arbitration. *See generally,* ECF No. 40-1. There is no mention of Zimbabwe (even in passing) in the Award. *Id.* The only party held liable for breaching the MOUs was ZMDC. *Id. at* 36. There was no finding of liability on the part of the Commissioner or Zimbabwe. *Id.*

### D. Plaintiffs are not seeking to enforce the Judgment against Zimbabwe in other jurisdictions

Plaintiffs sought to enforce the Award in Zambia only against ZMDC and the Commissioner. ECF No. 1-5. Similarly, in 2022, Plaintiffs initiated proceedings in Ontario, Canada seeking to enforce the Award and Zambian judgment against ZMDC and the Commissioner. Notably absent is Zimbabwe as a named party in those proceedings. *See* Smith Decl. **Ex. F**

### E. Plaintiffs' previous attempts under an *alter ego* theory have failed before other courts

This is not the first time that Plaintiffs attempt an *alter ego* theory. Plaintiffs sought in 2014 to seize assets belonging to two of ZMDC's subsidiaries (Mdaba Diamonds and Marange Resources) to satisfy the Award before the courts in Belgium under an *alter ego* theory. Smith Decl. **Ex. G** at 3. The Belgian court rejected a finding of *alter ego*, deciding that ZMDC's subsidiaries solely owned the assets,

separate and apart from ZMDC or Zimbabwe. *See id.* at 5-6. In that same ruling, the Funnekotter claimants argued that ZMDC is an *alter ego* of Zimbabwe. *Id.* The court also rejected this claim. *Id.*

      Neither Zimbabwe nor ZMDC appeared in these proceedings, which were brought against Plaintiffs by three entities DTZ OZGEO Private Ltd, Mbada Diamonds Private Ltd., and Marange Resources. *Id.* at 1.

**ARGUMENT**

**I.      Plaintiffs bear the burden of proof to establish the existence of an *alter ego* relationship**

      As this Court has set out in its prior order, "[o]n a motion to dismiss for lack of subject matter jurisdiction or lack of personal jurisdiction, '[t]he plaintiffs bears the burden of establishing, by a preponderance of the evidence." ECF No. 38 ("Court Order") at 5. On the issue of whether an exception to the FSIA applies, Plaintiffs bear the initial burden to overcome the presumption of immunity by producing evidence that the exception applies. *Id.* at 6. Contrary to Plaintiffs' position, the issue of *alter ego*, however, does not resolve, in and of itself, whether an exception applies, and thus the burden of proof under the FSIA is not applicable. Rather, where there is a factual dispute concerning the presumed separateness between a sovereign and its agency or instrumentality, the party seeking to overcome the presumption must prove it by a preponderance of the evidence. *See, e.g., Crystallex Int'l Corp. v. Republic of Venezuela,* 333 F. Supp. 3d 380, 399 (D. Del. 2018) (requiring preponderance of the evidence for *Bancec* inquiries).

**II.      This Court should disregard any evidence or allegations of an *alter ego* relationship outside of the relevant period it established in its Decision**

      The law of the case doctrine dictates that "the same issue presented a second time in the *same case* in the *same* court leads to the *same result." LaShawn A. Barry,* 87 F.3d 1389, 1393 (D.C. Cir. 1996).

      Here, this Court has already identified that the relevant time period for subject matter jurisdiction

4

"is whether ZMDC was the Republic's alter ego either when it entered into the MOUs with Plaintiffs in 2007 and 2008 or when it participated in the Zambian arbitration in 2011." Court Order at 14. Thus, the time period identified by the Court is not only the time the contracts were signed but also concerns the time of ZMDC's participation in the underlying arbitration proceedings. *Id.*

Plaintiffs deny in a footnote of their Response that the Court limited the time period in its prior order because the Court was simply holding that "the analysis of the period at issue in *Funnekotter* might differ from that at issue here." Response at 30, fn 13. But it is precisely that differentiation in the relevant time period between the cases that factored into the Court's decision that the offensive nonmutual collateral estoppel doctrine is inapplicable. Court Order at 15. Plaintiffs' footnote is plainly incorrect. If the time period was any and all circumstances as the Plaintiffs argue, the Court would not have needed to distinguish the time period between the facts of this case and that of *Funnekotter.*

Plaintiffs also attempt to downplay this Court's decision in *TIG Ins. Co. v. Argentina* because it is an unpublished decision and was decided in the context of the arbitration exception, rather than the implied waiver exception. Response at 29-30. Under that reasoning, Plaintiffs undermine their reliance on *OI Eur. Grp.,* which is not a binding decision and arose under the arbitration exception. Response at 30; *OI Eur. Grp. B.V.* 73 F.4th at 165 (finding FSIA jurisdiction under arbitration exception). Plaintiffs then do nothing to explain why the exception invoked would make any difference—the ratification of the New York Convention has nothing to do with the time period for an *alter ego* analysis.

Plaintiffs cite *Bancec* as support, but that decision is not determinative on the issue of timing. In *Bancec,* the Court did not specifically address the relevant time period and cautioned that its decision "announces no mechanical formula" for "determining the circumstances" for disregarding the normal separate juridical status of a government instrumentality. *Bancec,* 462 U.S. at 633.

Considering this Court's prior Order, any evidence outside of the time period identified by this

Court should be disregarded for purposes of any *alter ego* determination.

