**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AMAPLAT MAURITIUS LTD.** *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 22-cv-58 (CRC) |
| **ZIMBABWE MINING DEVELOPMENT CORPORATION**, *et al.*, | |
| Defendants. | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Mining companies Amaplat Mauritius Ltd. and Amari Nickel Holdings Zimbabwe Ltd. ("Plaintiffs") filed suit under the D.C. Uniform Foreign-Country Money Judgments Recognition Act. The suit seeks recognition of a foreign court judgment enforcing an arbitral award against the Republic of Zimbabwe, the Chief Commissioner of the Zimbabwean Ministry of Mines, and the Zimbabwe Mining Development Corporation ("ZMDC"). The Court has already ruled on one round of motions to dismiss. Teed up now are the Republic and ZMDC's ("Defendants") motion to dismiss the amended complaint for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim. All three grounds for dismissal turn on whether the Republic and ZMDC can be considered alter egos under the Foreign Sovereign Immunities Act ("FSIA"). Finding that Plaintiffs have established an alter-ego relationship between the Republic and ZMDC, the Court denies the motion to dismiss.

## I.    **Background**

The Court's previous opinion detailed the facts and procedural history of this case so the Court will pick up the thread where that opinion left off. See Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp., 663 F. Supp. 3d 11, 16–18 (D.D.C. 2023). After the Court

dismissed the original complaint without prejudice, Plaintiffs filed an amended complaint and included new allegations detailing the Republic and ZMDC's purported alter-ego relationship. Am. Compl. ¶¶ 41–80.  In turn, the Defendants moved to dismiss the amended complaint, contending that the Court lacks both subject matter and personal jurisdiction over them and that the complaint fails to state a claim.  Plaintiffs also filed a conditional cross-motion for jurisdictional discovery, requesting an opportunity to explore the Republic and ZMDC's relationship should the Court find Plaintiffs' alter-ego allegations inadequate.  Both motions are fully briefed.

## II.   Legal Standards

On a motion to dismiss for lack of subject matter jurisdiction or lack of personal jurisdiction, "[t]he plaintiff bears the burden of establishing, by a preponderance of the evidence, that the court has jurisdiction."  Cause of Action Inst. v. Internal Revenue Serv., 390 F. Supp. 3d 84, 91 (D.D.C. 2019) (quoting Whiteru v. Wash. Metro. Area Transit Auth., 258 F. Supp. 3d 175, 182 (D.D.C. 2017)).  Because this suit involves claims against a foreign nation, the FSIA provides the framework for determining subject matter jurisdiction.  Creighton Ltd. v. Gov't of State of Qatar, 181 F.3d 118, 121 (D.C. Cir. 1999).  Under the FSIA, a federal district court has original jurisdiction over a civil suit against a foreign state only if the foreign state is not entitled to immunity under the statute.  28 U.S.C. § 1330(a).  "[T]he FSIA begins with a presumption of immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an exception applies."  Bell Helicopter Textron, Inc. v. Islamic Republic of Iran, 734 F.3d 1175, 1183 (D.C. Cir. 2013).  Once the plaintiff has made that threshold showing, however, "the sovereign bears the ultimate burden of persuasion to show that the exception does not apply."  Id.; accord Phoenix Consulting Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000)

("'In accordance with the restrictive view of sovereign immunity reflected in the FSIA,' the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." (quoting <u>Transamerican S.S. Corp. v. Somali Democratic Republic</u>, 767 F.2d 998, 1002 (D.C. Cir. 1985))).

If, on the one hand, "the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." <u>Phoenix Consulting</u>, 216 F.3d at 40.  On the other hand, if the motion to dismiss presents "a dispute over the factual basis of the court's subject matter jurisdiction under the FSIA" by contesting a jurisdictional fact or raising a "mixed question of law and fact," such as whether the "person alleged to have harmed [the] plaintiff was [an] agent of [the] sovereign," then "the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged" but instead "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." <u>Id.</u> (citing <u>Foremost-McKesson, Inc. v. Islamic Republic of Iran</u>, 905 F.2d 438, 448–49 (D.C. Cir. 1990)).

Defendants also move to dismiss under Rule 12(b)(6) for failure to state a claim.  In reviewing a Rule 12(b)(6) motion, the Court must "accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor." <u>Banneker Ventures, LLC v. Graham</u>, 798 F.3d 1119, 1129 (D.C. Cir. 2015). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," however, nor does the Court "assume the truth of legal conclusions." <u>Id.</u> (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)).  Accordingly, "[t]o survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Iqbal, 556 U.S. at 678).[1]

## III. Analysis

Defendants' twin jurisdictional arguments—that the Court lacks subject matter and personal jurisdiction over them—overlap and both hinge on whether ZMDC is the Republic's alter ego. The two involve other considerations as well, but the Court will begin by conducting its alter-ego analysis in the context of the Republic's claim that the Court lacks subject matter jurisdiction over it.