### III.  **Plaintiffs' latest allegations and documents are insufficient to show the existence of an *alter ego* relationship**

Plaintiffs allege that the issue of *alter ego* is dispositive as to whether this case goes forward. Response at 32. This Court's Order recognized that "Plaintiffs' theory for the Court's subject matter jurisdiction over the Republic and their theory for personal jurisdiction over ZMDC are both premised on the allegation that ZMDC is the Republic's *alter ego*." Court Order at 1. Plaintiffs must therefore show that ZMDC is the Republic's *alter ego* to avoid due process requirements of minimum contacts to establish personal jurisdiction over ZMDC. *See GSS Grp. Ltd v. Nat'l Port Auth.,* 680 F.3d 805, 815 (D.C. Cir. 2012). As for the Republic, the *alter ego* relationship is necessary to attribute ZMDC's agreement to arbitrate to the Republic.[1] Court Order at 35.

Instead of engaging with Defendants' criticisms of the evidence,[2] Plaintiffs add more exhibits that continue the theme of relying largely on opinion, speculation, and unsupported assumptions concerning the relationship between ZMDC and Zimbabwe. This latest round of documents falls short.

Among the new exhibits submitted, Plaintiffs continue to add additional news reports and articles filled with opinions, assumptions, and vague factual allegations concerning ZMDC's operations. *See* Exs. E, H, I, J, K, O, V, W, X, Y, Z, and NN. There are also several documents submitted that have no relevance to the *alter ego* discussion because they address in more general terms the mining industry

---

[1] This Court conclusively excluded the possibility of applying the arbitration exception under Section 1608(a)(6). *See* Court's Order at 30. ("In light of *Comimpex*, and without any countervailing authority to suggest that an action to enforce a foreign judgment falls within the text of § 1605(a)(6), the Court concludes that the arbitration exception does not apply in this case.

[2] Plaintiffs try to categorize Defendants' criticisms of the evidence as "only conclusory denials" (Response at 2) but Defendants pointed out, among other issues, the inconsistency in the evidence and the discrepancy between the allegations and the actual content of the evidence. ECF No. 43, Motion to Dismiss at 7-25. The failure to engage with Defendants' arguments leaves Defendants' points unscathed and persuasive.

in Zimbabwe or fail to even refer to ZMDC. *See, e.g.,* Ex. A, G, X, Y, and MM. Plaintiffs also revisit evidence concerning allegations raised in the underlying arbitration that focused on whether Amari obtained the MOUs through corruption, an issue that was addressed by the Tribunal in the Award. *See* Ex. P, Q, R, S and T. Further afield, Plaintiffs introduce evidence of court cases involving ZMDC's former CEO, Dominic Mubayiwa, which dealt with a labor dispute between him and ZMDC. Exs. M and N. Notably, Mr. Mubayiwa sued ZMDC, not Zimbabwe, for matters related to his employment agreement, and Mr. Mubayiwa based his claim on disagreements with the Board of Directors of ZMDC, not the Minister. Ex. M at 2-3. Mr. Mubayiwa certainly did not take the position that ZMDC operated without a board or was an *alter ego* of Zimbabwe. Exhibit N is an irrelevant court case, except for the fact that the court found that ZMDC is a "State-owned public company." Ex. N at 2. No one involved in the case treated ZMDC as an *alter ego* of Zimbabwe.

Plaintiffs also submit several documents related to U.S. sanctions against ZMDC and its entities, most of which repeat the same general statement that ZMDC operates without a board. *See* Exs. AA through MM. On this point, Plaintiffs' evidence is contradictory. *See, e.g.,* Exs. F,H, I , J, N, U (all of which refer to the existence of a Board for ZMDC). The last of the documentary evidence are two parliamentary reports focused on the diamond industry in Zimbabwe, one of which addresses issues outside of the relevant time period (Exs F. and U) and a purported memorandum indicating a cabinet decision to transfer ZMDC's shareholding in Kamativi Tin Mines and Todal (Pvt) Ltd to another state-owned entity in 2021. Ex. OO. As to this last exhibit, there is no indication that any transfer occurred or its value.

Lastly, the Plaintiffs submit the expert declaration of Zimbabwean lawyer Mr. Sternford Moyo. While declaring it an expert report, Mr. Moyo does not qualify his expertise. *See* ECF No. 45-1. He also does not disclose that he has had several litigations where he has represented interests against the

government and ZMDC, despite referring to a number of those cases in his declaration. *Id.* The declaration also is scant on legal support and citation, which Defendants address in more detail below.

### A. Plaintiffs have not sufficiently plead or provided factual evidence that supports a finding of an *alter ego* relationship between Zimbabwe and ZMDC under the "extensive control" prong

As the Supreme Court cautioned in *Rubin, Bancec* provides no "mechanical formula" for disregarding juridical separateness." *See Rubin v. Republic of Iran,* 138 S. Ct. 816, 822 (2018). The five factors that courts have coalesced around are meant to "aid" a "case-by-case" analysis for "identifying extensive control." *See Crystallex Int'l Corp. v. Bolivarian Rep. of Venezuela,* 932 F. 3d 126, 141 (3rd Cir. 2019). In cases where courts have applied these five *Bancec* factors, they look at all, not just one set of facts to make the determination. *See, e.g., Crystallex,* 932 F.3d at 173. Unfortunately, courts have provided little insight into the relative importance of these factors in the analysis. From the case law, the conclusion that can be drawn is that these factors are guideposts for courts carrying out a type of balancing test in light of the particular circumstances of a case.

Plaintiffs make an unnecessary fuss that Defendants failed to cite *Bancec,* especially since Plaintiffs failed to follow the *Bancec* factors in their Amended Complaint.[3] In any event, there is no doubt that Defendants addressed *Bancec's* test under which Plaintiffs seek to establish an *alter ego* relationship: (1) principal-agent relationship (or extensive control)[4] and (2) fraud and injustice. *See* Motion at 8-24. These same two theories were reflected in this Court's Order, which indicated that the

---

[3] The *Bancec* factors are meant to "aid case-by-case analysis rather than establish a "mechanical formula" for identifying *extensive control. See Crystallex Int'l Corp.,* 932 F.3d at 141 (citing to *Bancec,* 462 U.S. at 633) (emphasis added).