### A. Subject Matter Jurisdiction

Unless one of the FSIA's exceptions to sovereign immunity applies, the FSIA bars suit against foreign sovereigns. Plaintiffs rely on two such exceptions: § 1605(a)(1)'s waiver exception and § 1605(a)(6)'s arbitration exception. The Court has already rejected the application of the arbitration exception in this case, leaving just the waiver exception at issue. See Amaplat, 663 F. Supp. 3d at 31–33. Section 1605(a)(1) divests a sovereign of immunity when "the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver." 28 U.S.C. § 1605(a)(1). Plaintiffs maintain, and ZMDC does not dispute, that ZMDC waived its sovereign immunity under § 1605(a)(1) by agreeing to arbitrate disputes in the 2007 and 2008 Memoranda of Understanding ("MOUs") between Plaintiffs and ZMDC and by participating in the arbitration in Zambia. Am. Compl. ¶

---

[1] As Plaintiffs' conditional cross-motion for jurisdictional discovery is moot in light of the Court's opinion, the Court need not address the standard for jurisdictional discovery.

10.  Plaintiffs allege that ZMDC's waiver is attributable to the Republic because the two are alter egos.

*1.  Alter-Ego Relationship*

"A government instrumentality 'established as [a] juridical entit[y] distinct and independent from [its] sovereign should normally be treated as such,'" and therefore such entities are "presumed to have legal status separate from that of the sovereign."  <u>Transamerica Leasing, Inc. v. La Republica de Venezuela</u>, 200 F.3d 843, 847 (D.C. Cir. 2000) (alterations in original) (quoting <u>First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec)</u>, 462 U.S. 611, 627 (1983)).  "That presumption can be overcome," however, if the plaintiff demonstrates that the sovereign and instrumentality are alter egos.  <u>Id.</u> at 847–48.  The two are deemed alter egos in either of two circumstances: (1) the "corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created" or (2) "recognition of the instrumentality as an entity apart from the state 'would work fraud or injustice.'"  <u>Id.</u> at 848 (quoting <u>Bancec</u>, 462 U.S. at 629).

To assess the presence of both circumstances, courts have "coalesced around [] five factors," dubbed the <u>Bancec</u> factors: (1) whether the government exercises economic control over the entity, (2) whether government officials manage the entity or its daily affairs, (3) whether the entity's profits go to the government, (4) whether the government is the sole beneficiary of the entity's conduct, and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations.  <u>Rubin v. Islamic Republic of Iran</u>, 583 U.S. 202, 210 (2018) (cleaned up).[2]

---

[2]  The parties' briefing reflects understandable confusion about how the five <u>Bancec</u> factors fit into the two alter-ego inquiries, namely the principal-agent and fraud-or-injustice

The first step in the alter-ego analysis is to define the relevant time period, which the parties dispute. See Mot. Dismiss at 16–17; Pls.' Opp'n at 29; Defs.' Reply at 4–5. Defendants urge the Court to consider only events that occurred between ZMDC's signing of the MOUs with Plaintiffs (2007 and 2008) and ZMDC's participation in the arbitration (2011). Mot. Dismiss at 16. Plaintiffs counter that the Court should also consider facts that post-date the commencement of the arbitration, including, for example, information in a 2017 Zimbabwe Parliamentary report. Pls.' Opp'n at 29–31, Third Declaration of Steven K. Davidson ("Third Davidson Decl.") Ex. F. The Court's approach falls somewhere between the parties' positions.

For the principal-agent analysis (roughly mapping onto Bancec factors one through four), the Court will consider only facts that bear on whether ZMDC was Zimbabwe's alter ego from 2007 to 2011. Of course, events that occurred soon before or after this period may be relevant to whether ZMDC acted as Zimbabwe's agent within this timeframe. But the pertinent question is whether ZMDC was Zimbabwe's agent between 2007 and 2011. This approach accords with the D.C. Circuit's guidance that jurisdiction over a sovereign cannot "necessarily" be maintained just because "a state and a state-owned corporation may in some circumstances be, respectively, principal and agent." Transamerica, 200 F.3d at 850. "[T]he agent's actions [must be] related to

_____

inquiries. See Pls.' Opp'n at 28–29; Defs.' Reply at 21–22. In Rubin, the Supreme Court suggested that the Bancec factors apply to both. 538 U.S. at 210. But the fit isn't perfect. Factors one through four bear more on the principal-agent inquiry. The fifth Bancec factor— whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations—does capture notions of fraud and injustice. But it is narrower than what courts have found relevant to the fraud-or-injustice prong. For example, the Supreme Court in Bancec, as well as the D.C. Circuit in subsequent cases, considered as part of the fraud-or-injustice analysis whether the state had undercapitalized the instrumentality or transferred money to avoid debtors. See Bancec, 462 U.S. at 633; Transamerica, 200 F.3d at 854. The Court will therefore use the framework of the five Bancec factors but incorporate other considerations into the equity factor. This flexible approach hews to the Supreme Court's guidance that the Bancec factors do not supply a "mechanical formula" for determining judicial separateness. Rubin, 583 U.S. at 210 (quoting Bancec, 462 U.S. at 633).

the substance of plaintiff's cause of action."  Id. (cleaned up); see also TIG Ins. Co. v. Republic

of Argentina, No. 18-mc-00129 (DLF), 2022 WL 1154749, at *9 (D.D.C. Apr. 18, 2022), order

corrected and superseded, No. 18-mc-00129 (DLF), 2022 WL 3594601 (D.D.C. Aug. 23, 2022)

(defining the "relevant time" for the principal-agent analysis as "when the contracts 'were

made.'").