[4] Under the first prong, contrary to Plaintiffs' assertion, Defendants addressed both control or apparent authority. "*See* Motion at 7-24.; Response at 18; *see GSS Group Ltd. v. Republic of Liberia,* 31 F. Supp 3d 50, 62 (D.C.C. 2014) (interpreting *Transamerica Leasing* as establishing two grounds under the "agency exception," which the court identified as control or apparent authority.

"presumption can be overcome, however, where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created or where recognition of the instrumentality as an entity apart from the state would work fraud or injustice." Court Order at 9 (citing *Bancec*). The extensive control prong can be satisfied by either showing "complete domination" or the existence of a "apparent authority," which requires plaintiffs to show reliance. *See Transamerica Leasing v. La Republica de Venezuela,* 200 F.3d 843, 848 (D.C. Cir. 2000). In their Response, Plaintiffs focus the inquiry on the "complete domination" approach, so Defendants limit their Reply accordingly. Response at 18-19. Plaintiffs would certainly fail to show "apparent authority" since they never thought that ZMDC could be an *alter ego* until after the MOUs.

It was not until their Response that Plaintiffs arranged their allegations/evidence around the five *Bancec* factors. Response at 20-28. For the ease of the Court's review, Defendants will address the evidence and allegations under each *Bancec* factor below.

### 1.  Plaintiffs have not shown that Zimbabwe exerts total economic control over ZMDC

*Bancec* clearly set out that ownership of a state-owned entity by a sovereign is not determinative. *Bancec,* 463 U.S. at 624. Even if the government provides capital or covers losses of that entity. *Id.* at 624 (recognizing that government "appropriations to provide capital or to cover losses" do not prevent a typical government instrumentality from being considered a separate juridical entity). The Court in *Bancec* also identified certain key features of an instrumentality, including that it is (1) created by an enabling statute that prescribes it powers and duties; (2) its board of directors is selected by a foreign state; (3) it has the power to hold and sell property ;(4) it has primary responsibility over its finances; and (5) it is run as a distinct economic enterprise. *See also DRC, Inc. v. Republic of Honduras,* 71 F. Supp 3d 201, 216-17 (D.C.C. 2014) (citing *Bancec*).

As a result, to establish this factor, economic control must be plenary or significant beyond that

normally existing between a State and a state-owned entity. *OI Eur. Grp. B.V.,* 73 F.4th at 172. This Court has found that a State may exercise some degree of financial oversight and allocate economic resources to a state-owned entity without undermining the presumption of separability. *See, e.g., DRC, Inc.,* 71 F Supp.3d at 211 (finding that ultimate supervisory economic control over an entity by an appointee of the President without day-to-day involvement was insufficient to show the entity as a state organ).

Plaintiffs rely on drawing comparisons between ZMDC and PDVSA in the *OI Eur. Grp. B.V.* and the State Property Fund of Ukraine ("SPF") in *TMR Energy*. The attempt is unavailing. There are several important distinctions that Plaintiffs overlook.

In *OI Eurp Grp.,* there were far more facts regarding Venezuela's economic control over PDVSA that are not present or alleged here.[5] Contrary to Plaintiffs' assertion (Response at 20), the ZMDC Act expressly provides that ZMDC can sell shares to persons other than the State, as long as the State retains a 51% share. *See* ECF No. 45-4, ZMDC Act, § 27 (2) and (5). PDVSA on the contrary had to remain fully owned by Venezuela. *OI Eurp. Grp.,* 73 F.4th at 172. Unlike ZMDC, PDVSA was also found to have no autonomy over its sales or prices and expressly announced in public documents that it was subject to government directives. Evidence in that case also showed that the government maintained direct access to PDVSA's bank accounts, paid its legal bills, and declared PDVSA's property "Venezuelan property." *Id.* On the contrary, ZMDC maintains its own bank accounts, negotiates the

---

[5] Plaintiffs overstate the impact of numerous, anodyne facts that contribute little, if anything, to the analysis. For example, Plaintiffs point to State ownership of minerals in Zimbabwe as evidence of State control sufficient to create an *alter ego* relationship. This is a red herring. State control of mineral assets is common throughout the world. *See, e.g.,* Chile https://www.trade.gov/country-commercial-guides/chile-mining (showing that all minerals vest with State); South Africa, Mineral and Petroleum Resources Development Act, 28 0f 2002 (vesting the State as the custodian of all mineral and petroleum resources). *See also,* Smith Decl., **Ex. P.**

terms of the joint venture agreements and its financials are supervised and approved by the Board of Directors and subject to annual external audits. ECF No. 29-1, ¶¶ 12; 16. Smith Decl., **Ex. H** at 18-20, 56. Unlike PDVSA, there is no admission by ZMDC that it is part of the Zimbabwean government or that its assets belong to the State. Smith Decl., **Ex. I**.