Events that pre- or post-date 2007 to 2011 are relevant, however, to the fraud-or-injustice

prong.  The Supreme Court adopted this approach in Bancec by considering the Cuban

government's conduct after the plaintiff filed suit.  462 U.S. at 615–16.  Namely, the Court found

that because the government dissolved Bancec and transferred its assets to other entities, in order

to insulate those assets from possible counterclaims, "adher[ing] blindly to the corporate form"

"would cause [] an injustice."  Id. at 632.  The Court will therefore follow suit and assess the

Republic's conduct beyond 2011 as part of the fraud-or-injustice inquiry.

With these guideposts in place, the Court now turns to the Bancec factors.

   a.  Economic Control and Day-to-Day Management

Plaintiffs have demonstrated that the Republic exercised significant economic control

over ZMDC.  ZMDC's organic statute, the ZMDC Act, vests the Republic with control over the

instrumentality.  Under the act, the government's Minister of Mines appoints ZMDC's board

members.  Third Davidson Decl., Ex. B ("ZMDC Act") § 5(1).[3]  The act also mandates that the

_____

[3] Defendants submit a declaration from Dominic Muzawazi, a Zimbabwean lawyer,
explaining that subsequent legislation has superseded some of the ZMDC Act's provisions.
Defs.' Reply, Declaration of Dominic Muzawazi ("Muzawazi Decl.") ¶ 3.2.  Of relevance to the
section cited above, Mr. Muzawazi notes that the Corporate Governance Act now requires the
Minister of Mines to consult with the president before appointing or terminating ZMDC's board
members.  Id. ¶ 4.1 ("[T]he President now has a close control on [Board] appointments.").  The
Corporate Governance Act went into effect only in 2018, however, and therefore would not have
impacted the Republic's authority over ZMDC during the relevant period.  See Date of

Republic hold at least fifty-one percent of ZMDC's shares and conditions the sale of other shares on government ministers' approval.  Id. §§ 27(2), (5).  And from ZMDC's founding until at least September 2023, the Republic has owned 100 percent of ZMDC's shares.  Am. Compl ¶ 45; Muzawazi Decl. ¶ 4.  These factors alone do not establish an alter-ego relationship.  See Foremost-McKesson, 905 F.2d at 448 ("Majority shareholding and majority control of a board of directors, without more, are not sufficient to establish a relationship of principal to agent under FSIA.").  But the ZMDC Act also grants the Minister of Mines authority to give ZMDC "directions of a general character relating to the exercise . . . of its functions, duties and powers," and ZMDC is required, "with all due expedition, [to] comply with [these] direction[s]."  ZMDC Act § 25.  Moreover, under Zimbabwe's Public Finance Management Act, ZMDC must notify and seek approval from the government before "the acquisition or disposal of a significant asset," "the commencement or cessation of a significant business activity," or "participation to a significant extent . . . in a partnership, trust, unincorporated joint venture or similar arrangement."  Defs.' Reply, Declaration of Quinn Smith ("Smith Decl."), Ex. Z ("PFM Act") § 48(3).[4]

The Republic's control is also "not merely aspirational."  See OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela, 73 F.4th 157, 172 (3d Cir. 2023) (finding Venezuela exercised economic control over a national oil company because "statements of authority [we]re not merely aspirational.")  A 2010 news article documented that the Minister of Mines "brought in" a new chairperson for ZMDC's Board, and then "at the instigation of [the] Mines Minister"

---

Commencement: Public Entities Corporate Governance Act (Jun. 8, 2018), https://perma.cc/9AV8-PLSJ.

[4]  The Public Finance Management Act went into effect April 2, 2010.  See PFM Act at 1.

ZMDC's senior executives were placed on forced leave.  Third Davidson Decl., Ex. J at 1.[5]  But see Transamerica, 200 F.3d at 851 (finding no alter-ego relationship even when the Venezuelan government appointed members of an instrumentality's Board and "exercis[ed] its influence, through the Board of Directors, to put its own chosen manager in charge of a corporation.").