Plaintiffs allege in a conclusory fashion that the statutory provisions of the ZMDC Act are "strikingly similar" to those in *TMR Energy.* Response at 21. This is yet another overstatement. In *TMR Energy,* while the Court cited *Bancec* generally, it provided only a single-paragraph analysis without resorting to the *Bancec* factors. 411 F. 3d at 302. In that paragraph, the Court cited certain statutory provisions, but those provisions differ from the law governing ZMDC in many ways. First, the Court cited regulations that expressly admit that STF is a "body of the State." *Id.* Second, SPF is funded directly from the budget of the State of Ukraine. *Id.* Lastly, the nature of SPF activities, unlike ZMDC, were activities that necessarily required strict government control as they involved the "privatization" of state-owned property. Smith Decl., **Ex. J**. (referring to itself as a "central bod[y] of executive power with special status)." ZMDC has none of those features. ZMDC was set up as a corporation, legally distinct and capable of suing and being sued. ZMDC Act § 3. ZMDC's day-to-day activities by statute are overseen by a Board of Directors, not the executive branch. ZMDC Act § 4. Although ZMDC was created, among other purposes, to implement a "government mining development policy," its right over the minerals (state assets) is no different than private enterprise—it applies as a joint-venture partner alongside private business for mining licenses. *See, e.g.,* Ex 45-1 at 11; *see also, id.* at Ex. C. at 63 (showing the ZMDC had to apply for an exemption since it had yet to "raise the required fees," which the government was free to deny or grant and, in that case, denied); *see also,* Muzawazi Decl. at ¶ 8 (noting that private mining investors can also apply). ZMDC is also funded through its operations, rather than from the State's budget. *Id.;* Smith Decl. **Ex. H** at 46 (item 19); **Ex. R** at 48 (item 17); **Ex. S** at 50

(item 17).

In any event, *TMR Energy* is of little import here because in that case there was evidence in the record that SPF had conceded that it was "part" of the government, that the government approved and funded its expenses, including litigation expenses, and had previously described itself as a "governmental organ" and a "state body" in the underlying arbitration proceedings. *See* Smith Decl., **Ex. K**. at 16-17, **Ex. L.** at 4 ¶ 18 and 94 *et seq.* (Ex. N). This is nothing like ZMDC.

Plaintiffs continue to insist that ZMDC operates "much more like an executive department of the government" because it is mandated to conform to "government economic policy," the "national interest" and "Government mining development policy." Response at 20. But these are key attributes of state-owned entities. In the United States, federal entities are created "to help address a broad range of public policy goals." Smith Decl., **Ex. M** at 4. On this point, Plaintiffs' reliance on *TMR Energy* is misleading. The D.C. Circuit did not find that "implement[ing]" national policies gave "plenary control" to the Government, rather it considered this along with a showing of express executive and legislative control to make its determination. 411 F. 3d at 302.

Beyond that, Plaintiffs complain, at length, about the role of the Minister of Mines in its capacity to ensure compliance with government policy. There is nothing to this argument. The Minister has no day-to-day control over ZMDC or its employees. *See* Muzawazi Decl. at ¶¶ 7, 11. Instead, the Minister must consult with the Board of Directors and has far less power than the President of the United States would have over government-owned entities. For example, the President of the United States can change the budget of a government-owned corporation. 31 U.S.C. § 9103(c). And there are other measures to limit the autonomy of government-owned corporations, far beyond any restrictions on ZMDC. Under U.S. law, appropriations are limited by Congress. 31 U.S.C § 9104(a). And audits are not necessarily external, such as the one that ZMDC must conduct. § 31 U.S.C 9105(a).

Indeed, Plaintiffs' arguments are so overreaching that they would effectively collapse the hundreds of agencies and instrumentalities owned by the United States government into a series of *alter egos*. Plaintiffs complain, wrongly, about the oversight provided by the ZMDC Board of Directors. This pales in comparison to the U.S. government's control over its corporations. For example, Fannie Mae has operated since 2008 under the direct control of the Department of Treasury. Smith Decl., **Ex. Q** at 3 (Part I); **Ex. M** at 18. The Board of Directors has no fiduciary duty to the shareholders, just to the U.S. government. *Id.*

As to the Minister's exercise of power in practice, the evidence is insufficient to overcome the presumption of separateness. Plaintiffs rely on their expert and two parliamentary reports (Exs. F and U) to claim that there is direct government involvement in operational issues because the Minister supposedly appointed the board of some of ZMDC's subsidiaries in violation of the ZMDC Act, directly diverted revenues from these entities, and gave specific directions to ZMDC as to whom to award diamond concessions. Response at 22.

In any event, the Parliamentary Reports are insufficient evidence. The Parliamentary Committee Report (2017) ("2017 Report") not only appears to address facts outside of the relevant time but also provides no factual basis for the findings Plaintiffs cite. The Committee reports that it was "clear" that the "Board of ZMDC has no control over the company" because of ZMDC's absence during the Committee's visit to Chiadzwa. ECF 45-7 at 16. The absence of ZMDC on a site visit does not in and of itself show "clear" evidence of no control. In conclusory form only, the Committee states that "the ZMDC board is answerable to the Permanent Secretary of Mines and Mining Development" and that "Secretary of Mines is directly involved in operational issues at . . . ZMDC." *Id.* at 16, 19. There is no factual basis provided for these conclusions.

The 2013 Parliamentary Committee Report ("2013 Report") fares no better, and on many points

reinforces the separateness between ZMDC and Zimbabwe. For example, as to the selection of joint venture partners, the Committee found that they were misled into believing that the choice of the two investors was made through a Cabinet decision because the Cabinet minutes only showed that they "simply encouraged ZMDC to enter into joint venture partnerships and *did not specifically state that ZMDC should enter into* joint ventures with Reclaim and Core Mining. 45-22 at 15 (emphasis added). The Committee also noted that a due diligence report had been prepared by ZMDC even though it noted that it was not clear who selected the two investors. *Id.* at 15-16. Plaintiffs focus on the Committee's statements regarding the manner of appointment of ZMDC's subsidiaries, but the report shows that ZMDC was working to manage a rush of activity in Zimbabwe's diamond fields. ZMDC conducted its own due diligence report (*id*. at 15-16), actively managed the entity it wholly owned (*id*. at 18-19) while deferring to its private industry partners to manage other subsidiaries (*ibid*.), and worked to assert its authority (*id*. at 17). In any event, precedent on the issue has established that appointments of individuals to a Board of Directors is insufficient. *See, e.g., Foremost-McKesson,* 905 F.3d at 440.