Plaintiffs have also submitted evidence that the Republic was involved in the "day-to-day operations" of ZMDC and its subsidiaries.  McKesson Corp. v. Islamic Republic of Iran, 52 F.3d 346, 352 (D.C. Cir. 1995).  In 2008, the U.S. Treasury Department's Office of Foreign Asset Controls ("OFAC") imposed sanctions against ZMDC and numerous other companies that supported the regime of former Zimbabwean President Robert Mugabe.  Third Davidson Decl., Ex. BB (OFAC press release) at 2.  In so doing, OFAC described ZMDC as "planning, coordinating and implementing mining projects on behalf of the Government of Zimbabwe."  Id. at 1.  And a 2013 Zimbabwe Parliamentary report noted that the Minister of Mines, not ZMDC's Board, controlled appointments to the boards of ZMDC's subsidiaries.  See Third Davidson Decl., Ex. U at 15 ("The ZMDC Board was rendered powerless when it came to the selection and appointment of members who sit on its subsidiary companies.  It[]s only function is to regulari[z]e [] appointments made by the Minister.").  Though a government's appointment of members to an instrumentality's board does not alone create an alter-ego relationship, see

---

[5]  The Court hesitates to rely on unsubstantiated newspaper articles, but Defendants themselves cite to this 2010 article as evidence that ZMDC had a board.  See Defs.' Reply at 19.  Moreover, though courts must rely only on "evidence satisfactory to the court" in deciding motions for default judgment under the FSIA, see 28 U.S.C. § 1608(e), and courts in this district have therefore rejected inadmissible hearsay when ruling on those motions, see, e.g., Strange v. Islamic Republic of Iran, No. 14-cv-435 (CKK), 2017 WL 11670394, at *1 (D.D.C. Feb. 8, 2017), the same standard does not apply to evidence used to establish subject matter jurisdiction.  In TJGEM LLC v. Republic of Ghana, for example, the D.C. Circuit considered information in "an internet news story" when analyzing the FSIA's commercial activity exception.  No. 14-7036, 2015 WL 3653187, at *1 (D.C. Cir. June 9, 2015) (ultimately concluding the allegations in the news story did not establish subject matter jurisdiction).

Transamerica, 200 F.3d at 851, the report found the Republic used board appointments to exercise control over ZMDC's subsidiaries. As a result, the ZMDC Board "ha[d] little control and information over its subsidiary companies." Id. at 15–16.[6]

        b.  Profits and Beneficiaries

Plaintiffs have also shown that the Republic took ZMDC's profits and was the beneficiary of its conduct during the relevant time period. The Republic owns ZMDC shares (indeed, all of its shares) and therefore receives profits in the form of dividends. Again, stock ownership does not alone create an alter-ego relationship. See Transamerica, 200 F.3d at 849 ("A sovereign does not create an agency relationship merely by owning a majority of a corporation's stock. . . ."). But Plaintiffs have also offered evidence that, as early as 2008, government officials illegally diverted ZMDC's revenue to their own coffers. OFAC placed ZMDC on its sanctions list that year because "Robert Mugabe, his senior officials, and regime cronies ha[d] used [ZMDC and other] entities to illegally siphon revenue and foreign exchange from the Zimbabwean people." Third Davidson Decl., Ex. BB at 1. And, in 2013, the State Department's Acting Assistant Secretary in the Bureau of African Affairs testified before Congress about similar misuse of mining funds. Third Davidson Decl., Ex. MM (June 18, 2013 testimony). He stated that the State Department was "concerned about ongoing reports that

---

[6] Plaintiffs also cite a 2017 Zimbabwe Parliamentary report about Zimbabwe's diamond industry. Pls.' Opp'n at 25. The Court will not rely on the report because, as it describes, the Republic's level of control over the diamond industry shifted in 2015. Previously, the Republic had "issue[d] multiple licenses to various investors." Third Davidson Decl., Ex. F at 5. In 2015, however, the government "centrali[zed] all diamond mines" in the Zimbabwe Consolidated Diamond Company, a subsidiary of ZMDC. Id. at 5–6. Analysis in the 2017 report therefore has limited relevance to the 2007 to 2011 time period. Likewise, the Court will not rely on the 2017 to 2023 State Department Investment Climate Impact Reports cited by Plaintiffs. See Third Davidson Decl. Exs. FF–LL. The 2017 to 2022 reports all noted that "recent[ly]" the "government allow[ed] [ZMDC] to function without [a] board[]." See, e.g., Third Davidson Decl. Ex. LL at 13. Recently is likely not 2011.

diamond mining entities in Zimbabwe [we]re being exploited by people in senior government and military positions for personal gain, that revenues from those enterprises [we]re being diverted for partisan activities that undermine democracy, and that proceeds from diamond sales [we]re enriching a few individuals and not the Treasury and people of Zimbabwe." Id. at 2.

As other courts have found, officials' use of an instrumentality's funds for personal gain or policy goals contributes to the creation of an alter-ego relationship.  In Transamerica, the D.C. Circuit held that an alter-ego relationship exists when the "affairs of the [instrumentality] [are] so intermingled that no distinct corporate lines are maintained" and cited as an example a company's use of its subsidiary's "profits for its own purposes."  200 F.3d at 849 (cleaned up). Likewise, in OI Eur. Grp. B.V., the Third Circuit held that Venezuela and a state instrumentality were alter egos because, among other things, Venezuela "committed [the instrumentality] to sell oil to [] allies at steep discounts" and senior officials used the instrumentality's "aircraft[s] for state purposes."  73 F.4th at 173.  See also McKesson, 52 F.3d at 352 (finding an alter-ego relationship because the instrumentality's "policy was not commercial" and instead was guided by "government representatives").  Plaintiffs' evidence here is of a similar vein.