Plaintiffs' expert continues the theme of overstatement. Plaintiffs' expert relies on the 2013 Report to claim that it is a "notorious fact" that the ZMDC Chairman confirmed that the ZMDC "had no control over ZMDC's subsidiaries." 45-1 at ¶ 6. There is no such statement contained in the 2013 Report or the 2017 Report. And no such statement could ever arise. Neither the 2013 Report nor the 2017 Report considers all of ZMDC's subsidiaries—only issues related to diamond mining. The only statement from a ZMDC Chairman is contained in the 2013 Report and simply reports that ZMDC was not "involved" in the "day-to-day" operations of its subsidiaries. Ex. 45-22 at 18. There is nothing remarkable about this statement, as it is common for parent companies not to be involved in the day-to-day operations of their subsidiaries. Otherwise, all subsidiaries would be at risk of being considered an *alter-ego* of their parent company.

Finally, Plaintiffs allege that there is "pervasive" evidence of ZMDC's assets being diverted for "policy purposes." Response at 23. For this allegation, Plaintiffs rely on a number of news articles that purport to claim that mineral rights are being granted in exchange for arms from Russia and China or to "compensate" government officials (Exs. X, Y, and Z). Putting aside the credibility of these news sources, the articles discussing Russia's involvement in a platinum joint venture do not even mention any rights or assets belonging to ZMDC or any deal in exchange for arms (Ex. X and Y). No content in these articles suggests that ZMDC's assets are being diverted for the government's own benefit. *Id.* The other article is from 2020 and claims that a police and secret service agency ("CIO") "covertly" owns a stake in Kusena Diamonds, which the article claims to be owned by ZMDC. Ex. Z at 2. ZMDC Annual Reports failed to mention Kusena Diamonds as a subsidiary at that time. Smith Decl., **Ex. R** at 13, **Ex. S** at 13 (identifying only Jena Mine and Sabi Mine as subsidiaries). To that end, Plaintiffs suggest that ZMDC has "awarded highly valuable concessions" to the "armed forces" (Response at 10), but ZMDC does not grant concessions; it can only apply for them just like any other company. *See, e.g.,* ECF 45-1 Ex. C to Moyo Decl.; ECF No. 29-1 ¶ 21; Response at 20.

### 2. Plaintiffs have not shown that Zimbabwe receives anything other than dividends as a shareholder

In reviewing whether this factor is satisfied, courts have looked at payments beyond dividends. *See OI Eur. Grp.* 73 F.4th at 173 (relying on the fact that profits, accompanied by taxes and royalties are paid sometimes at an "artificially high rate" and that the government retained direct access to PDVSA's bank accounts which were characterized as Venezuelan assets). It thus has to be more than entitlement to profits as a shareholder. Otherwise, it would make every state-owned entity susceptible to being an *alter ego*.

Plaintiffs allege that "revenues are taken directly from subsidiaries rather than going to ZMDC first" and that "Zimbabwe takes money from ZMDC without verifying it has any profits to distribute."

Response at 23-24. To support these allegations, Plaintiffs rely on supposed expert testimony and allegations presented before a Zimbabwean court. *See* Response at 24. As to the first issue, there is no evidence other than conclusory statements that Zimbabwe is taking revenue directly from the subsidiaries. Mr. Moyo claims that this is a "notorious fact" that "any tribunal in Zimbabwe would take judicial notice." 45-1 at ¶ 10. There is no basis for his opinion that it is a notorious fact in Zimbabwe. Muzawazi Decl. ¶ 10; Smith Decl., **Ex. U**. There is also evidence to the contrary. Annual Reports issued by ZMDC show that independent auditors found that revenues from the subsidiaries were accounted for under ZMDC's consolidated statement.[6] *See* Smith Decl., **Ex. H** at 20-21. There is no indication that the revenues bypassed ZMDC, something a highly regarded firm such as BDO would have surely flagged. This is also belied by the Belgium court's 2014 finding that the subsidiaries were not *alter egos* of either ZMDC or Zimbabwe. *See, e.g.,* Smith Decl. **Ex. G.** As to the second allegation, Plaintiffs rely solely on allegations made in a labor dispute between ZMDC and its former CEO. Plaintiffs' allegation is not supported by any factual finding of the Court in that case. ECF No. 45-14, Ex. M at 2-3 (referring to the former CEO's allegations against the new Chairperson). The court decided no issues concerning acts by the Minister or Zimbabwe in that case, let alone find that Zimbabwe was taking profits without an audit. *Id.* In light of this, it is difficult to accept Mr. Moyo's conclusory statement that the Minister exercises day-to-day control over ZMDC's board. Muzawazi Decl. at ¶ 11. Without persuasive evidence to support that Zimbabwe has received anything but dividends as a shareholder, this Court should find that this factor weighs in favor of Defendants.

---

[6] The auditors provided a "qualified opinion" concerning the consolidated financial statements which they claim provided a "true and fair view of the position of" ZMDC and its subsidiaries "as of 31 December 2012." *See* Smith Decl., **Ex. H** at 19.

### 3.   Plaintiffs have not shown that Zimbabwe "manages" or exerts day-to-day control over ZMDC's operations

"Mere involvement by the state in the affairs of an agency or instrumentality does not answer the question of whether the agency or instrumentality is controlled by the state for purposes of FSIA. *Foremost-McKesson, Inc. v. Islamic Republic of Ira,* 905 F. 2d 438 (D.C. Cir. 1990). This means that it is "not enough to show that various government entities or officials represent a majority of the shareholders or constitute a majority of the board of directors of the applicable agency or instrumentality." *Id.* Government involvement must rise to a higher level. *McKesson Corp. v. Islamic Republic of Iran,* 52 F.3d 346, 351–52 (D.C.Cir.1995) (concluding that the separate juridical entity presumption was overcome where Iran controlled routine business decisions, such as declaring and paying dividends and honoring contracts). *See also, Transamerica Leasing,* 200 F.3d at 849 (finding that a sovereign does not create an agency relationship by appointing a corporation's Board of Directors)*.* In light of precedent on the issue, this Court agreed. *See* Court Order at 11-12.