> c.  Fraud and Injustice

Under a narrow application of the fifth Bancec factor—whether adherence to separate identities would entitle the foreign state to benefits in U.S. courts while avoiding its obligations—Plaintiffs have not demonstrated that the Republic seeks any benefits from the U.S. legal system.  But, more broadly, "recognition of [ZMDC] as an entity apart from the state 'would work fraud or injustice.'"  Transamerica, 200 F.3d at 848 (quoting Bancec, 462 U.S. at 629).  When a government shields its instrumentality from creditors—for example, by "thinly

capitaliz[ing]" the instrumentality or transferring its "assets to separate juridical entities"—this conduct supports an alter-ego finding.  See id. at 854; Bancec, 462 U.S. at 633.

And there is evidence that the Republic did exactly that.  According to a 2022 Zimbabwean news article, as legal judgments against ZMDC began to pile up, the Republic started "selling off parts" of the company.  Third Davidson Decl., Ex. NN at 3.  In 2018, the Republic issued a tender offer for six mines held by ZMDC.  Id.  In early 2022, the Minister of Mines then ordered that two of ZMDC's few remaining assets—the Kamativi and Todal mining projects—"be spirited away into a new government company, Defold," even though ZMDC's board expressed concern that the asset transfer was "illegal and against [ZMDC's] interest."  Id. at 2–3.  According to the article, the government made the transfer to "stave off US$467 million in claims from [ZMDC's] creditors."  Id. at 1.[7]  In April of that year, the Secretary for Finance and Economic Development approved the transfer of ZMDC's shares to Defold.  Third Davidson Decl., Ex. OO (April 14, 2022 approval letter).  The fraud-or-injustice inquiry therefore supports a finding that the Republic and ZMDC are alter egos.

In light of Plaintiffs' evidence, the Court finds that the Republic was ZMDC's alter ego and can therefore be subject to this Court's jurisdiction.  Moreover, because Plaintiffs seek to take jurisdictional discovery only "to prove that the Amended Complaint's alter ego allegations are true," the Court denies that motion as moot.  Pls.' Opp'n at 31.

---

[7]  Again, the Court is cautious not to put too much stock in news articles.  But Plaintiffs' other evidence—namely, the record indicating that the government authorized ZMDC to sell its shares in the Kamativi and Todal mining projects to Defold—substantiates the 2022 article.  Third Davidson Decl., Ex. OO.  And, though Defendants take issue with Plaintiffs' citations to news articles and the government record, they do not deny that ZMDC's assets were diverted to Defold or offer countervailing evidence.  See Defs.' Reply at 22.

## 2.   Remaining Subject Matter Jurisdiction Arguments

The subject matter jurisdiction analysis does not end with the alter-ego determination.

Defendants suggest that, even if ZMDC is the Republic's alter ego, § 1605(a)(1)'s implied-

waiver exception is still not satisfied.  See Mot. Dismiss at 24–27; Defs.' Reply at 22–23.

Defendants offer two supporting theories, but neither is availing.  First, Defendants contend that

a foreign state that "was not a party to the arbitration agreement" could not have impliedly

waived its immunity to suit.  Mot. Dismiss at 25; Defs.' Reply at 23.  But the D.C. Circuit has

rejected this argument; indeed, that is the whole point of the alter-ego exception.  See

Transamerica, 200 F.3d at 848 (the principal-agent and fraud-or-injustice alter-ego theories are

"exceptions to the rule that a foreign sovereign is not amenable to suit based upon the acts of

such an instrumentality").

Second, Defendants renew their argument that the waiver exception does not apply

because the New York Convention governs enforcement of arbitration awards, not enforcement

of foreign judgments confirming arbitral awards.  Mot. Dismiss at 26–27.  This theory would

deprive the Court of jurisdiction over both the Republic and ZMDC, but the Court has already

rejected it.  See Amaplat, 663 F. Supp. 3d at 35–36.  When a sovereign (or its instrumentality)

waives immunity by signing on to the New York Convention and agreeing to arbitrate in another

signatory's jurisdiction, "the cause of action to enforce [a] foreign judgment is within the scope

of [that] implicit waiver of sovereign immunity."  Seetransport Wiking Trader

Schiffahrtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala, 989

F.2d 572, 582 (2d Cir. 1993).[8]  "The cause of action is within the scope of the waiver because

---

[8]   Although the Court adopted Seetransport's implicit-waiver rule in its ruling on
Defendants' prior motion to dismiss, it cautioned that a panel of the D.C. Circuit recently

the cause of action is so closely related to the claim for enforcement of the arbitral award."  Id. at 583.[9]

The Court finds, accordingly, that it has subject matter jurisdiction over the Republic and ZMDC.