Moreover, where the daily affairs of a corporation are overseen by the Board of Directors, control over the entity by the government has been considered quite limited. *See Flatow v. Republic of Iran,* 308 F.3d 1065, 1074 (9th Cir 2002). Even if the Board is deemed to be composed of government officials or "political" appointments, that is not enough to show the requisite control over the entity. *See Gen. Star Nat'l Insu. Co. v Asigurarilor de Stat, Carom, S.A., 713 F. Supp. 2d 267 (S.D.N.Y. 2010); BCI Aircraft Leasing, Inc. v Republic of Ghana,* 2006 WL 2989291 *(N.D. Ill. 2006); (First Inv. Corp. v Fujian Mawei Shipbuilding, Ltd.,* 858 F. Supp. 2d 658 (E.D. La. 2012)). It also stands that a foreign state can inject capital into an entity, cover its debts, and engage in a financial rescue without being viewing the entity as an alter ego. *See Transamerica Leasing,* 200 F.3d at 851 (finding that a sole shareholder exercising its influence, through the Board of Directors, where the subsidiary is troubled is insufficient to overcome the presumption).

17

Yet, Plaintiffs claim that this Court "could deem this factor satisfied by the fact that the Minister appoints the Chairman…and the rest of the Board." Response at 24. This baseless assertion contradicts the case law discussed above. Plaintiffs then proceed to reiterate many of the same arguments addressed under the first factor,[7] including the Minister's powers enumerated under the ZMDC Act and allegations concerning the Minister's exercise of those powers. *Id.*

As far as the enumerated powers of the Minister, these are the types of limited supervisory powers that are common in state entities. *See, e.g.,* 31 U.S.C. §§ 9103-9108 (referring to powers of the President as to U.S. government corporations); *see also,* Smith Decl., **Ex. M** at 13-15 (describing a more significant oversight role by the U.S. government of government corporations). As to the remaining evidence cited, Defendants have already addressed much of it (Expert Report, Exs. F and U) above in section (a), so the focus will be on addressing the additional cited evidence (Exs. L, FF-LL). *See* Response at 25-26.

The additional evidence can be divided into two types. One is a journal article from a South African professor reviewing new legislative initiatives passed by Zimbabwe to increase good governance and accountability in mining. Ex. L. The other evidence is a string of reports and statements from the U.S. government concerning sanctions against Zimbabwe and certain entities.

As to the journal article, this Court should find it is of little weight as the text referenced by Plaintiffs is based on the title of a news article cited in the footnote of the journal. ECF No. 45-13 at 240, fn, 47. That article appears to not be available as Plaintiffs failed to include it. The remaining evidence (Exs. FF-LL) refers to reports on the Investment Climate in Zimbabwe issued by the U.S. State Department between 2017 and 2023, which all contain the same text that asserts that ZMDC was

---

[7] Plaintiffs concede that the evidence and allegations for the first and third factor overlap. ¶Response at 24.

allowed to "function" without a board. *See* Ex. FF-LL. Besides being outside of the relevant time frame, the finding of the U.S. government concerning a lack of a board is directly contradicted by other evidence Plaintiffs rely on that shows the existence of a ZMDC board. *See, e.g.,* Exs. F, H, I, J, N, and U. In any event, annual reports for ZMDC show the existence of a board. *See* Smith Decl., **Exs. R and S** at 6-8 (identifying board members in 2019 and 2020)

To the extent that Plaintiffs are relying on Exs. AA-EE, which they do not cite under this section, the existence of sanctions against ZMDC is not itself sufficient to establish an *alter ego*. Response at 27. Moreover, the continuation of sanctions by the United States against ZMDC is contradicted by the findings of the EU which lifted sanctions in 2013. Smith Decl., **Ex T**. As far as the congressional testimony cited, it fails to provide any specific allegations concerning ZMDC itself. *See, e.g.,* Ex. MM at 3 (which refers generally to reports concerning "diamond mining entities" without specific reference to state-owned entities or ZMDC and is focused on concerns involving corruption because Zimbabwe is *not* benefiting from mining revenues).

### 4. Plaintiffs have not shown that Zimbabwe is the real beneficiary of ZMDC's conduct

Similar to the profits prong, courts reviewing this factor look for benefits that go beyond those of a shareholder. This factor is satisfied when finding that the sovereign used the assets of the state-owned entity without compensation or consent to further policy goals, pay a debt, or enrich itself. *See, e.g., Crystallex,* 932 F.3d at 148; *OI Eur.Grp.* 73 F.4th at 173.

None of the evidence is sufficient to satisfy this factor. Plaintiffs' supposed expert claims in a conclusory fashion that "the beneficiary of all the operations and activities of the corporation is the Government of Zimbabwe which is its sole shareholder." 45-1 at ¶ 4.21. But the benefits of a shareholder alone are not sufficient to satisfy this factor, otherwise, this would make every state entity an *alter ego* of the government. To the extent that Plaintiffs claim that the Treasury extracts the

dividends directly from ZMDC subsidiaries (Response at 27), this is belied by evidence to the contrary. Smith Decl., **Ex H** at 20-21, ECF No. 45-40, Ex. MM at 3 (referring to reports that mining revenues are not going to Zimbabwe's treasury)

Plaintiffs then turn to comparing what a "normal" company would do with ZMDC, relying primarily on Exs. X, Y, and Z, which Defendants have already addressed above as irrelevant because ZMDC cannot assign mining rights, while there is no evidence that ZMDC's assets were involved in the Russian transaction. *See* Exs. X and Y. Moreover, a state-owned entity cannot be compared to a "normal company" because by its nature state-owned entities are set up to pursue policy goals and have other unique attributes as identified by the Supreme Court which in and of themselves do not make them part of the State. *Bancec,* 463 U.S. at 624.