B.  Personal Jurisdiction

1.  *The Republic*

Under the FSIA, personal jurisdiction exists over a foreign state if the district court has subject matter jurisdiction and service has been effected.  28 U.S.C. § 1330(b).  In other words, a simple equation governs:  "[S]ubject matter jurisdiction plus service of process equals personal jurisdiction."  GSS Grp. Ltd. v. Nat'l Port Auth., 680 F.3d 805, 811 (D.C. Cir. 2012) (quoting Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 95 (D.C. Cir. 2002)).

The Republic does not dispute that it was properly served.  Thus, because the Court may exercise subject matter jurisdiction over the Republic, it also has personal jurisdiction.

2.  *ZMDC*

The personal jurisdiction analysis is a bit more complicated for ZMDC.  "Whenever a foreign sovereign controls an instrumentality to such a degree that a principal-agent relationship

---

signaled concerns about the rule's application.  Amaplat, 663 F. Supp. 3d at 33–35; see also Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria, 27 F.4th 771 (D.C. Cir. 2022).

[9] Defendants' Reply also seems to suggest that ZMDC could not have waived its immunity to suit because it was improperly served in the Zambian award enforcement proceeding.  Defs.' Reply at 23.  Putting aside whether Zambian service issues are properly considered at this stage of proceedings, see Amaplat, 663 F. Supp. 3d at 39–40, as the Second Circuit explained in Seetransport, it was ZMDC's agreement to arbitrate and its participation in the arbitration proceeding—not its participation in the Zambian award proceeding—that waived its immunity in this suit, see Seetransport, 989 F.2d at 582 ("Navimpex, a Romanian agency or instrumentality, had implicitly waived its sovereign immunity because it was a signatory to the Convention and had proceeded to arbitration in the I.C.C.").

arises between them, the instrumentality receives the same due process protection as the sovereign: none." GSS, 680 F.3d at 815.  In that situation, the simple equation for personal jurisdiction over a state—"subject matter jurisdiction plus service of process equals personal jurisdiction"—also applies to the instrumentality.  But, when an instrumentality is not the sovereign's alter ego, "the instrumentality [] enjoy[s] all the due process protections available to private corporations," including the requirement of "minimum contacts" with the relevant forum. Id. at 815, 817.  Plaintiffs have opted for the alter-ego route, contending that ZMDC is not entitled to due process protections due to the Republic's substantial control over it.  The Court agrees.  Since ZMDC and the Republic are alter egos, personal jurisdiction over ZMDC is satisfied by subject matter jurisdiction and service.[10]  As the Court has already concluded it may exercise subject matter jurisdiction over ZMDC, all that is left to consider is service.[11]  And the Court finds service was proper:  Plaintiffs served ZMDC pursuant to the "special arrangement" in the 2007 and 2008 MOUs.  See 28 U.S.C. § 1608(b)(1).

The FSIA creates a "hierarchical regime for the appropriate methods of service" on agencies or instrumentalities of a foreign state.  Est. of Hartwick v. Islamic Republic of Iran, No. 18-cv-1612, 2021 WL 6805391, at *8 (D.D.C. Oct. 1, 2021).  The first-choice method in the

---

[10]  Defendants claim Plaintiffs "cannot rely on contradictory arguments" to establish jurisdiction and therefore cannot contend ZMDC is an "instrumentalit[y] [or] agenc[y]" after arguing it is Zimbabwe's "alter ego."  Defs.' Reply at 24.  The two theories offered by Plaintiffs are not contradictory:  ZMDC can be both an instrumentality and an alter ego of the Republic.  In fact, the D.C. Circuit defined the alter-ego doctrine as applying to a "sovereign" that dominates its "instrumentality."  See Transamerica, 200 F.3d at 848 ("A sovereign is amenable to suit based upon the actions of an instrumentality it dominates because the sovereign and the instrumentality are in those circumstances not meaningfully distinct entities; they act as one.").

[11]  As noted above, Defendants made, and the Court rejected, the contention that subject matter jurisdiction over ZMDC does not lie because service in the Zambian award proceedings was allegedly improper and because ZMDC's waiver does not extend to this suit.

hierarchy, and the one Plaintiffs used, allows a party to effect service by "deliver[ing] [] a copy of the summons and complaint in accordance with [a] special arrangement for service between the plaintiff and the agency or instrumentality."  28 U.S.C. § 1608(b)(1).  The MOUs contain the following "special arrangement":

> The Parties choose the following physical addresses at which documents in legal proceedings or any written notices in connection with this MOU may be served. . . .  Any notice given in terms of this MOU shall be in writing and shall if delivered by hand to a responsible person during ordinary business hours at the physical address chosen as its *domicilium citandi et executandi* be deemed to have been duly received by the addressee.

Am. Compl. Ex. B §§ 12.8.1–2 (emphasis added); Am. Compl. Ex. D §§ 10.9.1–2 (emphasis added).  The MOUs further provide that "a written notice or communication actually received by one of the Parties from the other Party shall be adequate written notice or communication to such Party."  Am. Compl. Ex. B § 12.8; Am. Compl. Ex. D § 10.9.