As to the U.S. government's sanctions on ZMDC, for the same reasons as set out above, these are not dispositive on the issue. Response at 27. In any event, Plaintiffs' reliance on subsequent U.S. reports is contradicted by other countries' findings, which are also reviewed annually, that removed the sanctions in 2013. Smith Decl., **Ex. T**.

Lastly, Plaintiffs vaguely claim that Zimbabwe is using ZMDC's assets for its own benefit. But the only evidence, aside from poorly sourced and exaggerated news articles, is a cabinet approval to transfer interest in two of ZMDC's companies to another state-owned entity. There is no evidence that this transaction is not for value or that the transfer is being done to benefit Zimbabwe directly. It is common for companies to restructure, especially in times of financial distress. *See, e.g., See Transamerica Leasing,* 200 F.3d at 851.

### 5.   Plaintiffs have not shown that equities weigh in their favor

Courts have focused on whether the corporate form has been abused, whether the sovereign has used the separate status of the entities for their own benefit (*Doe v. Holy See,* 557 F.3d at 1078-80 (9th

Cir. 2009), or whether the agency or instrumentality was formed or liquidated to evade liability of the sovereign. *See, e.g., Bancec,* 462 U.S. at 633 (finding that since Bancec was dissolved before Citibank asserted its setoff, any benefit from disallowance of the setoff would accrue solely to Cuba); *Bridas S.A.P.I.C. v. Gov't of Turkmenistan,* 447 F.3d 411 (5th Cir. 2006) (finding that foreign state was "intentionally bleeding" the instrumentality to avoid recovery).

Unlike the cases Plaintiffs cite involving Venezuela, the judgment here is not against the sovereign State. The judgment is against ZMDC, a separate instrumentality. Zimbabwe has not been involved in the underlying dispute until now. Moreover, there is no indication that ZMDC or Zimbabwe derive significant benefits from the U.S. judicial system, as was the case with *Bancec* seeking relief before U.S. courts. To the extent that Plaintiffs rely on allegations that Zimbabwe is transferring assets to shield ZMDC from creditors, the only evidence they have presented does not show that an actual transfer has taken place, that the transfer was for no value or nefarious reasons. *See* Exs. OO and NN. This is a far cry from an *alter ego*.

**B.  Plaintiffs have not shown that adherence to separate identities would permit fraud or injustice**

In applying the second theory for disregarding juridical separateness, which the Supreme Court applied in *Bancec,* this Court has identified certain nonexclusive grounds that might apply. These include where a foreign sovereign (1) "intentionally seeks to gain a benefit while using the legally separate status of its instrumentality as a shield, (2) "unjustly enriches itself through the instrumentality; and (3) "uses instrumentality to defeat a statutory policy." *DRC, Inc. v. Republic of Honduras,* 71 F.Supp.3d 201, 218 (D.C.C. 2014). This Court also found that this exception may also apply where the "complaining party reasonably relies upon that manifestation of authority." *Id.*

In their Response, Plaintiffs do not focus their arguments and evidence expressly on the fraud and injustice approach. Response at 20-29 (focused on *Bancec* factors for establishing control). But in

their Amended Complaint they allege that treating Zimbabwe and ZMDC would result in fraud and injustice, mainly because they claim that the Republic is unjustly enriching itself through ZMDC. *See* Am. Compl. at 9. To the extent that this Court will analyze the existence of an *alter ego* relationship through the lens of "fraud or injustice," Plaintiffs have not satisfied this prong for reasons already stated. Motion at 17-24. Plaintiffs' additional, related evidence continues to be insufficient. For the same reasons, this Court dismissed previous evidence on the issue, it should find that Plaintiffs additional evidence continues to fall short. Opinion at 13, n. 4.

For the same reasons expressed previously, this Court should give little weight to inadmissible hearsay in news articles (Exs. NN, X, Y and Z). To the extent this Court considers the Cabinet's authorization of a transfer of ZMDC's assets, there is nothing from that document that suggests that a transfer occurred, that it was for no value, or that it was done for purposes of evading creditors. As far as congressional testimony Plaintiffs cite, as mentioned before, this does not address specific issues with state-owned entities or ZMDC itself, as the comment Plaintiffs cite refers to mining entities in general. *See* Ex. MM. There is simply no evidence presented that shows that Zimbabwe had moved assets from ZMDC to thwart creditors.

## IV.   Even if an alter ego relationship exists, Zimbabwe has not impliedly waived immunity under 1605(a)(1)

The existence of an *alter ego*, standing alone, does not answer the question of whether ZMDC and Zimbabwe have impliedly waived immunity.[8] While this Court found implied waiver applicable to

---

[8] Plaintiffs claim that it was unclear in Defendants' motion to dismiss whether Defendants were "merely explaining why the alter ego analysis is dispositive or are making an argument to stand on its own." It is the latter. The alter ego argument does not in and of itself resolve the implied waiver issue. Defendants continue to maintain that the implied waiver is inapplicable regardless of an alter ego finding.

the Commissioner because Zimbabwe is a signatory to the New York Convention (ECF No. 38 at 36), that does not necessarily apply to ZMDC and Zimbabwe.

As this Court noted in its Opinion, the application of the implied waiver exception must be done with "due caution." Order at 34. Caution is warranted here. The New York Convention addresses arbitration awards, and if there is a waiver, it must come from the existence of the arbitration and later award. Zimbabwe never agreed to arbitrate, a fact uncontested by Plaintiffs, and where ZMDC's implied waiver is connected to Zimbabwe through an *alter ego* argument, the absence of Zimbabwe's consent to arbitration undermines both parties' implied waiver.