Plaintiffs complied with the special arrangement in the MOUs:  They hand delivered copies of the summons, complaint, and notice of suit to Theresa Kanengoni, "a secretary for Zimbabwe Mining Development Corporation," who "stated that she was authorized to accept service" for ZMDC.  Return of Service [ECF No. 24] ¶¶ 2–4.[12]

---

[12]  As Plaintiffs acknowledge, they hand delivered the papers to a different address than the one listed for ZMDC in the MOUs.  See Pls.' Opp'n at 37; Return of Service ¶ 3.  ZMDC does not suggest that this change rendered service improper, and, in any event, service was still proper for several reasons.  First, prior to the date of service, ZMDC notified Plaintiffs that its address had changed.  See Second Declaration of Steven K. Davidson, Ex. 1 [ECF No. 32–2].  And, as other courts have noted, it would be "senseless" to attempt service at a location plaintiffs know the defendant does not occupy.  Int'l Rd. Fed'n v. Embassy of the Democratic Republic of the Congo, 131 F. Supp. 2d 248, 251 (D.D.C. 2001).  Second, the MOUs allow some wiggle room; they provide that "a written notice or communication *actually received* by one of the Parties from the other Party shall be adequate written notice or communication to such Party."  Am. Compl. Ex. B § 12.8 (emphasis added); Am. Compl. Ex. D § 10.9 (emphasis added).  Finally, 28 U.S.C. § 1608(b) also permits some flexibility:  "[S]ection 1608(b) may be satisfied by technically faulty service that gives adequate notice to the foreign state."  Transaero, Inc. v.

ZMDC contends that Plaintiffs cannot rely on the MOUs' special service provision for two reasons:  (1) the MOUs were terminated as a result of the arbitration proceedings and (2) even if the MOUs' service provisions survived contract termination, they do not apply in a proceeding to enforce an arbitration award.  Defs.' Reply at 24–25.

As to the first contention, other district courts, including at least one in this district, have held that service under the FSIA can be effected pursuant to a special service provision in a terminated contract.  In G.E. Transp. S.P.A. v. Republic of Albania, for example, petitioners sought confirmation of an arbitral award against the Republic of Albania.  693 F. Supp. 2d 132, 133 (D.D.C. 2010).  Even though the arbitral tribunal determined the underlying contract was no longer in effect (in fact, the tribunal determined the contract never "enter[ed] into force" because Albania "prevented [its] reali[z]ation"), the district court still held the petitioners could rely on the contract's special service provision.  Id. at 136–37; Petition, Ex. A at 60, G.E. Transp. S.P.A. v. Republic of Albania, 693 F. Supp. 2d 132, 133 (D.D.C. 2010) (No. 08-cv-2042), ECF No. 1–1.  Likewise in Arbitration Between Space Systems/Loral, Inc. v. Yuzhnoye Design Office, the court found "[t]he fact that [the plaintiff] purported to terminate the contract at some point before serving its petition [did] not prohibit it from using the special arrangement established" in the contract. 164 F. Supp. 2d 397, 403 (S.D.N.Y. 2001).

This view—that special service provisions can survive contract termination—accords with the Supreme Court's holding in Nolde Brothers, Inc. v. Local No. 358, Bakery and Confectionary Workers Union.  430 U.S. 243 (1977).  There, the Supreme Court considered whether a mandatory arbitration clause (and not a special service provision) survived contract

---

La Fuerza Aerea Boliviana, 30 F.3d 148, 153 (D.C. Cir. 1994); see also Agudas Chasidei Chabad of U.S. v. Russian Fed'n, 798 F. Supp. 2d 260, 267 (D.D.C. 2011) (applying a "substantial compliance" standard to service of agencies or instrumentalities under § 1608(b)).

termination and therefore governed the parties' dispute over severance pay.  Id. at 244.  The arbitration clause at issue provided that "'any grievance' arising between the parties was subject to binding arbitration."  Id. at 245.  The Supreme Court found the arbitration clause governed:  A contract provision "survive[s] contract termination when the dispute [i]s over an obligation arguably created by the expired agreement."  430 U.S. 243, 252 (1977) (citing John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 552 (1964)); see also Livingston, 376 U.S. at 553 (a provision requiring arbitration for any disputes "arising out of or relating to [the] agreement, or its interpretation or application, or enforcement" survived termination).

The same is true here for MOUs' special service provisions.  Though the arbitral panel considered a number of arguments, the core of the dispute was whether ZMDC illegally cancelled the MOUs.  See Am. Compl. Ex. A ¶¶ 7–8, 92, 179.  A dispute about whether a contract can be cancelled—or, put differently, whether a contract remains binding—is a dispute "over an obligation [] created" by the contract.  The special service provision therefore survived contract termination.