There are additional problems with applying the New York Convention. As Defendants have previously pointed out, unlike in this case, the underlying awards in *Seetransport* and *Comimpex,* were subject to New York Convention scrutiny because the award debtors were able to litigate the enforceability of the award. *See, e.g.,* ECF No. 29 at 18-19. Here, none of the Defendants were allowed to defend against the award enforcement in Zambia because Zimbabwe was not a party to those proceedings and ZMDC was not properly served as explained in Defendants' prior pleadings. *See* ECF No. 29 at 20; ECF No. 29-2. It cannot stand to reason that Zimbabwe impliedly consented to the enforcement of an award, let alone a subsequent judgment, that was not afforded any scrutiny under the New York Convention.

## V.    Plaintiffs have not properly served ZMDC with either the Complaint or Amended Complaint

Although this issue was previously briefed, the Court did not determine whether ZMDC had been properly served in its Opinion of March 5, 2023. The issue remains open and ZMDC continues to rely on its prior arguments, including those submitted in response to the Original Complaint. *See* ECF Nos. 30 at 7-8 and ECF No.34 at 8-11.

In a contradictory fashion, Plaintiffs allege that since ZMDC is an agency or instrumentality,

substantial compliance plus actual notice suffices, and that ZMDC was served through a special arrangement contained in the MOUs in compliance with section 1608(a)(1). None of their arguments withstand scrutiny.

First, Plaintiffs cannot rely on contradictory arguments to establish jurisdiction. To establish jurisdiction over ZMDC, Plaintiffs have admittedly relied solely on allegations that ZMDC is the Republic's *alter ego*, *i.e.*, that it is the foreign state. *See Transaereo, Inc. v. La Fuerza Area Boliviana*, 30 F.3d 148, 151 (1994) (which held in part that for the purpose of determining the proper method of service under the FSIA, an entity that is an "integral part of a foreign state's political structure" is to be treated as the foreign state itself"). Yet, to claim that they have properly served ZMDC they are invoking the standard applied to foreign instrumentalities and agencies to claim that substantial, rather than strict compliance applies. *See* ECF No. 45 at 35.

Even if this Court were to accept that substantial compliance is applicable, Plaintiffs have made no attempt to substantially comply with the service provisions of 1608. *See Harris Corp. v. Nat'l Iranian Radio,* 691 F.2d 1344, 1353, n. 16 (11th Cir. 1982)*;* (finding that for actual notice to compensate the failure to strictly follow section 1608(b), actual notice must be accompanied by substantial compliance with the FSIA requirements); *see also, Freedom Watch, Inc. v. Organization of the Petroleum Exporting Countries,* 766 F.3d 74, 81 (D.C. Cir. 2014)(finding that substantial compliance with federal rules on service required for the court to consider actual notice).

First, there is no special arrangement in place because the MOUs were terminated in January 2011. *See* ECF No. 40-1 at ¶¶ 182, 227. The Tribunal accepted Plaintiffs' arguments that the MOUs were wrongfully terminated and made a factual finding that the MOUs came "to an end" when Plaintiffs initiated the Arbitration. ECF 40-1 at ¶ 182. In any event, the MOUs do not provide a special arrangement here because Plaintiffs are not seeking relief under the MOUs, rather they are seeking to

enforce a Zambian High Court Judgment before this Court. *See* ECF No. 40; *see also* reasons outlined in ECF No. 34 at 9-10.

Without a special arrangement in place, plaintiffs must serve ZMDC pursuant to section 1608(b)(3). *See* 28 U.S.C. § 1608(b). According to section 1608(b)(3)(B), a plaintiff can serve an agency "by any form *of mail* requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency…to be served." 28 U.S.C. § 1608 (b)(3)(B) (emphasis added).

In their affidavit of service filed on August 18, 2022, Plaintiffs indicate that they effected service by "personally hand delivering" the Summons and Complaint on "Theresa Kanengoni" who allegedly "was a secretary" of ZMDC. ECF No. 24 at ¶¶ 2-4 (emphasis added). This method of service does not comply with 28 U.S.C. § 1608(b)(3)(B) or any of the provisions under section 1608(b). *See Daly v. Casto LLanes*, 30 F. Supp. 2d at 416 (S.D.N.Y 1998) (holding that service through personal delivery is incompatible with 28 U.S.C. § 1608(b)(3)). Accordingly, this Court lacks personal jurisdiction over ZMDC.[9]

## CONCLUSION

For the foregoing reasons, Zimbabwe and ZMDC request that the Court grant the Motion to Dismiss and grant any additional relief the Court considers just and proper.

Respectfully submitted,


/s/ Quinn Smith
GST LLP
Quinn Smith
DCD Bar No. FL0027

---

[9] Since Plaintiffs fail to defend the sufficiency of the factual allegations contained in the Amended Complaint in light of Defendants' criticisms, no further response from Defendants is required. Defendants refer the Court to those arguments outlined in their Motion to Dismiss. ECF No. 42 at 31-32.

quinn.smith@gstllp.com
Katherine Sanoja
DC Bar No. 1019983
katherine.sanoja@gstllp.com
1111 Brickell Avenue, Ste 2715
Tel. (305) 856-7723

**CERTIFICATE OF SERVICE**

I hereby certify that on September 5, 2023, I electronically filed this document with the Clerk of the Court of the U.S. District Court of the District of Columbia by using the CM/ECF system, which will automatically generate and serve notices of this filing to all counsel off record. I further certify that I am unaware of any parties who will not receive such notice.

By: /s/ Quinn Smith
Quinn Smith