Second, ZMDC contends that the service provisions do not cover actions to enforce arbitral judgments.  This comes down to contract interpretation.  As noted above, the MOUs' service provisions provide (1) that "documents in legal proceedings or any written notices in connection with this MOU may be served" at listed addresses and (2) that "[a]ny notice given in terms of this MOU . . . shall[,] if delivered by hand to a responsible person . . . at the physical address chosen as its *domicilium citandi et executandi*[,] be deemed to have been duly received."  Am. Compl. Ex. B §§ 12.8.1–2 (emphasis added); Am. Compl. Ex. D §§ 10.9.1–2 (emphasis added).

The MOUs' service provisions extend to the current case.  *Domicilium citandi et executandi* is a term in Zimbabwean and South African law that refers to the address for service of process.  See Pls.' Opp'n at 36; Christian Schulze, Practical Problems Regarding the Enforcement of Foreign Money Judgments, 17 S. Afr. Mercantile L. J. 125, 131 (2005) ("[A] domicilium citandi et executandi" refers to a "domicile for the purpose of facilitating service of process and levying execution.").  Because the MOUs used this term of art, it is clear the parties intended for hand-delivery to the chosen location to satisfy service of process in legal proceedings.

Defendants nevertheless contend that the service provisions' phrase "in connection with this MOU" renders the provisions inapplicable to actions to enforce arbitral judgments.  See Defs.' First Reply [ECF No. 34] at 9–10 ("Under section 12.8 and section 10 of MOUs, ZMDC only agreed to accept service of 'documents in legal proceedings or any written notices in connection with the' MOUs . . . .  Plaintiffs are not seeking relief under the MOUs, such as a finding of a breach of the MOUs.  Rather, the Complaint is connected to the Zambian High Court's order.").  Yet the D.C. Circuit has held that the phrase "in connection with" is "quite broad."  Azima v. RAK Inv. Auth., 926 F.3d 870, 877 (D.C. Cir. 2019).  It is equivalent to the phrase "in relation to," and a dispute arises "in relation to" an agreement so long as "the origin of the dispute is related to that agreement, meaning it has some logical or causal connection to the agreement."  Id. (cleaned up).  Applying these definitions, the D.C. Circuit rejected the notion that a claim "is 'in connection with' a contract only when 'the dispute occurs as a fairly direct result of the performance of contractual duties.'"  Id. at 878.  Though the current suit is now several steps removed from the original arbitration, it still has a direct "logical or causal connection" to the MOUs.  Plaintiffs won an arbitration award finding Defendants illegally

terminated the MOUs, a Zambian court confirmed that award, and now Plaintiffs seek to have it enforced.

Moreover, the MOUs specifically contemplated that the parties might dispute the confirmation or enforcement of awards.  See Am. Compl. Ex. B § 11 ("[A]ny Party may submit [a] dispute to ICC International Court of Arbitration in Paris for arbitration . . . , the award of which shall be final and binding upon all Parties."); Am. Compl. Ex. D § 9 (same).  See also Yuzhnoye Design Off., 164 F. Supp. 2d at 403 (finding a special service provision applied to arbitration enforcement actions because the parties' contract "specifically contemplate[d] that 'disputes between the [p]arties arising out of [the contract]' [would] be submitted to arbitration and that the parties [could] apply for judicial confirmation of an arbitration award").  "If [ZMDC] had wished to mark a narrower boundary for th[e] [service] clause[s], [it] could have easily done so."  Azima, 926 F.3d at 878..  It did not, so it cannot now claim that service pursuant to the special arrangements was improper.

The personal jurisdiction equation is therefore solved:  The Court has subject matter jurisdiction over ZMDC and Plaintiffs properly served ZMDC, ergo the Court has personal jurisdiction over ZMDC.

C.   Failure to State a Claim

Finally, Defendants contend that Plaintiffs have failed to plead facts sufficient to establish an alter-ego relationship.  As Defendants acknowledge, however, the standard under Rule 12(b)(6) is "more forgiving than that applicable to allegations for establishing personal and subject-matter jurisdiction."  Mot. Dismiss at 31.  See also Citizens for Resp. & Ethics in Washington v. Pruitt, 319 F. Supp. 3d 252, 256 (D.D.C. 2018) ("The standard to survive a motion to dismiss under Rule 12(b)(1) is less forgiving" than Rule 12(b)(6)'s standard.)  Thus,

for the reasons explained above, the Court finds Plaintiffs have pled facts sufficient to establish that the Republic and ZMDC are alter egos.

The Court therefore denies Defendants' motion to dismiss.  To avoid juggling two complaints and because the Amended Complaint reincorporates the original complaint's allegations against the Chief Mining Commissioner, the Amended Complaint shall be the operative complaint for all three defendants.

## IV.  Conclusion

For these reasons, it is hereby

**ORDERED** that [ECF No. 42] Defendants' Motion to Dismiss is DENIED.  It is further

**ORDERED** that [ECF No. 46] Plaintiffs' Cross-Motion for Jurisdictional Discovery is DENIED as moot.  It is further

**ORDERED** that the Amended Complaint shall be the operative complaint in this case.  It is further

**ORDERED** that the Republic, ZMDC, and the Chief Mining Commissioner are directed to file an answer to Plaintiffs' Amended Complaint by March 11, 2024.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: February 9, 2024

21